**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 21-cv-00387-NRN

DARLENE GRIFFITH,

      Plaintiff,

v.

EL PASO COUNTY, COLORADO,
WELLPATH, LLC,
CHRISTINE MOHR, in her individual capacity,
DOCTOR JANE ROE, in her individual capacity,
SHERIFF BILL ELDER, in his individual and official capacities,
COMMANDER CY GILLESPIE, in his individual capacity,
DEPUTY JOHN DOE, in his individual capacity,
DEPUTY JANE DOE, in her individual capacity,
DEPUTY F/N/U DRAPER, in his individual capacity,

      Defendants.

---

**SECOND AMENDED COMPLAINT AND JURY DEMAND**

---

      Plaintiff, by and through her attorneys, Andy McNulty and Mari Newman of KILLMER, LANE & NEWMAN, LLP, respectfully alleges for her Second Amended Complaint and Jury Demand as follows:

**INTRODUCTION**

      1.    Darlene Griffith has suffered repeated sexual harassment, sexual assault, denial of medical and mental health care, and discrimination as a result of El Paso County's policy of refusing to house transgender inmates based on their gender identity, and a pervasive culture of

purposeful discrimination against, and subjugation of, transgender inmates who suffer from Gender Dysphoria.

2.      Ms. Griffith is a transgender woman who has been diagnosed with Gender Dysphoria. In the community, she lives in accordance with her female gender identity and undergoes hormone therapy. Despite this well-documented history, Defendants purposefully housed Ms. Griffith in an all-male unit in the El Paso County Jail. Despite Ms. Griffith's multiple requests to be moved to a unit that corresponds with her gender identity, El Paso County has continued to discriminatorily house her in a unit that exposes her to a significantly increased risk of sexual harassment, assault, and emotional distress.

3.      Defendants have also subjected Ms. Griffith to a pervasive culture of discrimination at the El Paso County Jail. Defendants denied her hormone therapy (which she had been prescribed for twenty years prior to entry to the El Paso County Jail) for over five months and she continues to have issues receiving her necessary hormone replacement shots. On Defendant, a male deputy sexually harassed Ms. Griffith and subjected her to a highly invasive (and completely unnecessary) strip-search while telling her that he wanted to go "balls deep in [her] ass." Another Defendant, again a male deputy, sexually assaulted her twice during non-routine searches by groping her breasts. Defendants also completely denied Ms. Griffith necessary mental health treatment for her Gender Dysphoria. Defendants continuously mis-gendered and when she has complained about it she was been threatened with solitary confinement. Defendants denied Ms. Griffith clothing that conforms with her gender identity despite the fact that cisgendered women are allowed panties and lipstick.

4.      All of these actions were taken in accordance with the official policies of El Paso County, or pursuant to widespread unwritten customs and practices that El Paso County has condoned.

5.      Ms. Griffith brings this lawsuit to vindicate her rights and the rights of all transgender women, so that they do not have to suffer the daily indignities that she continues to suffer in the El Paso County Jail.

## JURISDICTION AND VENUE

6.      This action arises under the Constitution and laws of the United States.

7.      Jurisdiction is conferred upon this Court pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3). Jurisdiction supporting Plaintiff's claims for attorney fees and costs is conferred by 42 U.S.C. § 1988.

8.      Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). All of the events alleged herein occurred within the State of Colorado, and all of the parties were residents of the State of Colorado at all times relevant to the subject matter of this Second Amended Complaint.

9.      Supplemental pendent jurisdiction for Plaintiffs' state law claims is based on 28 U.S.C. § 1367 because the violations of federal law alleged are substantial and the pendent state law causes of action derive from a common nucleus of operative facts.

## PARTIES

**Plaintiff:**

10.      At all times relevant to the subject matter of this Complaint, Plaintiff Darlene Griffith was a citizen of the United States and a resident of the State of Colorado.

11.     During the relevant time period, Ms. Griffith was detained at the El Paso County Jail.

12.     All available administrative remedies have been exhausted to the extent required by the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a). There are no other administrative exhaustion requirements that would pose as a bar to the claims asserted herein.

**Defendants:**

13.     Defendant El Paso County is a municipality and as such is a proper defendant under 42 U.S.C. § 1983.

14.     At all relevant times, Defendant El Paso County had a nondelegable duty to provide adequate medical and mental health care to inmates and detainees at the El Paso County Jail. El Paso County is liable under the nondelegable duty doctrine for the deliberate indifference of Defendant Wellpath LLC and its employees or contractors.

15.     Defendant Wellpath LLC ("Wellpath") is a Delaware corporation with its principal address located at 1283 Murfreesboro Road, Nashville, Tennessee, and its registered agent in Colorado, is Corporate Creations Network, Inc., located at 155 E. Boardwalk # 490, Fort Collins, Colorado.

16.     Wellpath has previously been known by several other names, including Correct Care Solutions ("CCS"), Correctional Healthcare Companies ("CHC"), and Correctional Healthcare Management ("CHM"). The corporate organization, leadership, and governance of Wellpath is substantially similar to that of its predecessor companies, and for all intents and purposes, it is the same company.

17.     At all times relevant to the subject matter of this litigation, Wellpath contracted with El Paso County to provide staff and medical and dental services at JCJ. At all relevant

times, Wellpath was responsible for the oversight, supervision, and training of all of the medical

and mental health staff at the El Paso County Jail, and the medical and mental health care of

inmates housed at the El Paso County Jail.

18.     At all relevant times, Wellpath was acting under color of state law and performing

a central function of the state.

19.     Defendant Wellpath is a private corporation, and neither it nor any of its

employees or contractors are entitled to any immunity under the Colorado Governmental

Immunity Act ("CGIA") on Colorado state law claims or qualified or any other immunity on the

federal law claims.

20.     At all times relevant to the subject matter of this litigation, Defendant Christine

Mohr was a citizen of the United States and a resident of and domiciled in Colorado and was

acting within the scope of her official duties and under color of state law in her capacity as a

mental health professional at the El Paso County Jail, who was employed by, or an independent

contractor for, Wellpath.

21.     At all times relevant to the subject matter of this litigation, Defendant Jane Roe

was a citizen of the United States and a resident of and domiciled in Colorado and was acting

within the scope of her official duties and under color of state law in her capacity as a medical

doctor at the El Paso County Jail, who was employed by, or an independent contractor for,

Wellpath.

22.     At all times relevant to the subject matter of this litigation, Defendant Bill Elder

was a citizen of the United States and a resident of Colorado. At all relevant times, Defendant

Elder was acting under color of state law in his capacity as the El Paso County Sheriff.

Defendant Elder was responsible for training and supervising all other Defendants and other

employees of the El Paso County Sheriff's Department working at the jail, for setting jail policy

for the county and the overall management of the jail, and for insuring the health and welfare of

all persons detained in the El Paso County Jail.

23.     At all times relevant to the subject matter of this litigation, Defendant Cy

Gillespie was a citizen of the United States and a resident of Colorado. At all relevant times,

Defendant Gillespie was acting under color of state law in his capacity as a Commander

employed by El Paso County and Defendant Elder.

24.     At all times relevant to the subject matter of this litigation, Defendant John Doe

was a citizen of the United States and a resident of Colorado. At all relevant times, Defendant

John Doe was acting under color of state law in his capacity as a deputy employed by El Paso

County and Defendant Elder.

25.     At all times relevant to the subject matter of this litigation, Defendant Jane Doe

was a citizen of the United States and a resident of Colorado. At all relevant times, Defendant

Jane Doe was acting under color of state law in her capacity as a deputy employed by El Paso

County and Defendant Elder.

26.     At all times relevant to the subject matter of this litigation, Defendant f/n/u Draper

was a citizen of the United States and a resident of Colorado. At all relevant times, Defendant

Draper was acting under color of state law in his capacity as a deputy employed by El Paso

County and Defendant Elder.

## **FACTUAL ALLEGATIONS**

### **Gender Identity, Gender Dysphoria, And The Incarceration Of Transgender Women Like Ms. Griffith**

27.     Gender identity is an innate, internal sense of one's sex—e.g., being male or

female—and is a basic part of every person's core identity. Everyone has a gender identity. Most

6

people's gender identity is consistent with the sex they were assigned at birth ("assigned sex"). Transgender people, however, have a gender identity that is different from their assigned sex. For example, a transgender woman is a woman who was assigned male at birth and has a female gender identity. A cisgender woman is a woman who was assigned female at birth and has a female gender identity.

28.    The American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013) ("DSM-5") recognizes that being transgender is not itself a disability, but that the clinically-relevant condition is the "Gender Dysphoria" experienced by many individuals whose gender identity conflicts with their assigned sex. Gender Dysphoria is defined as the significant distress that may accompany the incongruence between a transgender person's gender identity and assigned sex. This distress limits major life activities and is therefore a disability. A transgender person's Gender Dysphoria can be alleviated when the person is able to live, and be treated by others, consistently with the person's gender identity.

29.    Gender Dysphoria often, but not always, emerges during childhood.

30.    The accepted course of medical treatment to alleviate the symptoms of Gender Dysphoria often involves allowing the individual to live as his or her chosen gender through one or more of the following treatments: changes in gender expression and role; dressing, grooming, and otherwise outwardly presenting in a manner consistent with one's gender identity; hormone therapy; psychotherapy; and, in some cases, surgery to change primary and/or secondary sex characteristics.

31.    Ms. Griffith has been diagnosed with Gender Dysphoria and has been living as a transgender woman for over twenty years. As part of her medically-supervised treatment, she changed her name and altered her physical appearance to conform to her female gender identity,

including dressing in feminine attire and taking feminizing hormones, which caused her to develop female secondary sex characteristics such as breasts, soft skin, a lack of facial hair, and other characteristics typically associated with women.

32.    At all times relevant to this action, Defendants were aware of Ms. Griffith's Gender Dysphoria and her identity as a transgender woman.

33.    At all times relevant to this action, Defendants were aware of Ms. Griffith's history of Gender Dysphoria and her identity as a transgender woman.

34.    At all times relevant to this action, Defendants perceived Ms. Griffith as having Gender Dysphoria and being a transgender woman.

35.    Ms. Griffith's Gender Dysphoria is a mental impairment that substantially limits one or more major life activities.

36.    Ms. Griffith is substantially limited in her ability to care for herself because she requires regular, ongoing, and life-long medical treatment, including ongoing psychotherapy and periodic hormone treatment. She is also substantially limited in other major life activities, such as eating, sleeping, learning, concentrating, thinking, communicating, and interacting with others because of distress associated with her Gender Dysphoria

37.    Ms. Griffith is substantially limited in the operation of major bodily functions, including neurological function, brain function, endocrine function, and reproductive function.

38.    Ms. Griffith has a history of Gender Dysphoria, which substantially limits one or more major life activities, including the ability to care for herself, eating, sleeping, learning, concentrating, thinking, communicating, interacting with others, and reproducing, and which substantially limits neurological function, brain function, endocrine function, and reproductive function.

39.    When a transgender person's Gender Dysphoria is left untreated, or is inadequately treated, the consequences can be dire. Symptoms of untreated Gender Dysphoria often include intense emotional suffering, anxiety and depression, suicidality, and thoughts or acts of self-harm. All of those symptoms can be mitigated, and often prevented altogether, for transgender people with access to appropriate individualized medical care as part of their gender transitions.

40.    Ms. Griffith has engaged in multiple acts of self-harm since childhood, because her Gender Dysphoria has not been accommodated and treated. Ms. Griffith engages in self-harm, specifically self-castration behavior, regularly. This activity is worsened when she is not receiving treatment for Gender Dysphoria, which includes not being allowed to live consistent with her gender identity and being denied hormone therapy.

41.    The prison environment can be particularly harmful to transgender women, as reports (including the 2009 report by the National Prison Rape Elimination Commission) consistently document that transgender women are victims of sexual abuse at much higher rates than the rest of the population while in custodial environments including lock-ups, jails and prisons, as well as while being searched by male prison guards. In its June 2015 report of data collection activities, the Bureau of Justice Statistics ("BJS") disclosed that an estimated 35% of transgender people held in prisons such as those in Colorado reported experiencing one or more incidents of sexual victimization in the past 12 months or since admission. According to the BJS report, when asked about the experiences surrounding their victimization by other incarcerated people, 72% of the transgender respondees said they experienced force or threat of force and 29% said they were physically injured.

**The Relevant Standards For Incarcerating Transgender People And Providing Healthcare To Transgender Prisoners**

9

42.     The World Professional Association for Transgender Health ("WPATH") is the leading professional association for surgeons, doctors, medical researchers and others who specialize in the medical treatment of people with Gender Dysphoria. Based on decades of clinical experience, WPATH has promulgated medical standards of care for treating patients with Gender Dysphoria, the Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People. All Defendants entrusted with the care, treatment, and safety of the transgender women in the El Paso County Jail are aware that WPATH standards of care are applicable to Ms. Griffith and other transgender women in the El Paso County Jail. The WPATH Standards of Care are widely recognized in the medical community as the authoritative standard for the provision of transgender healthcare and the National Commission on Correctional Healthcare recommends the WPATH standards for use in all correctional facilities.

43.     The WPATH standards of care apply in their entirety to transgender people in prisons and require individual assessment for appropriate treatment in a fair and tolerant climate, which may consist of outward expression of one's internal sense of gender identity, including hormone therapy and/or transition-related surgery, and social role transition, including access to gender-affirming canteen items, like feminine grooming products and clothing.

44.     WPATH provides that placement of transgender people in a single-sex housing unit, ward, or pod on the sole basis of the appearance of the external genitalia places transgender people at risk for victimization. Despite these known risks, El Paso County and its officials promulgating and carrying out official policy, including Defendants Elder and Gillespie, make facility assignments to people in custody solely on the basis of the individual's genitalia.

45.     WPATH also provides that housing and shower/bathroom facilities for transgender people living in institutions should take into account their gender identity and role,

physical status, dignity, and personal safety. Defendants have failed to follow these requirements for Ms. Griffith and other transgender women in El Paso County's care, resulting in the ongoing violence they face.

46.     In 2003, Congress passed the Prison Rape Elimination Act of 2003, 42 U.S.C. § 15601 et seq. ("PREA"). PREA establishes a zero-tolerance standard against sexual abuse in adult prisons and other confinement centers. PREA requires agencies to comply with national standards to eliminate sexual abuse, recognizes that transgender people face elevated risks of being victimized in prisons, mandates that state correctional facilities provide proper training to correctional staff, and requires subject agencies to establish methods to deter and detect sexual violence in prison, to identify and treat such victims, and to report incidents of such violence to the Bureau of Justice Statistics.

47.     The Commission established to monitor compliance with PREA noted in 2009 that gender nonconformity places transgender people at extremely high risk for abuse, and, as a result, the Commission opined that, "In determining whether to house transgender individuals in men's or women's facilities, the Commission requires individualized determinations based on other factors in addition to the person's current genital status" (NPREC, 2009, p. 89). Defendants have been aware of the standards required by PREA.

**El Paso County And Its Officials Have An Official Policy Of Housing Transgender Women, Like Ms. Griffith, In All-Male Units At The El Paso County Jail**

48.     When Ms. Griffith first entered El Paso County Jail on July 20, 2020, she was an openly transgender woman with a feminine appearance.

49.     During her intake screening, she notified El Paso County Jail and Wellpath personnel that she was a transgender woman receiving hormone therapy for her diagnosed Gender Dysphoria. Ms. Griffith explicitly requested placement in a women's facility because she

feared being sexually abused and assaulted in male facilities by both guards and inmates, along with fearing the humiliation of being constantly searched by male guards in a male unit and the general degradation of being considered a man when she is a transgender woman.

50.    El Paso County, as a matter of official policy, refuses to house transgender women in female housing facilities. El Paso County continues to house Ms. Griffith, and other transgender women in its custody in male units within the El Paso County Jail.

51.    El Paso County officials ignored Ms. Griffith's health and safety requests, despite knowing the risks she faced, and subjected her to a terrible sequence of constitutional violations over the last year.

52.    El Paso County officials disregarded Ms. Griffith's safety concerns and housed her in men's units within the El Paso County Jail where she foreseeably became a victim of multiple instances of sexual assault, harassment, and degrading and transphobic behavior  at the hands of male deputies.

53.    Ms. Griffith continuously requested that she be placed in a unit that conformed with her gender identity.

54.    On October 29, 2020, Ms. Griffith filed an inmate grievance, addressed to Defendant Gillespie, requesting that she be housed in a female ward because she is a transgender woman. Ms. Griffith further informed Defendant Gillespie that she had previously been housed in the Denver Women's Prison Facility and that all of her documentation outside of El Paso County's system correctly notes that she is a transgender woman. In response to Ms. Griffith's grievance, El Paso County (along with Defendant Gillespie) stated that Ms. Griffith would continue to be housed in the men's unit and that her status in their system would not be changed.

55.     On December 9, 2020, Ms. Griffith filed another inmate grievance requesting that she be placed in a female unit. That grievance also noted that deputies at the El Paso County Jail were continuously referring to her with male pronouns. Ms. Griffith again noted that all of her documentation outside of the El Paso County system reflects her correct gender identity and that she had previously been housed in female units in other correctional facilities. On January 4, 2021, El Paso County responded to Ms. Griffith's grievance by stating that she would continue to be housed in a male unit based on El Paso County's policies and procedures.

56.     Upon information and belief, El Paso County has never housed a transgender women in a facility that corresponds with her gender identity upon initial intake. El Paso County is routinely discriminating against these women, including Ms. Griffith, based on their sex, transgender status and/or disability and exposing them to harassment, rape, sexual assault, and other anti-transgender violence, or a heightened risk thereof by refusing to provide them safe housing.

57.     The decision to house Ms. Griffith in housing that does not conform with her gender identity has exacerbated symptoms of her Gender Dysphoria leading her to suffer significant emotional distress and have increased ideation of self-harm.

58.     El Paso County's decision to house Ms. Griffith in housing that does not conform with her gender identity Ms. Griffith was a discriminatory action and a failure to reasonably accommodate Ms. Griffith's diagnosed Gender Dysphoria.

**Defendant John Doe Sexually Harassed And Assaulted Ms. Griffith During An Unconstitutional Strip Search Pursuant To El Paso County's Official Policy That Male Guards Conduct Unsupervised Strip Searches Of Transgender Women Inmates**

59.     It is El Paso County's official policy that transgender women (including those with Gender Dysphoria) are searched, including strip searched, by male staff and not by female

13

staff. No female guards are required to be present during searches (including strip searches).

Transgender women in El Paso County custody have routinely been subjected to searches,

including strip searches, by male staff.

60.    Ms. Griffith was strip-searched by a male deputy upon arrival at the El Paso

County Jail in accordance with this policy.

61.    When Ms. Griffith was booked into the jail, she was taken to the strip out room.

Before Ms. Griffith began stripping off her clothes, both a male and female deputy arrived.

62.    When Ms. Griffith saw that both a male and female deputy would be conducting

her strip-search, Ms. Griffith protested and asked that the male deputy leave. Ms. Griffith told

both deputies that, because she is transgender, she does not want a male deputy to be present.

Defendant Jane Doe told Ms. Griffith that, per her sergeant's orders, the male deputy would stay

throughout the entire strip out process. Deputy Jane Doe told Ms. Griffith that because she was

"still a male" in El Paso County's "system" that a male deputy would be conducting her search

pursuant to El Paso County policy and procedure. That policy, 702(IV)(N)(3), states that a

deputy that corresponds with the biological sex of the inmate must conduct the strip search. Ms.

Griffith again asked that Defendant Jane Doe conduct the search because Ms. Griffith is a

transgender woman. Defendant Jane Doe refused and cited the policy.

63.    Defendant Jane Doe then told Ms. Griffith to take off her shirt, which she did. Ms.

Griffith was compliant throughout the whole strip-out process.

64.    After examining Ms. Griffith's breasts, with Defendant John Doe present,

Defendant Jane Doe gave Ms. Griffith a sports bra and then left the room. As Defendant Jane

Doe left the room, she told Defendant John Doe, "*he* is all yours now to strip out." Defendant

Jane Doe left Ms. Griffith alone with Defendant John Doe and did nothing to ensure that

Defendant John Doe did not sexually harass Ms. Griffith and subject her to an unconstitutional strip search.

65.    After Defendant Jane Doe left the room, Defendant John Doe ordered Ms. Griffith to take off her socks, pants, and panties, and then place her hands on the wall. Defendant John Doe then told Ms. Griffith to step back, bend over, and "spread [her] sexy cheeks." Ms. Griffith protested Defendant John Doe's use of this derogatory language, but complied with his directive.

66.    Defendant John Doe then told Ms. Griffith that he was "going to go balls deep in that ass" while grabbing his own penis in view of Ms. Griffith. Defendant John Doe was extremely aggressive while searching Ms. Griffith's genitals and making these comments.

67.    After Defendant John Doe was finished sexually harassing Ms. Griffith, he warned her that she had better not tell anyone about what he did and said to her. He threatened Ms. Griffith that if she did tell someone, he would make sure that she was brutalized by the guards at the El Paso County Jail.

68.    There was no legitimate penological purpose for allowing a male guard to conduct a strip search of Ms. Griffith. And, there was certainly no penological purpose for any of the actions taken by Defendants John Doe and Jane Doe.

69.    El Paso County officials' threatening, intimidating and harassing strip-search of Ms. Griffith, which per policy was conducted by an unaccompanied male deputy, was a discriminatory action and a failure to reasonably accommodate Ms. Griffith's diagnosed Gender Dysphoria.

70.    El Paso County officials' threatening, intimidating and harassing strip-search of Ms. Griffith, which per policy was conducted by an unaccompanied male deputy, has

exacerbated symptoms of her Gender Dysphoria leading her to suffer significant emotional

distress and have increased ideation of self-harm.

**Defendant Draper Sexually Assaulted Ms. Griffith During An Unconstitutional Search Pursuant To El Paso County's Official Policy That Male Guards Conduct Unsupervised Searches Of Transgender Women Inmates**

71.     On August 8, 2020, while Ms. Griffith was housed in an all-male unit within the

El Paso County Jail, Ms. Griffith left her cell to go to the law library. Upon her leaving to go to

the law library, Deputy Draper insisted that he search Ms. Griffith. This was not a routine pat-

down search.

72.     While purportedly "searching" Ms. Griffith, Deputy Draper grabbed Ms.

Griffith's breasts and began to fondle them. Deputy Draper then ran his hands on the inside of

Ms. Griffith's thigh and slammed his hand against her crotch.

73.     Deputy Draper's decision to fondle Ms. Griffith's breasts caused her great

physical discomfort and emotional distress. His decision to slam his hand into her crotch also

caused Ms. Griffith great physical discomfort and emotional distress.

74.     Ms. Griffith went to the law library and, when she returned to her cell, Deputy

Draper subjected her to another non-routine pat down search.

75.     Again, while purportedly "searching" Ms. Griffith, Deputy Draper grabbed Ms.

Griffith's breasts and began to fondle them. Deputy Draper then ran his hands on the inside of

Ms. Griffith's thigh and slammed his hand against her crotch.

76.     This time, Ms. Griffith told Deputy Draper to stop fondling her breasts. In

response, Deputy Draper directed Ms. Griffith to lift up her shirt to expose her breasts. Ms.

Griffith refused.

77.     Deputy Draper's decision to fondle Ms. Griffith's breasts a second time caused her great physical discomfort and emotional distress. His decision to direct her to expose her breasts was demeaning and caused her emotional distress. His decision to slam his hand into her crotch a second time also caused Ms. Griffith great physical discomfort and emotional distress.

78.     There was no penological purpose for Deputy Draper's fondling of Ms. Griffith's breasts, slamming his hand into her crotch, or his order that she expose her breasts to him.

79.     Deputy Draper's assault of Ms. Griffith was caused by the policy promulgated and enforced by Defendants El Paso County and Sheriff Elder housing transgender women, like Ms. Griffith, in the men's facility and continuing to require male deputies, like Defendant Draper, to search transgender women without any supervision.

80.     El Paso County officials' continuous searches of Ms. Griffith and related sexual assaults, which per policy were conducted by unaccompanied male deputies, were discriminatory actions and a failure to reasonably accommodate Ms. Griffith's diagnosed Gender Dysphoria.

81.     El Paso County officials' continuous searches of Ms. Griffith and related sexual assaults, which per policy were conducted by unaccompanied male deputies, have exacerbated symptoms of her Gender Dysphoria leading her to suffer significant emotional distress and have increased ideation of self-harm.

### Defendants Wellpath, Elder, and Mohr Denied Necessary Mental Health Care To Ms. Griffith Pursuant To El Paso County's Customary Practice Of Denying Transgender Inmates Necessary Mental Health Care

82.     Ms. Griffith, as a transgender inmate diagnosed with Gender Dysphoria, requires regular mental health care. Despite well-settled authority that dictates that mental health care is necessary to treat transgender women who suffer from Gender Dysphoria, Defendants Wellpath, El Paso County, Elder, and Mohr refuse to provide that necessary treatment.

83.    El Paso County and Wellpath officials denied Ms. Griffith medically necessary Gender Dysphoria care, including mental health treatment.

84.    When Ms. Griffith initially arrived at the El Paso County Jail, she specifically requested mental health treatment for her diagnosed Gender Dysphoria. Defendant Mohr told her that she would not receive treatment for her Gender Dsyphoria. Instead, she would be seen once a month by a mental health professional that would ask her a few standard questions. Since her arrival at the El Paso County Jail, the only time that Ms. Griffith sees a mental health professional is once a month, when Defendant Mohr comes to Ms. Griffith's cell and asks her five standard questions (whether she is suicidal, whether she is hearing voices, etc.) and then leaves. None of the questions relate to Gender Dysphoria. Defendant Mohr's monthly visits are completed in a matter of minutes, and with no follow up whatsoever.

85.    Ms. Griffith has repeatedly filed grievances requesting appropriate mental health treatment, in line with WPATH guidelines, for her Gender Dysphoria. Defendants have repeatedly denied these grievances.

86.    Ms. Griffith specifically asked Defendant Mohr to provide appropriate mental health treatment, in line with WPATH guidelines, for her Gender Dysphoria. Defendant Mohr has not done so.

87.    El Paso County Jail officials have told Ms. Griffith that the El Paso County Jail does not have a policy for treating inmates with Gender Dysphoria and, therefore, she would not receive mental health treatment for Gender Dysphoria.

88.    Defendant Elder has specifically failed to implement a policy that would allow for Ms. Griffith to receive appropriate mental health treatment for Gender Dysphoria. It is obvious that the El Paso County Jail would house inmates with Gender Dysphoria and Defendant Elder's

refusal to implement a policy to allow for appropriate mental health treatment of Gender
Dysphoria was deliberately indifferent to the serious mental health needs of transgender inmates
with Gender Dysphoria, including Ms. Griffith.

89.     Ms. Griffith's Gender Dysphoria consequently remained untreated leading her to
become depressed and have increased ideation of self-harm.

90.     Defendants lack qualified mental health staff to provide the proper care and
treatment required for Gender Dysphoria. Defendants have made an intentional decision not to
hire qualified mental health staff.

91.     Upon information and belief, Defendants Wellpath, El Paso County, and Elder
provide mental health care to inmates who do not suffer from Gender Dysphoria, but specifically
deny mental health care to inmates who suffer from Gender Dysphoria.

92.     Ms. Griffith has been denied the programs, services and benefits of the El Paso
County Jail on the basis of her disability and her sex.

93.     El Paso County and Sheriff Elder knew and know about the necessary
accommodations, including the mental health care needed by Ms. Griffith, yet have denied these
accommodations and/or have decision-making authority over whether the accommodations have
been granted, and failed to take necessary action.

94.     Defendant Wellpath continues to have a legal and ethical duty to make
independent medical decisions about what, if any, mental health accommodations are necessary
for Ms. Griffith. Instead of exercising that independent medical judgment, Defendant Wellpath
denied necessary accommodations and treatment in reckless disregard for the safety of Ms.
Griffith and was deliberately indifferent to her serious mental health needs. Despite being

responsible for the care and treatment of Ms. Griffith, Wellpath blatantly refused necessary care and accommodations.

95.     El Paso County's policy of not providing weekly therapy to transgender inmates from a qualified mental healthcare provider was a discriminatory action and a failure to reasonably accommodate Ms. Griffith's diagnosed Gender Dysphoria.

96.     El Paso County policy of not providing weekly therapy to transgender inmates from a qualified mental healthcare provider have exacerbated symptoms of her Gender Dysphoria leading her to suffer significant emotional distress and have increased ideation of self-harm.

### Defendants Wellpath, Elder, and Roe Denied Necessary Medical Care To Ms. Griffith Pursuant To El Paso County's Customary Practice Of Denying Transgender Inmates Hormone Therapy

97.     Ms. Griffith, as a transgender inmate diagnosed with Gender Dysphoria, requires regular medical care, including hormone therapy. Despite well-settled authority that dictates that hormone therapy is necessary to treat transgender women who suffer from Gender Dysphoria, Defendants refuse to provide that necessary treatment.

98.     Ms. Griffith has been on hormone therapy to treat her Gender Dysphoria for over twenty years.

99.     Defendants were aware of both Ms. Griffith's diagnosis and her long history of being treated with hormone therapy. When Ms. Griffith was booked into the El Paso County Jail, she noted that she was on hormone therapy.

100.     El Paso County and Wellpath refused to provide Ms. Griffith with hormone therapy shots.

101.    Ms. Griffith complained to the head of medical for Wellpath at the El Paso County Jail, Defendant Roe, and told Defendant Roe specifically that she has been receiving hormone therapy for over twenty years. Defendant Roe told Ms. Griffith that she would not receive hormone therapy at the El Paso County Jail.

102.    Because Defendants El Paso County, Wellpath, and Roe stopped Ms. Griffith's hormone therapy, her body went through physical changes and she suffered physical harm, along with emotional distress.

103.    Defendants El Paso County, Wellpath, and Roe denied Ms. Griffith hormone therapy for approximately five months. It was only after Ms. Griffith convinced a friend to bring her prescription for hormone therapy to the El Paso County Jail that Defendants El Paso County, Wellpath, and Roe eventually allowed Ms. Griffith to receive hormone therapy.

104.    Ms. Griffith continues to have difficulty getting Defendant Roe to provide her with hormone therapy shots on a regular basis. Ms. Griffith often has to argue with Defendant Roe to receive her shots. For instance, when Ms. Griffith was quarantined from potential exposure to the Coronavirus, she was denied her hormone replacement therapy shots. This has caused her great physical and emotional discomfort.

105.    El Paso County's and Wellpath's policy of not providing hormone therapy to transgender inmates was a discriminatory action and a failure to reasonably accommodate Ms. Griffith's diagnosed Gender Dysphoria.

106.    Defendants' failure to provide Ms. Griffith with hormone therapy exacerbated symptoms of her Gender Dysphoria leading her to suffer significant emotional distress and have increased ideation of self-harm.

**El Paso County Customarily Mis-Genders Ms. Griffith and other Transgender Individuals In Its Custody**

107.    El Paso County refuses to recognize transgender women in its custody as the women that they are. Instead, El Paso County officials routinely refers to these women, including Ms. Griffith, using the male names they were assigned at birth. Documentation maintained by El Paso County, whether in case management, mental health or medical files, routinely refer to these women as "men" or using male pronouns, despite El Paso County's own documentation showing that these individuals belong to the community of transgender women.

108.    On multiple occasions throughout her incarceration at the El Paso County Jail, sergeants and deputies have mis-gendered Ms. Griffith and used language that does not conform with her gender identity. For example, on January 12, 2021, Deputy Stirling mis-gendered Ms. Griffith by calling her "sir."

109.    Another El Paso County official, Specialist Gonzales, mis-gendered Ms. Griffith while she was receiving her COVID-19 vaccine; when Ms. Griffith protested Specialist Gonzales' mis-gendering of her, another El Paso County Jail official, Sergeant Gomez, threatened to place Ms. Griffith in solitary confinement if she continued to protest El Paso County Jail officials mis-gendering her and told Ms. Griffith that he did not believe that it was inappropriate for El Paso County Jail officials to call her "sir."

110.    On three separate other occasions El Paso County Jail officials, Deputies Motto, Blackberry, and Jaygo, mis-gendered Ms. Griffith.

111.    These are just a sampling of countless such incidents of mis-gendering.

112.    Mis-gendering is a form of sexual harassment.

113.    This constant mis-gendering of Ms. Griffith has been caused by El Paso County's and Defendant Elder's policy of housing Ms. Griffith in a male unit, along with the customs and

practices at the El Paso County Jail that condone discriminatory and harassing treatment of
transgender prisoners.

114.    El Paso County officials' actions in constantly mis-gendering Ms. Griffith was a
discriminatory action and a failure to reasonably accommodate Ms. Griffith's diagnosed Gender
Dysphoria.

115.    The constant mis-gendering of Ms. Griffith has exacerbated symptoms of her
Gender Dysphoria leading her to suffer significant emotional distress, become depressed, and
have increased ideation of self-harm.

### El Paso County Customarily Denies Ms. Griffith And Other Transgender Inmates The Ability To Dress In Accordance With Their Gender Identity

116.    On September 7, 2020, Ms. Griffith sought permission to purchase a sports bra
and panties. Defendants denied that request. In response, Ms. Griffith filed a grievance seeking
to allow her to purchase a sports bra and panties. Defendants denied that request as well.
Eventually, Ms. Griffith filed another grievance seeking to talk to Sergeant Auyad about the
purchase of a sports bra and panties. Defendants continued to deny Ms. Griffith's request to have
the ability to purchase a sports bra and panties until October 5, 2020, when Sergeant Auyad
approved her request but only to purchase a sports bra.

117.    Defendants denied Ms. Griffith a reasonable accommodation for her Gender
Dysphoria and forced to leave her breasts without a bra, to be ogled by male inmates and
deputies for approximately a month. This caused Ms. Griffith significant emotional distress and
physical discomfort.

118.    Several days later, Lieutenant Cornell came to Ms. Griffith's cell with a sports
bra. Lieutenant Cornell told Ms. Griffith that she would only receive one sports bra, and not
panties, because she did not need to "hold female products down there." When Ms. Griffith

protested, and again asked for an accommodation for her Gender Dysphoria in the form of being provided the ability to purchase panties, Lieutenant Cornell again denied her request. On October 24, 2020, Lieutenant Cornell filed a formal response to Ms. Griffith's grievance and, again, told her that she would not be issued, or allowed to purchase, panties. Lieutenant Cornell again denied Ms. Griffith's request for an accommodation.

119.    Ms. Griffith subsequently elevated her concerns to Commander Cy Gillespie and requested that she be provided panties. In response, Defendant Gillespie told Ms. Griffith that she would never get panties in the El Paso County Jail.

120.    Defendants have also denied Ms. Griffith the ability to purchase lipstick because she is a transgender woman. Cisgender women are allowed to purchase lipstick at the commissary. Defendant Gillespie specifically told Ms. Griffith that she cannot purchase lipstick per El Paso County Jail policy.

121.    Defendants' denial of gender appropriate undergarments and lipstick to Ms. Griffith was caused by El Paso County's and Defendant Elder's policy of housing Ms. Griffith in a male unit, along with the customs and practices at the El Paso County Jail that condone discriminatory treatment of transgender prisoners.

122.    El Paso County officials' actions in denying Ms. Griffith access to female undergarments and lipstick was a discriminatory action and a failure to reasonably accommodate Ms. Griffith's diagnosed Gender Dysphoria.

123.    El Paso County officials' customary decisions to deny Ms. Griffith the right to dress in accordance with her gender identity was a discriminatory action and a failure to reasonably accommodate Ms. Griffith's diagnosed Gender Dysphoria.

124.    El Paso County officials' customary decisions to deny Ms. Griffith the right to

dress in accordance with her gender identity has exacerbated symptoms of her Gender Dysphoria

leading her to suffer significant emotional distress and have increased ideation of self-harm.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Fourteenth Amendment – Equal Protection
### Discrimination
*Against All Defendants*

125.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set

forth herein.

126.    Defendants were acting under color of state law at all times relevant to this action.

127.    Under the Equal Protection Clause of the Fourteenth Amendment, discrimination

against transgender people is a form of sex discrimination that is presumptively unconstitutional

and subject to heightened scrutiny.

128.    Discrimination based on sex includes, but is not limited to, discrimination based

on gender, gender nonconformity, transgender status, gender expression, and gender transition.

129.    Discrimination based on transgender status is also presumptively unconstitutional

under the Equal Protection Clause and subject to heightened scrutiny.

130.    Transgender people have suffered a long history of extreme discrimination across

the country, in prisons and outside of prisons, and continue to suffer such discrimination to this

day.

131.    Many, if not most, transgender and cisgender women who are incarcerated,

including Plaintiff, have discernable feminine characteristics and secondary female-typical sex

characteristics that place them at heightened risk of sexual victimization by male deputies

without adequate safeguards and subject to the humiliation of searches by male deputies if placed in men's prisons.

132. Both transgender and cisgender women face substantially similar risks of sexual victimization by male deputies without adequate safeguards and the humiliation through searches by male deputies.

133. Defendants' actions and inactions in placing and keeping Plaintiff in the men's unit at the El Paso County Jail and requiring that male deputies, like Defendants Doe and Draper, search transgender women without any supervision discriminates against her on the basis of sex.

134. Defendants' actions and inactions in placing and keeping Plaintiff in the men's unit at the El Paso County Jail also discriminates against her based on sex stereotyping, namely, treating her as though she were a cisgender man based on the presumption that her gender identity and expression should align with her sex assigned at birth, and housing her in accordance with that perception. This sex stereotyping is based solely on Plaintiff's sex assigned at birth, disregarding her gender identity even though she is a woman and has had medical treatment to bring her body into alignment with her female gender identity.

135. Defendants, acting under color of state law, intentionally discriminated against Plaintiff by placing her, and continuing to house her, exclusively in men's prisons without adequate safeguards, even though she faces similar risks as all other women in such custody.

136. Defendants' actions as described herein were taken without an important or legitimate governmental interest or rational reason, and they had no penological basis to deny Plaintiff a safe and appropriate placement in a female facility, based on her sex, gender identity, characteristics, risk factors, and her history of sexual victimization in male facilities.

137.    Plaintiff was placed in the male unit and searched by male deputies at the El Paso County Jail in accordance with the customs, policies, and practices of the El Paso County Jail, which are set by Defendant El Paso County and Elder. Defendants El Paso County and Elder discriminated against Plaintiff and other transgender women by adopting and applying these customs policies, and practices that deny transgender women safe and appropriate housing placements based on their sex, transgender identity, and impermissible sex stereotypes without a compelling, important, or legitimate governmental interest.

138.    Defendants' actions and inactions were taken in reckless and callous indifference to the federally protected rights of Plaintiff.

139.    Defendants' acts and omissions were the legal and proximate cause of Plaintiff's damages in that she suffered physical intrusion into bodily privacy and integrity, humiliation, and mental and emotional pain and anguish, physical manifestations of emotional distress, physical injury, and continues to suffer mental and emotional pain and anguish to this day and likely for the rest of her life.

140.    As a direct and proximate cause and consequence of the unconstitutional policies, procedures, customs, acts, inactions, and/or practices described above, Plaintiff suffered and continues to suffer injuries, damages and losses as set forth herein.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Fourteenth Amendment**
**Conditions Of Confinement**
*Against All Defendants*

141.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

142.    Defendants were acting under color of state law at all times relevant to this action.

143.    Plaintiff was and is a pre-trial detainee.

144.    As a pre-trial detainee, Plainitff was and is protected from unconstitutional conditions of confinement by the Fourteenth Amendment.

145.    Under the Fourteenth Amendment, Plaintifff was and is also protected from conduct that is not rationally related to a legitimate nonpunitive governmental purpose or actions that appear objectively excessive in relation to that purpose under *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015).

146.    Each Defendant knew or should have known of these clearly established rights at the time of Plainitff's incarceration.

147.    Defendants El Paso County's policy of assigning all detained transgender individuals to housing units based on their genitalia as the default or sole criterion, without any individualized assessment of the individual's safety or gender identity, poses an excessive risk to Ms. Griffith's health and safety.

148.    Defendants knew that Plainitff was a transgender woman and that housing her in an all-male unit subjected her to a risk of sexual harrassment, sexual assault, and extreme emotional distress from being treated as a man given her Gender Dysphoria. They knew that this posed a substantial risk of serious harm to Plaintiff.

149.    Despite this knowledge and Plainitff's repeated requests for a transfer, Defendants refused to house Plaintiff in a unit that conformed with her gender identity in deliberate indifference to a serious risk of harm to her.

150.    Defendants' failure to recognize Plaintiff as the transgender woman that she is subjected her to unconstitutional conditions of confinement.

151.    Defendants' sexual assault and harrassment of Plaintiff subjected her to unconstitutional conditions of confinement.

152.    Defendants' failure to provide Plaintiff appropriate medical and mental health care because she is a transgender woman subjected her to unconstitutional conditions of confinement.

153.    All of the deliberately indifferent acts of each individual Defendant were conducted within the scope of their official duties and employment.

154.    Defendants' actions and inactions were taken in reckless and callous indifference to Plaintiff's federally protected rights.

155.    Defendants' acts or omissions were the legal and proximate cause of Plaintiff's damages in that she suffered physical pain and suffering, humiliation, and mental and emotional pain and anguish, and continues to suffer mental and emotional pain and anguish to this day and likely for the rest of her life.

156.    As a direct and proximate cause and consequence of the unconstitutional policies, procedures, customs, acts, inactions, and/or practices described above, Plaintiff suffered and continues to suffer injuries, damages and losses as set forth herein.

### THIRD CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Fourteenth Amendment
### Excessive Force
*Against Defendants El Paso County, Elder, and Draper*

157.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

158.    Defendants were acting under color of state law at all times relevant to this action.

159.    Defendant Draper purposefully and knowingly used physical force against Plaintiff by fondling her breasts and forcibly slamming his hand into her crotch without her consent.

160.    Defendant Draper's use of force against Plaintiff caused her unnecessary pain.

161.    Defendant Draper's use of force against Plaintiff had no legitimate penological purpose.

162.    Defendants El Paso County and Elder knowingly allowed male deputies, like Defendants Doe and Draper, to search transgender women without any supervision and it was obvious that sexual assault would occur through housing, per official policy, transgender women, like Plaintiff, in the men's facility and continuing to require, per official policy, male deputies, like Defendant Draper, to search transgender women without any supervision.

163.    Defendants El Paso County and Elder exhibited deliberate indifference to the substantial risk of harm to Plaintiff, and other transgender women inmates in the El Paso County Jail, by housing, per official policy, transgender women, like Plaintiff, in the men's facility and continuing to require, per official policy, male deputies, like Defendant Draper, to search transgender women without any supervision.

164.    It was obvious to those in Defendants El Paso County's and Elder's positions that transgender inmates at El Paso County Jail, including Plaintiff, faced a substantial risk of serious harm from sexual abuse by male deputies.

165.    Defendants El Paso County and Elder failed to provide humane conditions of confinement for Plaintiff and other similarly situated transgender inmates by failing to implement practices, policies and procedures that protected transgender inmates, including Plaintiff, from the substantial risk of serious harm posed by housing, per official policy, transgender women, like Plaintiff, in the men's facility and continuing to require, per official policy, male deputies, like Defendant Draper, to search transgender women without any supervision.

166.    Therefore, Defendants El Paso County and Elder set in motion a series of events that they knew would cause an inmate in Plaintiff's situation to be deprived of her constitutional right to be free from excessive force; but for the above acts or omissions of Defendants El Paso County and Elder, Plaintiff would not have been subjected to a violation of her constitutional rights; and such a deprivation was a natural and foreseeable consequence of these acts and omissions.

167.    Defendants' actions and inactions were taken in reckless and callous indifference to Plaintiff's federally protected rights.

168.    Defendants' acts and omissions were the legal and proximate cause of Plaintiff's damages in that she suffered physical intrusion into bodily privacy and integrity, humiliation, and mental and emotional pain and anguish, physical manifestations of emotional distress, physical injury, and continues to suffer mental and emotional pain and anguish to this day and likely for the rest of her life.

169.    As a direct and proximate cause and consequence of the unconstitutional policies, procedures, customs, acts, inactions, and/or practices described above, Plaintiff suffered and continues to suffer injuries, damages and losses as set forth herein.

**FOURTH CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Fourth Amendment**
**Unreasonable Search**
*Against Defendants El Paso County, Elder, John Doe, Jane Doe, and Draper*

170.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

171.    Defendants were acting under color of state law at all times relevant to this action.

172.    Plaintiff has a legitimate expectation of privacy in her body being free from unreasonable governmental search.

173.    Defendants Doe and Draper's actions were objectively unreasonable in light of the circumstances confronting them. Namely, there was no basis for Defendant Doe to strip search Plaintiff. Defendant Doe's sexually charged and offensive comments while strip searching Plaintiff and sexual harassment of her was objectively unreasonable. And there was no objectively reasonable basis for Defendant Draper to grope Plaintiff's breasts and slam his hand into her crotch during his search of her.

174.    Defendants El Paso County and Elder's custom, policy, and practice of housing, per official policy, transgender women, like Plaintiff, in the men's facility and continuing to require, per official policy, male deputies, like Defendants Doe and Draper, to search transgender women without any supervision caused the violation of Plaintiff's rights and it was obvious and foreseeable to Defendants El Paso County and Elder that their custom, policy, and practice of allowing male deputies, like Defendants Doe and Draper, to search transgender women without any supervision would cause a violation of Plaintiff's constitutional rights in the manner in which that violation occurred.

175.    Defendant Jane Doe failed to intervene to prevent the unconstitutional search by Defendant John Doe.

176.    Defendants' actions and inactions were taken in reckless and callous indifference to Plaintiff's federally protected rights.

177.    Defendants' acts and omissions were the legal and proximate cause of Plaintiff's damages in that she suffered physical intrusion into bodily privacy and integrity, humiliation, and mental and emotional pain and anguish, physical manifestations of emotional distress, physical injury, and continues to suffer mental and emotional pain and anguish to this day and likely for the rest of her life.

178.     As a direct and proximate cause and consequence of the unconstitutional policies, procedures, customs, acts, inactions, and/or practices described above, Plaintiff suffered and continues to suffer injuries, damages and losses as set forth herein.

**FIFTH CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Fourteenth Amendment – Substantive Due Process**
**Invasion of Bodily Privacy and Integrity**
*Against Defendants El Paso County, Elder, Gillespie, John Doe, Jane Doe, and Draper*

179.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

180.     Defendants were acting under color of state law at all times relevant to this action.

181.     By sexually harassing and assaulting Plaintiff without her consent, Defendants Doe and Draper violated Plaintiff's right to be secure in her bodily integrity, a liberty interest protected by the Due Process Clause of the Fourteenth Amendment.

182.     Defendants El Paso County and Elder recklessly, with conscious disregard to the serious and obvious risk to the safety of transgender inmates like Plaintiff, violated Plaintiff's right to be secure in her bodily integrity by allowing male deputies, like Defendants Doe and Draper, to search transgender women without any supervision.

183.     Defendant Jane Doe failed to intervene to prevent the unconstitutional invasion of privacy by Defendant John Doe.

184.     Defendants El Paso County and Elder knew that their acts or omissions were substantially certain to cause El Paso County officials to violate constitutional rights of transgender inmates like Plaintiff to be free from secure in their bodily integrity, and Defendants El Paso County and Elder consciously or deliberately chose to disregard this risk of harm in failing to provide and/or in deliberately choosing not to change the policy that housed

transgender women inmates with men and required, per official policy, male deputies, like Defendants Doe and Draper, to search transgender women without any supervision.

185.    Defendants El Paso County and Elder exhibited deliberate indifference to the substantial and obvious risk of harm to Plaintiff, and other transgender inmates, by housing, per official policy, transgender women, like Plaintiff, in the men's facility and continuing to require, per official policy, male deputies, like Defendants Doe and Draper, to search transgender women without any supervision.

186.    Defendants El Paso County and Elder proximately caused an unconstitutional invasion of Plaintiff's bodily integrity by housing, per official policy, transgender women, like Plaintiff, in the men's facility and continuing to require, per official policy, male deputies, like Defendants Doe and Draper, to search transgender women without any supervision.

187.    Defendants El Paso County and Elder set in motion a series of events that they knew would cause an inmate in Plaintiff's situation to be deprived of her constitutional right to be secure in her bodily integrity; but for the above acts or omissions of Defendants, Plaintiff would not have been subjected to a violation of her constitutional rights; and such a deprivation was a natural and foreseeable consequence of these acts and omissions.

188.    Defendant Gillespie's decision to house Plaintiff in an all-male unit subjected her to have her privacy constantly invaded.

189.    The policies implemented by Defendants El Paso County and Elder, as well as Defendants' actions and inactions, violated Plaintiff's substantive due process right to bodily integrity under the Fourteenth Amendment to the United States Constitution.

190.    Defendants' actions and inactions were taken in reckless and callous indifference to Plaintiff's federally protected rights.

191.    When viewed in total, this conduct is outrageous and shocks the conscience.

192.    Defendants' acts and omissions were the legal and proximate cause of Plaintiff's damages in that she suffered physical intrusion into bodily privacy and integrity, humiliation, and mental and emotional pain and anguish, physical manifestations of emotional distress, physical injury, and continues to suffer mental and emotional pain and anguish to this day and likely for the rest of her life.

193.    As a direct and proximate cause and consequence of the unconstitutional policies, procedures, customs, and/or practices described above, Plaintiff suffered and continues to suffer injuries, damages and losses as set forth herein.

## SIXTH CLAIM FOR RELIEF
### C.R.S. § 13-21-131 – Colo. Const. Art. II, Section 25
### Excessive Force
*Against Defendants Elder and Draper*

194.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

195.    Defendants acted under color of state law, and within the course and scope of their employment, in their capacities as law enforcement officers at all times relevant to the allegations in this Complaint.

196.    Defendants are "peace officers" under C.R.S. § 24-31-901(3) employed by a local government and therefore subject to C.R.S. § 13-21-131.

197.    Plaintiff had a protected Colo. Const. Art. II, Section 25 interest against being unreasonably harmed by the use of excessive force.

198.    Defendant Draper purposefully and knowingly used physical force against Plaintiff by fondling her breasts and forcibly grabbing her crotch without her consent.

199.    Defendant Draper's use of force against Plaintiff caused her unnecessary pain.

200.    Defendant Draper's use of force against Plaintiff had no legitimate penological purpose.

201.    Defendant Elder knowingly allowed male deputies, like Defendant Draper, to search transgender women without any supervision and it was obvious that sexual assault would occur through housing, per official policy, transgender women, like Plaintiff, in the men's facility and continuing to require, per official policy, male deputies, like Defendant Draper, to search transgender women without any supervision.

202.    Defendant Elder exhibited deliberate indifference to the substantial risk of harm to Plaintiff, and other transgender women inmates in the El Paso County Jail, by housing, per official policy, transgender women, like Plaintiff, in the men's facility and continuing to require, per official policy, male deputies, like Defendant Draper, to search transgender women without any supervision.

203.    It was obvious to those in Defendant Elder's positions that transgender inmates at El Paso County Jail, including Plaintiff, faced a substantial risk of serious harm from sexual abuse by male deputies.

204.    Defendant Elder failed to provide humane conditions of confinement for Plaintiff and other similarly situated transgender inmates by failing to implement practices, policies and procedures that protected inmates, including Plaintiff, from the substantial risk of serious harm posed by housing, per official policy, transgender women, like Plaintiff, in the men's facility and continuing to require, per official policy, male deputies, like Defendant Draper, to search transgender women without any supervision.

205.    Therefore, Defendant Elder set in motion a series of events that he knew would cause an inmate Plaintiff's situation to be deprived of her constitutional right to be free from

excessive force; but for the above acts or omissions of Defendant Elder, Plaintiff would not have been subjected to a violation of her constitutional rights; and such a deprivation was a natural and foreseeable consequence of these acts and omissions.

206.    Defendants' actions and inactions were taken in reckless and callous indifference to Plaintiff's federally protected rights.

207.    Defendants acts or omissions were the legal and proximate cause of Plaintiff's damages in that she suffered physical intrusion into bodily privacy and integrity, humiliation, and mental and emotional pain and anguish, physical manifestations of emotional distress, and continues to suffer mental and emotional pain and anguish to this day and likely for the rest of her life.

208.    As a direct and proximate cause and consequence of the unconstitutional policies, procedures, customs, acts, inactions, and/or practices described above, Plaintiff suffered and continues to suffer injuries, damages and losses as set forth herein.

## SEVENTH CLAIM FOR RELIEF
### C.R.S. § 13-21-131 – Colo. Const. Art. II, Section 25
### Unreasonable Search
*Against Defendants Elder, John Doe, Jane Doe, and Draper*

209.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

210.    Defendants acted under color of state law, and within the course and scope of their employment, in their capacities as law enforcement officers at all times relevant to the allegations in this Complaint.

211.    Defendants are "peace officers" under C.R.S. § 24-31-901(3) employed by a local government and therefore subject to C.R.S. § 13-21-131.

212.    Plaintiff had a protected Colo. Const. Art. II, Section 25 interest against being unreasonably searched.

213.    Plaintiff has a legitimate expectation of privacy in her body being free from unreasonable governmental search.

214.    Defendants Doe and Draper's actions were objectively unreasonable in light of the circumstances confronting them. Namely, there was no basis for Defendant Doe to strip search Plaintiff. Defendant Doe's offensive sexually charged comments while strip searching Plaintiff and sexual harassment of her was objectively unreasonable. And there was no objectively reasonable basis for Defendant Draper to grope Plaintiff's breasts and slam his hand into her crotch during his search of her.

215.    Defendant Jane Doe failed to intervene to prevent the unconstitutional search by Defendant John Doe.

216.    Defendant Elder's custom, policy, and practice of housing, per official policy, transgender women, like Plaintiff, in the men's facility and continuing to require, per official policy, male deputies, like Defendants Doe and Draper, to search transgender women without any supervision caused the violation of Plaintiff's rights and it would have been obvious and foreseeable to Defendant Elder that his custom, policy, and practice of allowing male deputies, like Defendants Doe and Draper, to search transgender women without any supervision would cause a violation of Plaintiff's constitutional rights in the manner in which that violation occurred.

217.    Defendants' actions and inactions were taken in reckless and callous indifference to Plaintiff's federally protected rights.

218.    Defendants acts and omissions were the legal and proximate cause of Plaintiff's damages in that she suffered physical intrusion into bodily privacy and integrity, humiliation, and mental and emotional pain and anguish, physical manifestations of emotional distress, physical injury, and continues to suffer mental and emotional pain and anguish to this day and likely for the rest of her life.

219.    As a direct and proximate cause and consequence of the unconstitutional policies, procedures, customs, acts, inactions, and/or practices described above, Plaintiff suffered and continues to suffer injuries, damages and losses as set forth herein.

**EIGHTH CLAIM FOR RELIEF**
**C.R.S. § 13-21-131 – Colo. Const. Art. II, Section 29  – Equality of the Sexes Discrimination**
*Against Defendants Elder, Gillespie, John Doe, Jane Doe, and Draper*

220.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

221.    The Individual Defendants acted under color of state law, and within the course and scope of their employment, in their capacities as law enforcement officers at all times relevant to the allegations in this Complaint.

222.    The Individual Defendants are "peace officers" under C.R.S. § 24-31-901(3) employed by a local government and therefore subject to C.R.S. § 13-21-131.

223.    Plaintiffs had a protected Colo. Const. Art. II, Section 25 right against discrimination based on sex. The Colorado Constitution, Article II, Section 29 provides: "Equality of the sexes. Equality of rights under the law shall not be denied or abridged by the state of Colorado or any of its political subdivisions on account of sex."

224.    Under Colo. Const. Art. II, Section 25, discrimination against transgender people is a form of sex discrimination that is presumptively unconstitutional and subject to strict scrutiny.

225.    Discrimination based on sex includes, but is not limited to, discrimination based on gender, gender nonconformity, transgender status, gender expression, and gender transition.

226.    Discrimination based on transgender status is also presumptively unconstitutional under the Equal Protection Clause and subject to strict, or at least heightened, scrutiny.

227.    Transgender people have suffered a long history of extreme discrimination across the country, in prisons and outside of prisons, and continue to suffer such discrimination to this day.

228.    Many, if not most, transgender and cisgender women who are incarcerated, including Plaintiff, have discernable feminine characteristics and secondary female-typical sex characteristics that place them at heightened risk of sexual victimization by male deputies without adequate safeguards and subject to the humiliation of searches by male deputies if placed in men's prisons.

229.    Both transgender and cisgender women face substantially similar risks of sexual victimization by male deputies without adequate safeguards and the humiliation through searches by male deputies.

230.    Defendants' actions and inactions in placing and keeping Plaintiff in the men's unit at the El Paso County Jail and requiring that male deputies, like Defendants Doe and Draper, search transgender women without any supervision discriminates against her on the basis of sex.

231.    Defendants' actions and inactions in placing and keeping Plaintiff in the men's unit at the El Paso County Jail also discriminates against her based on sex stereotyping, namely,

treating her as though she were a cisgender man based on the presumption that her gender

identity and expression should align with her sex assigned at birth, and housing her in

accordance with that perception. This sex stereotyping is based solely on Plaintiff's sex assigned

at birth, disregarding her gender identity even though she is a woman and has had medical

treatment to bring her body into alignment with her female gender identity.

232.    Defendants, acting under color of state law, intentionally discriminated against

Plaintiff by placing her, and continuing to house her, exclusively in men's units without adequate

safeguards, even though she faces similar risks as all other women in custody.

233.    Defendant's actions as described herein were taken without an important or

legitimate governmental interest or rational reason, and they had no penological basis to deny

Plaintiff a safe and appropriate placement in a female facility, based on her sex, gender identity,

characteristics, risk factors, and her history of sexual victimization in male facilities.

234.    Plaintiff was placed in the male unit, and searched by male deputies, at the El

Paso County Jail in accordance with the customs, policies, and practices of the El Paso County

Jail, which are set by Defendant Elder. Defendant Elder discriminated against Plaintiff and other

transgender women by adopting and applying these customs policies, and practices that deny

transgender women safe and appropriate housing placements based on their sex, transgender

identity, and impermissible sex stereotypes without a compelling, important, or legitimate

governmental interest.

235.    Defendants' actions and inactions were taken in reckless and callous indifference

to Plaintiff's federally protected rights.

236.    Defendants' acts and omissions were the legal and proximate cause of Plaintiff's

damages in that she suffered physical intrusion into bodily privacy and integrity, humiliation,

and mental and emotional pain and anguish, physical manifestations of emotional distress,
physical injury, and continues to suffer mental and emotional pain and anguish to this day and
likely for the rest of her life.

237.    As a direct and proximate cause and consequence of the unconstitutional policies,
procedures, customs, acts, inactions, and/or practices described above, Plaintiff suffered and
continues to suffer injuries, damages and losses as set forth herein.

**NINTH CLAIM FOR RELIEF**
**C.R.S. § 13-21-131 – Colo. Const. Art. II, Section 25 – Substantive Due Process**
**Invasion of Bodily Privacy and Integrity**
*Against Defendants Elder, Gillespie, John Doe, Jane Doe, and Draper*

238.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set
forth herein.

239.    Defendants acted under color of state law, and within the course and scope of
their employment, in their capacities as law enforcement officers at all times relevant to the
allegations in this Complaint.

240.    Defendants are "peace officers" under C.R.S. § 24-31-901(3) employed by a local
government and therefore subject to C.R.S. § 13-21-131.

241.    Plaintiff had a protected Colo. Const. Art. II, Section 25 interest against
deprivation of life, liberty, or property without due process of law.

242.    By sexually harassing and assaulting Plaintiff without her consent, Defendants
Doe and Draper violated Plaintiff's right to be secure in her bodily integrity, a liberty interest
protected by the Due Process Clause of the Fourteenth Amendment.

243.    Defendant Elder recklessly, with conscious disregard to the serious and obvious
risk to the safety of transgender inmates like Plaintiff, violated Plaintiff's right to be secure in her

bodily integrity by allowing male deputies, like Defendants Doe and Draper, to search

transgender women without any supervision.

244.    Defendant Jane Doe failed to intervene to prevent the unconstitutional invasion of

bodily integrity by Defendant John Doe.

245.    Defendant Elder knew that his acts or omissions were substantially certain to

cause El Paso County officials to violate constitutional rights of transgender inmates like

Plaintiff to be free from secure in their bodily integrity, and Defendant Elder consciously or

deliberately chose to disregard this risk of harm in failing to provide and/or in deliberately

choosing not to change the policy that housed transgender women inmates with men and

required, per official policy, male deputies, like Defendants Doe and Draper, to search

transgender women without any supervision.

246.    Defendant Elder exhibited deliberate indifference to the substantial and obvious

risk of harm to Plaintiff, and other transgender inmates, by housing, per official policy,

transgender women, like Plaintiff, in the men's facility and continuing to require, per official

policy, male deputies, like Defendants Doe and Draper, to search transgender women without

any supervision.

247.    Defendant Elder proximately caused an unconstitutional invasion of Plaintiff's

bodily integrity by housing, per official policy, transgender women, like Plaintiff, in the men's

facility and continuing to require, per official policy, male deputies, like Defendants Doe and

Draper, to search transgender women without any supervision.

248.    Defendant Elder set in motion a series of events that he knew would cause an

inmate in Plaintiff's situation  to be deprived of her constitutional right to be secure in her bodily

integrity; but for the above acts or omissions of Defendants, Plaintiff would not have been

subjected to a violation of her constitutional rights; and such a deprivation was a natural and foreseeable consequence of these acts and omissions.

249.    Defendant Gillespie's decision to house Plaintiff in an all-male unit subjected her to have her privacy constantly invaded.

250.    The policies implemented by Defendant Elder, as well as Defendants' actions and inactions, violated Plaintiff's substantive due process right to bodily integrity.

251.    Defendants' actions and inactions were taken in reckless and callous indifference to Plaintiff's federally protected rights.

252.    When viewed in total, this conduct is outrageous and shocks the conscience.

253.    Defendants' acts or omissions were the legal and proximate cause of Plaintiff's damages in that she suffered physical intrusion into bodily privacy and integrity, humiliation, and mental and emotional pain and anguish, physical manifestations of emotional distress, physical injury, and continues to suffer mental and emotional pain and anguish to this day and likely for the rest of her life.

254.    As a direct and proximate cause and consequence of the unconstitutional policies, procedures, customs, and/or practices described above, Plaintiff suffered and continues to suffer injuries, damages and losses as set forth herein.

**TENTH CLAIM FOR RELIEF**
**C.R.S. § 13-21-131 – Colo. Const. Art. II, Section 25 – Due Process**
**Deliberately Indifferent Mental Health Care**
*Against Defendants Elder and Gillespie*

255.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

256.    Defendants acted under color of state law, and within the course and scope of their employment, in their capacities as law enforcement officers at all times relevant to the

allegations in this Complaint.

257.    Defendants are "peace officers" under C.R.S. § 24-31-901(3) employed by a local government and therefore subject to C.R.S. § 13-21-131.

258.    Plaintiff had a protected Colo. Const. Art. II, Section 25 interest against deprivation of life, liberty, or property without due process of law

259.    Plaintiff was a pre-trial detainee.

260.    As a pre-trial detainee, Plaintiff was and is protected from deliberate indifference to her serious medical needs by the Colorado Constitution's due process clause.

261.    Defendants knew or should have known of these clearly established rights at the time of Plaintiff's incarceration.

262.    Defendants knew that Plaintiff has Gender Dysphoria, a serious medical need requiring treatment to avert a serious risk of physical and psychological harm. Defendants also knew that the medically accepted standards for the treatment of Gender Dysphoria are the Standards of Care.

263.    Defendants knew that the medically necessary treatments for Plaintiff's Gender Dysphoria are hormone therapy in uninterrupted and therapeutic doses, accommodations related to her gender expression (including female undergarments, commissary items, and grooming allowances), and ongoing care and evaluations from mental health professionals qualified to treat Gender Dysphoria.

264.    Defendants knew that the Standards of Care require that Gender Dysphoria treatment be administered in a manner sufficient to alleviate severe symptoms, which in the case of Plaintiff include severe depression and self-harm.

265.    Despite this knowledge and Plaintiff's repeated requests for care, Defendants

refused to provide Plaintiff medically necessary treatment in deliberate indifference to her serious risk of harm.

266.    Defendants denied Plaintiff all ongoing care and evaluations from mental health professionals qualified to treat Gender Dysphoria and refused to provide her accommodations related to her gender expression. This included housing her in the men's unit of the El Paso County Jail and treating her in a manner inconsistent with her gender.

267.    Defendants provided Plaintiff care that was so poor, cursory, grossly inadequate, and out of step with accepted professional norms that it constitutes a wanton infliction of pain, not medical treatment at all—placing Plaintiff at serious risk of harm.

268.    By failing to provide Plaintiff with treatment sufficient to alleviate her symptoms, Defendants failed to provide the minimally adequate care required to be provided to incarcerated transgender people.

269.    Defendants' actions and omissions, as described herein, were done without the exercise of any individualized medical judgment whatsoever—based on the decision to take an easier but less efficacious course of (non)treatment—and were so cursory and inadequate that they amount to no treatment at all.

270.    All of the deliberately indifferent acts of each individual Defendant were conducted within the scope of their official duties and employment.

271.    Each Defendant's acts or omissions were the legal and proximate cause of Plaintiff's injuries.

272.    Defendants' actions and inactions were taken in reckless and callous indifference to Plaintiff's protected rights.

273.    Defendants' acts and omissions were the legal and proximate cause of Plaintiff's damages in that she suffered physical pain and suffering, humiliation, and mental and emotional pain and anguish, and continues to suffer mental and emotional pain and anguish to this day and likely for the rest of her life.

274.    As a direct and proximate cause and consequence of the unconstitutional policies, procedures, customs, acts, inactions, and/or practices described above, Plaintiff suffered and continues to suffer injuries, damages and losses as set forth herein.

## ELEVENTH CLAIM FOR RELIEF
### C.R.S. § 13-21-131 – Colo. Const. Art. II, Section 20 – Cruel And Unusual Punishment Deliberately Indifferent Mental Health Care
*Against Defendants Elder and Gillespie*

275.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

276.    Defendants acted under color of state law, and within the course and scope of their employment, in their capacities as law enforcement officers at all times relevant to the allegations in this Complaint.

277.    Defendants are "peace officers" under C.R.S. § 24-31-901(3) employed by a local government and therefore subject to C.R.S. § 13-21-131.

278.    Plaintiff had a protected Colo. Const. Art. II, Section 25 interest against deprivation of life, liberty, or property without due process of law

279.    Plaintiff was a pre-trial detainee.

280.    As a pre-trial detainee, Plainitff was and is protected from deliberate indifference to her serious medical needs by the Colorado Constitution's due process clause.

281.    Plaintifff was and is also protected from conduct that is not rationally related to a legitimate nonpunitive governmental purpose or actions that appear objectively excessive in

relation to that purpose.

282.    Defendants knew that Plainitff has Gender Dysphoria, a serious medical need requiring treatment to avert a serious risk of physical and psychological harm. Defendants also knew that the medically accepted standards for the treatment of Gender Dysphoria are the Standards of Care.

283.    Defendants knew that the medically necessary treatments for Plainitff's Gender Dysphoria are hormone therapy in uninterrupted and therapeutic doses, accommodations related to her gender expression (including female undergarments, commissary items, and grooming allowances), and ongoing care and evaluations from mental health professionals qualified to treat Gender Dysphoria.

284.    Defendants knew that the Standards of Care require that Gender Dysphoria treatment be administered in a manner sufficient to alleviate severe symptoms, which in the case of Plaintiff include severe depression and self-harm.

285.    Despite this knowledge and Plainitff's repeated requests for care, Defendants refused to provide Plaintiff medically necessary treatment in deliberate indifference to her serious risk of harm.

286.    Defendants denied Plaintiff all ongoing care and evaluations from mental health professionals qualified to treat Gender Dysphoria and refused to provide her accommodations related to her gender expression. This included housing her in the men's unit of the El Paso County Jail and treating her in a manner inconsistent with her gender.

287.    Defendants provided Plainitff care that was so poor, cursory, grossly inadequate, and out of step with accepted professional norms that it constitutes a wanton infliction of pain, not medical treatment at all—placing Plaintiff at serious risk of harm.

288.    By failing to provide Plaintiff with treatment sufficient to alleviate her symptoms, Defendants failed to provide the minimally adequate care required to be provided to incarcerated transgender people.

289.    Defendants' actions and omissions, as described herein, done made without the exercise of any individualized medical judgment whatsoever—based on the decision to take an easier but less efficacious course of (non)treatment—and were so cursory and inadequate that they amount to no treatment at all.

290.    All of the deliberately indifferent acts of each individual Defendant were conducted within the scope of their official duties and employment.

291.    Each Defendants' acts or omissions of each Defendant were the legal and proximate cause of Plaintiff's injuries.

292.    Defendants' actions and inactions were taken in reckless and callous indifference to Plaintiff's protected rights.

293.    Defendants' acts or omissions were the legal and proximate cause of Plaintiff's damages in that she suffered physical pain and suffering, humiliation, and mental and emotional pain and anguish, and continues to suffer mental and emotional pain and anguish to this day and likely for the rest of her life.

294.    As a direct and proximate cause and consequence of the unconstitutional policies, procedures, customs, acts, inactions, and/or practices described above, Plaintiff suffered and continues to suffer injuries, damages and losses as set forth herein.

**TWELFTH CLAIM FOR RELIEF**
**C.R.S. § 13-21-131 – Colo. Const. Art. II, Section 20 – Cruel And Unusual Punishment**
**Conditions Of Confinement**
*Against Defendants Elder, John Doe, Jane Doe, Draper, Elder and Gillespie*

295.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

296.     Defendants were acting under color of state law at all times relevant to this action.

297.     Plaintiff was and is a pre-trial detainee.

298.     As a pre-trial detainee, Plainitff was and is protected from unconstitutional conditions of confinement.

299.     Plaintifff was and is also protected from conduct that is not rationally related to a legitimate nonpunitive governmental purpose or actions that appear objectively excessive in relation to that purpose.

300.     Each Defendant knew or should have known of these clearly established rights at the time of Plainitff's incarceration.

301.     Defendant Elder' policy of assigning all detained transgender individuals to housing units based on their genitalia as the default or sole criterion, without any individualized assessment of the individual's safety or gender identity, poses an excessive risk to Ms. Griffith's health and safety.

302.     Defendants knew that Plainitff was a transgender woman and that housing her in an all-male unit subjected her to a risk of sexual harrassment, sexual assault, and extreme emotional distress from being treated as a man given her Gender Dysphoria. They knew that this posed a substantial risk of serious harm to Plaintiff.

303.     Despite this knowledge, and Plainitff's repeated requests for a transfer, Defendants refused to house Plaintiff in a unit that conformed with her gender identity in deliberate indifference to a serious risk of harm to her.

304.    Defendants subjected Plaintiff to unconstitutional conditions of confinement by sexually harrassing and assaulting her.

305.    All of the deliberately indifferent acts of each individual Defendant were conducted within the scope of their official duties and employment.

306.    Defendants' actions and inactions were taken in reckless and callous indifference to Plaintiff's federally protected rights.

307.    Defendants' acts and omissions were the legal and proximate cause of Plaintiff's damages in that she suffered physical pain and suffering, humiliation, and mental and emotional pain and anguish, and continues to suffer mental and emotional pain and anguish to this day and likely for the rest of her life.

308.    As a direct and proximate cause and consequence of the unconstitutional policies, procedures, customs, acts, inactions, and/or practices described above, Plaintiff suffered and continues to suffer injuries, damages and losses as set forth herein.

**THIRTEENTH CLAIM FOR RELIEF**
**C.R.S. § 13-21-131 – Colo. Const. Art. II, Section 25 – Due Process**
**Conditions Of Confinement**
*Against Defendants Elder, John Doe, Jane Doe, Draper, Elder and Gillespie*

309.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

310.    Defendants were acting under color of state law at all times relevant to this action.

311.    Plaintiff was and is a pre-trial detainee.

312.    As a pre-trial detainee, Plainitff was and is protected from unconstitutional conditions of confinement.

313.    Plaintifff was and is also protected from conduct that is not rationally related to a legitimate nonpunitive governmental purpose or actions that appear objectively excessive in relation to that purpose.

314.    Each Defendant knew or should have known of these clearly established rights at the time of Plainitff's incarceration.

315.    Defendants Elder's policy of assigning all detained transgender individuals to housing units based on their anatomy as the default or sole criterion, without any individualized assessment of the individual's safety or gender identity, poses an excessive risk to Ms. Griffith's health and safety.

316.    Defendants knew that Plainitff was a transgender woman and that housing her in an all-male unit subjected her to a risk of sexual harrassment, sexual assault, and extreme emotional distress from being treated as a man given her Gender Dysphoria. They knew that this posed a substantial risk of serious harm to Plaintiff.

317.    Despite this knowledge, and Plainitff's repeated requests for a transfer, Defendants refused to house Plaintiff in a unit that conformed with her gender identity in deliberate indifference to a serious risk of harm to her.

318.    Defendants subjected Plaintiff to unconstitutional conditions of confinement by sexually harrassing and assaulting her.

319.    All of the deliberately indifferent acts of each individual Defendant were conducted within the scope of their official duties and employment.

320.    Defendants' actions and inactions were taken in reckless and callous indifference to Plaintiff's federally protected rights.

321.    Defendants' acts and omissions were the legal and proximate cause of Plaintiff's damages in that she suffered physical pain and suffering, humiliation, and mental and emotional pain and anguish, and continues to suffer mental and emotional pain and anguish to this day and likely for the rest of her life.

322.    As a direct and proximate cause and consequence of the unconstitutional policies, procedures, customs, acts, inactions, and/or practices described above, Plaintiff suffered and continues to suffer injuries, damages and losses as set forth herein

**FOURTEENTH CLAIM FOR RELIEF**
**U.S.C. § 12101, *et. seq.* – Americans with Disabilities Act**
**Disability Discrimination**
*Against Defendant El Paso County*

323.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

324.    Title II of the ADA provides that "[s]ubject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

325.    In particular, in providing any aid, benefit, or service, under Title II of the ADA, a public entity "may not ... [d]eny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit or service," "[a]fford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others," "[p]rovide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity . . . as that provided to others," or "[o]therwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others[.]" 28 C.F.R. § 35.130(b)(1)(i), (ii),

(iii), and (vii).

326.    A public entity "shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(7).

327.    A public entity may not (1) "impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary," 28 C.F.R.§ 35.130(b)(8); or (2) "utilize criteria or methods of administration … that have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability … or the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities." 28 C.F.R. § 35.130(b)(3)(i)(ii).

328.    A public entity is also prohibited from aiding and perpetuating discrimination against persons with disabilities in the programs, services, or activities it provides. 28 C.F.R. § 35.130(b)(1)(v).

329.    The ADA's "integration mandate" requires public entities to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d); 28 C.F.R. § 35.152(b)(2) (requiring that prisoners with disabilities be housed in the most integrated setting appropriate to their needs under the program access obligation); see also Guidance on ADA Regulation on Nondiscrimination on the Basis of Disability in State and Local Government Services, originally published July 26, 1991, 28 C.F.R. pt. 35, App. B ("Integration is fundamental to the purposes of the Americans with Disabilities Act. Provision of segregated accommodations and services

relegates persons with disabilities to second-class status.").

330.    Defendant El Paso County violated the rights of Plaintiff secured by Title II of the
ADA and its implementing regulations.

331.    El Paso County is currently, and at all times relevant to this action has been a
"public entity" as defined by the ADA, 42 U.S.C. § 12131(1)(B), and provides a "program,
service, or activity" within the meaning of the ADA, including educational and rehabilitative
programs and services.

332.    Plaintiff suffers from Gender Dysphoria, Developmental Trauma Disorder.

333.    Gender Dysphoria is not excluded under the ADA, 42 U.S.C. § 12211(b)(1),
because it is a gender identity disorder that results from a physical impairment. In 2015, the U.S.
Department of Justice concluded that, "[i]n light of the evolving scientific evidence suggesting
that Gender Dysphoria may have a physical basis, along with the remedial nature of the ADA
and the relevant statutory and regulatory provisions directing that the terms 'disability' and
'physical impairment' be read broadly, the [ADA's exclusion of gender identity disorders not
resulting from a physical impairment] should be construed narrowly such that Gender Dysphoria
falls outside its scope."[1]

334.    Alternatively, Gender Dysphoria is not excluded under the ADA because it is not
a "gender identity disorder" under 42 U.S.C. § 12211(b)(1)—it is a dysphoria.

335.    Because of the date of the actions complained of, the expanded definition of
"disability" under the Americans with Disabilities Act Amendments Act of 2008 ("ADAAA")
applies.

---

[1] Second Statement of Interest of the United States at 5, *Blatt v. Cabela's Retail, Inc.*, No. 5:14-cv-4822-JFL, 2015 WL 9872493 (E.D. Pa. Nov. 16, 2015).

336.    Under the ADAAA and DOJ regulations, the definition of disability is to be construed broadly in favor of expansive coverage. 42 U.S.C. § 12102(4)(A); 28 C.F.R. §§ 35.108(a)(2)(i), 35.108(d)(1)(i). Accordingly, the terms "substantially" and "major" in the definition of disability are to be interpreted consistently with the ADAAA's findings and purposes, which reinstate "the broad scope of protection intended to be afforded by the ADA" and convey Congress's intent "that the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis." 42 U.S.C. §§ 12102(4)(B), ADA Amendments Act of 2008, Pub. L. No. 110-325, §§ (2)(a)(5), (b)(5).

337.    In determining disability, the ADAAA requires that impairments must be assessed "without regard to the ameliorative effects of mitigating measures," such as medication, therapy, and reasonable accommodations. 42 U.S.C. § 12102(4)(E)(i).

338.    In determining disability, the ADAAA requires that impairments that are "episodic or in remission" must be assessed in their active state. 42 U.S.C. § 12102(4)(D).

339.    In determining disability, a "major life activity" includes "the operation of a major bodily function," including neurological, brain, and reproductive functions. 42 U.S.C. § 12102(2)(B).

340.    Under the ADAAA and DOJ regulations, "an individual meets the requirement of 'being regarded as having' an impairment that substantially limits one or more major life activities if the individual establishes that he or she has been subjected to an action prohibited under th[e ADA] because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. §§ 12102(3)(A); see also 28 C.F.R. § 35.108(f)(1); ADA Amendments Act of 2008, Pub. L. No. 110-325, § (2)(b)(3) (reinstating "broad view of the third prong" of the definition of disability).

Accordingly, no showing of substantial limitation of a major life activity is required under the regarded-as prong. 28 C.F.R. § 35.108(a)(2)(iii) ("[T]he 'regarded as' prong of the definition of "disability" . . . does not require a showing of an impairment that substantially limits a major life activity or a record of such an impairment.").

341.    Plaintiff's Gender Dysphoria substantially limits one or more major life activities, including her ability to care for herself, eating, sleeping, learning, concentrating, thinking, communicating, interacting with others, and reproducing, and also substantially limits the operation of major bodily functions, including neurological function, brain function, endocrine function, and reproductive function.

342.    Plaintiff has a record of Gender Dysphoria, which substantially limits one or more major life activities, including her ability to care for herself, eating, sleeping, learning, concentrating, thinking, communicating, interacting with others, and reproducing, and also substantially limits the operation of major bodily functions, including neurological function, brain function, endocrine function, and reproductive function.

343.    Plaintiff "meets the requirement of 'being regarded as having' an impairment that substantially limits one or more major life activities" because El Paso County excluded her from participation in and denied her the benefits of El Paso County's programs, services, and activities based on Gender Dysphoria, and also subjected her to discrimination based on Gender Dysphoria.

344.    Plaintiff is currently and at all times relevant to this action has been a "qualified individual with a disability" within the meaning of Title II of the ADA.

345.    As an inmate in the custody of El Paso County, Plaintiff was qualified to participate in El Paso County's programs, services, and activities. El Paso County provides these

services to other inmates committed to its custody.

346.    El Paso County failed to provide reasonable modification to its policies, procedures, and practices regarding Ms. Griffith, as it was legally required to do. 28 C.F.R. § 35.130(b)(7). El Paso County did not attempt accommodations such as increased mental health counseling.

347.    El Paso County failed to provide Plaintiff with intensive individual psychotherapy from a developmentally, psychodynamically, and trauma-oriented clinician with sensitivity to transgender issues.

348.    By virtue of the fact that El Paso County did not put these or other reasonable modifications in place, Plaintiff was discriminated against because of her disabilities.

349.    By confining Plainitff in the men's unit at the El Paso County Jail, a facility where staff members referred to Plaintiff using a male pronoun and her male given name and staff refused to permit Plainitff to wear her own gender's clothes and underwear, El Paso County subjected Plainitff to discrimination based on Gender Dysphoria.

350.    Defendants' actions and inactions were taken in reckless and callous indifference to the protected rights of Plaintiff.

351.    Defendants' acts or omissions were the legal and proximate cause of Plaintiff's damages in that she suffered physical pain and suffering, humiliation, and mental and emotional pain and anguish, and continues to suffer mental and emotional pain and anguish to this day and likely for the rest of her life.

352.    As a direct and proximate cause and consequence of the unconstitutional policies, procedures, customs, acts, inactions, and/or practices described above, Plaintiff suffered and continues to suffer injuries, damages and losses as set forth herein.

**FIFTEENTH CLAIM FOR RELIEF**
**U.S.C. § 701, *et. seq.* – Rehabilitation Act of 1973**
**Disability Discrimination**
*Against Defendant El Paso County*

353.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

354.    Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. . . ." 29 U.S.C. § 794(a).

355.    El Paso County accepts federal financial assistance and has done so at all times relevant to this complaint. El Paso County is therefore a "program . . . receiving Federal financial assistance" for purposes of the Rehabilitation Act. 214. The definition of disability is identical under the ADA and Rehabilitation Act, and the expanded definition of "disability" under the ADAAA applies with equal force to the definition of "disability" under Section 504 of the Rehabilitation Act. See ADA Amendments Act of 2008, Pub. L. No. 110-325, §7 (conforming Section 504 of Rehabilitation Act's definition of "disability," 29 U.S.C. § 705, to definition of disability "in section 3 of the Americans with Disabilities Act of 1990 (42 U.S.C. 12102))."

356.    Plaintiff suffers from Gender Dysphoria, which substantially limits one or more major life activities and also the operation of major bodily functions. Plaintiff "meets the requirement of 'being regarded as having' an impairment that substantially limits one or more major life activities" because El Paso County excluded her from participation in and denied her the benefits of El Paso County's programs, services, and activities based on Gender Dysphoria, and also subjected her to discrimination based on these impairments.

357.    Gender Dysphoria is not excluded under the Rehabilitation Act because it is a gender identity disorder that results from a physical impairment or, alternatively, it is not a gender identity disorder—it is a dysphoria.

358.    Plaintiff is currently and at all times relevant to this action has been a "qualified individual with a disability" for purposes of the Rehabilitation Act.

359.    By confining Plaintiff in the men's unit at the El Paso County Jail, a facility where staff members referred to Plaintiff using a male pronoun and her male given name and staff refused to permit Plainitff to wear her own gender's clothes and underwear, El Paso County subjected Plainitff to discrimination based on Gender Dysphoria in violation of Section 504 of the Rehabilitation Act.

360.    Defendants' actions and inactions were taken in reckless and callous indifference to Plaintiff's protected rights.

361.    Defendants' acts and omissions were the legal and proximate cause of Plaintiff's damages in that she suffered physical pain and suffering, humiliation, and mental and emotional pain and anguish, and continues to suffer mental and emotional pain and anguish to this day and likely for the rest of her life.

362.    As a direct and proximate cause and consequence of the unconstitutional policies, procedures, customs, acts, inactions, and/or practices described above, Plaintiff suffered and continues to suffer injuries, damages and losses as set forth herein.

**SIXTEENTH CLAIM FOR RELIEF**
**C.R.S. § 24-34-601, *et. seq.* – Colorado Anti-Discrimination Act**
**Sex and Transgender Discrimination**
*Against All Defendants*

363.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

364.    The Colorado Anti-Discrimination Act, C.R.S. § 24-34-601(2)(a) provides that it is a violation of Colorado law for any place of public accommodation to discriminate against any person based on sex or sexual orientation, including transgender status.[2]

365.    The El Paso County Jail is a place of "public accommodation" as defined under C.R.S. § 24-34-601(1). Defendants operate the facilities that house Plaintiff and are responsible for providing the full and equal enjoyment of its services, programs and benefits to the public regardless of the status of Plaintiff as a transgender woman.

366.    Defendants refuse to provide these services, programs and benefits of these public accommodations to Plaintiff because of her transgender status.

367.    Defendants provide these public accommodations to cisgender men and cisgender women but deny these services to transgender women because of their sex and transgender status.

368.    Defendants discriminate against Plaintiff on the basis of her sex and transgender status, in violation of Colorado law, and in so doing, cause Plaintiff serious physical and psychological harm, and subject them to an unreasonable risk of harm.

**SEVENTEENTH CLAIM FOR RELIEF**
**C.R.S. § 24-34-601, *et. seq.* – Colorado Anti-Discrimination Act**
**Disability Discrimination**
*Against All Defendants*

369.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

---

[2] Although sexual orientation and gender identity are separate concepts, C.R.S. § 24-34-301(7) defines "sexual orientation" as "an individual's orientation toward heterosexuality, homosexuality, bisexuality, or transgender status or another individual's perception thereof."

370.     The Colorado Anti-Discrimination Act, C.R.S. § 24-34-601(2)(a) provides that it is a violation of Colorado law for any place of public accommodation to discriminate against any person based the disability of that person.

371.     The El Paso County Jail is a place of "public accommodation" as defined under C.R.S. § 24-34-601(1). Defendants operate the facilities that house Plaintiff and are responsible for providing the full and equal enjoyment of its services, programs and benefits to the public regardless of the status of Plaintiff as a transgender woman.

372.     Defendants refuse to provide these services, programs and benefits of these public accommodations to Plaintiff because of her transgender status.

373.     Defendants provide these public accommodations to cisgender men and cisgender women but deny these services to transgender women because of their sex and transgender status.

374.     Defendants discriminate against Plaintiff on the basis of her sex and transgender status, in violation of Colorado law, and in so doing, her women serious physical and psychological harm, and subject them to an unreasonable risk of harm.

## EIGHTEENTH CLAIM FOR RELIEF
### Negligence
*Against Defendants Wellpath, Roe, and Mohr*

375.     Plaintiff hereby incorporates all other paragraphs of this Second Amended Complaint as if fully set forth herein.

376.     At all times relevant, Wellpath was a private corporation that contracted with El Paso County to provide medical care and mental health services to inmates at the El Paso County Jail, and Wellpath is not entitled to immunity under the CGIA.

377.    At all times relevant, Plaintiff was in the involuntary custody of the El Paso County Jail, and under the medical responsibility, care and treatment of Wellpath.

378.    Wellpath, and its employees Roe and Mohr, had a duty to provide reasonable medical care and treatment to detainees at the El Paso County Jail, including Plaintiff.

379.    Wellpath's employees, including Roe and Mohr, had a psychotherapist-patient relationship with Ms. Griffith at all relevant times and were acting within the scope of their employment throughout the duration of that relationship.

380.    With respect to their care and treatment of Plaintiff, Wellpath and its employees, including Roe and Mohr, owed her a duty to exercise the degree of care, skill, caution, diligence, and foresight exercised by and expected of mental health personnel in similar situations.

381.    Wellpath had a duty to exercise reasonable care in providing mental health care and treatment to the El Paso County Jail detainees, including Plaintiff, and to exercise reasonable care in the training and supervision of Wellpath's employees.

382.    These duties of care are informed by state law. Under Colo. Rev. Stat. § 16-3-401, prisoners arrested or in custody shall be treated humanely and provided with adequate food, shelter, and, if required mental health treatment. The provision of adequate mental health treatment and humane care is a statutory (as well as constitutional) obligation.

383.    Wellpath and its employees, including Roe and Mohr, breached their duty of care to Plaintiff and deviated from the standard of care they owed her when they failed to timely provide her with reasonably obtainable and necessary medical assessment, monitoring, care, and treatment.

384.    As a direct and proximate result of the Wellpath's, and its employees' (including Roe's and Mohr's), breach of their duty to provide reasonable care and treatment to Plaintiff, she

suffered significant physical and mental pain and suffering, permanent injury, and other damages.

385.    Wellpath is sued directly and indirectly for negligence, negligent supervision, and negligent training of its staff; for failing to ensure the provision of appropriate care in the treatment of Plaintiff; for the acts and omissions of its agents and/or employees; and for the herein described acts by its involved employees, agents, staff, and affiliates, who were acting within the scope and course of their employment.

386.    Wellpath is vicariously liable for the negligent acts and omissions by its non-physician agents and/or employees, including, but not limited to, those named individually herein, and those directly liable for negligent failures in training, policies, and practices.

387.    Wellpath is directly liable for breaching its duty to exercise reasonable care in its training and supervision of its employees and agents and El Paso County Jail staff in a manner that provided El Paso County Jail detainees with reasonable medical care and treatment.

388.    Wellpath knew or should have known that the lack of adequate supervision and training of its employees and agents, including Mohr, and El Paso County Jail staff was likely to harm El Paso County Jail detainees in need of medical care, like Plaintiff.

389.    In failing to exercise reasonable care in the training and supervision of its employees and agents and El Paso County Jail staff, as it relates to their providing reasonable medical care and treatment, Wellpath was negligent and proximately caused Plaintiff's harm.

390.    The negligent acts and omissions by Wellpath were a substantial and significant contributing cause of Ms. Griffith's injury and suffering, and it was reasonably foreseeable that these Wellpath and its employees' (including Mohr's) negligence would cause the harm or a similar harm that Plaintiff suffered.

391.    As a direct and proximate result of the negligent conduct of Wellpath and its employees, Plaintiff suffered significant permanent harm and physical and mental pain and suffering and other damages.

392.    Plaintiff suffered and continues to suffer economic and non-economic damages due to Wellpath's, and its employees', negligent conduct, including but not limited to economic damages for medical expenses and lost wages, and non-economic damages for impairment in the quality of his life, inconvenience, pain and suffering, and extreme emotional stress.

393.    Wellpath's, and its employees', conduct was attended by circumstances of malice, or willful and wanton conduct, which Wellpath and its employees must have realized was dangerous, or that was done recklessly, without regard to the consequences to Plaintiff.

394.    Wellpath and its employees consciously disregarded a substantial and unjustifiable risk that they knew or should have known would cause harm to another.[3]

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendants, and grant:

(a)    Appropriate declaratory and other injunctive and/or equitable relief;

(b)    Compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

(c)    All economic losses on all claims allowed by law;

---

[3] Given the circumstances of malice and willful and wanton conduct surrounding Wellpath's, and its employees', treatment of Plaintiff, Plaintiff anticipates seeking exemplary damages for Wellpath's, and its employees', negligence once Plaintiff has established prima facie proof of a triable issue of exemplary damages.

(d)      Punitive damages on all claims allowed by law and in an amount to be

determined at trial;

(e)      Attorney fees and the costs associated with this action on all claims allowed by

law;

(f)      Pre- and post-judgment interest at the lawful rate; and

(g)      Any further relief that this court deems just and proper, and any other relief as

allowed by law and equity.

**PLAINTIFF REQUESTS A TRIAL TO A JURY ON ALL ISSUES SO TRIABLE.**

Dated this 4th day of October 2021.

KILLMER, LANE & NEWMAN, LLP

*s/ Andy McNulty*

_____

Andy McNulty
Mari Newman
1543 Champa St., Ste. 400
Denver, CO 80202
Phone: (303) 571-1000
Fax: (303) 571-1001
amcnulty@kln-law.com
mnewman@kln-law.com

ATTORNEYS FOR PLAINTIFF