IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 21-cv-00387-NRN

DARLENE GRIFFITH,

    Plaintiff,

v.

EL PASO COUNTY, COLORADO, *et al.*,

    Defendants.

___

**MOTION FOR PRELIMINARY INJUNCTION, EXPEDITED BRIEFING SCHEDULE, AND EXPEDITED HEARING**
___

    Plaintiff, by and through counsel Andy McNulty and Mari Newman of KILLMER, LANE & NEWMAN, LLP, requests that this Court issue a preliminary injunction (after expedited briefing and holding an expedited evidentiary hearing, if necessary), and states in support as follows:

1. **INTRODUCTION**

    This case is "about protecting the rights of transgender people in public spaces and not forcing them to exist on the margins." *G.G. v. Gloucester Cty. Sch. Bd.*, 853 F.3d 729, 730 (4th Cir. 2017) (Davis, J., concurring). It is a case that is, at its core, "about governmental validation of the existence and experiences of transgender people, as well as the simple recognition of their humanity." *Id.* Far from isolated, this case "is part of a larger movement that is redefining and broadening the scope of civil and human rights so that they extend to a vulnerable group that has traditionally been unrecognized, unrepresented, and unprotected." *Id.* Plaintiff Darlene Griffith, a transgender woman, asks this Court to take her plight, and the plight of countless transgender prisoners throughout this state and nation, seriously by allowing her to be housed in a unit within the El Paso County Jail that conforms with her identity as a transgender woman. In doing so, she

1

asks this Court to rebuke the inherent "inequities that arise when the government organizes society by outdated constructs like biological sex and gender," and uphold her constitutional rights just as the Court would a cisgender man or woman. *Id.*

Ms. Griffith has suffered repeated sexual harassment, sexual assault, denial of medical and mental health care, and discrimination as a result of Defendant El Paso County's policy of housing transgender inmates based on solely on their genitalia and sex assigned at birth. Despite repeated requests that El Paso County house her in accordance with her gender identity in a female unit, Ms. Griffith remains languishing in an all-male unit in the El Paso County Jail. Because she is housed in an all-male unit, she is subjected to daily indignities that cause her ongoing emotional, and constitutional, harm. Defendants' refusal to house Ms. Griffith in accordance with her gender identity continues to violate her constitutional rights on a daily basis.

Ms. Griffith asks this Court to issue a preliminary injunction in her favor. Because every day that she is housed in a unit that does not conform with her gender identity is another day of discrimination, Ms. Griffith also asks that this Court consider this motion within an expedited briefing schedule and hold an expedited evidentiary hearing, if necessary.

2. **NOTICE TO DEFENDANT AND CERTIFICATE OF CONFERRAL UNDER D.C.COLO.LCIVR 7.1**

Via email on October 13, 2021 and via phone on October 15, 2021, counsel for Plaintiff gave notice of their intent to file this action to the counsel for Defendants in compliance with Fed.R.Civ.P. 65 and D.C.COLO.LCivR 65.1. Counsel for Defendants, Nathan Whitney, who stated that Defendants oppose the relief requested herein.

3. **REQUEST FOR RELIEF**

Plaintiff asks that this Court require that Defendants El Paso County, Sheriff Elder, and Commander Gillespie: (1) house Ms. Griffith in a unit within the El Paso County Jail that conforms with her transgender female gender identity; (2) allow Ms. Griffith access to clothing

2

and feminine grooming products that conform with her gender identity; and (3) classify Ms. Griffith within all El Paso County systems in accordance with her gender identity. Multiple other courts have ordered similar relief to that requested here. *See Tay v. Dennison*, 457 F. Supp. 3d 657, 690 (S.D. Ill. 2020); *Hampton v. Baldwin*, No. 3:18-CV-550-NJR-RJD, 2018 U.S. Dist. LEXIS 190682, at *52-53 (S.D. Ill. Nov. 7, 2018).

4. **FACTUAL BACKGROUND**[1]

Ms. Griffith has been diagnosed with Gender Dysphoria and has been living as an openly transgender woman for over twenty years. As part of her medically-supervised treatment, she changed her name and altered her physical appearance to conform to her female gender identity, including dressing in feminine attire, using feminine grooming products, and taking feminizing hormones which caused her to develop female secondary sex characteristics such as breasts, soft skin, a lack of facial hair, and other characteristics typically associated with women.

When a transgender person's Gender Dysphoria is left untreated, or is inadequately treated, the consequences can be dire. Symptoms of untreated Gender Dysphoria often include intense emotional suffering, anxiety and depression, suicidality, and thoughts or acts of self-harm. All of those symptoms can be mitigated, and often prevented altogether, for transgender people with access to appropriate care. Ms. Griffith has engaged in multiple acts of self-harm since childhood, specifically self-castration behavior, when her Gender Dysphoria has not been accommodated and treated.

When Ms. Griffith first entered El Paso County Jail on July 20, 2020, she was an openly transgender woman with a feminine appearance. During her intake screening, she notified El Paso County Jail personnel that she was a transgender woman receiving hormone therapy for her

---

[1] Plaintiff anticipates being able to establish these facts at a preliminary injunction hearing in this matter.

3

diagnosed Gender Dysphoria. Ms. Griffith explicitly requested placement in a women's facility because she feared being sexually abused and assaulted in male facilities by both deputies and inmates. She also knew that being housed in an all-male unit would result in the humiliation and risk of sexual assault of being constantly searched by male deputies, and the general degradation of being considered a man when she is a transgender woman. Not only did Ms. Griffith request housing in a female unit upon arrival, but she has continuously requested that she be placed in a unit that conformed with her gender identity since entering the El Paso County Jail. She has filed multiple grievances seeking to be housed in a unit that corresponds with her gender identity.

Despite Ms. Griffith's near-constant attempts to be housed in a unit that conforms with her gender identity, El Paso County continues to house Ms. Griffith, and other transgender women in its custody, in male units within the El Paso County Jail as a matter of official policy, which dictates that everyone will be housed in a unit that corresponds to their genitalia and birth sex. The decision to house Ms. Griffith in a male unit that does not conform with her gender identity has exacerbated symptoms of her Gender Dysphoria leading her to suffer significant emotional distress and have increased ideation of self-harm. El Paso County officials denied Ms. Griffith's requests, despite knowing the risks she faced, and subjected her to a terrible sequence of constitutional violations over the last year.

For example, because Ms. Griffith was not housed in accordance with her gender identity, or classified in El Paso County's system in accordance with her female gender identity, upon intake to the El Paso County Jail, she was strip-searched by a male deputy. The male deputy ordered Ms. Griffith to take off her socks, pants, and panties, and then place her hands on the wall. The male deputy then told Ms. Griffith to step back, bend over, and "spread [her] sexy cheeks." Ms. Griffith protested the deputy's use of this derogatory language, but complied with his directive. The male deputy then told Ms. Griffith that he was "going to go balls deep in that ass"

4

while grabbing his own penis in view of Ms. Griffith. The male deputy was extremely aggressive while searching Ms. Griffith's genitals and making these disgusting and threatening statements.

Additionally, because Ms. Griffith was not housed in accordance with her gender identity, or classified in El Paso County's system in accordance with her female gender identity, she has been subject to multiple other searches by male deputies, both routine and non-routine. On one occasion, a male deputy grabbed Ms. Griffith's breasts and began to fondle them. Then, he ran his hands on the inside of Ms. Griffith's thigh and slammed his hand against her crotch. Later, after doing the same thing again, the deputy directed Ms. Griffith to lift up her shirt to expose her breasts.

Furthermore, because Ms. Griffith was not housed in accordance with her gender identity, or classified in El Paso County's system in accordance with her female gender identity, El Paso County officials have routinely referred to Ms. Griffith using male pronouns. Throughout her incarceration at the El Paso County Jail, sergeants and deputies have mis-gendered Ms. Griffith and used language that does not conform with her gender identity. And, documentation maintained by El Paso County, whether in case management, mental health, or medical files, routinely refers to Ms. Griffith as "male" or using male pronouns, despite Ms. Griffith clearly putting El Paso County on notice that she belongs to the community of transgender women.

Finally, because Ms. Griffith was not housed in accordance with her gender identity, or classified in El Paso County's system in accordance with her female gender identity, El Paso County has customarily denied Ms. Griffith the ability to dress in accordance with her gender identity. Ms. Griffith was forced to leave her breasts without a bra, to be ogled by male inmates and deputies, for approximately a month on intake. After that month, Ms. Griffith was given a sports bra, but was told that she would only receive one sports bra, and no panties, because she did not need to "hold female products down there." After multiple grievances, which were denied,

Defendant Gillespie told Ms. Griffith that she would never get panties in the El Paso County Jail. Ms. Griffith has also been denied the ability to purchase lipstick because she is a transgender woman. Cisgender women are allowed to purchase lipstick at the commissary. Defendant Gillespie specifically told Ms. Griffith that she could not purchase lipstick pursuant to El Paso County Jail policy.

These customary forms of discrimination were all caused by Defendant El Paso County's, Defendant Elder's, and Defendant Gillespie's decisions to house of Ms. Griffith in an all-male unit and classify her in the El Paso County system as man and not as a transgender woman.

5. **ARGUMENT**

To succeed on a typical preliminary-injunction motion, the moving party needs to prove four things: (1) that she's substantially likely to succeed on the merits, (2) that she'll suffer irreparable injury if the court denies the injunction, (3) that her threatened injury (without the injunction) outweighs the opposing party's under the injunction, and (4) that the injunction isn't adverse to the public interest. *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 797 (10th Cir. 2019). Ms. Griffith meets all of these factors.

5.1 **Ms. Griffith is likely to succeed on the merits of her Fourteenth Amendment claim.**

The Equal Protection Clause of the Fourteenth Amendment directs that "all persons similarly situated should be treated alike," thereby protecting against intentional discrimination by way of classifications that reflect "a bare . . . desire to harm a politically unpopular group." *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1050 (7th Cir. 2017) (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)). Defendants' decision to disregard Ms. Griffith's identity as a transgender woman, and instead treat her as a male inmate, continues to violate her Fourteenth Amendment rights.

6

### 5.1.1 **Defendants engaged in sex- and gender-based discrimination against Ms. Griffith.**

Refusing to allow transgender individuals to use public facilities that correspond with their gender identities is sex- and gender-based discrimination under the Fourteenth Amendment. *Adams v. Sch. Bd.*, 968 F.3d 1286, 1302 (11th Cir. 2020); *Grimm v. Gloucester Cty. Sch. Bd.*, 976 F.3d 399, 402 (4th Cir. 2020); *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1048-49 (7th Cir. 2017). And, multiple courts have held that when an inmate is "placed in a facility based on their genitalia" that "a sex-based classification is used, and intermediate scrutiny must be applied." *Hampton v. Baldwin*, No. 3:18-CV-550-NJR-RJD, 2018 U.S. Dist. LEXIS 190682, at *32-37 (S.D. Ill. Nov. 7, 2018); *Tay v. Dennison*, 457 F. Supp. 3d 657, 690 (S.D. Ill. 2020); *Doe v. Mass. Dep't of Corr.*, No. 17-12255-RGS, 2018 U.S. Dist. LEXIS 99925, at *25 (D. Mass. June 14, 2018) (holding that a transgender prisoner's "compulsory assignment to a men's prison caused Doe to be treated differently from other female prisoners"). Defendants have discriminated against Ms. Griffith in the same way by housing her in an all-male unit, and denying her access to women's facilities, solely based on her transgender status. A similarly situated woman to Ms. Griffith would not be housed in an all-male facility.

Moreover, Defendants have discriminated against Ms. Griffith by denying her items that cisgender women have access to, including clothing and grooming products, solely based on her transgender status. The United States Supreme Court has long held that sex stereotyping based on preconceived notions about the appropriate dress for men and women is intolerable sex discrimination. *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989); *Smith v. City of Salem*, 378 F.3d 566, 574 (6th Cir. 2004) ("After *Price Waterhouse*, an employer who discriminates against women because, for instance, they do not wear dresses or makeup, is engaging in sex discrimination because the discrimination would not occur but for the victim's sex."); *Dawson v.*

7

*Bumble & Bumble*, 398 F.3d 211, 221 (2d Cir. 2005) (recognizing that one can fail to conform to gender stereotypes through appearance).

Simply put, "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1741 (2020). Ms. Griffith can easily demonstrate that Defendants' actions continue to constitute sex- and gender-based discrimination.

### 5.1.2 Ms. Griffith, as a transgender woman, is a member of a suspect, or quasi-suspect, class.

While the Tenth Circuit has not determined that transgender individuals constitute a suspect or quasi-suspect class, a growing consensus of courts have held as much. *See, e.g., Grimm*, 972 F.3d at 610-13 (holding that transgender people constitute a quasi-suspect class); *Crowder v. Diaz*, No. 2:17-CV-1657-TLN-DMC, 2019 U.S. Dist. LEXIS 140306, at *30 (E.D. Cal. Aug. 16, 2019) (same); *Evancho v. Pine-Richland Sch. Dist.*, 237 F. Supp. 3d 267, 288 (W.D. Pa. 2017); *Adkins v. City of New York*, 143 F. Supp. 3d 134, 139 (S.D.N.Y. 2015) (same); *Bd. of Educ. of the Highland Local Sch. Dist. v. U.S. Dep't of Educ.*, 208 F. Supp. 3d 850, 873 (S.D. Ohio 2016) (same); *M.A.B. v. Bd. of Educ.*, 286 F. Supp. 3d 704, 718-19 (D. Md. 2018) (same); *Norsworthy v. Beard*, 87 F. Supp. 3d 1104, 1119 (N.D. Cal. 2015) (same); *F.V. v. Barron*, 286 F. Supp. 3d 1131, 1145 (D. Idaho 2018) (same); *Karnoski v. Trump*, 2018 U.S. Dist. LEXIS 63563, 2018 WL 1784464 (W.D. Wash. Apr. 13, 2018) (same); *see also Flack v. Wis. Dept. of Health Servs.*, 328 F. Supp. 3d 931, 951-53 (W.D. Wis. 2018) (explaining in a ruling on a preliminary injunction why heightened scrutiny would likely apply to transgender persons).

And, when evaluating transgender individuals under the four-factor test outlined for determining whether a class qualifies as suspect or quasi-suspect, it becomes clear that discrimination against transgender individuals merits heightened scrutiny. Heightened scrutiny is

appropriate when the class being discriminated against: (1) has been "historically subjected to discrimination," (2) has a defining characteristic bearing no "relation to ability to perform or contribute to society," (3) has "obvious, immutable, or distinguishing characteristics," and (4) is a "minority or is politically powerless." *Windsor v. United States*, 699 F.3d 169, 181 (2d Cir. 2012), *aff'd on other grounds*, 570 U.S. 744 (2013); *see also Bowen v. Gilliard*, 483 U.S. 587, 602 (1987); *Cleburne*, 473 U.S. at 440-41. Transgender individuals, like Ms. Griffith, meet all of these criteria.

First, "[i]t is generally accepted that transgender individuals face an alarming rate of discrimination, harassment, and violence." *Crowder*, 2019 U.S. Dist. LEXIS 140306, at *32-35;[2] *see also Grimm v. Gloucester Cty. Sch. Bd.*, 302 F. Supp. 3d 730, 749 (E.D. Va. 2018). For example, the transgender community "suffers from high rates of employment discrimination, economic instability, and homelessness." *Grimm*, 972 F.3d at 611. Additionally, transgender individuals frequently experience harassment in places such as schools, medical settings, and retail stores, while also experiencing physical assault in places such as schools and places of public accommodation, at high levels and being disproportionate victims of violent crime. *Id.* "In the prison context, the [Prison Rape Elimination Act ("PREA")] exposed heightened risk of sexual assault against LGBTQI prisoners and the atypical severity of punishments LGBTQI people face solely for being themselves" and "transgender inmates are thirteen times more likely to be assaulted than other prisoners." *Crowder*, 2019 U.S. Dist. LEXIS 140306, at *33. And, the El Paso County Jail's treatment of Ms. Griffith is an exemplar of how "current measures and policies continue to target transgender persons for differential treatment." *Grimm*, 972 F.3d at 611.

---

[2] Citing Jaime M. Grant et al., *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey*, Nat'l Center for Transgender Equality (2011), available at https://www.transequality.org/sites/default/files/docs/resources/NTDS_Report.pdf.

9

Second, in *Windsor*, the Second Circuit concluded "the aversion homosexuals experience has nothing to do with aptitude or performance." 699 F.3d at 182-83. "The same can be said of discrimination leveled at transgender people." *Crowder*, 2019 U.S. Dist. LEXIS 140306, at *35; *Grimm*, 972 F.3d at 611.

Third, the Fourteenth Amendment is meant to protect citizens from discrimination based on circumstances beyond their control. *See Plyler*, 457 U.S. at 216 n.14. "[B]eing transgender is not a choice." *Grimm*, 972 F.3d at 612. At least three courts, based on substantial evidence, have acknowledged that gender identity is biologically determined. *Id.*; *Crowder*, 2019 U.S. Dist. LEXIS 140306, at *35-36; *Doe v. McConn*, 489 F. Supp. 76, 78 (S.D. Tex. 1980) ("These findings indicate that the transsexual has not made a choice to be as he is, but rather that the choice has been made for him through many causes preceding and beyond his control"). And, "given the discrimination transgender individuals face, it is illogical to assert that a person would actively choose this 'lifestyle.'" *Crowder*, 2019 U.S. Dist. LEXIS 140306, at *35-36 (quoting *Hernandez-Montiel v. Immigration & Naturalization Serv.*, 225 F.3d 1084, 1095 (9th Cir. 2000) (stating a transgender asylum applicant's female sexual identity "must be fundamental, or [s]he would not have suffered this persecution and would have changed years ago")).

Fourth, "transgender people constitute a minority lacking political power" given that "approximately 0.6% of the adult population in the United States" identifies as transgender. *Grimm*, 972 F.3d at 612. "[T]ransgender persons are underrepresented and have not gained positions of significant power" and "no acknowledged transgender person has ever held a significant position in Congress or the federal judiciary." *Crowder*, 2019 U.S. Dist. LEXIS 140306, at *36-37 (citing *Adkins*, 143 F. Supp. 3d at 140 ("[T]here is no indication that there have ever been any transgender members of the United States Congress or the federal judiciary.") and *M.A.B.*, 286 F. Supp. 3d at 721 ("Only two openly transgender candidates have ever been

10

elected; both won seats in a state legislature.")). Importantly, "the examples of discrimination" against transgender individuals (which this case represents) "affirm what we intuitively know: Transgender people constitute a minority that has not yet been able to meaningfully vindicate their rights through the political process." *Grimm*, 972 F.3d at 612.

For these reasons, this Court should join the growing consensus of courts that have held "transgender persons constitute a quasi-suspect class" and discrimination against them is subject to heightened scrutiny. *Id*. at 613.

### 5.1.3 Defendants' decision to disregard Ms. Griffith's gender identity, and instead treat her as a male inmate, was not substantially related to an important interest.

Under intermediate scrutiny, "classifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives" in order to be upheld. *Craig v. Boren*, 429 U.S. 190, 197 (1976). "When a sex-based classification is used, the burden rests with the state to demonstrate that its proffered justification is 'exceedingly persuasive.'" *Whitaker*, 858 F.3d at 1050 (citing *United States v. Virginia*, 518 U.S. 515, 533 (1996)). "It is not sufficient to provide a hypothesized or *post hoc* justification created in response to litigation." *Id.* The Tenth Circuit has recognized that "[a]t least since *Virginia*, [the arc of the Supreme Court's equal protection jurisprudence] bends toward requiring more—not less—judicial scrutiny when asserted physical differences are raised to justify gender-based discrimination[.]" *Free the Nipple-Fort Collins*, 916 F.3d at 805. Ultimately, the question this Court must answer is whether Defendants' "policy of placing transgender inmates in the prison of their assigned sex at birth [is] substantially related to the achievement of prison security?" *Hampton*, 2018 U.S. Dist. LEXIS 190682, at *32-37. The answer to that question is a resounding no.

Ms. Griffith was given no reason for her assignment to an all-male unit other than the fact that she has male genitalia and her sex assigned at birth was male. There is no evidence that Ms.

Griffith, individually, presents a security concern or that transgender inmates generally pose a greater security threat than cisgender inmates. *Mass. Dep't of Corr.*, 2018 U.S. Dist. LEXIS 99925, 2018 WL 2994403, at *10 (citing *Virginia*, 518 U.S. at 531 and holding that "generalized concerns for prison security are insufficient to meet the 'demanding' burden placed on the State to justify sex-based classifications"). Given the lack of any justification for housing Ms. Griffith in an all-male unit other than her genitalia and sex assigned at birth, that classification does not pass intermediate scrutiny.

Therefore, based on substantial precedent, it is clear that Defendants will not be able to establish that Plaintiff's placement in an all-male unit is substantially related to an important government interest. *See Tay*, 457 F. Supp. 3d at 682 (holding that a transgender prisoner's placement in a men's prison was not substantially related to an important government interest even though the prisoner had a history of violent behavior); *Hampton*, 2018 U.S. Dist. LEXIS 190682, 2018 WL 5830730, at *12 (finding that a transgender female inmate's equal protection claim based on her placement in a men's prison had a "greater than negligible chance of success on the merits"); *see also Mass. Dep't of Corr.*, 2018 U.S. Dist. LEXIS 99925, 2018 WL 2994403, at *9 (refusing to dismiss transgender woman prisoner's equal protection claim because "[t]he court agrees with Doe that for present purposes the DOC has not met its burden of demonstrating that housing her and other similarly-situated transgender prisoners in facilities that correspond to their birth sex serves an important governmental interest"); *Norsworthy*, 87 F. Supp. 3d at 1120 (finding that a transgender woman prisoner adequately stated equal protection claim against prison officials for denying her sex reassignment surgery).

> 5.2 **Ms. Griffith is likely to succeed on the merits of her claim under the Colorado Constitution's Equal Rights Amendment.**

Defendants' decision to disregard Ms. Griffith's gender identity, and instead treat her as a male inmate, continues to violate the Colorado Constitution's Equal Rights Amendment. In Colorado, classifications based solely on sex are prohibited. Colo. Const. Art. II, Section 29. "This amendment prohibits unequal treatment based exclusively on the circumstance of sex, social stereotypes connected with gender, and culturally induced dissimilarities." *People v. Salinas*, 551 P.2d 703, 705 (Colo. 1976). Importantly, the Equal Rights Amendment requires that any "classifications based exclusively on sexual status receive the closest judicial scrutiny." *People v. Green*, 183 Colo. 25, 514 P.2d 769 (1973).

While there is little jurisprudence in Colorado on the Equal Rights Amendment and its application in the prison context, looking at an analogue situation in federal law is instructive. When the government discriminates on the basis of race in prisoner placement, the Fourteenth Amendment (like the Equal Rights Amendment) requires strict scrutiny. *See Johnson v. California*, 543 U.S. 499, 512 (2005); *Lee v. Washington*, 390 U.S. 333, 333 (1968). And, in applying strict scrutiny, the Supreme Court has explicitly stated that under strict scrutiny analysis, "[t]he purpose of the narrow tailoring requirement is to ensure that 'the means chosen 'fit' th[e] compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype.'" *Grutter v. Bollinger*, 539 U.S. 306 (2003) (quoting *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989)). While "necessities of prison security and discipline are a compelling government interest" they only justify "those uses of race [or, in this case, gender] that are narrowly tailored to address those necessities." *Johnson*, 543 U.S. at 512 (cleaned up). And, ultimately, the burden is squarely on the government to establish both that its interest is compelling and that its means are narrowly tailored. *Grutter*, 539 U.S. at 306.

What does strict scrutiny mean in practice? Well, Justice Scalia posited that "only a social emergency rising to the level of imminent danger to life and limb--for example, a prison race riot,

13

requiring *temporary* segregation of inmates--can justify an exception to the principle embodied in the Fourteenth Amendment that '[o]ur Constitution is color-blind, and neither knows nor tolerates classes among citizens[.]'" *J. A. Croson Co.*, 488 U.S. at 521 (Scalia, J., concurring in judgment) (emphasis added) (quoting *Plessy v. Ferguson*, 163 U.S. 537, 559 (1896) (Harlan, J., dissenting)). Defendants can not meet their burden of showing that their decision to place Ms. Griffith in an all-male dorm was narrowly tailored to a compelling government interest. And, it is absolutely clear that Ms. Griffith was not only temporarily housed in an all-male unit because of an immediate threat of violence. At least under Justice Scalia's conception of strict scrutiny, Ms. Griffith's automatic placement in an all-male unit based on her status as a transgender, rather than cisgender, woman was not narrowly tailored to a compelling government interest and, therefore, Ms. Griffith is likely to succeed on the merits of her Equal Rights Amendment claim.

### 5.3 Stopping the violation of Ms. Griffith's constitutional rights prevents irreparable harm, is consistent with the balance of the equities in this case, and does not harm the public interest.

Where, as here, Ms. Griffith demonstrates that her constitutional rights have been violated, it follows that granting injunctive relief: (1) prevents irreparable harm, (2) is consistent with the balance of the equities in this case, and (3) is in the public interest. *Free the Nipple-Fort Collins*, 916 F.3d at 806-07. First, "well-settled law supports the constitutional-violation-as-irreparable-injury principle." *Id.* at 806 (citing *Elrod v. Burns*, 427 U.S. 347, 373-74 (1976) and *Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012)); *Obergefell v. Hodges*, 135 S. Ct. 2584, 2606 (2015) ("Dignitary wounds cannot always be healed with the stroke of a pen."); *Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001) (When an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.").[3] Second, when a constitutional right

---

[3] Even if this Court does not accept the constitutional-right-as-irreparable-harm principle, Ms. Griffith has clearly suffered irreparable harm through the harassment and discrimination she has

hangs in the balance "even a temporary loss [of that right] usually trumps any harm to the defendant." *Free the Nipple-Fort Collins*, 916 F.3d at 806; *see also Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114 (10th Cir. 2013). Third, "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012); *Free the Nipple-Fort Collins*, 916 F.3d at 807. For these reasons, the last three factors tip strongly in favor of granting Ms. Griffith a preliminary injunction.

    5.4 **This Court should not require bond.**

Under Rule 65(c) of the Federal Rules of Civil Procedure, district courts have discretion to determine the amount of the bond accompanying a preliminary injunction, and this includes the authority to set a nominal bond. *Denver Homeless Out Loud v. Denver, Co.*, 514 F. Supp. 3d 1278, 1307 (D. Colo. 2021); *McDonnell v. City & Cty. of Denver*, 238 F. Supp. 3d 1279, 1306 (D. Colo. 2017); *see* 11A Charles Alan Wright et al., Federal Practice & Procedure § 2954 n.29 (3d ed., Apr. 2017 update) (citing public rights cases where the bond was excused or significantly reduced). In this case, the Court should waive bond because Ms. Griffith is indigent, *Pocklington v. O'Leary*, 1986 WL 5748, at *2 (N.D. Ill. May 6, 1986), the requested interim relief is in the public interest, *Davis v. Mineta*, 302 F.3d 1104, 1126 (10th Cir. 2002), and the injunction is necessary to vindicate constitutional rights. *Complete Angler, L.L.C. v. City of Clearwater*, 607 F.Supp.2d 1326, 1335 (M.D. Fla. 2009).

6. **CONCLUSION**

For the above-stated reasons, Plaintiff's Motion For Preliminary Injunction should be granted in its entirety.

---

faced in the all-male unit. *Hampton*, 2018 U.S. Dist. LEXIS 190682, 2018 WL 5830730, at *15 (finding that transgender prisoner faced irreparable harm where her mental health was at risk of "degrading further" due to daily verbal harassment and discrimination by prison staff); *Tay*, 457 F. Supp. 3d at 687.

Dated: October 15, 2021

          KILLMER, LANE & NEWMAN, LLP

          */s/ Andy McNulty*
          Andy McNulty
          Mari Newman
          1543 Champa St., Ste. 400
          Denver, CO 80202
          Phone: (303) 571-1000
          Facsimile: (303) 571-1001
          amcnulty@kln-law.com
          mnewman@kln-law.com

          COUNSEL FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I hereby certify that on October 15, 2021, I electronically filed the foregoing **MOTION FOR PRELIMINARY INJUNCTION, EXPEDITED BRIEFING SCHEDULE, AND EXPEDITED HEARING** with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Nathan J. Whitney
Terry Sample
Chris Strider
County Attorney's Office
El Paso County
nathanwhitney@elpasoco.com
terrysample@elpasoco.com
chrisstrider@elpasoco.com

*Counsel for Defendants*

                                                                                            KILLMER, LANE & NEWMAN, LLP

                                                                                            *s/ Andy McNulty*

                                                                                            Andy McNulty

17