## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 21-cv-00387-NRN

DARLENE GRIFFITH

Plaintiff,

v.

EL PASO COUNTY, COLORADO, e*t al.*

Defendants.

---

## DEFENDANTS' MOTION TO DISMISS THIRD AMENDED COMPLAINT
## PURSUANT TO FED. R. CIV. P.  12(b)(1) and (6)

---

Defendants El Paso County ("El Paso County"), Bill Elder ("Elder"), Cy Gillespie ("Gillespie"), Dawne Elliss ("Elliss"), Andrew Mustapick ("Mustapick"), Elizabeth O'Neal ("O'Neal"), Brande Ford ("Ford"), and Tiffany Noe ("Noe") (collectively the "Defendants"), through the Office of the County Attorney of El Paso County, Colorado, move to dismiss Plaintiff's Third Amended Complaint (Doc. 124, the "Complaint") under Fed. R. Civ. P. 12(b)(1) and (6) as follows:

### CERTIFICATION OF CONFERRAL

The Parties have conferred about Plaintiff Darlene Griffith's ("Plaintiff's") allegations, including during a settlement conference and via telephone on June 28, 2022. The parties do not believe any further amendment of the Complaint is warranted. Plaintiff opposes this Motion.

## I.   <u>INTRODUCTION</u>

Plaintiff is a transgender female who has been diagnosed with Gender Dysphoria. In the Complaint, Plaintiff asserts 16 claims for relief under federal and state laws alleging that: (i) during intake into the El Paso County Criminal Justice Center ("CJC"), she was misgendered by the female deputy who visually searched her upper torso, and verbally harassed and threatened by the male deputy who visually searched her lower torso; (ii) she asked to be housed in a female ward but was housed in a male ward instead, where she was sexually assaulted by a male inmate, misgendered by deputies, and subject to pat down searches by male deputies; and (iii) she was denied access to female undergarments. While the Defendants vigorously deny many of Plaintiff's allegations, Fed. R. Civ. P. 12(b)(6) mandates they be accepted as true for purposes of this Motion. Even so, Plaintiff's allegations do not state viable constitutional or statutory violations and do not implicate clearly established rights. The Defendants respectfully ask the Court to grant this Motion and dismiss Plaintiff's claims against them.

## II.  <u>MATERIAL ALLEGATIONS</u>

The Complaint is 55 pages long with 347 individually numbered paragraphs, yet it contains surprisingly few material allegations. These allegations are summarized below.

### A.  <u>Material Allegations Related to Plaintiff's Housing Classification</u>

Plaintiff is a transgender woman who has been diagnosed with Gender Dysphoria. (Doc. 124, ¶ 2) Elder is the elected sheriff of the El Paso County Sheriff's Office ("EPSO") and is responsible for running CJC. (*Id.* at ¶ 14) Gillespie is an EPSO Commander responsible for overseeing CJC's operations. (*Id.* at ¶ 15, 42)

Plaintiff entered CJC on July 20, 2020, as a pretrial detainee and an openly transgender woman with a feminine appearance. (*Id.* at ¶ 47) During the intake process, Plaintiff informed unidentified individuals at CJC that she is a transgender woman diagnosed with Gender Dysphoria and requested placement in the women's ward because she feared abuse, being misgendered, and being searched by male deputies. (*Id.* at ¶ 48)

Separately during intake into CJC, Noe classified Plaintiff into a men's ward "despite knowing that [Plaintiff] is a transgender woman and that [Plaintiff] wished to be placed into [a women's ward]." (*Id.* at ¶ 54) Plaintiff does not plausibly allege that Noe knew of Plaintiff's Gender Dysphoria diagnosis or her fear that she would be abused, misgendered, or searched by male deputies in the men's ward.

On July 29, 2020, Ford did an ADA interview with Plaintiff during which Plaintiff informed Ford that she wished to be placed in a women's ward because "[i]t was clear to [Ford]" that Plaintiff is a transgender woman (*Id.* at ¶ 55) Ford wrote in Plaintiff's records that there were no disability concerns related to Plaintiff's housing. (*Id.*) Plaintiff does not plausibly allege that Ford knew of Plaintiff's Gender Dysphoria diagnosis or her fear that she would be abused, misgendered, or searched by male deputies in the men's ward.

On October 29, 2020, Plaintiff submitted a grievance "which she believed would be transmitted to [] Gillespie" requesting placement in a women's ward "because she is a transgender woman." (*Id.* at ¶ 57) The grievance also stated that Plaintiff had been placed in a women's ward in a different facility. (*Id.*) O'Neal, not Gillespie, denied Plaintiff's request to be placed in the women's ward. (*Id.*) Plaintiff does not plausibly allege that

O'Neal knew of Plaintiff's Gender Dysphoria diagnosis or her fear that she would be abused, misgendered, or searched by male deputies in the men's ward.

The Complaint also contains allegations about Plaintiff's kites, grievances, and communications with individuals who are not parties to this case in which she discussed her placement in the men's ward. On December 9, 2020, Plaintiff submitted a grievance requesting placement in a women's ward, complaining that deputies were referring to her using male pronouns, and noting that she had previously been placed in a women's ward in a different facility. (*Id.* at ¶ 58) On January 4, 2021, an unidentified individual responded by denying Plaintiff's request. (*Id.*) On January 15, 2021, Plaintiff submitted another grievance regarding her housing and the conduct of "numerous staff regarding the issue," and notifying CJC and its medical provider that she had been placed in a women's ward in a different facility. (*Id.* at ¶ 59) On January 22, 2021, Plaintiff told Raymond Carrington ("Carrington," a jail mental health provider employed by WellPath) that she was experiencing anxiety because of her treatment as a transgender inmate and her fear of retaliation from grieving said conduct. (*Id.* at ¶ 60).  That same day, Plaintiff also wrote a grievance asking to be transferred to a women's ward. (*Id.* at ¶ 61) On February 26, 2021, Plaintiff asked an unidentified mental health provider why she continued to be housed in the men's ward and notified the provider of her resulting anxiety and depression. (*Id.* ¶ at 62) On March 9, 2021, Plaintiff wrote a grievance asking that Christine Mohr ("Mohr," a formerly named party employed by WellPath) provide information to EPSO about Plaintiff's Gender Dysphoria. (*Id.* at ¶ 63) On March 10, 2021, Plaintiff wrote a kite complaining about her placement in CJC. (*Id. at* ¶ 64) On March 11, 2021, Plaintiff

informed Mohr that she wanted to be housed in a women's ward and had previously been housed in a women's ward in a different facility, and Mohr informed Plaintiff she would consult with EPSO regarding Plaintiff's housing. (*Id.* at ¶ 65) On March 19, 2021, Mohr acknowledged talking to unidentified EPSO officials about Plaintiff's concerns and, on March 27, 2021, Mohr informed Plaintiff that she would not be moved to a female ward. (*Id.* at ¶ 66)

B. **Material Allegations Related to the Initial Strip-Search of Plaintiff**

Plaintiff was subject to a "visual body-cavity search" upon intake at CJC. (*Id.* at ¶ 72) Plaintiff was taken to a separate room where a male deputy (Mustapick) and female deputy (Elliss) arrived, prompting Plaintiff to ask Mustapick to leave. (*Id.* at ¶ 73-74) Elliss informed Plaintiff that, per her sergeant's orders, a male deputy would be present during the search and conduct part of the search because Plaintiff was "still a male" in CJC's "system." (*Id. a*t ¶ 74) Elliss directed Plaintiff to take off her shirt and Plaintiff complied. Elliss visually inspected Plaintiff's breasts while Mustapick was present. (*Id.* at ¶ 75-76) Elliss then gave Plaintiff a sports bra and allegedly told Mustapick "he is all yours now to strip out" before leaving the room. (*Id.* at ¶ 76) Mustapick ordered Plaintiff to remove the clothing on the lower half of her body and Plaintiff complied. (*Id.* at ¶ 77) Mustapick allegedly told Plaintiff to "spread [her] sexy cheeks," that he was "going to go balls deep in that ass" while grabbing his groin, and that Plaintiff had better not tell anyone about what he said or Plaintiff would be "brutalized" by CJC guards. (*Id.* at ¶ 77-78 (brackets in original)).

C. **Material Allegations Regarding an Alleged Sexual Assault by Another Inmate**

Plaintiff alleges that, on November 18, 2021, another inmate groped her right breast and said, "you know you want this dick." (*Id.* at ¶ 84-85) Afterward, Plaintiff asked to see a mental health provider and to be moved to a female ward. (*Id.* at ¶ 86, 88) Plaintiff broadly asserts that "[t]his was not the first time that [Plaintiff] was assaulted by the other inmate" but provides no further allegations about the inmate's identity or any other purported assault. (*Id.* at ¶ 87)

D. **Material Allegations Regarding Pat-Down Searches of Plaintiff by Male Deputies**

On January 20, 2021, Plaintiff wrote a grievance saying that her anxiety went "through the roof" when she was patted down by male deputies and that she was "being singled out as a transgender woman for different treatment." (*Id.* at ¶ 90) On January 21, 2021, Plaintiff complained to the jail medical provider about the impact of male pat-downs on her mental health. (*Id.*) The next day, Plaintiff wrote a grievance because she was continually subject to cross-gender pat-down searches, including one where a deputy intentionally touched her breast. (*Id.* at ¶ 91) On January 23, 2021, Plaintiff wrote a kite regarding the lack of accommodations for her Gender Dysphoria, citing cross-gender pat-down searches.  The following month, Plaintiff wrote a grievance because she was subjected to "non-routine cross-gender pat down searches on a daily basis..." (*Id.* at ¶ 92-93)

E. **Material Allegations Regarding Misgendering by Deputies**

Plaintiff alleges that she was misgendered by sergeants and deputies throughout her incarceration at CJC. (*Id.* at ¶ 99.) Plaintiff alleges that, on September 16, 2020, a

deputy yelled a derogatory term in reference to Plaintiff after she complained that other inmates in her ward were not required to wear shirts. (*Id.* at ¶ 100) On November 10, 2020, and December 9, 2020, Plaintiff submitted grievances because she was repeatedly misgendered by deputies. (*Id.* at ¶ 101) On February 3, 2021, Plaintiff submitted a grievance because she was being subject to "verbal harassment" by unidentified male deputies. (*Id.* at ¶ 102) On February 26, 2021, Plaintiff informed a medical provider that deputies continued to call her "sir." (*Id.*)  On June 23, 2021, Plaintiff submitted a grievance because she was misgendered by a CJC official. (*Id.* at ¶ 103) And, on July 1, 2021, Plaintiff told Carrington that she identifies as female, wished jail personnel would refer to her using female pronouns, she might harm herself, and WPATH standards of care should be followed in CJC. (*Id.* at ¶ 104) Carrington informed unidentified CJC officials about Plaintiff's statements, but no action was taken. (*Id.*)

### F. <u>Material Allegations Regarding Plaintiff's Ability to Dress in Accordance with Her Gender Identity</u>

Despite clearly stating that "Elliss gave [Plaintiff] a sports bra" upon intake, (*Id.* at ¶ 76), Plaintiff asserts that her requests for a women's sports bra and underwear were denied even after she submitted grievances on September 7, 2020, and October 24, 2020.  (*Id.* at ¶ 110-114) Plaintiff alleges that she eventually elevated her concerns to Gillespie, who also denied her request. (*Id.* at ¶ 114) On March 11, 2021, Plaintiff expressed concerns about her lack of access to female undergarments to CJC's medical provider. (*Id.* at ¶ 116) On March 27, 2021, the same provider told Plaintiff that CJC officials decided not to issue female panties to Plaintiff. (*Id.*)

### III.    STANDARDS OF REVIEW

This Court set forth the applicable standards of review in *Simon v. Burtlow*, No. 20-cv-01207-CMA-KMT, 2021 WL 4059782, at * 2 (D. Colo. Sept. 7, 2021) (unpublished).

### IV.    ARGUMENT

#### A. The Claims Asserted Against "El Paso County" Must Be Dismissed

Plaintiff asserts claims against both El Paso County and Elder in his official capacity. The official capacity claims are the same as suing EPSO because Elder is the elected Sheriff of EPSO. *Hafer v.Melo*, 502 U.S. 21, 25 (1991). EPSO and El Paso County are, however, separate entities. *See Bristol v. Bd. of Cnty. Comm'rs of Clear Creek,* 312 F.3d 1213, 1219 (10th Cir. 2002).

Section 30-11-105 of the Colorado Revised Statutes provides "the exclusive method by which jurisdiction over a county can be obtained." *See Calahan v. Jefferson Cnty.,* 429 P.2d 301, 302 (Colo. 1967) (stating that "the name in which the county shall sue or be sued shall be, 'The board of county commissioners of the county of .........'" (emphasis added)). The Complaint fails to properly name El Paso County as a party and this Court lacks jurisdiction over it as a result. (*See* Doc. 124, case caption.)

Even if the Court considers El Paso County properly named, the Complaint fails to state a plausible claim against it because EPSO, not El Paso County, is responsible for CJC's operations. *See* Colo. Rev. Stat. § 30-10-511. Plaintiff therefore cannot assert a claim against El Paso County unless she plausibly alleges that EPSO sets policy for El Paso County or that El Paso County sets policy for CJC's operations. *See, e.g., Gonzales v. Martinez*, 403 F.3d 1179, 1182 n.7 (10th Cir. 2005). Plaintiff makes no such allegations

in the Complaint.  Consequently, the claims asserted against El Paso County must be dismissed under Fed. R. Civ. P. 12(b)(1) and (6).

**B. The § 1983 Claims Asserted Against Elder and Gillespie Must be Dismissed Because the Complaint Fails to Plausibly Allege Their Personal Participation**

Because Plaintiff levies allegations against several individuals and entities, it "is particularly important…that the complaint make clear exactly who is alleged to have done what to whom, to provide each individual defendant with fair notice as to the basis of the claims against him or her…" *Robbins v. Oklahoma*, 519 F.3d 1242, 1249-50 (10th Cir. 2008). In other words, the "complaint must isolate the allegedly unconstitutional acts of each defendant; otherwise the complaint does not provide adequate notice as to the nature of the claims against each and fails for this reason." *Matthews v. Bergdorf*, 889 F.3d 1136, 1144 (10th Cir. 2018) (quotations omitted).

The Complaint alleges that Elder and Gillespie set relevant policy for CJC rather than asserting that they were directly involved in the alleged constitutional violations. (*See* Doc. 124, ¶ 14, 42, 54, 57, 106, 118, 135, 160, 187, 205, 232, 247, 312, 326, 340.)  As a result, Plaintiff may allege that Elder and Gillespie's personal participation is satisfied under a theory of supervisory liability. (*Id.* at ¶ 14) *See Dodds v. Richardson*, 614 F.3d 1185, 1195 (10th Cir. 2010) (personal participation may be satisfied under a theory of supervisory liability).

Supervisory liability requires a plaintiff to first show an underlying constitutional violation committed by the supervisor's subordinate.  The plaintiff must then show: (1) the defendant's personal involvement; (2) a causal connection; and (3) a culpable state of mind. *See id.* Personal involvement requires a plaintiff to "show an 'affirmative link'

between the supervisor and the constitutional violation." *Estate of Booker v. Gomez*, 745 F.3d 405, 435 (10th Cir. 2014) (quotations omitted). Personal participation may be established by showing that the individual enacted a "policy or custom" recognizable under *Monell. Schneider v. Cty. of Grand Junction Police Dep't*, 717 F.3d 760, 768-70 (10th Cir. 2013). A causal connection requires a showing that "the defendant set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights." *Dodds*, 614 F.3d at 1211 (Tymkovich, J., concurring) (quotations omitted). Deliberate indifference is "a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 410 (1997).

As explained below, Plaintiff has failed to establish an underlying constitutional violation (*see* § IV.C and D below); the existence of a "policy or custom" (*see* § IV. F below); a causal link (*see id.*); or that Elder or Gillespie acted with deliberate indifference (*see id.*). Consequently, Plaintiff's claims against Elder and Gillespie, individually, must be dismissed under Fed. R. Civ. P. 12(b)(6).

**C.** **Plaintiff Fails to State Any Claims Under the Fourteenth Amendment**

Plaintiff brings four claims under the Fourteenth Amendment alleging a violation of the Equal Protection Clause, unconstitutional conditions of confinement, a violation of her substantive due process rights, and a failure to protect. Each of Plaintiff's Fourteenth Amendment claims must be dismissed for the reasons set forth below.

1. <u>The § 1983 Claims Asserted Against All Defendants Under the Equal Protection Clause of the Fourteenth Amendment Must Be Dismissed (Claim One)</u>

The equal protection clause of the Fourteenth Amendment requires that "all persons similarly situated should be treated alike." *City of Cleburne, Tex. V. Cleburne Living Center*, 473 U.S. 432, 439 (1985). To succeed in a claim under the Fourteenth Amendment's equal protection clause, Plaintiff must allege facts showing that she is similarly situated to other inmates and that those inmates received disparate treatment from her. *Fogle v. Pierson*, 435 F.3d 1252, 1261 (10th Cir. 2006). This is not to say that the law "may never draw distinctions between persons in meaningfully dissimilar situations," but rather that where the state action does treat similarly situated people differently, it does so for at least a rational reason. *SECSYS v. Vigil*, 666 F.3d 678, 684 (10th Cir. 2012). Determining whether Defendants' actions have violated the Equal Protection Clause requires a two-part analysis: (1) whether the government action intentionally discriminates between two groups, and (2) whether the discriminatory action can be "justified by reference to some upright government purpose." *Id.* at 685-86. The level of scrutiny the Court applies to the Defendants' actions in the second part of the analysis rests on whether the Plaintiff is a member of a suspect or quasi-suspect class. *Id.* at 686. Transgender is not a suspect or quasi-suspect class; therefore, the Defendants' classifications are subject to only rational basis analysis. *Brown v. Zavaras*, 63 F.3d 967, 971 (10th Cir. 1985); *Druley v. Paxton*, 601 F. App'x 632, 635-36 (10th Cir. 2015) (unpublished); *Qz'Etax v. Ortiz*, 170 F. App'x 551, 553 (10th Cir. 2006) (unpublished). In the context of a motion to dismiss the equal protection claim of a

non-suspect class plaintiff under Rule 12(b)(6), the plaintiff "must allege facts sufficient to overcome a presumption of government rationality." *Id.*

Plaintiff claims that Defendants' actions discriminated against her by placing her in "men's wards without adequate safeguards, even though she faces similar risks as all other women in such custody." (Doc. 124, ¶133). This is an apparent attempt to classify Plaintiff as similarly situated to female inmates. However, Plaintiff can only be considered similarly situated as other female inmates if she is "alike in all relevant aspects." *Grissom v. Roberts*, 902 F.3d 1162, 1173 (10th Cir. 2018). Here, the fact that Plaintiff has not undergone gender affirmation surgery and still has male genitalia is a highly relevant factor differentiating her from the class of female inmates to whom she claims to be similarly situated. *See Templeman v. Gunter*, 16 F.3d 367, 371 (10th Cir. 1994) (slight distinctions between inmates based on history or risk of future misconduct rendered them not similarly situated for purposes of the Equal Protection clause). Because Plaintiff is not similarly situated to other members of a suspect class, her disparate treatment from other members of that class does not support a discrimination claim under the Equal Protection Clause and does not subject the Defendants' actions to heightened scrutiny.

Plaintiff goes on to attempt to align herself with the class of "other transgender women" by alleging that placement in the male housing ward and searches at the jail amounted to discrimination. (Doc. 124, ¶135.) However, Plaintiff fails to establish that other transgender inmates who have female breasts and male genitals received different treatment during any part of the intake, search, classification, or housing procedures at CJC. *See Brown v. Montoya*, 662 F.3d 1152, 1172-73 (10th Cir. 2011) (regardless of level

of scrutiny, plaintiff in equal protection claim must make a threshold showing of disparate treatment from others who are similarly situated). In fact, none of Plaintiff's allegations indicate that other inmates who were identified as male at birth but later identify as female, who have female breasts, and who have male genitals are searched solely by guards who match the inmates' gender identification, housed in the ward that matches the inmates' gender identification, or are otherwise treated differently than Plaintiff was.

Even if Plaintiff's allegations align her with other similarly situated individuals, they do not sufficiently overcome the presumption of government rationality. Defendants' classification of Plaintiff as male, housing Plaintiff in the male ward, and employing reasonable search procedures were all actions rationally based in the need to provide for the safe and secure function of CJC. Plaintiff's conclusory statements that Defendant discriminated against her without "a compelling, important, or legitimate governmental interest," (Doc. 124, ¶ 135, 205), and that "Defendants' actions and inactions were taken in reckless and callous indifference to the federally protected rights of Plaintiff," (*Id.* at ¶ 162, 176,188, 206), both cite the wrong standard for the Court to apply and fail to allege sufficient facts to state a cause of action for which relief can be granted under an equal protection theory. *See Brown*, 662 F.3d at 1172-73. Plaintiff's claim must therefore be dismissed.

2. *Plaintiff Fails to State a Viable Claim Challenging the Conditions of Her Confinement at CJC (Claim Two)*

As a pretrial detainee, Plaintiff's challenge to the conditions of her confinement is governed by the Fourteenth Amendment's due process clause. *See Porro v. Barnes*, 624 F.3d 1322, 1326 (10th Cir. 2010). The Eighth Amendment proscription against cruel and

unusual punishment, however, "provides the benchmark" for claims challenging a pre-trial detainee's conditions of confinement. *McClendon v. City of Albuquerque*, 79 F.3d 1014, 1022 (10th Cir. 1996) (citations omitted). To succeed under the Eighth Amendment, Plaintiff must prove both an objective and a subjective component. The objective component requires Plaintiff to show that the alleged deprivation denied "the minimal civilized measure of life's necessities," while the subjective component requires Plaintiff to show that the Defendants had "a sufficiently culpable state of mind, i.e., deliberate indifference." *Id.* (citations and quotation omitted). Under the deliberate indifference standard, an official is only liable if he "knows of and disregards an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

Here, Plaintiff's claim fails with respect to each Defendant. Starting with O'Neal, Plaintiff's only allegation is that O'Neal told Plaintiff her October 2020 grievance asking to be moved to a female ward was denied by unidentified County officials. (Doc. 124, ¶ 57) O'Neal's communication to Plaintiff that other County officials denied her grievance does not establish O'Neal's personal participation in any constitutional violation. *See Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009) (claims against prison officials properly dismissed where officials' only alleged involvement was the denial of grievances).

The Court should also dismiss Plaintiff's claim against Noe and Ford. Plaintiff alleges that Noe knew Plaintiff was transgender and wished to be housed in a ward corresponding with her gender identity but placed Plaintiff in a male housing unit instead.

14

(Doc. 124, ¶ 54) Plaintiff alleges that Ford conducted an initial interview with Plaintiff in July 2020 for purposes of the Americans with Disabilities Act. (*Id.* at ¶ 55) Plaintiff alleges "[i]t was clear to Ford" that Plaintiff was transgender and wished to be placed in housing that corresponded with her gender identity, but Ford did not "re-classify Plaintiff" or change her housing assignment. (*Id.)* Plaintiff goes on to allege that all Defendants failed to protect Plaintiff from sexual assault by other CJC inmates. (Doc. 124, ¶ 84-86, 151)[1]

Plaintiff's allegations suffer two pitfalls. First, they fail to show that any Defendants other than Noe and Ford were involved in Plaintiff's housing assignment. Plaintiff has not stated a claim challenging the conditions of her confinement against the remaining Defendants. *See Foote v. Spiegel*, 118 F.3d 1416, 1423 (10th Cir. 1997) ("Individual liability under § 1983 must be based on personal involvement in the alleged constitutional violation."). Second, Plaintiff's allegations fail to state a constitutional violation because they do not show that Noe and Ford's actions constituted deliberate indifference. *See Green v. Hooks*, 798 F. App'x 411, 422-23 (11th Cir. 2020) (unpublished) (prison officials were not deliberately indifferent when they housed a transgender inmate in a general population dormitory, despite subsequent sexual assaults). Plaintiff has not stated a viable claim.

---

[1] Plaintiff alleges one incident of sexual assault by a male CJC inmate that occurred on November 18, 2021. (Doc. 124, ¶ 84-86) Plaintiff also alleges that an unidentified witness told unidentified El Paso County officials "that he witnessed at least three to four other similar assaults" of Plaintiff. (*Id.* at ¶ 87) Plaintiff does not provide any factual allegations about these three or four other assaults, or allege that she told any of the Defendants about them.  *See Robbins*, 519 F.3d at 1250 (section 1983 plaintiff must support claims with specific facts).

Additionally, the Court should dismiss Plaintiff's conditions of confinement claim against Elliss and Mustapick. Plaintiff alleges that Elliss—a biological female—performed a visual inspection of Plaintiff's breasts and then misgendered Plaintiff. (Doc. 124, ¶ 74-76) Plaintiff alleges that Mustapick—a biological male—performed a visual search of Plaintiff's lower torso, during which he made sexually suggestive comments and gestures, and threatened Plaintiff not to tell anyone. (*Id.* at ¶ 76-79) The sexual harassment that Plaintiff attributes to Mustapick and the single instance of misgendering that Plaintiff attributes to Elliss do not state a constitutional claim. *Barney v. Pulsipher*, 143 F.3d 1299, 1310 n.11 (10th Cir. 1998) ("Although plaintiffs allege [defendant] subjected them to severe verbal sexual harassment and intimidation, these acts of verbal harassment alone are not sufficient to state a claim under the Eighth Amendment."); *Adkins v. Rodriguez*, 59 F.3d 1034, 1037-38 (10th Cir. 1995) (verbal sexual harassment did not amount to Eighth Amendment violation).

Finally, the remaining allegations in Plaintiff's challenge to the conditions of her confinement are unavailing. Plaintiff alleges that she was subjected to cross-gender pat-down searches at CJC, but she does not identify who conducted the pat-down searches or state when many of these pat-down searches occurred. (*See* Doc. 124, ¶ 89-96) Plaintiff's imprecise allegations fail to state a constitutional claim. *Robbins*, 519 F.3d at 1250. The Court should dismiss Plaintiff's conditions of confinement claim with respect to all Defendants.

3. _Plaintiff's Substantive Due Process Claim Must Be Dismissed for Two Reasons (Claim Four)_

Plaintiff alleges that housing her in a male ward and subjecting her to searches by male deputies violated her right to bodily privacy and integrity, which is protected by the Fourteenth Amendment's guarantee of substantive due process. (Doc. 124, ¶ 165-79) Substantive due process primarily protects "matters relating to marriage, family, procreation, and the right to bodily integrity." _Albright v. Oliver_, 510 U.S. 266, 271 (1994) (citation omitted). The Tenth Circuit has applied substantive due process protections to a student's § 1983 claims of sexual abuse by a state actor. _See Maldonado v. Josey_, 975 F.2d 727, 730-31 (10th Cir. 1992). Importantly, however, "the [Supreme] Court has always been reluctant to expand the concept of substantive due process because the guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." _Albright v. Oliver_, 510 U.S. 266, 271 (1994).

Here, Plaintiff fails to state a substantive due process claim for two reasons. First, her claim is properly analyzed through the lens of the Eighth Amendment's cruel and unusual punishment clause rather than the Fourteenth Amendment's substantive due process guarantee. The Supreme Court explained in _Graham v. Connor_ that when "an explicit textual source of constitutional protection" applies to claims, that Amendment rather than "the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." 490 U.S. 386, 395 (1989). Thus, "claims of excessive force against convicted prisoners should be analyzed under the Eighth and not the Fourteenth Amendment." _Berry v. City of Muskogee_, 900 F.2d 1489, 1494 (10th Cir. 1990). The Tenth Circuit and this Court have found, albeit under somewhat different circumstances from

those in this case, that a prisoner's claimed violations of bodily integrity are properly analyzed under the Eighth Amendment. *Ullery v. Raemish*, No. 18-cv-00839-STV, 2019 WL 529570, at *11 (D. Colo. Feb. 9, 2019) (unpublished) (citing *Berry*, 900 F.3d at 1494 n.6). The Court should thus dismiss Plaintiff's substantive due process claim.

Second, even if the Court entertains Plaintiff's substantive due process claim, she has not plausibly alleged action that satisfies the high standard required for such a claim. Government action violates substantive due process if it "shocks the conscience." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 848 (1998). To satisfy the shocks the conscience standard, "the plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." *Uhlrig v. Harder*, 64 F.3d 567, 574 (10th Cir. 1995). This "requires a high level of outrageousness, because the Supreme Court has admonished that a substantive due process violation requires more than an ordinary tort." *Id.* In the prison and jail context, actions that shock the conscience include sexual assault and rape of prisoners by guards. *Hall v. Zavaras*, No. 08-cv-00999-DME, 2008 WL 5044553, at *4 (D. Colo. Nov. 19, 2008) (unpublished). The actions alleged by Plaintiff do not rise to such egregious levels. The Court should thus dismiss Plaintiff's substantive due process claim.

4. *Plaintiff Fails to State a Failure to Protect Claim Under the Fourteenth Amendment (Claim Fourteen)*

In another permutation of her Fourteenth Amendment claims, Plaintiff alleges that Elder, Gillespie, O'Neal, Noe, and Ford failed to protect her "from sexual assault at the hands of other inmates." (Doc. 124, ¶ 315) The Eighth Amendment (via the Fourteenth Amendment) requires prison officials "to protect prisoners in custody from violence at the

18

hands of other prisoners." *Grimsley v. MacKay*, 93 F.3d 676, 679 (10th Cir. 1996) (citing *Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994)). To prevail on a failure to protect claim, the plaintiff must meet two prongs: (1) she was incarcerated under conditions posting a substantial risk of serious harm, and (2) prison officials acted with a sufficiently culpable state of mind, i.e., deliberate indifference. *Grimsley*, 93 F.3d at 681, citing *Farmer*, 511 U.S. at 834.

Here, Plaintiff has not plausibly alleged an affirmative link between Elder or Gillespie, and the violation she alleges. As a result, Plaintiff has not stated a viable failure to protect claim against them. *See Grimsley*, 93 F.3d at 680 (prison executives not liable for failure to protect).  As for O'Neal, her only involvement in Plaintiff's case is her delivery of an unfavorable grievance response as described above. (Doc. 124, ¶ 57) This does not establish her personal participation in a constitutional violation. *See Gallagher*, 587 F.3d at 1069.

Finally, Plaintiff has not stated a viable failure to protect claim against Noe and Ford.  Noe allegedly knew that Plaintiff was transgender and wanted to be assigned to a female ward but she assigned Plaintiff to an all-male ward instead. (Doc. 124, ¶ 54). Ford conducted an Americans with Disabilities Act interview and knew Plaintiff was transgender, but she did not "re-classify Plaintiff" or change her housing assignment. (*Id.*). These allegations do not provide specific facts showing that Noe and Ford (or any of the other Defendants) knew that Plaintiff was at risk of serious harm and took no action to alleviate that risk. *See Cox v. Nobles*, 2020 WL 1541698, at *6-9 (S.D. Ga. Mar. 31, 2020) (unpublished) (stating "the mere fact that Plaintiff is transgender is insufficient to show

Moving Defendants are liable under the Eighth Amendment for any assault Plaintiff experienced," and finding that officials at three different prisons were not deliberately indifferent where the officials were not subjectively aware of a substantial risk to plaintiff); *see also Alsteens v. Piper*, 2020 WL 3668781, at *3 (D. Colo. Jun. 12, 2020) (unpublished) (Plaintiff failed to allege viable failure to protect claim where allegations did not show prison official had repeated warnings of danger to plaintiff that were disregarded); *Straker v. Stancil*, 2022 WL 714690, at *3 (D. Colo. Mar. 10, 2022) (unpublished) (granting qualified immunity to prison staff where plaintiff did not plausibly allege staff were aware of substantial risk of harm). Plaintiff has not alleged a viable failure to protect claim.

### D. Plaintiff Fails to State a Claim Under the Fourth Amendment (Claim 3)

The constitutionality of a strip search requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. In *Bell v. Wolfish*, the Supreme Court set forth the balancing test for determining a search's reasonableness:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which its conducted, the justification for initiating it, and the place in which it is conducted.

441 U.S. 520, 559 (1979). In the context of prisoner civil rights litigation, the Supreme Court has instructed that:

> when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests. Subjecting the day-to-day judgments of prison officials to an

> inflexibly strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration.

*Turner v. Safley*, 482 U.S. 78, 89 (1987).

Here, Plaintiff is a pre-operation male to female, meaning Plaintiff has male genitalia and female breasts. Plaintiff claims that during the intake process into CJC, Mustapick remained in the strip-out room while Elliss conducted an examination of Plaintiff's upper body and Mustapick searched Plaintiff's lower body. Plaintiff alleges Elliss exited the room after completing the search of Plaintiff's upper body and prior to Mustapick conducting the search of Plaintiff's lower body. While Plaintiff clearly takes issue with the fact that Mustapick was present during the search, Plaintiff fails to state how the search itself was unreasonable, other than a bare assertion that the search was "objectively unreasonable in light of the circumstances" (Doc. 124, ¶ 159), and due to Mustapick's alleged "sexually charged and offensive comments," (*Id*.), directed at Plaintiff during the search.

Applying the *Bell* factors to these allegations, the Complaint fails to establish a constitutional violation against Elliss or Mustapick. First, the complaint of intrusion was minor considering the circumstances. The strip search occurred as Plaintiff entered CJC to be housed in general population, which is a standard procedure implemented for safety and security reasons. *See Archuleta v. Wagner*, 523 F.3d 1278, 1284 (10th Cir. 2008) (reasonableness of strip search turns in part on whether inmate will be housed in general population). The only individuals present during Plaintiff's strip search were Mustapick and Elliss. Plaintiff's nude body was not exposed to any other staff or inmate. Thus, the

intrusion complained of was relatively minor.  *See Hyberg v. Enslow*, 801 F. App'x 647, 650-51 (10th Cir. 2020) (unpublished) (finding no plausible Fourth Amendment claim where inmate was strip searched in a designated area "with limited access for other inmates and staff" before returning to general population, and where staff made insensitive comments).

Plaintiff goes on to complain about the way her strip search was conducted.  But verbal statements made during a search, like those attributed to Mustapick, are insufficient to establish a constitutional violation. *See Adkins*, 59 F.3d at 1037 (holding that verbal sexual harassment by a prison guard did not violate a constitutional right); *Hyberg*, 801 F. App'x at 650-51. Accordingly, the second *Bell* factor weights against a constitutional violation by Mustapick.

The third and fourth *Bell* factors also weigh against a constitutional violation. The justification for the strip search of Plaintiff was strong. Plaintiff was strip searched during intake into CJC to ensure the safety and security of the facility.  Such searches ensure that newly admitted inmates being housed in general population do not introduce weapons or contraband into the facility. *See Florence v. Bd. of Chosen Freeholders*, 566 U.S. 318, 332 (2012) (contraband undermines security when introduced into a secure facility); *see also Hyberg*, 801 F. App'x 650 ("[T]here are obvious security concerns inherent when an inmate will be placed in the general prison population." (citation omitted)). The allegations further establish that the strip search was not conducted in a public area in CJC, but in an area where only Elliss and Mustapick could observe Plaintiff.

*See id.* (discussing setting of a search). Accordingly, the third and fourth *Bell* factors do not support finding a constitutional violation.

In sum, the *Bell* factors weigh against finding a constitutional violation against Elliss and Mustapick, and the Court must dismiss Plaintiff's claims against them under Fed. R. Civ. P. 12(b)(6).

### E. **The Individual Defendants Are Entitled to Qualified Immunity**

Plaintiff's allegations not only fail to state constitutional claims, but also fail to overcome each individual Defendant's qualified immunity defense. Qualified immunity is an affirmative defense to a § 1983 action that protects government officials from liability for civil damages, provided that their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Ullery v. Bradley*, 949 F.3d 1282, 1289 (10th Cir. 2020). A motion to dismiss based on qualified immunity imposes the burden on the plaintiff to show (1) a constitutional violation occurred, and (2) the constitutional right was clearly established at the time of the alleged violation. *Hulen v. Yates*, 322 F.3d 1229, 1237 (10th Cir. 2003). Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Regardless of the court's starting point, the plaintiff must show that *both* prongs are met to defeat a qualified immunity defense. *See Herrera v. City of Albuquerque*, 589 F.3d 1064, 1070 (10th Cir. 2009). Plaintiff fails to make such a showing.

First, Plaintiff has not shown that a constitutional violation occurred. As described above, Plaintiff fails to state viable claims under the Fourth, Eighth, or Fourteenth Amendment. The Defendants are thus entitled to qualified immunity, and the Court should end its inquiry here. *See Herrera*, 589 F.3d at 1070.

Second, even if the Court continues with the qualified immunity analysis, Plaintiff has not shown that the rights in question were clearly established. A right is clearly established if the law was "sufficiently clear that a reasonable official would have understood that his conduct violated the right." *Currier v. Doran*, 242 F.3d 905, 923 (10th Cir. 2001). This generally requires a "Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Id.* (internal quotations omitted).  Although it is not necessary for the facts in the cited authority to correspond exactly to the situation the plaintiff complains of, the "plaintiff must demonstrate a substantial correspondence between the conduct in question and prior law allegedly establishing that the defendant's actions were clearly prohibited." *Trotter v. Regents*, 219 F.3d 1179, 1184 (10th Cir. 2000) (internal quotations omitted).

Here, Plaintiff's alleged rights were not clearly established at the time she was admitted to and housed in CJC. It was not clearly established that the visual strip search by a male and female deputy of a transgender inmate who identifies as female, has female breasts, and has male genitals violates a constitutional right. *See Naisha v. Metzger*, 2021 WL 5632063, at *1-2 (3d Cir. 2021) (unpublished) (granting qualified immunity to male deputy who conducted visual strip search of transgender inmate and

laughed at inmate, because law was not clearly established); *see generally Carter-el v. Boyer*, No. 1:19cv243 (TSE/MSN), 2020 WL 939289, at *4 (E.D. Va. Feb. 25, 2020) (unpublished) (observing that "little if any case law addresses the issue of the propriety of cross-gender searches of transgender inmates."). Plaintiff's allegation of verbal harassment during the search does not change this. *See Adkins*, 59 F.3d at 1037-38. Similarly, it was not clearly established that housing a transgender inmate who identifies as female, has female breasts, and has male genitals in a male ward violates a constitutional right. Defendants can find no case law in the Tenth Circuit or any other circuit holding that such a right was clearly established when Plaintiff was admitted to CJC. On the contrary, one federal court has found that a female inmate's "right not to be housed on an all male ward [sic] was not clearly established at the time of the alleged violations." *See Galvan v. Carothers*, 855 F. Supp. 285, 293 (D. Alaska. 1994). It also was not clearly established that providing a sports bra but not panties to a transgender inmate who identifies as female, has female breasts, and has male genitals violated a constitutional right. *See generally Druley v. Patton*, 601 F. App'x 632, 635 (10th Cir. 2015) (unpublished) (denying female undergarments to transgender inmate only required rational relation to legitimate state purpose). Finally, it was not clearly established that prisoners have a substantive due process right to bodily integrity, as this Court has found. *Ullery*, 2019 WL 529570, at *11. The Defendants are thus entitled to qualified immunity from Plaintiff's federal constitutional claims.

**F. Plaintiff Fails to State a Municipal Liability Claim[2]**

Plaintiff not only brings claims against the individual Defendants, but also against El Paso County and EPSO. Municipalities cannot be held liable for the unconstitutional actions of their employees under a theory of *respondeat superior*. *Brown*, 520 U.S. at 405 (1997). Municipalities may instead be liable under § 1983 when the execution of a policy or custom "inflicts the injury" upon the plaintiff. *Monell v. Dep't of Sec. Servs. of N.Y.*, 436 U.S. 658, 694 (1978). To state a cognizable *Monell* claim, a plaintiff must first establish an underlying constitutional violation and then show the existence of a municipal custom or policy and a direct causal link between the custom or policy and the violation alleged. *Myers v. Okla. Cnty. Bd. of Cnty. Commr's*, 151 F.3d 1313, 1316 (10th Cir. 1998). An official policy or custom may be proven by the existence of a formally promulgated policy; a well-settled custom or practice; a final decision by a municipal policymaker; failure to train or supervise; or ratification by the final policymaker of the decisions of subordinates to whom authority was delegated subject to the policymaker's review and approval. *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1189 (10th Cir. 2010). Plaintiff must establish causation by showing that "the municipality was the 'moving force' behind the injury alleged.'" *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 770 (10th Cir. 2013) (citations omitted). "Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the

---

[2] Plaintiff's municipal liability claims first fail because there is no underlying constitutional violation for the reasons described above.

municipality is not held liable solely for the actions of its employees." *Brown*, 520 U.S. at 405.

The Complaint does not clearly elucidate any theory of municipal liability through plausible allegations. (*See* Doc. 124, ¶ 4, 14, 135, 145, 160, 168, 170, 171, 172, 312.) For instance, the Complaint refers to formal policies in passing but fails to identify any specific EPSO policy or aspect thereof that caused the alleged constitutional violations. As such, Plaintiff cannot succeed under this theory of municipal liability. *See Carney v. City and Cnty. of Denver*, 534 F.3d 1269, 1274 (10th Cir. 2008) (plaintiff must turn to other theories of municipal liability where she fails to identify a formal policy).

Likewise, the Complaint offers mere conclusory allegations regarding the existence of an informal custom.  While municipal liability may be based "on an informal custom so long as this custom amounts to a widespread practice that, although not authorized by written laws or express municipal policy, is so permanent and well settled as to constitute a custom or usage within the force of law," *Brammer-Hoelter*, 602 F.3d at 1189, it generally requires a showing of "evidence suggesting that similarly situated individuals were mistreated by the municipality in a similar way." *Carney*, 534 F.3d at 1274.  The Complaint does not identify any similarly situated individuals that were mistreated in a similar way, which "seriously undermines [Plaintiff's] claim."  *Id.* (quoting *Randle v. City of Aurora*, 69 F.3d 441, 447 (10th Cir. 1995)).

The Complaint does not explicitly assert municipal liability under a failure to train or supervise theory. But even if it did, such a theory would fail due to a lack of precise, plausible allegations. "A municipality's culpability for a deprivation of rights is at its most

tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). Thus, to establish a failure to train or supervise claim, a plaintiff must show that the alleged failure "amounts to deliberate indifference to the rights of the persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). In other words, a "plaintiff must prove the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the [municipality] can be reasonably said to have been indifferent to the need for additional training." *Jenkins v. Wood*, 81 F.3d 988, 994 (10th Cir. 1996) (internal citations omitted). Deliberate indifference in this context ordinarily requires showing a pattern of similar constitutional violations by untrained employees. *See Brown*, 520 U.S. at 407-08.

The Complaint does not identify any similarly situated individuals who were mistreated in a similar way, as explained above. Plaintiff may, in turn, argue that her allegations satisfy the "narrow range of circumstances" in which a single incident may be sufficient to show deliberate indifference. *Connick*, 536 U.S. at 64 (2011). If such an argument were made, it should fail because numerous courts have found that a municipal entity cannot be deliberately indifferent in the context of a failure to train or supervise where the right asserted is not clearly established, such as in this case. *See Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 994-96 (6th Cir. 2017) ("But a municipal policymaker cannot exhibit fault rising to the level of deliberate indifference to a constitutional right when that right has not yet been clearly established.") (internal citations and quotations omitted); *Bustillos v. El Paso Cty. Hosp. Dist.*, 891 F.3d 214, 222

(5th Cir. 2018); *Nicholas v. Wany Cnty., Mich.*, 822 F. App'x 445, 451-52 (6th Cir. 2020)

(unpublished); *Townes v. City of New York*, 176 F.3d 138, 143–44 (2d Cir. 1999); *Szabla*

*v. City of Brooklyn Park*, 486 F.3d 385, 393 (8th Cir. 2007); *Moya v. City of Clovis*, No.

18-494-GBW-KRS, 2019 WL 6255217, at * 10 (D.N.M. Nov. 22, 2019) (unpublished); *see*

*also Montoya v. City & Cnty. of Denver*, No. 16-cv-01457-JLK, 2021 WL 8087380, at *2

n.3 (D. Colo. July 27, 2021) (unpublished) (noting that the issue of whether a municipal

entity can be deliberately indifferent to a right that is not clearly established was left open

by *Contreras ex rel. A.L. v. Dona Ana Cnty. Comm'rs*, 965 F.3d 114, 1124 (10th Cir. 2020)

(Carson, J. concurring)).

The Complaint also alludes to municipal liability by virtue of a final decision by a

policymaker. In this context, "it is not enough for a § 1983 plaintiff merely to identify conduct

properly attributable to the municipality. The plaintiff must also demonstrate that, through

its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged."

*Brown*, 520 U.S. at 404 (emphasis in original). That is to say, it must be shown that a final

policymaker's decision directly deprived a plaintiff of a constitutional right or was made

with deliberate indifference. *Id.* at 404-08.

Because the Complaint does not plausibly allege that Elder's decisions pertained

directly to Plaintiff, she must show that his decisions were made with deliberate

indifference.  *See id.* at 404-07. But in situations such as this, where the existence of the

alleged right is unclear, courts have found that policymakers cannot act with the requisite

degree of deliberate indifference.  *See Moya*, 2019 WL 6255217, at * 10 ("But a municipal

policymaker  cannot  exhibit  fault  rising  to  the  level  of *deliberate* indifference  to  a

constitutional right when that right has not yet been clearly established.") (quoting *Arrington-Bey*, 858 F.3d at 994 (6th Cir. 2017); *see also Szbala*,*v. City of Brooklyn Park,* 486 F.3d 385, 292 (8th Cir. 2007).

Absent an articulable theory of municipal liability, the Complaint fails to satisfy the "rigorous standards…of causation." *Brown*, 520 U.S. at 405. The Complaint, instead, appears to rely on a hybrid theory of municipal liability, alleging elements of various types of customs or policies but failing to fully develop any. The Tenth Circuit has rejected such an approach because it "would be at odds with the Court's conservative, restrictive approach regarding the individual theories of liability." *Cacioppo v. Town of Vail, Colo.*, 528 F. App'x 929, 934 (10th Cir. 2013) (unpublished). Consequently, the Court should dismiss Plaintiff's § 1983 claims asserted against EPSO and El Paso County.

### G. Plaintiff's Claim Under the Enhance Law Enforcement Integrity Act Must Be Dismissed

The Enhance Law Enforcement Integrity Act ("Act") creates a cause of action against:

> [a] peace officer, as defined in section 24-31-901(3), who, under color of law, subjects or causes to be subjected, including failing to intervene, any other person to the deprivation of any individual rights that create binding obligations on government actors secured by the bill of rights, article II of the state constitution…

Colo. Rev. Stat. § 13-21-131(1). The Act defines a "peace officer" as "any person employed by a political subdivision of the state required to be certified by the P.O.S.T. board pursuant to section 16.2.5-102…and any noncertified deputy sheriff as described in section 16-2.5-103(2)." Colo. Rev. Stat. § 24-31-901(3). A "noncertified deputy" means,

a peace officer employed by a county or city and county whose authority is limited to the duties assigned by and while working under the direction of the chief of police, sheriff, an official who has the duties of a sheriff in a city and county, or chief executive of the employing law enforcement agency.

*Id.* § 16-2.5-103(2).

### 1. *Plaintiff Cannot Assert "Official Capacity" Claims Under the Act*

Plaintiff cannot assert an "official capacity" claim under the Act because a municipal entity, such as EPSO, does not fit within the Act's definition of a "peace officer." *See* Colo. Rev. Stat. § 24-31-901(3). Consequently, Claims 5, 6, 7, 8, 9, 15, and 16 must be dismissed to the extent they assert "official capacity" claims against Elder or are asserted against El Paso County directly.

### 2. *Plaintiff Has Failed to Plausibly Allege Personal Participation by Elder or Gillespie*

The Complaint appears to premise Elder and Gillespie's personal participation upon a theory of supervisory liability. *See* § IV.B above. The plain language of the Act does not, however, expressly allow for supervisory liability and Defendants have been unable to locate any authority from any Colorado court recognizing such a claim under the Act. This federal Court should not, for the first time, expand liability under the Act to allow for a theory of liability not expressly provided for in the Act. *See Przekurat ex rel. Przekurat v. Torres*, 428 P.3d 512, 514 (Colo. 2018) (court first looks to a statute's plain language). If, however, the Court applies § 1983 precedent, such as *Dodd*, and recognizes a claim for supervisory liability under the Act, such claim must be dismissed for the reasons set forth in § IV.C.1-4 above.

### 3.   O'Neal, Noe, and Ford Are Not "Peace Officers"

The Complaint's allegations concerning O'Neal, Noe, and Ford do not show that they satisfy the Act's definition of a "peace officer." The Complaint alleges that Noe classified Plaintiff into an all-male unit upon Plaintiff's intake at CJC, (Doc. 124, ¶ 54), Ford did an ADA interview of Plaintiff but did not place Plaintiff into an all-female unit (*id.* at ¶ 55), and O'Neal reviewed and denied Plaintiff's request for a transfer to an all-female unit (*Id.* at ¶ 57). Such duties do not plausibly assert that O'Neal, Noe, and Ford are "peace officers" as opposed to administrative employees, such as ADA coordinators or inmate intake coordinators. Consequently, Claims 5, 6, 7, 8, 9, 15, and 16 asserted against O'Neal, Ford, and Noe must be dismissed because the Complaint is devoid of plausible allegations supporting its conclusory assertion that O'Neal, Ford, and Noe are "peace officers."

### 4.   Plaintiff Fails to State a Plausible Violation of Her Rights Under the Colorado Constitution

The Colorado Constitution generally does not give rise to an individual cause of action for damages. *Bd of Cnty. Comm'rs v. Sundheim*, 926 P.2d 545, 549-50 (Colo. 1996).  Absent a § 1983-like state statute, *Sundheim's* holding has resulted in a somewhat limited body of case law delineating the specific rights protected by the Colorado Constitution.  This is particularly important here because this case involves asserted rights that have not been clearly recognized under the United States Constitution, let alone the less litigated Colorado Constitution. Thus, when applying the Act (passed in 2020), this federal Court should not recognize rights for the first time under the Colorado Constitution. *See e.g. Younger v. Harris*, 401 U.S. 37 (1971). If, however, the Court

applies § 1983 precedent to Plaintiff's claims asserted under the Act, such claims fail for the same reasons as set forth above in § IV.C.1-4 above.

**H.** **The Claims Asserted Under the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act") Must Be Dismissed (Claims 10 and 11)**

Plaintiff asserts claims under Title II of the ADA and the Rehabilitation Act. Courts examine both claims using a similar framework requiring a plaintiff to show that: (1) she is a qualified individual with a disability; (2) she was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) her exclusion, denial, or discrimination was by reason of her disability. 42 U.S.C. § 12132; *Cunningham v. Univ. of N.M Bd. of Regents*, 531 F. App'x 909, 919 (10th Cir. 2013) (unpublished) (noting that because the same substantive standards apply, court's rulings with regard to the ADA apply with equal force to the Rehabilitation Act); *but see Crane v. Utah Dep't of Corr.*, 15 F.4th 1296, 1312-13 (10th Cir. 2021) (discussing the different causal standards under Title II of the ADA and Rehabilitation Act). A violation occurs when disabled individuals are excluded from the benefits of a public entity's services, that is, they are denied "meaningful access" to those services. *Alexander v. Choate*, 469 U.S. 287, 301 (1985).

Plaintiff's ADA and Rehabilitation Act claims are asserted against El Paso County only.  Such claims must be dismissed for the reasons set forth in § IV.A above. To the extent the Complaint can be read to assert these claims against EPSO, they must be dismissed for the following reasons.

1.  *Plaintiff Fails to Allege a Disability*

"[G]ender identity disorders not resulting from physical impairments" are categorically excluded from the ADA's definition of "disability." 42 U.S.C. § 12211(b)(1). "No federal court of appeals or the Supreme Court has…addressed whether [this] exclusion applies to gender dysphoria." *Venson v. Gregson*, No. 3:18-cv-2185-MAB, 2021 WL 673371, at *2 (S.D. Ill. Feb. 22, 2021) (unpublished). But there has been significant disagreement amongst district courts across the country regarding whether "gender dysphoria" is a "gender identity disorder" and categorically excluded from the ADA's definition of "disability" when it is not caused by a physical impairment. *See London v. Evans*, No. 19-599-MN, 2019 WL 5726983, at * 6 n.3 (D. Del. Nov. 5, 2019) (unpublished).

In the 2021 case *Doe v. Pa. Dep't of Corr.*, the district court for the Western District of Pennsylvania surveyed decisions from across the country and identified three general approaches to this issue. "The first, and apparently the majority approach, views the [ADA's] language as expressing Congress' intent to exclude from the ADA's protection both disabling and non-disabling gender identity disorders [including gender dysphoria] that do not result from physical impairment." No. 1:20-cv-00023-SPB-RAL, 2021 WL 1583556, at *8-9 (W.D. Pa. Feb. 19, 2021) (unpublished) (quotations omitted). The second approach holds that gender dysphoria falls outside of the ADA exclusion so long as the condition substantially limits a major life activity, but this approach has drawn subsequent criticism for "lacking any textual or other support." *Id.* at *9 (citing *Parker v. Strawser Constr.*, *Inc.*, 307 F.Supp.3d 744, 754 (S.D. Ohio 2018). Finally, the "third approach recognizes a physical etiology underlying gender dysphoria may exist to place

the condition outside of the exclusion of gender identity disorders 'not resulting from physical impairments'…[But] [t]his third approach acknowledges that courts typically lack sufficient expertise…to determine the cause or causes of gender dysphoria." *Doe*, 2021 WL 1583556, at *9.

Here, the Court should adopt the first approach because it is in line with this Court's earlier decision in *Michaels v. Akal Sec., Inc.*, No. 09-cv-01300-ZLW-CBS, 2010 WL 2573988, at *6 (D. Colo. Jun. 24, 2010) (unpublished). There, the Court found that "[g]ender dysphoria, as a gender identity disorder, is specifically exempted as a disability…". *Id.* Thus, to survive dismissal, the Complaint must plausibly allege that Plaintiff's gender dysphoria results from a physical impairment. The Complaint contains no such plausible allegations. Consequently, Plaintiff's ADA and Rehabilitation Act claims should be dismissed.

### 2. *Plaintiff Fails to Allege Causation*

In its 2021 *Crane* decision, the Tenth Circuit addressed the divergent causal standards for claims asserted under Title II of the ADA and resolved this issue "by joining our sibling circuits in holding the ADA merely requires the plaintiff's disability be a but-for cause (i.e., 'by reason of') of the discrimination, rather than—as the Rehabilitation Act requires—its sole cause (i.e., 'solely by reason of')." 15 F.4th at 1312-13 (internal citations omitted). Notwithstanding this difference, the Tenth Circuit found that the plaintiff's claims were properly subject to dismissal because the plaintiff "fail[ed] to allege [his] disability was a but-for cause of the purported discrimination." *Id.* at 1313.

Like in *Crane*, the Complaint does not plausibly allege causation under the less onerous ADA standard or higher Rehabilitation Act standard because Plaintiff asserts that her transgender status—not Gender Dysphoria, the alleged disability—was the reason for her exclusion from certain programs and services within CJC (*See* Doc. 124, ¶ 1 ("El Paso County's policy of refusing to house transgender inmates based on their gender identity…"); 3 ("Defendants denied [Plaintiff] clothing that conforms with her gender identity despite the fact that cisgender women are allowed panties and lipstick."); 50 ("El Paso County, as a matter of policy, refuses to house transgender women in female housing facilities."); 71 ("It is El Paso County's official policy that transgender women (including those with Gender Dysphoria) are searched, including strip searched, by male staff and not female staff." )). Consequently, the Court must dismiss Plaintiff's ADA and Rehabilitation Act claims.

### 3. *Plaintiff Cannot Recover Emotional Distress Damages and Other Types of Damages Not Generally Compensable for Breach of Contract Claims*

In the 2022 case *Cummings v. Premier Rehab Keller, P.L.L.C.*, the Supreme Court noted that the Rehabilitation Act is akin to a contract between the federal government and recipients of federal funds which expressly provides that the recipients cannot discriminate on the basis of certain protected classes, including on the basis of a disability. 142 S. Ct. 1562, 1571-76 (2022). The Supreme Court had previously held that this created an implied private right of action to enforce such protections of the Rehabilitation Act. *Id.* However, in *Cummings*, the Supreme Court held that the damages available to plaintiffs in such claims must be limited to those available under contract law. *Id.* Emotional distress

damages are generally not compensable for breach of a contract and thus are not available as remedies under the Rehabilitation Act. *Id.*

Expanding upon the Supreme Court's reasoning, other types of damages that are generally unavailable in breach of contract claims, like those for pain and suffering, should also be unavailable as a remedy under the Rehabilitation Act. *See, e.g., Cianciott v. Hospice Care Network*, 927 N.Y.S.2d 779, 785 (N.Y.S. July 26, 2011) ("[P]ain and suffering damages are not ordinarily recoverable in breach of contract actions.").

Furthermore, federal law expressly limits the remedies available under Title II of the ADA to those remedies available under the Rehabilitation Act. 42 U.S.C. § 12133; *Barnes v. Gorman*, 536 U.S. 181, 184-85 (2002) (noting that "the remedies for violations of [Title II of the ADA] and § 504 of the Rehabilitation Act are coextensive…"). *Cumming*'s damage limitation should, therefore, apply with equal force to claims asserted under Title II of the ADA. Consequently, Claims 12 and 13 must be dismissed to the extent they seek to recover damages that are generally unavailable in breach of contract claims.

### 4. *Plaintiff Cannot Recover Compensatory Damages*

Compensatory damages under Title II of the ADA and Rehabilitation Act are only available in instances of intentional discrimination. *See Havens v. Colo. Dep't. of Corr.*, 897 F.3d 1250, 1264 (10th Cir. 2018). Intentional discrimination can be inferred from a defendant's deliberate indifference to a strong likelihood that the pursuit of its questioned policies will likely result in a violation of federally protected rights and a corresponding failure to act. *Id.*; *Rogers v. Colo. Dep't of Corrs.*, No. 16-cv-02733-STV, 2019 WL 4464036, at * 17 (D. Colo. Sept. 18, 2019) (unpublished).

It is unclear whether Gender Dysphoria is excluded from the ADA's definition of "disability" for the reasons set forth in § IV.K.1 above.  That is to say, it is unclear whether the right alleged by Plaintiff is protected under the ADA and Rehabilitation Act at all.  In similarly unclear circumstances, the Eighth Circuit applied § 1983 principles to find that a municipality was not deliberately indifferent under the ADA and Rehabilitation Act when the right in question was not clearly established. *See Roberts v. City of Omaha*, 723 F.3d 966, 975-76 (8th Cir. 2013) (holding the plaintiff "can only prevail on [the ADA and Rehabilitation Act] claims by showing the city's deliberate indifference to his alleged right to be free from discrimination in the circumstances of this case, but the city, like the individual officers, lacked notice the officers' actions might have violated [the plaintiff's] asserted rights.").

Applying the well-reasoned holding in *Roberts*, Plaintiff has failed to plausibly allege that EPSO was deliberately indifferent under the ADA and Rehabilitation Act given that the right alleged (*i.e.* Gender Dysphoria's protection under the ADA and Rehabilitation Act) is not clearly established.  Consequently, the Court must dismiss Plaintiff's ADA and Rehabilitation Act claims.

I.  **The Claims Asserted Under Colorado's Anti-Discrimination Act ("CADA") Must Be Dismissed Because Plaintiff Failed to Exhaust Her Administrative Remedies (Claims 12 and 13)**

Claims 12 and 13 allege discrimination in a place of public accommodation in violation of Colo. Rev. Stat. § 24-34-601(2)(a) (*i.e.* Part 6 of CADA). (Doc. 124, ¶ 295, 296, 301, 302.) CADA clearly states that,

[n]o person may file a civil action in a district court in this state based on an alleged discriminatory or unfair practice prohibited by parts 4 to 7 of this

article without first exhausting the proceedings and remedies available to him under this part 3 unless he shows, in an action filed in the appropriate district court, by clear and convincing evidence, his ill health which is of such a nature that pursuing administrative remedies would not provide timely and reasonable relief and would cause irreparable harm.

Colo. Rev. Stat. § 24-34-306(14). Part 3 of CADA lays out the administrative procedure that a plaintiff must exhaust before filing a private action. Critically, the right to sue notice, issued at the conclusion of the administrative process, constitutes the exhaustion of administrative remedies. Colo. Rev. Stat. § 24-34-306(15).

Plaintiff's CADA claims are subject to CADA's exhaustion requirement because they assert discrimination in a place of public accommodation in violation of Colo. Rev. Stat. § 24-34-601(2)(a). (Doc. 124, ¶ 295, 296, 301, 302); Colo. Rev. Stat. § 24-34-306(14); *Brooke v. Restaurant Sevs., Inc.* 906 P.2d 66, 70 (Colo. 1995) ("We hold that administrative remedies under [CADA] must be exhausted only for claims filed pursuant to [CADA]."); *Mullen v. S. Denver Rehab., LLC*, No. 18-cv-01552-MEH, 2020 WL 2557501, at *18 (D. Colo. May 20, 2020) (unpublished) ("Part 6 of the CADA, under which Plaintiffs bring their claims, is included in the plain language of the statute requiring exhaustion of administrative remedies. Accordingly, the Plaintiffs must demonstrate that they exhausted administrative remedies before filing their claims under the CADA.") (internal citations and quotations omitted).

Plaintiff did not exhaust her administrative remedies under CADA before filing this lawsuit and does not allege exhaustion of her administrative remedies under CADA in the Complaint. (*See* Doc. 124, ¶ 12) (alleging PLRA exhaustion only). Consequently, the Court must dismiss Claims 12 and 13 under Fed. R. Civ. P. 12(b)(1) and/or (6).

## V.  CONCLUSION

Defendants respectfully ask the Court to enter an order dismissing Plaintiff's Complaint with prejudice, awarding Defendants reasonable attorneys' fees and costs, and for such other and further relief the Court deems just and proper.

Dated this 28th day of June 2022.

By: s/ *Nathan J. Whitney*
Nathan J. Whitney, #39002
Senior Assistant County Attorney
Terry A. Sample, #33919
Senior Assistant County Attorney
Chris Strider, #33919
Assistant County Attorney
Steven Martyn, #47429
El Paso County Attorney's Office
200 S. Cascade Ave.
Colorado Springs, CO 80903
(719) 520-6485 (Main Office Line)
(719) 520-7264 (Office)
Email:
nathanwhitney@elpasoco.com
chrisstrider@elpasoco.com
terrysample@elpasoco.com
stevenmartyn@elpasoco.com

## CERTIFICATE OF SERVICE

I hereby certify that on June 28, 2022, I electronically filed a true copy of the Defendants' Motion to Dismiss Third Amended Complaint with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Andy McNulty
Mari Newman
1543 Champa Street, Suite 400
Denver, CO 80202
(303) 571-1000
(303) 571-1001
amcnulty@kln-law.com


      s/*Casey Campbell*
Paralegal