**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 21-cv-00387-NRN-CMA

DARLENE GRIFFITH,

     Plaintiff,

v.

EL PASO COUNTY, COLORADO, *et al*.

     Defendants.

---

**RESPONSE TO DEFENDANTS' MOTION TO DISMISS THIRD AMENDED**
**COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(1) AND (6)**

---

     Plaintiff, by and through her attorneys, responds to Defendants' Motion to Dismiss Third

Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(1) and (6). [Doc. #132], as follows:

1. **Introduction**

     This case is "about protecting the rights of transgender people in public spaces and not

forcing them to exist on the margins." *G.G. v. Gloucester Cty. Sch. Bd.*, 853 F.3d 729, 730 (4th

Cir. 2017) (Davis, J., concurring). It is a case that is, at its core, "about governmental validation of

the existence and experiences of transgender people, as well as the simple recognition of their

humanity." *Id.* Far from isolated, this case "is part of a larger movement that is redefining and

broadening the scope of civil and human rights so that they extend to a vulnerable group that has

traditionally been unrecognized, unrepresented, and unprotected." *Id.*

     Ms. Griffith is a transgender woman who has been diagnosed with Gender Dysphoria. In

the community, she lives in accordance with her female gender identity. Despite this well-

documented history, Defendants Bill Elder, Cy Gillespie, Elizabeth O'Neal, Tiffany Noe, and

Brande Ford purposefully housed Ms. Griffith in an all-male unit in the El Paso County Jail. Even

in the face of Ms. Griffith's repeated requests to be moved to a unit that corresponds with her gender identity, Defendants continued to deny her this reasonable accommodation.

Defendants' decision to house Ms. Griffith in a unit that does not conform with her gender identity also subjected Ms. Griffith to a pervasive culture of discrimination and harassment. She was sexually harassed and subjected to a highly invasive (and completely unnecessary) cross-gender visual body cavity search by Defendant Andrew Mustapick, who told her that he wanted to go "balls deep in [her] ass" while Defendant Dawne Elliss did nothing to prevent this clearly unconstitutional search. She was continuously subjected to demeaning cross-gender pat-down searches. She was regularly mis-gendered and demeaned by El Paso County officials. She was not given clothing that conforms with her gender identity, despite the fact that cisgendered women are allowed women's underwear and grooming products. All of these actions were taken in accordance with the official policies of El Paso County, which were implemented by Defendants Elder and Gillespie, and pursuant to widespread unwritten customs and practices that El Paso County, Defendant Elder, and Defendant Gillespie have condoned. Defendants' motion to dismiss should be denied in its entirety.

2. **Relevant Factual Allegations**

As amply alleged in Plaintiff's Third Amended Complaint, El Paso County and its officials violated Ms. Griffith's Constitutional and statutory rights in a variety of different ways. First, Defendants Ford, O'Neal, Noe, Gillespie, and Elder purposefully intentionally disregarded Ms. Griffith's repeated requests to be housed in a unit that corresponded with her female gender identity by instead housing Ms. Griffith in an all-male unit within the El Paso County Jail because she is a transgender woman with male genitalia. [Doc. #124], ¶¶ 47-70. Defendants made this conscious decision to discriminate and expose Ms. Griffith to obvious danger despite knowing that

Ms. Griffith suffered from Gender Dysphoria that was exacerbated by being housed in an all-male unit. *Id.*

Second, Defendant Mustapick sexually harassed and assaulted Ms. Griffith during an unconstitutional cross-gender visual body-cavity search while Defendant Elliss stood by and allowed Mustapick to violate Ms. Griffith's rights without intervening. *Id.*, ¶¶ 71-83. After Defendant Elliss left Ms. Griffith alone with Defendant Mustapick (a male deputy), Defendant Mustapick ordered Ms. Griffith to take off her socks, pants, and panties, place her hands on the wall, bend over, and "spread [her] sexy cheeks." *Id.*, ¶ 77. Defendant Mustapick then told Ms. Griffith that he was "going to go balls deep in that ass" while grabbing his own penis in view of Ms. Griffith. *Id.*, ¶78. Defendant Mustapick's threatening and demeaning search of Ms. Griffith served no legitimate penological purpose. *Id.*, ¶ 80.

Third, Defendants Ford, O'Neal, Noe, Gillespie, and Elder failed to protect Ms. Griffith by housing her in an all-male unit, which predictably led to her being assaulted by a male inmate. That inmate approached Ms. Griffith while she was laying in her bunk and groped her right breast while telling Ms. Griffith, "you know you want this dick." *Id.*, ¶¶ 84-88.

Fourth, because of Defendants Ford's, O'Neal's, Noe's, Gillespie's, and Elder's decision to house Ms. Griffith in an all-male facility, El Paso County officials subjected Ms. Griffith to continuous cross-gender pat-down searches. *Id.*, ¶¶ 89-96. Male deputies repeatedly touched Ms. Griffith's breasts and groin when patting her down. *Id.*, ¶ 90.

Fifth, because of Defendants Ford's, O'Neal's, Noe's, Gillespie's, and Elder's decision to house Ms. Griffith in an all-male facility, El Paso County officials constantly mis-gendered Ms. Griffith throughout her incarceration. *Id.*, ¶¶ 97-109. In one instance, an El Paso County deputy called Ms. Griffith a "blind faggot" in front of other inmates. *Id.*, ¶ 100. Mis-gendering is a form of sexual harassment.

Sixth, because of Defendants Ford's, O'Neal's, Noe's, Gillespie's, and Elder's decision to house Ms. Griffith in an all-male facility, she was denied the ability to dress in accordance with her gender identity. *Id.*, ¶¶ 110-122. Ms. Griffith repeatedly requested gender affirming clothing, but was denied each time. *Id.*, ¶¶ 115-117.

Importantly, all of this conduct that violated Ms. Griffith's Constitutional and statutory rights was undertaken either pursuant to official El Paso County Jail policies (enacted and implemented by Defendant Elder and Gillespie), *id.*, ¶¶ 42, 57, 74, 81, 94, 106, 117, 118, and/or the widespread customs and practices at the El Paso County Jail. Doc. *Id.*, ¶¶ 67, 87, 94, 106, 118. These policies, customs, and practices directly caused the violation of Ms. Griffith's Constitutional rights. *Id.*, ¶¶ 42, 57, 67, 74, 81, 87, 94, 106, 117, 118. All of these actions by Defendants also caused Ms. Griffith to engage in self-harm by wrapping a rubber band around her genitalia extremely tightly with the purpose of self-castration. *Id.*, ¶¶ 69, 83, 96, 109, 122.

3. **STANDARD OF REVIEW**

3.1 **The general standard of review disfavors granting motions to dismiss.**

"There is a strong presumption against the dismissal of claims under [Fed.R.Civ.P. 12(b)(6)]." *Blevins v. Reid*, 2008 U.S. Dist. LEXIS 46168, at *9 (D. Colo. June 12, 2008).  A complaint will survive a Rule 12(b)(6) motion if it contains "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Plausible" does not mean "likely to be true," but is, instead, a nudge beyond "conceivable." *See Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008). When evaluating a Rule 12(b)(6) motion, a court must accept as true "all well-pleaded factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff." *Kerber v. Qwest Group Life Ins. Plan*, 647 F.3d 950, 959 (10th Cir. 2011).

Courts have rejected a heightened pleading standard for claims of municipal liability.

> The reasons for not requiring heightened fact pleading in a § 1983 municipal liability
> complaint remain even in the wake of *Twombly* and *Iqbal*: a plaintiff, as an outsider to
> municipal government, is not expected to have information about a city's official policies,
> practices, or training programs at the pleading stage.

*Walker v. Zepeda*, 2012 U.S. Dist. LEXIS 74386, *14 (D. Colo. May 29, 2012) (Ebel, J). Thus, a

complaint sufficiently alleges municipal liability where "it contain[s] not only 'a boilerplate

recitation of the grounds for municipal liability,'" but also makes "*some additional allegation to*

*put the municipality on fair notice* of the grounds for which it [is] being sued." *Id*. (quoting *Taylor*

*v. RED Dev., LLC*, 2011 U.S. Dist. LEXIS 97985, at *4 (D. Kan. Aug. 31, 2011). "To require

more could foreclose legitimate § 1983 claims that, after appropriate discovery, turn out to have

evidentiary support." *Id*. at *15-16 (citing *Wilson v. City of Chicago*, 2009 U.S. Dist. LEXIS

93912, at *3 (N.D. Ill. Oct. 7, 2009).

### 3.2 <u>Qualified immunity does not shield defendants from liability where there conduct is egregious, or where caselaw puts them on notice their conduct is unconstitutional.</u>

To show that a right was clearly established, a plaintiff may point to "a Supreme Court or

Tenth Circuit decision on point, or the clearly established weight of authority from other courts."

*Gutierrez v. Cobos*, 841 F.3d 895, 899 (10th Cir. 2016) (citations omitted). But, even absent such

a showing, qualified immunity does not shield a defendant when "a reasonable officer would

understand that what he is doing violates that right." *Medina v. Cram*, 252 F.3d 1124, 1128 (10th

Cir. 2001). Nor does qualified immunity require the plaintiff to show "the very act in question

previously was held unlawful." *Gutierrez*, 841 F.3d at 899 (10th Cir. 2016). "[N]ot every

constitutional violation has factual antecedents," and courts "can occasionally rely on the general

proposition that it would be 'clear to a reasonable officer that his conduct was unlawful in the

situation he confronted…even though existing precedent does not address similar circumstances.'"

*Colbruno v. Kessler*, 928 F.3d 1156, 1165 (10th Cir. 2019) (quoting *D.C. v. Wesby*, 138 S. Ct.

577, 590 (2018)). The Tenth Circuit has held, in line with Supreme Court precedent, that "general

statements of the law are not inherently incapable of giving fair and clear warning to officers as long as the unlawfulness of an action is apparent[.]" *Ashaheed v. Currington*, 7 F.4th 1236, 1246 (U.S. 10th Cir. 2021) (cleaned up) (quoting *White v. Pauly*, 137 S. Ct. 548, 552 (2017)). In fact, "[t]he more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation." *Perea v. Baca*, 817 F.3d 1198, 1204 (10th Cir. 2016) (internal quotation marks and citation omitted). "[I]t would be remarkable if the most obviously unconstitutional conduct should be the most immune from liability only because it is so flagrantly unlawful that few dare its attempt." *Colbruno*, 928 F.3d at 1165.

4. **ARGUMENT**

    4.1 **Plaintiff adequately alleges that Defendants Elder and Gillespie personally participated in the violation of her Constitutional rights.**

"Personal involvement [in a constitutional violation] does not require direct participation because § 1983 states any official who 'causes' a citizen to be deprived of her constitutional rights can also be held liable." *Dodds v. Richardson*, 614 F.3d 1185, 1195 (10th Cir. 2010) (citation omitted). In *Dodds*, the court held that a sheriff was personally responsible under Section 1983 where the enforcement of jail policy caused the violation of the plaintiff's constitutional rights when the sheriff was "responsible for the policies that operated [at the jail] and [those policies] enforced by his subordinates at the jail." *Id.* at 1203. Similarly, here, Plaintiff alleges that the policies enacted by Defendant Elder and Gillespie, [Doc. #124], ¶¶ 14, 57, caused the violation of her constitutional rights. Further, Plaintiff alleges that Defendants Elder and Gillespie make facility assignments to people in custody solely on the basis of the individual's genitalia, in contravention of widely accepted standards, *Id.*, ¶ 42, which caused the violation of Plaintiff's constitutional rights in numerous ways. *Id.*, ¶¶ 47-122.

Further, where the "underlying unconstitutional misconduct was so widespread or flagrant that in the proper exercise of its official responsibilities the governing body should have known of it," a factfinder may infer that the governing officials *did* know about the misconduct. *Jojola v. Chavez*, 55 F.3d 488 (10th Cir. 1995). The violation of Ms. Griffith's rights was no secret, and transgender inmates at the El Paso County Jail are constantly housed in facilities that do not correspond with their gender identity, subjecting them to discrimination and exposing them to an extreme risk of assault and harassment. [Doc. #124], ¶ 67. This case is very similar to *Lopez v. LeMaster*, in which the Tenth Circuit held that a sheriff was liable for deliberate indifference because he did not take action to prevent inmates from being attacked by other inmates at the jail, despite being aware of prior attacks and deficiencies in staffing and surveillance that prevented the jail from preventing attacks. 172 F.3d 756, 760-64 (10th Cir. 1999). As alleged, Defendants Elder and Gillespie are personally liable for the violation of Plaintiff's Constitutional rights.

Finally, *Dodds* and *Lopez* clearly establish that an official who implements an official policy that causes the violation of the Constitution is not entitled to qualified immunity.

4.2 **Plaintiff adequately alleges that Defendants violated her rights under the Fourteenth Amendment's Equal Protection Clause.**

The Equal Protection Clause of the Fourteenth Amendment directs that "all persons similarly situated should be treated alike," thereby protecting against intentional discrimination by way of classifications that reflect "a bare . . . desire to harm a politically unpopular group." *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1050 (7th Cir. 2017) (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)). As alleged, Ms. Griffith is a transgender woman and Defendants knew as much. [Doc. #124], ¶¶ 25-27, 110-112. Defendants' decision to disregard Ms. Griffith's identity as a transgender woman, and instead treat her as a male inmate, violated her Fourteenth Amendment rights.

### 4.2.1 **As alleged, Defendants engaged in sex- and gender-based discrimination against Ms. Griffith.**

Refusing to allow transgender individuals to use public facilities that correspond with their gender identities is sex- and gender-based discrimination under the Fourteenth Amendment. *Adams v. Sch. Bd.*, 968 F.3d 1286, 1302 (11th Cir. 2020); *Grimm v. Gloucester Cty. Sch. Bd.*, 976 F.3d 399, 402 (4th Cir. 2020); *Whitaker*, 858 F.3d at 1048-49. When an inmate is "placed in a facility based on their genitalia… a sex-based classification is used, and intermediate scrutiny must be applied." *Hampton v. Baldwin*, No. 3:18-CV-550-NJR-RJD, 2018 U.S. Dist. LEXIS 190682, at *32-37 (S.D. Ill. Nov. 7, 2018); *see also Tay v. Dennison*, 457 F. Supp. 3d 657 (S.D. Ill. 2020); *Doe v. Mass. Dep't of Corr.*, No. 17-12255-RGS, 2018 U.S. Dist. LEXIS 99925, at *25 (D. Mass. June 14, 2018) (holding that a transgender prisoner's "compulsory assignment to a men's prison caused Doe to be treated differently from other female prisoners"); *Iglesias v. Fed. Bureau of Prisons*, No. 19-CV-415-NJR, 2021 U.S. Dist. LEXIS 245517, at *72 (S.D. Ill. Dec. 27, 2021). Defendants violated Ms. Griffith's rights under the Equal Protection Clause in the same way by housing her in an all-male unit and denying her access to women's facilities, solely based on her transgender status and the fact that she has male genitalia. [Doc. #124], ¶¶ 42, 47-70. In other words, a similarly situated woman to Ms. Griffith would not be housed in an all-male facility.

Moreover, Defendants discriminated against Ms. Griffith by denying her items that cisgender women have access to, including clothing and grooming products, solely based on her transgender status. [Doc. #124], ¶¶ 110-122. The United States Supreme Court has long held that sex stereotyping based on preconceived notions about appropriate dress for men and women is intolerable sex discrimination. *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989); *Smith v. City of Salem*, 378 F.3d 566, 574 (6th Cir. 2004) ("After *Price Waterhouse*, an employer who discriminates against women because, for instance, they do not wear dresses or makeup, is

engaging in sex discrimination because the discrimination would not occur but for the victim's sex."); *Dawson v. Bumble & Bumble*, 398 F.3d 211, 221 (2d Cir. 2005). Simply put, "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1741 (2020). Plaintiff adequately alleges that Defendants' actions constitute sex- and gender-based discrimination.

### 4.2.2 Plaintiff, as a transgender woman, is a member of a suspect, or quasi-suspect, class.

A growing consensus of courts have held that transgender individuals constitute a suspect or quasi-suspect class.[1] And, when evaluating transgender individuals under the four-factor test outlined for determining whether a class qualifies as suspect or quasi-suspect, it becomes clear that discrimination against transgender individuals merits heightened scrutiny. Heightened scrutiny is appropriate when the class being discriminated against: (1) has been "historically subjected to discrimination," (2) has a defining characteristic bearing no "relation to ability to perform or contribute to society," (3) has "obvious, immutable, or distinguishing characteristics," and (4) is a

---

[1] *See, e.g., Grimm*, 972 F.3d at 610-13 (holding that transgender people constitute a quasi-suspect class); *Crowder v. Diaz*, No. 2:17-CV-1657-TLN-DMC, 2019 U.S. Dist. LEXIS 140306, at *30 (E.D. Cal. Aug. 16, 2019) (same); *Evancho v. Pine-Richland Sch. Dist.*, 237 F. Supp. 3d 267, 288 (W.D. Pa. 2017); *Adkins v. City of New York*, 143 F. Supp. 3d 134, 139 (S.D.N.Y. 2015) (same); *Bd. of Educ. of the Highland Local Sch. Dist. v. U.S. Dep't of Educ.*, 208 F. Supp. 3d 850, 873 (S.D. Ohio 2016) (same); *M.A.B. v. Bd. of Educ.*, 286 F. Supp. 3d 704, 718-19 (D. Md. 2018) (same); *Norsworthy*, 87 F. Supp. 3d at 1119 (same); *F.V. v. Barron*, 286 F. Supp. 3d 1131, 1145 (D. Idaho 2018) (same); *Karnoski v. Trump*, 2018 U.S. Dist. LEXIS 63563, 2018 WL 1784464 (W.D. Wash. Apr. 13, 2018) (same); *see also Flack v. Wis. Dept. of Health Servs.*, 328 F. Supp. 3d 931, 951-53 (W.D. Wis. 2018) (explaining in a ruling on a preliminary injunction why heightened scrutiny would likely apply to transgender persons); *Doe v. Wash. State Dep't of Corr.*, No. 4:21-CV-5059-TOR, 2021 U.S. Dist. LEXIS 93455, at *21 (E.D. Wash. May 17, 2021); *McQueen v. Brown*, No. 2:15-cv-2544 JAM AC P, 2018 U.S. Dist. LEXIS 66377, 2018 WL 1875631, at *3 (E.D. Cal. Apr. 19, 2018*), report and recommendation adopted*, No. 2:15-cv-2544 JAM AC P, 2018 U.S. Dist. LEXIS 91170, 2018 WL 2441713 (E.D. Cal. May 31, 2018) (collecting cases); *Karnoski v. Trump*, No. C17-1297-MJP, 2018 U.S. Dist. LEXIS 63563, 2018 WL 1784464, at *1 (W.D. Wash. Apr. 13, 2018) ("The Court also rules that, because transgender people have long been subjected to systemic oppression and forced to live in silence, they are a protected class.").

"minority or is politically powerless." *Windsor v. United States*, 699 F.3d 169, 181 (2d Cir. 2012), *aff'd on other grounds*, 570 U.S. 744 (2013); *see also Bowen v. Gilliard*, 483 U.S. 587, 602 (1987); *Cleburne*, 473 U.S. at 440-41. Transgender individuals, like Ms. Griffith, meet all of these criteria.

First, "[i]t is generally accepted that transgender individuals face an alarming rate of discrimination, harassment, and violence." *Crowder*, 2019 U.S. Dist. LEXIS 140306, at *32-35;[2] *see also Grimm v. Gloucester Cty. Sch. Bd.*, 302 F. Supp. 3d 730, 749 (E.D. Va. 2018). For example, the transgender community "suffers from high rates of employment discrimination, economic instability, and homelessness." *Grimm*, 972 F.3d at 611. Additionally, transgender individuals frequently experience harassment in places such as schools, medical settings, and retail stores, while also experiencing physical assault in places such as schools and places of public accommodation, at high levels and being disproportionate victims of violent crime. *Id.* "In the prison context, [PREA] exposed heightened risk of sexual assault against LGBTQI prisoners and the atypical severity of punishments LGBTQI people face solely for being themselves" and "transgender inmates are thirteen times more likely to be assaulted than other prisoners." *Crowder*, 2019 U.S. Dist. LEXIS 140306, at *33. And, the El Paso County Jail's treatment of Ms. Griffith is an exemplar of how "current measures and policies continue to target transgender persons for differential treatment." *Grimm*, 972 F.3d at 611.

Second, in *Windsor*, the Second Circuit concluded "the aversion homosexuals experience has nothing to do with aptitude or performance." 699 F.3d at 182-83. "The same can be said of

---

[2] Citing Jaime M. Grant et al., *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey*, Nat'l Center for Transgender Equality (2011), available at https://www.transequality.org/sites/default/files/docs/resources/NTDS_Report.pdf.

discrimination leveled at transgender people." *Crowder*, 2019 U.S. Dist. LEXIS 140306, at *35; *Grimm*, 972 F.3d at 611.

Third, the Fourteenth Amendment is meant to protect citizens from discrimination based on circumstances beyond their control. *See Plyler*, 457 U.S. at 216 n.14. "[B]eing transgender is not a choice." *Grimm*, 972 F.3d at 612. At least three courts, based on substantial evidence, have acknowledged that gender identity is biologically determined. *Id.*; *Crowder*, 2019 U.S. Dist. LEXIS 140306, at *35-36; *Doe v. McConn*, 489 F. Supp. 76, 78 (S.D. Tex. 1980) ("These findings indicate that the transsexual has not made a choice to be as he is, but rather that the choice has been made for him through many causes preceding and beyond his control"). And, "given the discrimination transgender individuals face, it is illogical to assert that a person would actively choose this 'lifestyle.'" *Crowder*, 2019 U.S. Dist. LEXIS 140306, at *35-36 (quoting *Hernandez-Montiel v. Immigration & Naturalization Serv.*, 225 F.3d 1084, 1095 (9th Cir. 2000) (stating a transgender asylum applicant's female sexual identity "must be fundamental, or [s]he would not have suffered this persecution and would have changed years ago")).

Fourth, "transgender people constitute a minority lacking political power" given that "approximately 0.6% of the adult population in the United States" identifies as transgender. *Grimm*, 972 F.3d at 612. "[T]ransgender persons are underrepresented and have not gained positions of significant power" and "no acknowledged transgender person has ever held a significant position in Congress or the federal judiciary." *Crowder*, 2019 U.S. Dist. LEXIS 140306, at *36-37 (citing *Adkins*, 143 F. Supp. 3d at 140 ("[T]here is no indication that there have ever been any transgender members of the United States Congress or the federal judiciary."); *M.A.B. v. Bd. of Educ.*, 286 F. Supp. 3d 704, 721 (D. Md. 2018) ("Only two openly transgender candidates have ever been elected; both won seats in a state legislature.")). Importantly, "the examples of discrimination" against transgender individuals (which this case represents) "affirm

what we intuitively know: Transgender people constitute a minority that has not yet been able to meaningfully vindicate their rights through the political process." *Grimm*, 972 F.3d at 612.

For these reasons, a growing consensus of courts that have held "transgender persons constitute a quasi-suspect class" and discrimination against them is subject to heightened scrutiny. *Id.* at 613. Ms. Griffith is a member of a quasi-suspect class.

### 4.2.3 Defendants' deliberate decision to disregard Ms. Griffith's female gender identity, and instead treat her as a male inmate, was not substantially related to an important interest and violated the Equal Protection clause.

Under intermediate scrutiny, "classifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives" in order to be upheld. *Craig v. Boren*, 429 U.S. 190, 197 (1976). "When a sex-based classification is used, the burden rests with the state to demonstrate that its proffered justification is 'exceedingly persuasive.'" *Whitaker*, 858 F.3d at 1050 (citing *United States v. Virginia*, 518 U.S. 515, 533 (1996)). "It is not sufficient to provide a hypothesized or *post hoc* justification created in response to litigation." *Id.* The Tenth Circuit has recognized that "[a]t least since *Virginia*, [the arc of the Supreme Court's equal protection jurisprudence] bends toward requiring more—not less—judicial scrutiny when asserted physical differences are raised to justify gender-based discrimination[.]" *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 805 (10th Cir. 2019). Ultimately, the question this Court must answer is whether Defendants' "policy of placing transgender inmates in the prison of their assigned sex at birth [is] substantially related to the achievement of prison security?" *Hampton*, 2018 U.S. Dist. LEXIS 190682, at *32-37. The answer to that question is a resounding no.

As alleged, there was no reason for Defendants to assign Plaintiff – who for decades has lived in society as a woman, and who has previously been housed with female offenders in the Colorado Department of Corrections – to an all-male unit other than the fact that she has male

genitalia and her sex assigned at birth was male. [Doc. #124], ¶¶ 42, 47-70. Transgender inmates do not generally pose a greater security threat than cisgender inmates. *Doe*, 2018 U.S. Dist. LEXIS 99925, 2018 WL 2994403, at *10 (citing *Virginia*, 518 U.S. at 531 and holding that "generalized concerns for prison security are insufficient to meet the 'demanding' burden placed on the State to justify sex-based classifications"). Defendants' placement of Plaintiff in an all-male facility is particularly glaring in light of her previous placement with female inmates in the CDOC, of which, as alleged, Defendants were aware. [Doc. #124], ¶ 65. Given the lack of any justification for housing Ms. Griffith in an all-male unit other than her genitalia and sex assigned at birth, that classification does not pass intermediate scrutiny.

Therefore, based on substantial precedent, it is clear that, as alleged, Plaintiff's placement in an all-male unit was not substantially related to an important government interest. *See Tay*, 457 F. Supp. 3d at 682 (holding that a transgender prisoner's placement in a men's prison was not substantially related to an important government interest even though the prisoner had a history of violent behavior); *Hampton*, 2018 U.S. Dist. LEXIS 190682, 2018 WL 5830730, at *12 (finding that a transgender female inmate's equal protection claim based on her placement in a men's prison had a "greater than negligible chance of success on the merits"); *Doe*, 2018 U.S. Dist. LEXIS 99925, 2018 WL 2994403, at *9 (refusing to dismiss transgender woman prisoner's equal protection claim because "the DOC ha[d] not met its burden of demonstrating that housing her and other similarly situated transgender prisoners in facilities that correspond to their birth sex serves an important governmental interest"); *Norsworthy*, 87 F. Supp. 3d at 1120 (finding that a transgender woman prisoner adequately stated equal protection claim against prison officials for denying her sex reassignment surgery).

Finally, Defendants are not entitled to qualified immunity based on the caselaw and well-established legal principles outlined above. Particularly, the Supreme Court's decision in *Bostock*,

the weight of authority from other circuits holding that discrimination against transgender individuals violates the Fourteenth Amendment, and the Tenth Circuit's decision in *Free the Nipple-Fort Collins* would have put Defendants on notice that they were violating Ms. Griffith's Fourteenth Amendment rights.

### 4.2.4 Separately, the sexual harassment that Ms. Griffith was subjected to demonstrates that Defendants violated the Equal Protection clause.

Ms. Griffith was subjected to significant verbal and physical harassment by staff and other inmates. "[I]t is well-settled that sexual harassment also violates the Equal Protection clause[.]" *Lucente v. Cty. of Suffolk*, 980 F.3d 284, 304, 305 (2d Cir. 2020); *Doe v. Beaumont Indep. Sch. Dist.*, No. 1:21-CV-00132, 2022 U.S. Dist. LEXIS 125296, at *31 n.15 (E.D. Tex. July 14, 2022) (citing cases). "To succeed on her sexual harassment claim under the Equal Protection Clause, [Ms. Griffith] must establish (1) the harassment was intentional and based on sex and (2) the harassment was 'sufficiently severe or pervasive.'" *Hampton*, 2018 U.S. Dist. LEXIS 190682, at *37-39 (quoting *Trautvetter v. Quick*, 916 F.2d 1140, 1149 (7th Cir. 1990). "[A] plaintiff wishing to sustain an equal protection claim of sexual harassment must show both 'sexual harassment' and an 'intent' to harass based upon that plaintiff's membership in a particular class of citizens." *Id*. at 1040.

As alleged, Ms. Griffith was sexually harassed by Defendant Mustapick who, on intake to the El Paso County Jail, ordered Ms. Griffith to undress, bend over, and "spread [her] sexy cheeks," and then grabbed his own penis while threatening Ms. Griffith that he was "going to go balls deep in that ass". [Doc. #124], ¶¶ 71-83. After this egregious harassment, Ms. Griffith continued to be consistently harassed and mis-gendered by deputies because she is a transgender woman (including an incident where a deputy called Ms. Griffith a "blind faggot"). *Id.*, ¶¶ 97-109. Ms. Griffith was also assaulted by another inmate because she was discriminatorily placed into a unit that does not correspond with her gender identity. *Id.*, ¶ 84-88. Given all of this, Ms. Griffith

has alleged a compelling sexual harassment claim under the Equal Protection clause McNamarah, Chan Tov, Misgendering as Misconduct, 68 UCLA L. Rev. Disc. 40, 43 (2020).[3] Defendant Mustapick is not entitled to qualified immunity based on the caselaw and well-established legal principles outlined here.

### 4.3 **Plaintiff adequately alleges that Defendants violated her substantive due process rights under the Fourteenth Amendment.**

The Due Process Clause of the Fourteenth Amendment protects pretrial detainees—who have not been adjudged guilty of any crime—from any conditions or restrictions that amount to punishment. *Bell v. Wolfish*, 441 U.S. 520, 535-37 (1979); *see also Valdez v. Rosenbaum*, 302 F.3d 1039, 1045 (9th Cir. 2002).[4] "[I]f a restriction or condition is not reasonably related to a

---

[3] Citing *G. G. ex rel. Grimm v Gloucester Cty. Sch. Bd.*, 822 F3d 709, 716 (4th Cir 2016) (finding misgendering "display[s] hostility"), *vacated*, 137 S Ct 1239 (2017); *Hampton*, 2018 U.S. Dist. LEXIS 190682, 2018 WL 5830730, at *2 (quoting medical testimony that "misgendering transgender people can be degrading, humiliating, invalidating, and mentally devastating" and holding that transgender woman had a strong equal protection claim based on sexual harassment in a male prison and was likely to succeed on the merits where prisoners and correctional officers constantly misgendered her and verbally abused her with slurs such as "fag," "it," "he-she", and "dick-sucker"); *Prescott v Rady Children's Hosp.-San Diego*, 265 F Supp 3d 1090, 1096 (S.D. Cal. 2017) ("For a transgender person with gender dysphoria, being referred to by the wrong gender pronoun is often incredibly distressing."); *Rumble v Fairview Health Servs.*, No. 14-CV-2037, 2015 U.S. Dist. LEXIS 31591, at *71 (D. Minn. Mar. 16, 2015) (rejecting defendant's characterization of misgendering as a "perceived slight[]" and concluding it was "objectively offensive behavior"); *Doe v City of New York*, 42 Misc. 3d 502 (Sup Ct NY County) (concluding purposeful misgendering as "not a light matter, but one which is laden with discriminatory intent"); *see also Gregory v. Jeffreys*, No. 21-1097, 2021 U.S. Dist. LEXIS 206187, at *10 (C.D. Ill. Oct. 26, 2021) (holding that "Plaintiff has adequately alleged Defendant Warden Jackson violated Plaintiff's equal protection rights based on a policy and practice of allowing staff to sexually harass transgender inmates"); *Tay*, 457 F. Supp. 3d at 683 (S.D. Ill. 2020); *Hecox v. Little*, 479 F. Supp. 3d 930, 957 (D. Idaho 2020) (finding that "misgendering" was "concerning" given that it is "degrading, mean, and potentially mentally devastating to transgender individuals"); *Joyner v. Snyder*, No. 06-3062, 2007 U.S. Dist. LEXIS 7214, 2007 WL 401269, at *2 (C.D. Ill. Feb. 1, 2007) (finding that prisoner sufficiently stated an equal protection violation where prisoner alleged that he was harassed and discriminated against because of his sexual orientation).

[4] Pretrial detainees possess greater constitutional rights than prisoners. *Stone v. City & County of San Francisco*, 968 F.2d 850, 857 n.10 (9th Cir. 1992); *see also Mendiola-Martinez v. Arpaio*, 836 F.3d 1239, 1246 n.5 (9th Cir. 2016) ("Eighth Amendment protections apply only once a prisoner

legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees[.]" *Bell*, 441 U.S. at 539 Punishment occurs if an official action causes the "infliction of pain" on an inmate that is "unnecessary and wanton." *Jordan v. Gardner*, 986 F.2d 1521, 1525 (9th Cir. 1993). Physical injury need not result for the punishment to state a cause of action, for the wanton infliction of psychological pain is also prohibited. *Benefield v. McDowall,* 241 F.3d 1267, 1272 (10th Cir. 2001); *Calhoun v. Detella,* 319 F.3d 936, 939 (7th Cir. 2003).

### 4.3.1 Defendant El Paso County subjected Ms. Griffith to unconstitutional conditions of confinement through near-constant sexual harassment and unwanted cross-gender touching.

"[A] female detainee has the right not to be sexually harassed, verbally or physically, by other detainees or guards." *Shaw v. District of Columbia*, 944 F. Supp. 2d 43, 58-59 (D.D.C. 2013); *Farmer v. Brennan*, 511 U.S. at 834 (1994) (unsolicited sexual touching, harassment, and coercion are "simply not part of the penalty that criminal offenders pay for their offenses against society" (internal quotations omitted)).[5] El Paso County officials' continuous harassment of Ms. Griffith and repeated unwanted cross-gender touching of her, as amply alleged, violated her substantive due process rights. [Doc. #124], ¶¶ 97-109.

---

has been convicted of a crime, while pretrial detainees are entitled to the potentially more expansive protections of the Due Process Clause of the Fourteenth Amendment.").
[5] *See also Women Prisoners of the District of Columbia Dep't of Corrections v. D.C.*, 877 F. Supp. 634, 664-67 (D.D.C. 1994) (sexual assault, coercion and harassment of the sort alleged by plaintiff violate contemporary standards of decency and can cause severe physical and psychological harm); *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992) (holding that where no legitimate law enforcement or penological purpose can be inferred from the defendant's alleged conduct, the harassment itself may also be sufficient evidence of a malicious and sadistic state of mind"); *Joseph v. U.S. Fed. Bureau of Prisons*, 232 F.3d 901 (10th Cir. 2000) ("[B]ecause the sexual harassment or abuse of an inmate by a corrections officer can never serve a legitimate penological purpose and may well result in severe physical and psychological harm, such abuse can, in certain circumstances, constitute the unnecessary and wanton infliction of pain[] that is forbidden by the Eighth Amendment."); *Barney v. Pulsipher*, 143 F.3d 1299, 1310 (10th Cir.1998).

### 4.3.2 **Defendant Mustapick subjected Ms. Griffith to unconstitutional conditions of confinement through the cross-gender visual body-cavity search he performed on her.**

A visual body-cavity search violates the Constitution where the search was "conducted in a harassing manner intended to humiliate and inflict psychological pain." *Fillmore v. Page,* 358 F.3d 496, 505 (7th Cir. 2004); *Calhoun,* 319 F.3d at 939. "[E]xposing a person's naked body involuntarily is a severe invasion of personal privacy." *Colbruno v. Kessler*, 928 F.3d 1155, 1161-63 (10th Cir. 2019) (holding that pretrial detainee who was walked naked through public areas of a hospital had a valid claim under the Fourteenth Amendment that his jailers violated clearly established law). Forcing Ms. Griffith to be naked in front of a male guard, who then made her spread her "sexy" butt cheeks to "go balls deep" while grabbing his own penis, [Doc. #124], ¶¶ 71-83, certainly rises to "calculated harassment unrelated to prison needs" with the intent to humiliate Ms. Griffith. *Richards v. Wexford*, 2021 U.S. App. LEXIS 31545, 2021 WL 4892160, at *3 (7th Cir. Oct. 20, 2021). This is highlighted by the multiple courts that have held that actions similar to, and less egregious than, the actions of Defendant Mustapick imposed unconstitutional conditions of confinement on the plaintiff-inmate; these cases and legal principles also demonstrate why Defendant Mustapick is not entitled to qualified immunity.[6]

---

[6] *See Vazquez v. Cty. of Kern*, 949 F.3d 1153, 1163-64 (9th Cir. 2020) (holding that a female pretrial detainee had shown Fourteenth Amendment violation where a guard had watched a female detainee shower, along with: (1) calling the detainee "babe"; (2) telling the detainee that she had a "big butt"; (3) commenting on the detainee's shower gown; (4) telling the detainee that he had seen her in the shower and that she should leave her boyfriend to find someone like him; and (5) telling the detainee about a sexual dream he had about her and that he wanted the dream to come true); *Kent v. Johnson*, 821 F.2d 1220, 1227- 28 (6th Cir. 1987) (holding that plaintiff sufficiently alleged a violation of his constitutional rights where he alleged "that female prison guards have allowed themselves unrestricted views of his naked body in the shower, at close range and for extended periods of time, to retaliate against, punish and harass him for asserting his right to privacy"); *Semelbauer v. Muskegon Cnty.*, No. 1:14-cv-1245, 2015 U.S. Dist. LEXIS 189417, 2015 WL 9906265, at *3-4 (W.D. Mich. Sept. 11, 2015) (permitting plaintiff to proceed on separate claims that the viewing of female inmates by male guards violated both her Fourth and Eighth Amendment rights); *Payette v. Hoenisch*, 284 Fed. Appx. 348, 2008 U.S. App. LEXIS 14441, No. 07-3249, 2008 WL 2648917, at *5 (7th Cir. 2008) (holding that plaintiff's evidence

### 4.3.3 Defendant El Paso County subjected Ms. Griffith to unconstitutional conditions of confinement through its officials' repeated cross-gender pat-down searches of her.

The cross-gender pat-down searches inflicted on Ms. Griffith violated her Fourteenth Amendment rights by imposing on her an unconstitutional condition of confinement. [Doc. #124], ¶¶ 89-96. Multiple courts have held that repeated cross-gender pat-down searches of women, absent emergency circumstances that would necessitate performing a cross-gender pat-down search, impose unconstitutional conditions of confinement. *See Jordan*, 986 F.2d at 1526; *Colman v. Vasquez*, 142 F.Supp.2d 226 (D. Conn. 2001); *Nelson v. City of Stamford*, No. 3:09-cv-1690 (VLB), 2012 U.S. Dist. LEXIS 8907, at *72-73 (D. Conn. Jan. 25, 2012). For example, in *Colman*, a court addressed the constitutionality of cross-gender at searches in the context of a female prisoner incarcerated in a special unit for victims of sexual assault who was forced to submit to pat searches by male guards. 142 F.Supp.2d at 226. The *Colman* court noted that "'women experience unwanted touching by men differently from men subject to comparable touching by women.'" 142 F.Supp.2d at 232 (quoting *Jordan*, 986 F.2d at 1521). And, in *Jordan*, the Court found that women who expressed significant emotional distress at being continually

---

"that he was strip searched in front of a window in which everyone in the booking department, including inmates and officials of both sexes, could see him . . . create a triable dispute whether the search was conducted 'in a harassing manner intended to humiliate and inflict psychological pain'") (quoting *Calhoun*, 319 F.3d at 939); *Solan v. Ranck*, No. CV-06-0049, 2007 U.S. Dist. LEXIS 84903, 2007 WL 4111424, at *8 (M.D. Pa. 2007) (holding that Eighth Amendment claim was stated where plaintiff alleged that correctional officers deliberately prevented him from placing his towel around his waist then dragged him naked in front of a large group of people of both sexes; this allegation supports the inference that they intended to humiliate him, an action without any penological justification, due to the fact that defendants deliberately put the plaintiff on display naked); *see also Vasquez v. Raemisch*, 480 F. Supp. 2d 1120, 1131-32 (W.D. Wis. 2007) (holding that Eighth Amendment claim was stated as to strip search where the plaintiff alleged his constitutional rights were violated by the manner of the search whereby several officers made contact with his genitals; the court held that "[e]ven if legitimate security reasons existed for proceeding directly to a manual search, there could be no legitimate purpose for using a strip search as a means of obtaining sexual gratification or conducting it in a manner intended to humiliate the prisoner, which is what petitioner alleges respondents . . . were doing").

being subjected to cross-gender pat-down searches had a claim for violation of their Constitutional rights. *Jordan*, 986 F.2d at 1531 (en banc) (holding that a cross-gender clothed body search policy at a women's prison constituted cruel and unusual punishment because many of the inmates had histories of sexual or physical abuse by men and because cross-gender bodily searches, even if conducted properly, would likely inflict psychological trauma).

Here, Ms. Griffith was part of a particularly vulnerable population, transgender woman inmates, and suffered from Gender Dysphoria. [Doc. #124], ¶¶ 48-49. She is also blind. *Id.*, ¶¶ 50. The searches were not performed under exigent circumstances or due to any emergency; she was routinely patted-down by male deputies. *Id.*, ¶¶ 89-96. Ms. Griffith has adequately alleged a claim against El Paso County for violating her Fourteenth Amendment rights through its customary practice, which was done pursuant to El Paso County policy, of subjecting her to continuous cross-gender pat-down searches. *Id.*, ¶¶ 89-96.

### 4.3.4 Defendants El Paso County, Ford, O'Neal, Noe, Gillespie, and Elder violated Ms. Griffith's rights under the United States and Colorado Constitutions by failing to protect her from assault.

Prison officials have a duty to "take reasonable measures to guarantee the safety of the inmates." *Farmer*, 511 U.S. at 832. More to the point, they "have a duty to protect prisoners from violence at the hands of other prisoners." *Farmer*, 511 U.S. at 833. "A prison official violates the [Constitution] 'when a substantial risk of serious harm, *of which the official is subjectively aware*, exists[,] the official does not respond reasonably to the risk,'" and the official's actions or inaction causes the injury. *Id.* The prison official must be both aware of the risk and draw the inference. *Farmer*, 511 U.S. at 837. The Supreme Court in *Farmer* held that circumstantial evidence and the obviousness of the substantial risk of harm, not just actual notification, may be used to establish subjective awareness. 511 U.S. at 842-44. Further, allegations suggesting the substantial risk was "long-standing, pervasive, [or] well-documented" and the defendants "had

been exposed to information concerning the risk and thus must have known about it ... could be sufficient ... to find that [the defendants] had actual knowledge of the risk." *Id.* at 842-43 (internal quotation marks and citation omitted).

When analyzing subjective awareness, courts have considered the obviousness of the risk to inmate safety, the defendant's knowledge about the vulnerability of certain types of inmates to risk of harm, prison policies pertaining to such inmates, and their housing placements. *See Greene v. Bowles*, 361 F.3d 290, 294 (6th Cir. 2004); *Taylor v. Mich. Dep't of Corr.*, 69 F.3d 76, 81-82 (6th Cir. 1995).[7] Placing Ms. Griffith, a blind, transgender woman, into a general population male ward was nearly *per se* deliberately indifferent to a risk that she would be assaulted by male inmates. *See Diamond v. Owens*, 131 F. Supp. 3d 1346, 1376-79 (M.D. Ga. 2015) (holding that a non-violent, transgender female inmate, faced a substantial risk of sexual assault at closed-security facilities because the risk was obvious and that guards are obviously aware from PREA that transgender inmates face a substantial vulnerability to sexual assault).

*Farmer* itself provides strong and binding authority that Defendants violated Ms. Griffith's rights by not protecting her from male inmates. In *Farmer*, a transgender inmate, allegedly known to be vulnerable to sexual assault, complained prison officials were deliberately indifferent to a substantial risk of sexual assault by placing her in general population at a "higher security facility" known for its violent environment and history of assaults. *Farmer*, 511 U.S. at 825. The Supreme Court emphasized the constitutional right of prisoners to be reasonably protected from the

---

[7] *See also Green v. Hooks*, 2013 U.S. Dist. LEXIS 124806, 2013 WL 4647493, at *2-*3 (S.D. Ga.); *Shaw*, 944 F. Supp. 2d at 59-60 ("Plaintiff ... points ... to [reports, regulations, and professional guidelines] ... to provide factual grounding to support the inference that the risk to transgender detainees was obvious, well-documented, and known to [d]efendants." (internal quotation marks and citation omitted)); *Newsome v. Higham*, 2010 U.S. Dist. LEXIS 29521, 2010 WL 1258013, at *3-*4 (M.D. Ga.); *Farmer v. Carlson*, 685 F. Supp. 1335, 1342 (M.D. Penn. 1988) ("Clearly, placing plaintiff, a twenty-one year old transsexual, into the general population at ... a [high-]security institution, could pose a significant threat to internal security in general and to plaintiff in particular.").

violence of other inmates. *Id.* at 833 ("[G]ratuitously allowing the beating or rape of one prisoner by another serves no 'legitimate penological objectiv[e].'" (citation omitted)). The Supreme Court ultimately held that "a prison official may be held liable... if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Id.* at 847. Here, Defendants were aware that Ms. Griffith is a transgender female, knew she is blind, and knew, because of these two things, that she placing her into an all-male unit would make her particularly vulnerable to sexual assault. [Doc. #124], ¶¶ 47-50.  They also knew that incarceration standards dictated that transgender women are vulnerable to sexual assault when placed in all-male units. *Id.*, ¶¶ 42-43, 45-46. Still, Defendant El Paso County took no action to move her to a female unit. This violated Ms. Griffith's rights. *See Diamond*, 131 F. Supp. 3d at 1379-80.

Finally, Defendants Ford, O'Neal, Noe, Gillespie, and Elder are not entitled to qualified immunity based on the caselaw and well-established legal principles outlined above.

### 4.4 **<u>Plaintiff adequately alleges that Defendants El Paso County, Elder, Gilespie, Mustapick, and Elliss subjected her to unlawful searches under the Fourth Amendment.</u>**

Whether a particular search is constitutional is judged by "balancing of the need for the particular search against the invasion of personal rights that the search entails." *Bell*, 441 U.S. at 559. Courts make this determination by balancing four non-exclusive factors. *Id.*; *see also Harris v. Miller*, 818 F.3d 49, 58 (2d Cir. 2016). Those factors are: "[1] the scope of the particular intrusion, [2] the manner in which it is conducted, [3] the justification for initiating it, and [4] the place in which it is conducted." *Id.*

Defendant Mustapick's visual body-cavity of Ms. Griffith, which included an inspection of her anal and genital areas, violated her constitutional rights. [Doc. #124], ¶¶ 71-83; *see Maricopa Cnty. Sheriff's Dep't*, 629 F.3d at 1142 (holding that a cross-gender strip search was unreasonable

21

as a matter of law where there was no emergency). A strip-search, let alone a visual body-cavity search, is "one of the clearest forms of degradation in Western Society" and the indignity imposed by strip searches is multiplied when one's body is "viewed by a member of the opposite gender." *Canedy v. Boardman*, 16 F.3d 183, 185 (7th Cir. 1994); *Chapman v. Nichols*, 989 F.2d 393, 395 (10th Cir.1993) ("[A] strip search is an invasion of personal rights of the first magnitude."). Courts have held that blanket policies subjecting all newly-arrested detainees in a local correctional facility to visual body cavity searches, even when performed by guard who is a member of the same gender as the detainee, are unconstitutional. *See Shain v. Ellison*, 273 F.3d 56, 64-65 (2d Cir. 2001); *Wachtler v. County of Herkimer*, 35 F.3d 77, 82 (2d Cir. 1994). In order for a visual body cavity search to be found reasonable under the circumstances, there must be some "'particularized suspicion,' arising either from the nature of the charge or specific circumstances relating to the arrestee and/or the arrest," that the arrestee is concealing weapons or other contraband. *Weber v. Dell*, 804 F.2d 796, 802 (2d Cir. 1986) (citing *United States v. Montoya De Hernandez*, 473 U.S. 531, 540 (1985)); *Murcia v. County of Orange*, 226 F. Supp. 2d 489, 494 (S.D.N.Y. 2002).

First, "regardless of who performs the search, a visual body cavity search, such as the one conducted here, is invasive." *Harris*, 818 F.3d at 58. A search "that involves a stranger peering without consent at a naked individual, and in particular at the most private portions of that person's body, is a serious invasion of privacy." *Florence v. Bd. of Chosen Freeholders*, 566 U.S. 318 (2012) (Breyer, J., dissenting).[8]

---

[8] *See also Canedy*, 16 F.3d at 185 ("[O]ne of the clearest forms of degradation in Western Society is to strip a person of his clothes. The right to be free from strip searches and degrading body inspections is thus basic to the concept of privacy." (quoting 3 George B. Trubow, ed., *Privacy Law and Practice*, ¶ 25.02[1] (1991))); *Cookish v. Powell*, 945 F.2d 441, 446 (1st Cir. 1991) ("[A] 'severe if not gross interference with a person's privacy [] occurs when guards conduct a visual inspection of body cavities.").

Second, "while all forced observations or inspections of the naked body implicate a privacy concern, it is generally considered a greater invasion to have one's naked body viewed by a member of the opposite sex." *Canedy*, 16 F.3d at 185; *see also Byrd v. Maricopa Cty. Sheriff's Dep't*, 629 F.3d 1135, 1141 (9th Cir. 2011). For this reason, "[c]ourts throughout the country have universally frowned upon cross-gender strip searches in the absence of an emergency or exigent circumstances." *Byrd*, 629 F.3d at 1143.[9]  "Indeed, best-practice standards in prison management typically discourage cross-gender strip searches." *Harris*, 818 F.3d at 59. For example, the 2009 National Prison Rape Elimination Commission Report "determined that[,] '[t]o prevent abuse, . . . the [Commission's recommended] standard on this subject strictly prohibits non-medical staff from conducting cross-gender strip and visual body cavity searches—except in the case of an emergency—because of their extraordinarily intrusive nature.'" *Byrd*, 629 F.3d at 1142 (quoting the Commission Report at 63). Likewise, the American Correctional Association's recommended standard for cross-gender strip searches "provide[s] that, except in emergency situations, visual inspections of inmate body cavities are conducted by officers of the same sex, in private." *Id.* (quoting Standards for Adult Correctional Institutions § 4-4194 (2003)).

Third, a visual body-cavity search conducted in an unprofessional manner is unreasonable. *See Byrd*, 629 F.3d at 1143 ("[W]e have consistently recognized the 'frightening and humiliating invasion' occasioned by a strip search, 'even when conducted with all due courtesy.'" (quoting *Way v. Cty. of Ventura*, 445 F.3d 1157, 1160 (9th Cir. 2006))). As the Supreme Court stated in *Bell*: "[O]n occasion a security guard may conduct the search in an

---

[9] *See also Lee v. Downs*, 641 F.2d 1117, 1119 (4th Cir. 1981) ("Most people, however, have a special sense of privacy in their genitals, and involuntary exposure of them in the presence of people of the other sex may be especially demeaning and humiliating. When not reasonably necessary, that sort of degradation is not to be visited upon those confined in our prisons."); *Fortner v. Thomas*, 983 F.2d 1024, 1030 (11th Cir. 1993) (citing *Lee* and "join[ing] other circuits in recognizing a prisoner's constitutional right to bodily privacy").

abusive fashion. Such abuse cannot be condoned. The searches must be conducted in a reasonable manner." *Bell*, 441 U.S. at 560 (citations omitted). Here, the visual body-cavity search was conducted in a disgusting and degrading manner by a male guard who made clear his prurient gratification, despite the ready availability of female officers to do the search. *See, e.g., Lee*, 641 F.2d at 1120 ("[I]t was wholly unnecessary for the male guards to remain in the room and to restrain the plaintiff while her underclothing was forcefully removed.").

Fourth, there was no justification for subjecting Ms. Griffith to a cross-gender visual body-cavity search. *See, e.g., Byrd*, 629 F.3d at 1137 n.2, 1142, 1143; *Hayes*, 70 F.3d at 1148.

Fifth, the fact that the visual body-cavity search was conducted outside of the presence of other individuals makes it less reasonable because there was more chance for abuse. *See Byrd*, 629 F.3d at 1143. Indeed, Defendant Mustapick predictably seized this opportunity to sexually degrade Ms. Griffith for his own prurient gratification.

The Tenth Circuit, in an analogous case, held that a cross-gender strip-search, less egregious than the one performed by Defendant Mustapick, violated an inmate's right to be free from unreasonable searches and seizures. In *Hayes v. Marriott*, the male plaintiff alleged that a video-taped strip search conducted in the presence of female corrections officers violated his constitutional rights under the Fourth Amendment. 70 F.3d 1144, 1145 (10th Cir. 1995). Despite an affidavit from a prison official attesting that no females actively participated in the strip search and expressing staffing considerations, the Tenth Circuit reversed the grant of summary judgment in favor of the prison officials. *Id*. at 1147-48. In doing so, the Tenth Circuit explicitly recognized that an inmate's privacy rights may be violated by a single cross-gender strip-search. *Id*. at 1147. And, in another case, the Tenth Circuit held that an officer who forced a female inmate to expose her breasts to a female deputy in order to pump her breast milk, without any penological justification, violated her right to be free from unreasonable searches. *Shroff v. Spellman*, 604 F.3d

1179, 1191 (10th Cir. 2010). Importantly, the Tenth Circuit defined the right of the plaintiff that was violated as the "personal right not to be required to expose her breasts before another person." *Id.*

Ultimately, the caselaw is clear that "cross-gender strip searches" let alone cross-gender visual body-cavity searches, "in the absence of an emergency violate an inmate's right under the Fourth Amendment to be free from unreasonable searches." *Byrd*, 629 F.3d at 1144-47; *Cookish*, 945 F.2d at 442; *Moore v. Carwell*, 168 F.3d 234, 235 (5th Cir. 1999); *Shaw*, 944 F. Supp. 2d at 56-57. Therefore, Ms. Griffith has adequately alleged that Defendants violated her rights and that they are not entitled to qualified immunity.

### 4.5 **Defendants El Paso County, Elder, Gilespie, Mustapick, and Elliss violated Ms. Griffith's rights under the Fourteenth Amendment by unconstitutionally invading her right to privacy and bodily integrity.**

"Visual body cavity searches are invasive and degrading, occasioning a serious invasion of privacy and working a significant harm to a person's bodily integrity." *Sloley v. Vanbramer*, 945 F.3d 30, 38 (2d Cir. 2019); *Vazquez*, 949 F.3d at 1165 (alteration in original) (quoting *Hydrick v. Hunter*, 500 F.3d 978, 1000 (9th Cir. 2007) ("[T]he Fourteenth Amendment protects a sphere of privacy, and the most 'basic subject of privacy . . . the naked body.'"); *Shroff*, 604 F.3d at 1191 ("In a civilized society, one's anatomy is draped with constitutional protections.").

"[A]ll forced observations or inspections of the naked body implicate a privacy concern." *Canedy*, 16 F.3d at 185. To state the obvious, visual body-cavity searches are even more intrusive as they "require an arrestee not only to strip naked in front of a stranger, but also to expose the most private areas of her body to others. This is often, as here, done while the person arrested is required to assume degrading and humiliating positions." *Swain v. Spinney*, 117 F.3d 1, 6 (1st Cir. 1997). The freedom from such "degrading body inspections is . . . basic to the concept of privacy." *Canedy*, 16 F.3d at 185 (internal quotation marks omitted); *Byrd*, 845 F.3d at 922-24

(noting that the right to bodily privacy may be violated if, for example, the viewing of an inmate's naked body while showering and/or using the toilet is "frequent[]" and "up close" or "neither obscured nor distant").

Moreover, "any reasonable adult in our society would understand that the involuntary exposure of an adult's nude body is a significant imposition on the victim. And law-enforcement officers in this circuit have been taught this lesson repeatedly." *Colbruno*, 928 F.3d at 1163-65.[10] Several other circuits have recognized that officials can violate the Eighth Amendment (which imposes a higher burden than the Fourteenth Amendment) by forcing inmates to expose their naked bodies for the purpose of humiliation. *See Calhoun*, 319 F.3d at 939; *Kent*, 821 F.2d at 1227-28; *Lee*, 641 F.2d at 1119. When considering Defendant Mustapick's sexually degrading statements and gesture, in combination with his position of power over Ms. Griffith and the humiliating position that he had Ms. Griffith in when he made the statements, it is clear that he violated her right to privacy and bodily integrity. *See Vazquez*, 949 F.3d at 1162; *Fontana v. Haskin*, 262 F.3d 871, 881-82 n.6. (9th Cir. 2001). According to this authority, Defendants Elder, Gilespie, Mustapick, and Elliss all violated Ms. Griffith's clearly established rights.

### 4.6 **Defendant Elliss failed to intervene to prevent the violation of Ms. Griffith's Fourth and Fourteenth Amendment rights.**

---

[10] In *Cumbey v. Meachum*, 684 F.2d 712 (10th Cir. 1982), the Tenth Circuit reversed the dismissal of a prisoner's complaint that his constitutional rights had been violated because female prison guards "are assigned to posts where they observe[d] him dressing and undressing and using the toilet and the shower," holding that "[a]lthough the inmates' right to privacy must yield to the penal institution's need to maintain security, it does not vanish altogether." *Id.* at 713-14. More recently, the Tenth Circuit stated that "exposing a person's naked body involuntarily is a severe invasion of personal privacy" in a case where it held that parading a naked inmate through a hospital violated his clearly established right to privacy and bodily integrity under the Fourteenth Amendment. *Colbruno*, 928 F.3d at 1163-65; *see also Hill v. Bogans*, 735 F.2d 391 (10th Cir. 1984) (holding that the Denver jail had violated a detainee's constitutional rights by requiring him to expose his naked body in a public area of the jail in front of "ten to twelve people [] milling about.").

As alleged, Defendant Elliss failed to intervene to prevent the violation of Ms. Griffith's Constitutional rights. [Doc. #124], ¶¶ 71-83. "[A]ll law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Vondrak v. City of Las Cruces*, 535 F.3d 1198, 1210 (10th Cir. 2008). For failure to intervene liability to attach, a plaintiff must simply establish that "officers have knowledge of a constitutional violation," *Jones v. Norton*, 809 F.3d 564 (10th Cir. 2015), and "a realistic opportunity to intervene to prevent the harm from occurring." *Vondrak*, 535 F.3d at 1210. The Tenth Circuit has repeatedly found an officer to possess knowledge where there was indeed an underlying constitutional violation, and where the officer was "on the scene[,]" *Casey v. City of Federal Heights*, 509 F.3d 1278, 1283 (10th Cir. 2017), or "present for the [violation]." *Fogarty v. Gallegos*, 523 F.3d 1147, 1164 (10th Cir. 2008). Here, as alleged, Defendant Elliss was present for the violation and explicitly allowed it to occur. [Doc. #124], ¶¶ 74-77. Ms. Griffith begged Defendant Elliss to let a woman search her. *Id.* Defendant Elliss refused and actively chose to leave and allow Defendant Mustapick to search Ms. Griffith unsupervised. *Id.* Under a failure to intervene theory, Ms. Griffith has adequately alleged that Defendant Elliss violated her Constitutional rights.

Finally, it is clearly established that officers who are present for constitutional violations by other officers, and do nothing to intervene, violate the Constitution. *Vondrak*, 535 F.3d at 1210 (an officer is liable if the officer had observed or had reason to know "that any constitutional violation has been committed by a law enforcement official."); *Fogarty v. Gallegos*, 523 F.3d 1147, 1164 (10th Cir. 2008). Defendant Elliss' violation was "obvious" and "particularly clear[.]" *Casey,* 509 F.3d at 1283. And, the Tenth Circuit has time and again held that when officials are on the scene and fail to intervene, regardless of the constitutional violation occurring, they are liable under clearly established law. *See Reid v. Wren*, 57 F.3d 1081, at *2 (10th Cir. 1995); *Walton v.*

*Gomez (In re Estate of Booker)*, 745 F.3d 405, 422 n.25 (10th Cir. 2014); *see also Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir. 1994).

    4.7 **Plaintiff adequately alleges municipal liability against El Paso County.**

        4.7.1 **El Paso County maintained a facially unconstitutional policies relating to the treatment of transgender inmates.**

Where an official policy or practice is unconstitutional on its face, it necessarily follows that a policymaker was not only aware of the specific policy, but was also aware that a constitutional violation was most likely to occur. *See Burge v. St. Tammany Parish*, 336 F.3d 363, 370 (5th Cir. 2003); *Craig v. Floyd County*, 643 F.3d 1306, 1310 (11th Cir. 2011); *Heaney v. Costigan*, Civil Action No. 09-cv-01006-MSK-BNB, 2012 U.S. Dist. LEXIS 55655, at *3 (D. Colo. Apr. 20, 2012). Where a plaintiff claims that a particular municipal action *itself* violates federal law, or directs an employee to do so, resolving issues of fault and causation is straightforward. *Bd. of the Cty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997). The conclusion that the action taken or directed by the municipality itself, or its authorized decisionmaker, violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains. *Id.* If a plaintiff is able to demonstrate that a municipality promulgated a policy that was unconstitutional on its face, she does not also need to prove that the policy was promulgated with knowing disregard for its consequences — knowledge is presumed. *Cf. Burge*, 336 F.3d at 370.

Under this framework, Ms. Griffith need not prove deliberate indifference to establish municipal liability. Although a pattern of unconstitutional action is generally required to prove municipal liability, "a constitutional violation may be such a 'known and obvious' or 'highly predictable consequence' of an ongoing course of action that knowledge of past violations is unnecessary." *Hernandez v. Borough of Palisades Park Police Dep't*, 58 F. App'x 909, 913 (3d Cir. 2003) (citing *Berg v. County of Allegheny*, 219 F.3d 261, 276 (3d Cir. 2000)); *Brown*, 520

U.S. at 409.

As alleged, El Paso County's policies, on their face, violate the Constitution and caused the violation of Ms. Griffith's constitutional rights. First, Ms. Griffith was housed in an all-male unit based specifically on El Paso County policy. [Doc. #124], ¶¶ 54, 57, 58, 66. Second, per El Paso County policy, Ms. Griffith was subjected to a cross-gender visual body cavity search. *Id.*, ¶ 74. Third, Ms. Griffith was subjected to continuous cross-gender pat down searches without any exigency or other penological basis pursuant to El Paso County policy. *Id.*, ¶ 94. Fourth, Ms. Griffith was denied access to gender-affirming clothing because of the official policies of El Paso County. *Id.*, ¶ 118. Because the violations of Ms. Griffith's rights were due to unconstitutional official policies, El Paso County's knowledge "necessarily follows[,]" *Hobart v. City of Stafford*, No. 4:09-CV-3332, 2015 U.S. Dist. LEXIS 47953, at *37-39 (S.D. Tex. Apr. 13, 2015)[,] and dismissing Ms. Griffith's claims against El Paso County is inappropriate.

### 4.7.2 El Paso County officials customarily violated Ms. Griffith's rights over the course of a year and a half.

To establish municipal liability, a plaintiff must show (1) the existence of a municipal custom, (2) that the defendant enacted or maintained the custom with the requisite state of mind, and (3) that the custom is the moving force behind the injury alleged. *Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010). Municipal liability is cognizable where there is "an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law." *Id.* State of mind and causation are "satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998).

Courts in this District have held that a plaintiff pleads existence of a continuing, persistent, and widespread practice of unconstitutional conduct through allegations demonstrating "multiple harms that occurred to the plaintiff himself" especially when those harms "occurred in the open" and involved "multiple officials[.]" *Arakji v. Hess*, No. 15-cv-00681-CMA, 2015 U.S. Dist. LEXIS 161600, at \*16-17 (D. Colo. Dec. 2, 2015) (quoting *Taylor*, 2011 U.S. Dist. LEXIS 97985, at \*3). Other authority holds that the repeated violation of an inmate's constitutional rights over the course of their incarceration demonstrates *Monell* liability. *See Crowson v. Wash. Cty. State of Utah*, 983 F.3d 1166, 1191 (10th Cir. 2020); *Cady v. Cumberland Cty. Jail*, No. 2:10-cv-00512-NT, 2013 U.S. Dist. LEXIS 109195, \*112 (D. Me. Mar. 22, 2013); *Jacoby v. DuPage Cty. Ill.*, No. 12 CV 6539, 2013 U.S. Dist. LEXIS 89934, at \*9 (N.D. Ill. June 26, 2013); *Rykard v. City of Dothan*, No. l:10-cv-868-MHT [wo], 2011 U.S. Dist. LEXIS 101135, at \*9 (M.D. Ala. Aug. 9, 2011); *see also Smith v. Corr. Corp. of Am., Inc.*, 674 F. Supp. 2d 201, 206 (D.D.C. 2009).

This is not a case where a decision by a single employee (or even a few employees) caused a single violation of Ms. Griffith's constitutional rights. This is a case where at least a half dozen El Paso County officials (and medical contractors), over the course of a year and a half, made *repeated* decisions to: (1) house Ms. Griffith in a facility that did not correspond with her gender identity despite her many requests to be moved to an all-women facility, [Doc. #124], ¶¶ 47-66; (2) continuously subject her to cross-gender pat-down searches without any exigency or penological justification, *Id.*, ¶¶  89-93; (3) constantly mis-gender her, *Id.*, ¶¶ 97-105; and (4) deny her access to gender-affirming clothing items simply because she is a transgender woman. *Id.*, ¶¶ 110-118. It is unfathomable that every El Paso County official that interacted with Ms. Griffith chose the same course of action over the entirety of Mr. Griffith's incarceration absent their decisions being guided by El Paso County's customs and practices. Because of the many separate wrongful actions (and inactions) committed by El Paso County officials, the events underlying the

Defendants' violations of Ms. Griffith's rights <u>alone</u> is sufficient evidence of a pattern to hold it liable under *Monell. Crowson v. Wash. Cty. State of Utah*, 983 F.3d at 1191.

### 4.7.3 Defendant Elder's decisions, as a final policymaker for El Paso County, subject the County to *Monell* liability.

Defendant Elder "is a final policymaker with regard to [the El Paso County] jail, such that his actions 'may fairly be said to be those of the municipality.'" *Lopez*, 172 F.3d at 763 (quoting *Brown*, 520 U.S. at 404); *see also Layton v. Bd. of Cty. Comm'rs*, 512 F. App'x 861, 870-72 (10th Cir. 2013). A decision by municipal policymakers on a single occasion can satisfy the "official policy" requirement of *Monell. Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986). Where action is directed by a "final policymaker," the municipality is equally responsible whether that action is taken only once or repeatedly. *Id*. at 484-85.

Here, Defendant Elder possesses final policymaking authority in the operation of the El Paso County and his decisions regarding the Jail's treatment of transgender individuals, in and of themselves, are the decisions of El Paso County. "[F]inal policymaking authority is a legal issue to be determined by the court based on local and state law." *Randle v. City of Aurora*, 69 F.3d 441, 447 (10th Cir. 1995). Colorado law explicitly grants that Defendant Elder, as the elected Sheriff of El Paso County, "shall have charge and custody of the jails of the county, and of the prisoners in the jails, and shall supervise them himself or herself or through a deputy or jailer." C.R.S. § 30-10-511. Defendant Elder's authority as to the operation of the El Paso County Jail is unlimited and unchecked.[11] In accordance with the undeniable fact that sheriffs have complete authority over the operation of their county jail, courts have consistently found that Colorado sheriffs are final policymakers when it comes to the operation of jails. *E.g. Cortese v. Black*, 838 F. Supp. 485, 495-96 (D. Colo. 1993) (holding that Larimer County Sheriff was a "final policymaker"); *Carrillo v.*

---

[11] *See, e.g.*, C.R.S. §§ 30-10-503, 504, 506 and 522.

*Suthers*, 2014 U.S. Dist. LEXIS 184359, *32 (D. Colo. December 29, 2014) (noting that "a sheriff is typically the final policymaker for matters concerning the operations of a county jail"). And, as alleged, the circumstances of Defendant Elder's authority make clear that he is a final policymaker for the El Paso County Jail's treatment of transgender individuals. [Doc. #124], ¶ 14. Because Defendant Elder is not "meaningfully constrained by policies not of that official's own making," Defendant's decisions are "final -- i.e., are [not] subject to any meaningful review," and the decision in how to treat transgender individuals is "within the realm of [his] grant of authority" at state law. *Randle*, 69 F.3d at 448. For these reasons, the decisions alleged to have been made by Defendant Elder are attributable to El Paso County and implicate its liability for the violation of Ms. Griffith's constitutional rights. [Doc. #124], ¶ 42 (make facility assignments to people in custody solely on the basis of the individual's genitalia); *Id.*, ¶¶ 54, 57, 106 (policy of housing Ms. Griffith in an all-male unit and condoning discriminatory and harassing treatment of transgender prisoners); *Id.*, ¶ 118 (denial of gender appropriate undergarments and lipstick); *Id.*, ¶ 160 (allowing male deputies to search transgender women without any supervision).

### 4.8 **Plaintiff adequately alleges claims under the Enhance Law Enforcement Integrity act.**

#### 4.8.1 **The Enhance Law Enforcement Integrity Act authorizes a claim against Defendants in their official capacities.**

The Enhance Law Enforcement Integrity Act establishes a cause of action against any "peace officer . . . who, acting under color of state law, subjects or causes to be subjected . . . any other person to the deprivation of any individual rights that create binding obligations on government actors secured by the bill of rights, section II of the state constitution." The statutory definitions further provide that "peace officer" means "any person employed by a political subdivision of the state required to be certified by the P.O.S.T. board," including "sheriffs." C.R.S. §§ 24-31-901(3), 16- 2.5-102 (emphasis added). Thus, the statutory language on its face

establishes a cause of action against sheriffs whose actions result in deprivations of constitutional rights. Section 13-21-131's use of the phrase "peace officer" distinguishes it from its federal counterpart under 42 U.S.C. § 1983, which establishes a cause of action against "any person" whose conduct causes a deprivation of federal constitutional rights. The Supreme Court has interpreted "person" to include municipal corporations. *See Monell*, 436 U.S. at 690-95. Thus, in Section 1983 cases, plaintiffs may bring suit for deprivations of constitutional rights directly against municipalities.

Defendants misapprehend the import of this distinction. First, Defendants' argument that the Enhance Law Enforcement Integrity Act does not authorize claims against peace officers in their official capacity would render meaningless one of the key remedial schemes of Section 13-21-131. *Cf. State, Dep't of Revenue, Motor Vehicle Div. v. Borquez*, 751 P.2d 639, 643 (Colo. 1988) (en banc) ("Rules of statutory construction require that in the interpretation of a statute, the legislature will be presumed to have inserted every part for a purpose, and to have intended that every part of a statute should be carried into effect."). C.R.S. § 13-21-131(1) provides that peace officers may be "liable to the injured party for legal or equitable relief or any other appropriate relief." The statute further provides that "in actions for injunctive relief, a court shall deem a plaintiff to have prevailed if the plaintiff's suit was a substantial factor or significant catalyst in obtaining the results sought by the litigation." C.R.S. § 13-21-131(3). Without the ability to bring official capacity suits, these provisions of the statute that allow for injunctive relief and discuss "results sought by the litigation" would be rendered mere surplusage. For example, an official capacity suit may seek a change in a municipality's training which would be beyond the control of an individual officer. Although a sheriff may temporarily have the authority in their individual capacity to implement such a change, if that sheriff dies or leaves office, the claim would not

survive. Only by suing the sheriff, and his deputies, in his official capacity could such equitable relief be obtained. *Cf. Kentucky v. Graham*, 473 U.S. 159, 166, n. 11(1985).

Second, reading the Enhance Law Enforcement Integrity Act to preclude official capacity suits against peace officers would contravene the Act's broad statutory purpose and scheme. The Enhance Law Enforcement Integrity Act is significantly broader than the provisions contained within C.R.S. §13-21-131, which involves only the private civil cause of action. During opening remarks when the Act was first presented, its co-prime sponsor summarized the bill as follows:

> Senate Bill 217 promotes accountability and integrity in law enforcement in a few ways. It mandates the use of body cameras, reigns in the use of deadly force by officers including outlawing chokeholds as methods of apprehension, prevents the rehiring of officers who are found guilty . . . of violent or unlawful behavior; requires public reporting on the use of force in the field; revokes qualified immunity for law enforcement which has served as a shield for many of them from accountability and has significantly denied families justice. Members, the time is now for accountability, transparency, and integrity within our law enforcement.

Hearing on S.B. 20-217 Before the Sen. Comm. on State, Veterans, & Military Affairs, Jun. 4, 2020, 2020 Leg. (statement of Sen. Leroy Garcia), at 5:39-6:33. Additionally, the Enhance Law Enforcement Integrity Act is significantly broader than its federal counterpart, Section 1983. In particular, the Enhance Law Enforcement Integrity Act provides that "[s]tatutory immunities and statutory limitations on liability, damages, or attorney fees do not apply," that "[t]he 'Colorado Governmental Immunity Act' . . . does not apply," and that "[q]ualified immunity is not a defense to liability." C.R.S. § 13-21-131(2)(a)-(b). By any measure, the Enhance Law Enforcement Integrity Act was a sweeping reform intended to apply broadly to actions involving police misconduct. Defendants ask this Court to rule that civil actions against officers in their official capacities—the only type of action that would allow litigants to bring claims seeking to prove a causal connection between departmental policies and deprivations of constitutional rights—should be precluded as a matter of law. Such a ruling would directly contravene the legislature's intent to

promote "accountability, transparency, and integrity." As such, this court should rule that official capacity suits are cognizable under C.R.S. § 13-21-131.

### 4.8.2 Plaintiff has alleged sufficient facts to plausibly state a claim against Defendants Elder and Gillespie in their individual capacities.

Contrary to Defendants' argument, the Enhance Law Enforcement Integrity Act's plain language creates liability against any peace officer, including "sheriffs" and "deputy sheriffs," C.R.S. § 16-2.5-102, who meet the statutory criteria for liability. Under the explicit terms of the statute, any "peace officer… employed by a local government"—whether in a supervisory role or otherwise—is liable under the Enhance Law Enforcement Integrity Act if she, under color of law, "subjects or causes to be subjected…any other person to the deprivation of any individual rights that create binding obligations on government actors secured by the bill of rights, article II of the state constitution." C.R.S. § 13-21-131(1).

When interpreting a statute, a court's "primary purpose is to give effect to the General Assembly's intent." *Ray v. People*, 2019 COA 24, ¶ 13. Courts "endeavor to effectuate the purpose of the legislative scheme, reading that scheme as a whole, giving consistent effect to all of its parts, and avoiding constructions that would render any words or phrases superfluous or would lead to illogical or absurd results." *Butler v. Bd. of Cty. Comm'rs*, 2021 COA 32, ¶ 9. To determine the legislative purpose of a statute, courts "focus first on the language of the statute," giving "the statutory words and phrases their plain and ordinary meanings." *Id.* "As the supreme court has instructed, '[i]f the statutory language is clear and unambiguous, [a court will] apply it as written—venturing no further.'" *Ray*, ¶ 13 (citation omitted).

The Enhance Law Enforcement Integrity Act clearly imposes liability on sheriffs and other supervisory peace officers like Defendants Elder and Gillespie, who, under the color of law, violate or cause a violation of an individual's rights that are secured by Colorado's Bill of Rights. The statute explicitly defines "peace officer" by reference to "section 24-31-901(3)." Section 24-

31-901(3)'s definition of peace officer includes "any person employed by a political subdivision of the state required to be certified by the P.O.S.T. board pursuant to section 16-2.5-102" and Section 16-2.5-102, in turn, includes in its definition sheriffs and deputy sheriffs. Thus, the statutory scheme explicitly and unambiguously contemplates liability against a sheriff and deputy sheriff like Defendants Elder and Gillespie.[12]

Regardless what substantive elements the legislature intended that a plaintiff would need to prove to establish liability under the statute, the plain language clearly contemplates sheriffs and deputy sheriffs as potential defendants. Whether any given sheriff or deputy sheriff is in fact liable for a particular incident will depend on the facts of the specific case at issue, but the statute's reach clearly will extend to impose liability on a sheriff or deputy sheriff if she "subject[ed] or cause[ed] to be subjected…[the plaintiff] to the deprivation of any individual rights…secured by [Colorado's] bill of rights,." C.R.S. § 13-21-131(1). For the reasons below, Plaintiff plausibly pleaded that Defendants Elder and Gillespie caused her to be subjected to such a violation, and the ultimate causation determination, a factual question, is for the jury to make.

Further, the Enhance Law Enforcement Integrity Act was intended to be much broader than its federal counterpart, which has been severely judicially narrowed by many federal courts over the past several decades. Statutes such as Colorado's, which give vitality to state constitutional protections, provide rights independent of potentially similar rights arising from the federal constitution. "[U]nless expressly adopted by a state legislature authorizing civil actions to

_____

[12] Claims against sheriffs like Elder an Gillespie were specifically contemplated in the drafting of the Law Enforcement Integrity Act. *See, e.g.* Leslie Herod, *et al.*, *Colorado took a revolutionary step to reform policing. Here's how we did it.* USA Today (Oct. 28, 2021), https://www.usatoday.com/story/opinion/2021/10/28/colorado-hold-cops-accountable-qualified-immunity/6101915001/.

redress violation of state constitutions, the intent of the 1871 federal legislature that enacted

Section 1983 is irrelevant to the construction of [a] state civil rights act." Gary S. Gildin,

*Redressing Deprivations of Rights Secured by State Constitutions Outside the Shadow of the*

*Supreme Court's Constitutional Remedies Jurisprudence*, 115 Penn St. L. Rev. 877, 904 (2011).

Additionally, the Enhance Law Enforcement Integrity Act is silent on whether it imposes a

heightened standard of liability on claims against individuals like sheriffs and deputy sheriffs. In

the face of such silence, interpretation turns to "other aids to statutory construction, such as the

consequences of a given construction, the end to be achieved by the statute, and the statute's

legislative history." *Butler*, ¶ 10.  The Act was passed amid state and nationwide protests,

including massive marches and demonstrations outside the state capitol in Denver, in response to

the murder of George Floyd by Minneapolis police.[13] The legislation implemented "[f]ar-reaching

reforms to Colorado policing."[14] "The law contained a raft of changes that reformers have long

sought, but the most significant provision is one that no state ha[d] successfully passed before, and

the change that cops fear most: Police officers can now be sued, they can no longer claim

'qualified immunity' from civil damages if they knowingly violate the law on the job, and they

could personally be on the hook for up to $25,000 in penalties stemming from a lawsuit."[15] The

Act explicitly provides that "[s]tatutory immunities and statutory limitations on liability, damages,

or attorney fees do not apply to claims brought pursuant to this section [13-12-131]"; the

"'Colorado Governmental Immunity Act' [CGIA] …does not apply to claims brought pursuant to

this section"; and "[q]ualified immunity is not a defense to liability." C.R.S. § 13-21-131(2).

---

[13] *See, e.g.*, Russell Berman, *The State Where Protests Have Already Forced Major Police Reform*, THE ATLANTIC (July 17, 2020), https://www.theatlantic.com/politics/archive/2020/07/police-reform-law-colorado/614269/.

[14] Saja Hindi, *Here's what Colorado's police reform bill does*, THE DENVER POST (June 13, 2020), https://www.denverpost.com/2020/06/13/colorado-police-accountability-reform-bill/.

[15] Berman, https://www.theatlantic.com/politics/archive/2020/07/police-reform-law-colorado/614269.

Further, "if [a] peace officer's employer determines that the officer did not act upon a good faith and reasonable belief that the action was lawful, then the peace officer is personally liable and shall not be indemnified by the peace officer's employer for five percent of the judgment or settlement or twenty-five thousand dollars, whichever is less." C.R.S. § 13-21-131(4). Based on the context in which it was enacted, its stated purpose to hold peace officers accountable for their unlawful conduct and increase law enforcement integrity, its explicit elimination of federally developed qualified immunity, CGIA immunity, and other limitations on liability, and its requirement that individual peace officers are personally financially liable for their violations, legislators indisputably intended that Section 13-21-131 be far more broad-reaching than federal law under Section 1983.

Moreover, the Enhance Law Enforcement Integrity Act's elimination of qualified immunity, a federal judicially created doctrine that serves to greatly restrict liability under Section 1983, is in itself a powerful rejection by the Colorado legislature of federal limitations on civil accountability for peace officers. Qualified immunity is not found in the Constitution or federal statute but rather was created by the Supreme Court; the doctrine "operates like absolute immunity" by "protect[ing] law enforcement officers from having to face any consequences for wrongdoing." *Jamison v. McClendon*, 476 F. Supp. 3d 386, 391, 404 (S.D. Miss. 2020). Qualified immunity "serve[s] as a shield" and "protect[s] [officers] from accountability," rendering section 1983 almost toothless in the face of "thousands [who] have died at the hands of law enforcement over the years,…the death toll continu[ing] to rise," and the "[c]ountless more [who] have suffered from other forms of abuse and misconduct by police." *Id.* at 392. As Fifth Circuit Judge Willett points out while urging reconsideration of qualified immunity's application, "it's curious how this entrenched, judge-created doctrine excuses constitutional violations by limiting the statute Congress passed to redress constitutional violations." *Zadeh v. Robinson*, 928 F.3d 457, 480-81

(5th Cir. 2019) (Willett, J., concurring in part and dissenting in part). Colorado legislators purposefully enacted the Enhance Law Enforcement Integrity Act, and the broader statutory scheme in which it sits,[16] against this backdrop of increasing judicial and scholarly criticism of qualified immunity and other judicially created restrictions on the federal civil rights remedy. Consciously aware of the shortcomings of Section 1983 now that federal courts have severely blunted its reach, state legislators deliberately intended for the Enhance Law Enforcement Integrity Act to broaden peace officer liability beyond that imposed by Section 1983 in order to increase accountability and hopefully reduce police misconduct.

The federal "supervisory liability" standards that Defendants urge are nowhere to be found in the statute. Because the application of such standards would contravene and undermine the Act's purpose to expand liability for peace officers who violate the law, this Court should reject Defendants' attempt to interpose federal standards into Colorado's ambitious police reform legislative scheme. Instead, this Court should apply familiar principles of tort liability in determining whether Ms. Griffith plausibly pleaded that Defendants Elder and Gillespie caused Ms. Griffith to be subject to a violation of her state constitutional rights.

The Enhance Law Enforcement Integrity Act creates a state cause of action in tort. Moreover, the substantive rights of the Enhance Law Enforcement Integrity Act are defined by reference to Colorado Constitution's Bill of Rights, which "serve[] to protect the rights of individuals when infringed upon by governmental action." *People v. Vigil*, 127 P.3d 916, 938 (Colo. 2006). Accordingly, rather than adopting complex and contrived supervisory liability standards from judicially created federal law on Section 1983, this Court need look no further than these two areas of Colorado law to determine Defendants' liability under Colorado's Enhance Law

---

[16] For example, the Act also provides that officers convicted of or found liable of using excessive force, or failing to intervene therein, will lose their peace officer certification, with no opportunity to become recertified. *See* C.R.S. § 24-31-904.

Enforcement Integrity Act.

"Under traditional tort principles, the plaintiff must show that the defendant's conduct 'proximately caused' the claimed injury." *Lorenzen v. Pinnacol Assurance*, 2019 COA 54, ¶ 23 (citation omitted). "Proximate cause has two components: causation in fact and legal causation." *Id.* at ¶ 24. "Legal causation…refers to the scope or foreseeability of liability." *Id.* "As to causation in fact, the test is whether, but for the alleged [tortious conduct], the harm would not have occurred," or alternatively, whether "the defendant's conduct was a necessary component of a causal set that would have caused the injury." *Id.* at ¶ 25 (citation omitted). Regarding causation in fact, black letter tort law provides that "[i]f more than one act or failure to act contributed to the claimed injury, then each act or failure to act may have been a cause of the injury." CJI-Civ 9:20. "A cause does not have to be the only cause or the last or nearest cause. It is enough if the act or failure to act joins in a natural and probable way with some other act or failure to act to cause some or all of the claimed injury." *Id.*

Therefore, to state a plausible claim against Defendants Elder and Gillespie, Ms. Griffith need only plead sufficient facts to allow the reasonable inference that assuming the truth of all factual allegations, the supervised Defendants' unlawful treatment of Ms. Griffith would not have occurred but for Defendant Elder's and Gillespie's conduct, and Ms. Griffith's unlawful treatment "was a foreseeable risk" of Defendant Elder's and Gillespie's policies. *Danko v. Conyers*, 2018 COA 14, ¶ 39. These standards of causation are consistent with and dictated by section 13-12-131(1), which provides that liability is established if the plaintiff proves that a peace officer "under color of law, subjects or ***causes to be subjected***,… any other person" to a violation of Colorado's Bill of Rights. (Emphasis added.)

The Complaint and the reasonable inferences therefrom plausibly assert that Defendants Elder and Gillespie were on notice that the jail's policies were contrary to well-established

national standards for the treatment of transgender individuals, 40-46, and that Defendants Elder and Gillespie put policies into place that violated these standards and the Constitutional rights of transgender individuals like Ms. Griffith. [Doc. #124], ¶¶ 42, 54, 57, 106, 114, 117, 118. Further, the Complaint alleges that Defendant Gillespie was specifically aware of the discriminatory treatment inflicted on Ms. Griffith and did nothing to stop the violation of her Constitutional rights. *Id.*, ¶¶ 57, 114, 117. Accordingly, the Complaint plausibly pleads a claim for relief against Defendants Elder and Gillespie.

### 4.8.3 Defendants O'Neal, Noe, and Ford are "peace officers."

Defendants O'Neal, Noe, and Ford are sheriff's deputies for El Paso County. [Doc. #124], ¶¶ 16, 19, 20. The Enhance Law Enforcement Integrity Act states that "peace officer, as defined in section 24-31-901 (3), who, under color of law, subjects or causes to be subjected, including failing to intervene, any other person to the deprivation of any individual rights that create binding obligations on government actors secured by the bill of rights, article II of the state constitution, is liable to the injured party for legal or equitable relief or any other appropriate relief." C.R.S. § 13-21-131(1). C.R.S. § 24-31-901(3) defines a peace officer as "any person employed by a political subdivision of the state required to be certified by the P.O.S.T. board pursuant to section 16-2.5-102, a Colorado state patrol officer as described in section 16-2.5-114, and any noncertified deputy sheriff as described in section 16-2.5-103(2)." Finally, C.R.S. § 16-2.5-102 states that P.O.S.T. certified "peace officers" include deputy sheriffs and C.R.S. § 16-2.5-103(2) states that "[a] noncertified deputy sheriff or detention officer is a peace officer employed by a county or city and county whose authority is limited to the duties assigned by and while working under the direction of the chief of police, sheriff, an official who has the duties of a sheriff in a city and county, or chief executive of the employing law enforcement agency." Conspicuously absent from the law are any limitations for peace officers for their constitutional violations while performing

administrative work. Clearly, as pled and under the plain language of the relevant statutes,

Defendants O'Neal, Noe, and Ford are "peace officers" subject to suit under the Enhance Law

Enforcement Integrity Act.

### 4.9 **Plaintiff states multiple claims for the violation of her rights under the Colorado Constitution.**[17]

Generally, the Colorado Supreme Court has "determined that the Colorado Constitution

provides more protection for our citizens than do similarly or identically worded provisions of the

United States Constitution." *People v. Young*, 814 P.2d 834, 842 (Colo. 1991).[18] The Colorado

Supreme Court has repeatedly recognized "that the Colorado Constitution, written to address the

concerns of our own citizens and tailored to our unique regional location, is a source of protection

for individual rights that is independent of and supplemental to the protections provided by the

United States Constitution." *Id.* As outlined below, Defendants violated Ms. Griffith's Colorado

Constitutional rights.

### 4.9.1 **Defendants Elder, Gillespie, O'Neal, Mustapick, Elliss, Noe, and Ford violated Ms. Griffith's rights under the Colorado Constitution's Equal Rights Amendment.**

Defendants' decision to disregard Ms. Griffith's gender identity, and instead treat her as a

male inmate, violates the Colorado Constitution's Equal Rights Amendment ("ERA"). In

Colorado, classifications based solely on sex are prohibited. Colo. Const. Art. II, Section 29. "This

amendment prohibits unequal treatment based exclusively on the circumstance of sex, social

stereotypes connected with gender, and culturally induced dissimilarities." *People v. Salinas*, 551

P.2d 703, 705 (Colo. 1976). Importantly, the Colorado ERA requires that any "classifications

---

[17] Should this Court elect to import the federal standards, and apply them to Ms. Griffith's state law claims, those claims are adequately pled as outlined above.

[18] *See, e.g., Bock v. Westminster Mall Co.*, 819 P.2d 55, 59-60 (Colo. 1991); *People v. Oates,* 698 P.2d 811 (Colo. 1985); *People v. Sporleder,* 666 P.2d 135 (Colo. 1983); *Charnes v. DiGiacomo,* 612 P.2d 1117 (Colo. 1980); *People v. Paulsen,* 601 P.2d 634 (Colo. 1979); *People ex rel. Juhan v. Dist. Court for Cty. of Jefferson*, 439 P.2d 741 (Colo. 1968).

based exclusively on sexual status receive the closest judicial scrutiny." *People v. Green*, 183 Colo. 25, 514 P.2d 769 (1973).

While there is little jurisprudence in Colorado on the ERA and its application in the prison context, looking at an analogue situation in federal law is instructive. When the government discriminates on the basis of race in prisoner placement, the Fourteenth Amendment (like the ERA) requires strict scrutiny. *See Johnson v. California*, 543 U.S. 499, 512 (2005); *Lee v. Washington*, 390 U.S. 333, 333 (1968). And, in applying strict scrutiny, the Supreme Court has explicitly stated that under strict scrutiny analysis, "[t]he purpose of the narrow tailoring requirement is to ensure that 'the means chosen 'fit' th[e] compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype.'" *Grutter v. Bollinger*, 539 U.S. 306 (2003) (quoting *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989)). While "necessities of prison security and discipline are a compelling government interest" they only justify "those uses of race [or, in this case, gender] that are narrowly tailored to address those necessities." *Johnson*, 543 U.S. at 512 (cleaned up). And, ultimately, the burden is squarely on the government to establish both that its interest is compelling and that its means are narrowly tailored. *Grutter*, 539 U.S. at 306.

What does strict srutiny mean in practice? Well, Justice Scalia posited that "only a social emergency rising to the level of imminent danger to life and limb--for example, a prison race riot, requiring *temporary* segregation of inmates--can justify an exception to the principle embodied in the Fourteenth Amendment that '[o]ur Constitution is color-blind, and neither knows nor tolerates classes among citizens[.]'" *J. A. Croson Co.*, 488 U.S. at 521 (Scalia, J., concurring in judgment) (emphasis added) (quoting *Plessy v. Ferguson*, 163 U.S. 537, 559 (1896) (Harlan, J., dissenting)). As alleged, Defendants cannot meet their burden of showing that their decision to place Ms. Griffith in an all-male unit was narrowly tailored to a compelling government interest. And, it is

absolutely clear that Ms. Griffith was not *temporarily* housed in an all-male unit because of an immediate threat of violence. At least under Justice Scalia's conception of strict scrutiny, Ms. Griffith's automatic placement in an all-male unit based on her status as a transgender, rather than cisgender, woman, and the corresponding treatment to which she was subjected by County officials because of it, was not narrowly tailored to a compelling government interest. Therefore, Ms. Griffith has adequately alleged a claim under the ERA.

### 4.9.2 Defendants Elder, Gillespie, Mustapick, and Elliss violated Ms. Griffith's rights under Colo. Const. Art. II, Section 25 by subjecting her to unreasonable searches[19] and by invading her right to privacy and bodily integrity.

This Court should apply a standard consistent with Colorado tort law in assessing Ms. Griffith's claim that Defendants unreasonably searched her and invaded her right to privacy and bodily integrity under the Colorado Constitution. The elements of such a negligence standard are that Defendants owed Ms. Griffith a constitutional duty to be free from unreasonable searches, that they violated their duty, that they were the cause of the violation of that duty, and that Ms. Griffith suffered damages. *See Davenport v. Cmty. Corr. of the Pikes Peak Region*, 942 P.2d 1301, 1303 (Colo. App. 1997). First, as alleged, Defendants owed Ms. Griffith a constitutional duty given that she was a ward of the El Paso County Jail and they were peace officers within the meaning of the Enhance Law Enforcement Integrity Act. *See Cisneros v. Elder*, 2022 CO 13M (Colo. 2022). Because Defendants, who were Ms. Griffith's jailers, had a special relationship with her, they had a duty to protect her from harm. *See Leake v. Cain*, 720 P.2d 152, 159 (Colo. 1986); Restatement (Second) of Torts § 315 (1965). And, the Colorado Constitution's Due Process Clause protects substantive rights. *See Coal. for Equal Rights, Inc. v. Owens*, 458 F. Supp. 2d 1251, 1263 (D.

---

[19] Should this Court find that Ms. Griffith's unreasonable search claims are better characterized under Colo. Const. Art. II, Section 7, Plaintiff requests that her claims be dismissed without prejudice with leave to amend.

Colo. 2006). Second, Defendant Mustapick breached that duty through his unreasonable search, Defendant Elliss breached that duty through her failure to intervene to prevent Defendant Mustapick's unreasonable search, and Defendants Elder and Gillespie violated their duty by implementing policies that required Defendant Mustapick engage in an unreasonable search of Ms. Griffith. Third and fourth, Defendants' actions caused the unreasonable search and Ms. Griffith to suffer damages. For these reasons, Ms. Griffith has alleged a claim under the Colorado Constitution's Art. II, Section 25.

### 4.9.3 Defendants violated Ms. Griffith's rights under Colo. Const. Art. II, Section 20 by subjecting her to cruel and unusual punishment.

This Court should also apply a standard consistent with Colorado tort law in assessing Ms. Griffith's claim that Defendants subjected her to cruel and unusual punishment under the Colorado Constitution. That same elements outlined above apply. *See Davenport*, 942 P.2d at 1303. First, as alleged, Defendants owed Ms. Griffith a Constitutional duty given that she was a ward of the El Paso County Jail and they were peace officers within the meaning of the Enhance Law Enforcement Integrity Act. *See Cisneros v. Elder*, 2022 CO 13M (Colo. 2022). Under Colo. Const. Art. II, Section 20, Defendants had a legal duty to not subject her to cruel and unusual punishment. This includes, necessarily, that they could not place her in negligently harm's way resulting in her assault by another inmate,[20] subject her to near-constant sexual harassment, require her to undergo repeated cross-gender pat-down searches, or force her to endure a cross-gender visual body-cavity searches that included grossly inappropriate sexual harassment. Because Defendants, who were

---

[20] A basic proposition of tort law is that the amount of care demanded by the standard of reasonable conduct must be in proportion to the risk; the greater the danger, the higher is the degree of caution which the person owing the duty must exercise. See W. Page Keeton et al., Prosser and Keeton on the Law of Torts 34, at 208-09 (5th ed. 1984); *Bayer v. Crested Butte Mt. Resort*, 960 P.2d 70, 72 (Colo. 1998). Clearly, Defendants failed to exercise the requisite care when they placed Ms. Griffith in an all-male unit given the standards outlining the extreme risk she would face in such a setting. [Doc. #124], 40-46.

Ms. Griffith's jailers, had a special relationship with her, they had a duty to protect her from harm. *See Leake v. Cain*, 720 P.2d 152, 159 (Colo. 1986); Restatement (Second) of Torts § 315 (1965). All of these actions by Defendants caused the violation of Ms. Griffith's rights under the Constitution's Colo. Const. Art. II, Section 20.

### 4.10   Plaintiff adequately alleges a violation of her rights under the Americans with Disabilities Act ("ADA") and Rehabilitation act of 1973 (Rehab Act").

The ADA was crafted to "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). To state a claim, a plaintiff must show "(1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities, or was otherwise discriminated against; and (3) that such an exclusion, denial of benefits, or discrimination was by reason of his disability." *Parker v. Universidad de Puerto Rico*, 225 F.3d 1, 5 (1st Cir. 2000). The Rehab Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of his or her disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a).

#### 4.10.1   Plaintiff adequately alleges that she is a person with a disability.

The definition of "disability" in both statutes is virtually identical. *See* 42 U.S.C. § 12101(b)(1) (ADA) (defining disability as "a physical or mental impairment that substantially limits one or more major life activities."); 29 U.S.C. § 705(9) (Rehabilitation Act) (defining a disability as "a physical or mental impairment that constitutes or results in a substantial impediment to employment"). In light of the twinned definitions, courts routinely apply the same legal analysis in interpreting claims under both statutes. *See Nunes v. Massachusetts Dep't of Corr.*, 766 F.3d 136, 144 (1st Cir. 2014) (noting that the court "need make no distinction between the two statutes for purposes of our analysis").

Ms. Griffith extensively outlines that she suffers from Gender Dysphoria and that Defendants were aware of Ms. Griffith's diagnosis. [Doc. #124], ¶¶ 25-32. The DSM-5 recognizes Gender Dysphoria as a mental disability that requires medical treatment, *Id.*, ¶ 22, and an impairment that substantially limits a number of Ms. Griffith's major life activities. *Id.*, ¶¶33-38. Multiple courts have held that Gender Dysphoria is covered under the Americans with Disabilities Act because Gender Dysphoria is a disability that substantially limits a transgender person's endocrine and reproductive systems, and results from a physical impairment. *See Doe v. Mass. Dep't of Corr.,* No. 17-12255-RGS, 2018 U.S. Dist. LEXIS 99925, at *12-14 (D. Mass. June 14, 2018); *Tay*, 2020 U.S. Dist. LEXIS 76911, 2020 WL 2100761, at *3; *Shorter v. Barr*, 2020 U.S. Dist. LEXIS 71453, 2020 WL 1942785, at *9 (N.D. Fla. Mar. 13, 2020), *report and recommendation adopted*, 2020 U.S. Dist. LEXIS 70773, 2020 WL 1942300 (Apr. 22, 2020); *Doe v. Pa. Dep't of Corr.*, No. 1:20-cv-00023-SPB-RAL, 2021 U.S. Dist. LEXIS 31970, at *26 (W.D. Pa. Feb. 19, 2021). Thus, as alleged and under the relevant legal authority, Ms. Griffith is a person with a disability for purposes of the ADA and Rehab Act.

### 4.10.2 **Plaintiff adequately alleges that she was discriminated against because of her disability.**

Defendants denied Ms. Griffith the services, programs, and activities of the El Paso County Jail as this provision "has been interpreted to be a catchall phrase that prohibits all discrimination by a public entity." *Noel v. N.Y.C. Taxi & Limousine Comm'n*, 687 F.3d 63, 68 (2d Cir. 2012) (internal quotation marks and citation omitted); *see also Hason v. Med. Bd. of California*, 279 F.3d 1167, 1172-1173 (9th Cir. 2002) ("[T]he ADA's broad language brings within its scope anything a public entity does."). When a correctional institution assigns a transgender woman "to a men's prison by virtue of her gender assignment at birth and denie[s] access to facilities and programs that would correspond with her gender identification" it violates the ADA. *Doe*, 2018 U.S. Dist. LEXIS 99925, at *22. Assigning a transgender inmate to a unit

based on biological sex "injects them into a prison environment that is contrary to a critical aspect of their prescribed treatment (that they be allowed to live as, in [Ms. Griffith]'s case, a woman). *Id.*, at *23. And, because Ms. Griffith "has adequately stated a claim under the ADA, it follows that her Rehabilitation Act claim is equally viable." *Id*. For these reasons, Ms. Griffith has adequately alleged claims under the ADA and Rehab Act.

### 4.10.3 Even after *Cummings*, the Rehab Act and ADA provide for emotional distress and other types of damages.

It is important to note that *Cummings v. Premier Rehab Keller, P.L.L.C.*, is a plurality opinion as the five justices did not agree on a single rationale, or the same or similar grounds, for their holding, making it non-binding. 142 S. Ct. 1562 (2022); *see Marks v. United States*, 430 U.S. 188, 193-94 (1977). But, even if this Court considers *Cummings* as controlling precedent, it does not apply to this case for a number of reasons.

First, *Cummings* does not address claims under the ADA. Therefore, Ms. Griffith's ADA claims are unaffected by *Cummings*.

Second, the *Cummings* court relied on a contract law analysis to limit the damages available under the Rehab Act. Under contract law, "the rights of the parties must necessarily be determined by the law as it was when the contract was made." *Town of Koshkonong v. Burton*, 104 U.S. 668, 679 (1881). At the time Ms. Griffith was injured, it was well-settled that emotional anguish damages may be claimed and be reimbursed pursuant to the ADA and Rehab Act. *See e.g., Delano-Pyle v. Vict. County*, 302 F.3d 567 (5th Cir. 2002) cert denied 2003 LEXIS 5495 (Oct. 6, 2003). There is nothing in *Cummings* that states it is retroactive and, therefore, emotional distress damages are available to Ms. Griffith based on principles of contract law.

Third, even if this Court were to conclude that emotional-distress damages are unavailable under the Rehab Act and ADA, Plaintiff is entitled to other forms of compensatory damages. A Defendant is subject to those remedies otherwise available for a breach of contract. *Cummings*,

142 S. Ct. at 1571. Contract damages are ordinarily based upon the injured party's expectation interest and are intended to give that person the benefit of her bargain by awarding her a sum of money that will, to the extent possible, put her in as good a position as she would have been, had the contract been performed. Restatement (Second) of Contracts §347 cmt. A (Am. L. Inst. 1981). Here, when Ms. Griffith was at the El Paso County Jail, she surely had an expectation she would be treated the same as her non-disabled peers and not less so because of her disability. Recently, in a post-*Cummings* decision, a district court confirmed the availability of such damages to make the subject of unlawful discrimination whole. *Montgomery v. District of Columbia*, 2022 U.S. Dist. LEXIS 9228 at *74, 76-77 (D.D.C., May 23, 2022). Similarly, Ms. Griffith would be entitled to compensatory damages for dignitary harm because she, and every other inmate, would have entered the El Paso County Jail under the assumption they would be treated with dignity and respect. *See Camarillo v. Carrols Corp.*, 518 F.3d 153, 158 (2nd Cir. 2008). And, even if the Court were to conclude that no form of compensatory damages is available under federal law, Ms. Griffith is still entitled to nominal damages. *Uzuegbunam v. Preczewski*, 141 S. Ct. 792 (2021) (noting that "every violation of a right imports damage").

### 4.10.4 Plaintiff adequately alleges that Defendants intentionally discriminated against her and is entitled to recover compensatory damages.

Intentional discrimination does not require discriminatory animus but rather may be "inferred from a defendant's deliberate indifference to the strong likelihood that pursuit of its questioned policies will likely result in a violation of federally protected rights." *Powers v. MJB Acquisition Corp.*, 184 F.3d 1147, 1153 (10th Cir. 1999). There is a two-pronged test for this standard: knowledge that a harm to a federally protected right is substantially likely; and a failure to act upon that likelihood. *Havens v. Colorado Dep't of Corr.*, 897 F.3d 1250, 1264 (10th Cir. 2018). Generally, courts have held that there exists a sufficient evidentiary basis for a factfinder to determine that intentional discrimination occurred under § 504 and/or Title II when the defendant

deliberately made *no good faith effort* to reasonably accommodate a plaintiff's known disability, thereby subjecting the plaintiff to disability discrimination.[21]

Here, Ms. Griffith has adequately alleged that El Paso County – directly and through its agents – had knowledge that a harm to her federally protected rights was substantially likely, and failed to act upon that likelihood. *See Havens*, 897 F.3d at 1264. When Ms. Griffith first entered El Paso County Jail, she was an openly transgender woman with a feminine appearance and during her intake screening, she notified El Paso County Jail and its healthcare personnel that she was a transgender woman with a diagnosis of Gender Dysphoria. [Doc. #124], ¶¶ 47-48. Ms. Griffith repeatedly and explicitly requested placement in a women's facility as an accommodation for her known disability. *Id.*, ¶¶ 48-70. One of El Paso County's officials even did an ADA review of Ms. Griffith's housing classification. *See Havens*, 897 F.3d at 1266 ("[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.") (internal citations omitted). Ms. Griffith's classification and placement in an all-male facility was by no means an inadvertent mistake either. It was done intentionally and for one reason: her disability. This subjects Defendants to compensatory damages.

5. **Conclusion**

For the foregoing reasons, Plaintiff respectfully requests that this Court deny Defendants' motion in its entirety.

---

[21] *See Updike v. Multnomah Cty.*, 870 F.3d 939, 954 (9th Cir. 2017); *Duvall v. Cty. of Kitsap*, 260 F.3d 1124, 1140 (9th Cir. 2001); *Bartlett v. N.Y. State Bd. of Law Exam'rs*, 156 F.3d 321, 330-31 (2d Cir. 1998); *Center v. City of West Carrollton*, 227 F. Supp. 2d 863, 868, 872 (S.D. Ohio 2002); *see also Robertson v. Las Animas Cty. Sheriff's Dep't*, 500 F.3d 1185 (10th Cir. 2007); *Randolph v. Rodgers*, 170 F.3d 850, 858 (8th Cir. 1999); *Paulone v. City of Frederick*, 787 F. Supp. 2d 360, 397 (D. Md. 2011); *Armstrong v. Schwarzenegger*, 622 F.3d 1058 (9th Cir. 2010); *see also Barber v. Colorado*, 562 F.3d 1222, 1229 (10th Cir. 2009) ("a public entity does not 'act' by proffering just any accommodation"); *Proctor v. Prince George's Hosp. Ctr.*, 32 F. Supp. 2d 820, 829 (D. Md. 1998) ("in cases where a public accommodation is on notice that its failure to provide an accommodation may violate the Rehabilitation Act and intentionally opts to provide a lesser accommodation, compensatory damages are available.").

Dated this 8th day of August 2022.

KILLMER, LANE & NEWMAN, LLP

*s/ Andy McNulty*

_____

Andy McNulty
Mari Newman
1543 Champa St., Ste. 400
Denver, CO 80202
Phone: (303) 571-1000
Fax: (303) 571-1001
amcnulty@kln-law.com
mnewman@kln-law.com

ATTORNEYS FOR PLAINTIFF

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 8, 2022, I electronically filed the foregoing **RESPONSE TO DEFENDANTS' MOTION TO DISMISS THIRD AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(1) AND (6)** with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Nathan J. Whitney
Terry Sample
Chris Strider
County Attorney's Office
El Paso County
nathanwhitney@elpasoco.com
terrysample@elpasoco.com
chrisstrider@elpasoco.com

*Counsel for Defendants*

*s/ Andy McNulty*