**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 21-cv-00387-NRN

DARLENE GRIFFITH

Plaintiff,

v.

EL PASO COUNTY, COLORADO, e*t al.*

Defendants.

---

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS THIRD
AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P.  12(b)(1) and (6)**

---

Defendants El Paso County ("El Paso County"), Bill Elder ("Elder"), Cy Gillespie ("Gillespie"), Dawne Elliss ("Elliss"), Andrew Mustapick ("Mustapick"), Elizabeth O'Neal ("O'Neal"), Brande Ford ("Ford"), and Tiffany Noe ("Noe") (collectively the "Defendants"), through the Office of the County Attorney of El Paso County, Colorado, submit their Reply in Support of their Motion to Dismiss Plaintiff's Third Amended Complaint (Doc. 124, the "Complaint") under Fed. R. Civ. P. 12(b)(1) and (6) as follows:

## I.    INTRODUCTION[1]

The law surrounding the housing and treatment of transgender individuals, including those diagnosed with Gender Dysphoria, in correctional institutions is exceedingly murky.  Plaintiff's claims fail in the absence of clarity because (i) the rights

---

[1] The defined terms used in this Reply have the same meaning as the defined terms used in the Motion to Dismiss.

alleged by Plaintiff do not exist, (ii) there is no clearly established law that would deprive the Individual Defendants of qualified immunity, and (iii) Defendants did not act with deliberate indifference.  Plaintiff's claims asserted under the Act also fail because Plaintiff seeks to bend the Act's plain language beyond its breaking point.  *See, e.g.*, *Ditirro v. Sando*, 2022 WL 3452486, at * 5 (Colo. App. Aug. 18, 2022).  For these reasons and the others set forth in the Motion to Dismiss, the Court must dismiss the Complaint in its entirety.

## II.    ARGUMENT

### A. THE COURT HAS NO JURISDICTION OVER THE CLAIMS ASSERTED AGAINST EL PASO COUNTY; BUT EVEN IF THE COURT HAS JURISDICTION, PLAINTIFF HAS FAILED TO STATE A PLAUSIBLE CLAIM AGAINST EL PASO COUNTY

The Response provides no argument explaining how this Court can exercise jurisdiction over El Paso County when it has not been properly named in the Complaint as required by C.R.S. § 30-11-105.  *See Calahan v. Jefferson Cnty.,* 429 P.2d 301, 302 (Colo. 1967).  Further, even if this Court can exercise jurisdiction over El Paso County, the Response fails to explain how the Complaint states a plausible claim against it given that,

> [u]nder Colorado law, the county sheriff is a separate and distinct position from the board of county commissioners. [T]he Board [of County Commissioners] does not exercise managerial control over either the sheriff or the detention center and its staff.  The Board of Commissioners is granted certain enumerated powers which do not include management of county jails.

*Mullen v. Comm'rs for Adams Cnty.*, 2022 WL 1266618, at * 5 (D. Colo. Apr. 28, 2022) (Recommendation of (then) Magistrate Wang) (internal quotations and citations omitted).

2

Consequently, the Court must dismiss all claims asserted against El Paso County pursuant to Fed. R. Civ. P. 12(b)(1) or (5).

### B. PLAINTIFF HAS FAILED TO STATE A PLAUSIBLE VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS

#### i. *No Equal Protection Violation*

Plaintiff asserts an equal protection claim under the Fourteenth Amendment arguing that the Court should apply strict scrutiny to CJC's decisions regarding Plaintiff's housing classification and access to feminine products.  Response, p. 7-8.  The Court should reject Plaintiff's argument because, if it does not, every decision a correctional institution makes with respect to a transgender inmate will be subject to the highest level of scrutiny.  This would run counter to the Supreme Court's warning in *Bell v. Wolfish* that the courts should stay out of the day-to-day management of correctional institutions.  441 U.S. 520, 547 (1979) ("[T]he problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions.  Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.").  Moreover, the Tenth Circuit has already ruled that transgender status is not a suspect or quasi-suspect class. *Brown v. Zavaras*, 63 F.3d 967, 971 (10th Cir. 1985); *Druley v. Paxton*, 601 F. App'x 632, 635-36 (10th Cir. 2015) (unpublished); *Qz'Etax v. Ortiz*, 170 F. App'x 551, 553 (10th Cir. 2006) (unpublished).  Plaintiff's Equal Protection claim consequently fails because she does not assert that CJC's decisions lacked a rational basis (i.e., were not related to her biological sex).

Furthermore, Plaintiff has failed to show that she is similarly situated to biological females detained in CJC because she is not "alike in all relevant aspects," *Grissom v. Roberts*, 902 F.3d 1162, 1173 (10th Cir. 2018), in that she has not undergone gender reassignment surgery. *See, e.g.*, *Shaw v. Dist. of Columbia*, 944 F.Supp.2d 43 (Dist. D.C. May 13, 2013) (treating the plaintiff, a transgender woman, the same as a biological female because she underwent gender reassignment surgery and had her sex legally changed to female).

In the Response, Plaintiff expands her Equal Protection claim to include the alleged sexual harassment she was subject to in CJC. Response, p. 14-15. But this claim does not appear anywhere in her Complaint. *See* Doc. 124, ¶¶ 123-138. Plaintiff cannot amend her Complaint in response to a dispositive motion. *See San Agustin, Jr. v. El Paso County*, 2019 WL 4059167, * 10 (D. Colo. Aug. 28, 2019) (citing Fed. R. Civ. P. 15). Accordingly, the Court must dismiss Plaintiff's Equal Protection claim pursuant to Fed. R. Civ. P. 12(b)(6).

### ii.    No Other Violation of the Fourteenth Amendment

In the Response, Plaintiff claims that Defendants should be held liable for the "near-constant" harassment she was allegedly subjected to in CJC. Response, p. 16. Yet Plaintiff fails to explain how any Defendant contributed to the "near-constant" harassment. Response, p. 16. Plaintiff has, therefore, failed to establish personal participation of any Defendant as required by *Robbins v. Oklahoma*, 519 F.3d 1242, 1249-50 (10th Cir. 2008).

The Response goes on to assert unconstitutional conditions of confinement based on Mustapick's visual body cavity search of Plaintiff.  Response, p. 17.  Plaintiff's assertion fails because Mustapick's alleged comments do not rise to the level of a constitutional violation.  *Barney v. Pulsipher*, 143 F.3d 1299, 1310 n.11 (10th Cir. 1998) ("Although plaintiffs allege [defendant] subjected them to severe verbal sexual harassment and intimidation, these acts of verbal harassment alone are not sufficient to state a claim under the Eighth Amendment."); *Adkins v. Rodriguez*, 59 F.3d 1034, 1037-38 (10th Cir. 1995) (verbal sexual harassment did not amount to Eighth Amendment violation).

The Response also asserts unconstitutional conditions of confinement based upon repeated cross-gender pat-down searches.  Response, p. 18-19.  But again, Plaintiff does not identify who conducted the pat-down searches or state when many of these pat-down searches occurred. (*See* Doc. 124, ¶ 89-96).  Plaintiff's imprecise allegations fail to state a constitutional claim.  *Robbins*, 519 F.3d at 1250.

The Response next asserts a failure to protect claim.  Response, pp. 19-21.  Yet again, Plaintiff fails to explain how the Complaint's allegations establish the personal participation of each Defendant.  *See id.*  Instead, the Response, like the Complaint, "use[s] either the collective term 'Defendants' or a list of the defendants named individually but with no distinction as to what acts are attributable to whom, [making it] impossible for any of these individuals to ascertain what particular unconstitutional acts they are alleged to have committed."  *Id.*

Finally, the Response alleges a failure to intervene claim against Ellis.  *Id.* pp. 26-28.  As Plaintiff acknowledges, however, a failure to intervene claim cannot succeed

unless the officer has knowledge of a constitutional violation. *Id.* p. 27, quoting *Jones v. Norton*, 809 F.3d 564, 576 (10th Cir. 2015). No constitutional violation occurred, however, because Mustapick's alleged comments during his visual search of Plaintiff do not rise to the level of a constitutional violation. *See Barney*, 143 F.3d at 1310 n.11; *Adkins*, 59 F.3d at 1037-38. Without an underlying constitutional violation, Plaintiff's failure to intervene claim fails. *See Jones*, 809 F.3d at 576 (citing *Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005)). In sum, for the reasons set forth herein and in the Motion to Dismiss, the Court must dismiss Plaintiff's Fourteenth Amendment Claims pursuant to Fed. R. Civ. P. 12(b)(6).

### iii.    No Fourth Amendment Violation

Contrary to Plaintiff's arguments, the Complaint does not state a plausible Fourth Amendment violation. In *Bell,* the Supreme Court discussed the factors that must be considered in assessing the reasonableness of prisoner searches:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

441 U.S. at 559.

As explained in the Motion to Dismiss, the application of these factors does not result in a plausible constitutional violation. First, the *visual* body cavity search of Plaintiff was indisputably reasonable given that it was performed as Plaintiff entered CJC and before she was admitted into the general population. *Archuleta v. Wagner*, 523 F.3d 1278, 1284 (10th Cir. 2008) (reasonableness of strip search turns in part on whether

inmate will be housed in general population); *Hyberg v. Enslow*, 801 F. App'x 647, 650-51 (10th Cir. 2020) (unpublished) (finding no plausible Fourth Amendment claim where inmate was strip searched in a designated area "with limited access for other inmates and staff" before returning to general population, and where staff made insensitive comments).  Second, the only individuals present during the visual strip search were Ellis and Mustapick, both of whom performed part of the search in a private area of CJC. Plaintiff's strip search was not video recorded as was the case in *Hayes v. Marriott*, 70 F.3d 1144, 1145 (10th Cir. 1995), or conducted without a penological purpose as was the case in *Shroff v. Spellman*, 604 F.3d 1179 (10th Cir. 2010).  Third, Plaintiff argues that she was subject to a cross-gender search because Mustapick, a biological male, participated in the search.  Yet Plaintiff presents no authority suggesting that Mustapick's visual search of Plaintiff constitutes a cross-gender search given they share the same biological sex.  Fourth, the verbal statements attributed to Mustapick are insufficient to establish a constitutional violation.  Indeed, in *Adkins*, the Tenth Circuit found that similar verbal harassment did not amount to a constitutional violation.  59 F.3d at 1037-38; *see also Hayes*, 70 F.3d at 1145.

Accordingly, tor the reasons set forth herein and in the Motion to Dismiss, the Court must dismiss Plaintiff's Fourth Amendment Claim pursuant to Fed. R. Civ. P. 12(b)(6).

### C.  PLAINTIFF HAS FAILED TO MEET THE TWO-PART BURDEN TO OVERCOME THE DEFENSE OF QUALIFIED IMMUNITY

To avoid the application of qualified immunity, Plaintiff bears the substantial burden of showing that (1) the actions of the Defendants violated Plaintiff's constitutional or

statutory rights, and (2) that the rights were clearly established at the time of Defendants' alleged violation.  *Albright v. Rodriguez*, 51 F.3d 1531,1534 (10th Cir. 1995).  To be clearly established, a plaintiff may point to "a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts." *Gutierrez v. Cobos*, 841 F.3d 895, 899 (10th Cir. 2016) (citations omitted).  Plaintiff appears to argue that she does not need to identify a case on point because less specificity, or no specificity, is required due to the supposedly egregious nature of the conduct alleged.  Response, p. 5-6. Plaintiff's argument is unfounded because this is not one of the rare cases where the alleged conduct is, in fact, so egregious that the Defendants' presumption of qualified immunity may be rebutted without citing to "on point" precedent or the weight of persuasive authority.  *See Dist. of Columbia v. Wesby*, 138 S. C.t 577, 590 (2018); *Ashaheed v. Currington*, 7 4.th 1236, 1248 (10th Cir. 2021) (quoting *Taylor v. Riojas*, 141 S.Ct. 52, 53 (2020) (*per curiam*)).

Plaintiff next asserts that *Dodds v. Richardson*, 614 F.3d 1185 (10th Cir. 2010), and *Lopez v. LeMaster*, 172 F.3d 756 (10th Cir. 1999), clearly establish the law surrounding her claims of supervisory liability.  Response at 7.  Not so.  *Dodds* merely recognized the viability of supervisory liability following the Supreme Court's decision in *Aschroft v. Iqbal* and is factually inapposite.  614 F.3d at 1194; *see also B.I.C. v. Gillen*, 761 F.3d 1099, 1105 (10th Cir. 2014) (a plaintiff "cannot simply identify a clearly established right in the abstract and allege that the defendant has violated it.").  *Lopez* is factually inapposite because, unlike here, it involved specific, identifiable threats to the safety of a specific inmate. 172 F.3d at 758 (plaintiff was placed in general population

after he reported to jailer that another inmate "poked [him] in the stomach with a broom and accused him of 'messing with' the inmate's sister and mother.")  In contrast, this case involves generalized risks to the safety of female transgender inmates housed in male wards.

Plaintiff also claims that the law surrounding her Fourteenth Amendment claims is clearly established.  *See* Response, p. 7 -21.  Not so.  The authority cited by Plaintiff consists largely of non-binding decisions from circuit courts other than the Tenth Circuit and district courts outside of Colorado.  To the extent Plaintiff cites a Supreme Court or Tenth Circuit decision, such decisions are factually inapposite and far from "on point."  For instance, Plaintiff cites the Supreme Court's decision *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1741 (2020), in support of her Fourteenth Amendment sex- and gender-based discrimination claim.  Response, p. 9.  But as this Court is aware, *Bostock*'s holding was confined to Title VII of the Civil Rights Act of 1964.  Plaintiff also cites *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 805 (10th Cir. 2019), and suggests that it is clearly established that strict scrutiny applies to her Equal Protection claim. Response, p. 12.  *Free the Nipple-Fort Collins* is factually inapposite because it dealt with challenges to a municipal ordinance that prevented females from going topless in public. 916 F.3d at 795.  Moreover, the extension of strict scrutiny advocated for by Plaintiff runs counter to binding Supreme Court precedent, such as *Turner v. Safley*, 482 U.S. 78, 89 (1987) ("[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."), and Tenth Circuit precedent, such as *Brown v. Zavaras*, 63 F.3d 967, 971 (10th Cir. 1985).

Plaintiff fails to show that the law was clearly established in connection with her Fourth Amendment claim alleging an unreasonable search.   To being with, under the circumstances presented here, the mere fact Plaintiff was strip searched does not give rise to a Fourth Amendment violation.   *See Hyberg*, 801 F. App'x at 650-51 (finding no plausible Fourth Amendment claim where inmate was strip searched in a designated area "with limited access for other inmates and staff" before returning to general population, and where staff made insensitive comments).   To the extent Plaintiff takes issue with how the strip search was conducted, the law was not so clearly established as to deprive Mustapick or Ellis of qualified immunity because none of the cases cited by Plaintiff involve similar facts—the strip search of a transgender female, who has not undergone gender reassignment surgery, by a biological male and a biological female.   Moreover, the law was not sufficiently clear with the respect to the alleged comments made by Mustapick during the strip search because, in *Adkins*, the Tenth Circuit found that similar verbal harassment did not amount to a constitutional violation.   59 F.3d at 1037-38.

While the law may one day be as Plaintiff argues it should be now, the Defendants cannot be deprived of qualified immunity for failing to predict how courts will rule on these hotly contested and rapidly evolving legal issues.

### D. PLAINTIFF HAS FAILED TO STATE A PLAUSIBLE § 1983 CLAIM OF SUPERVISORY LIABILITY AGAINST ELDER OR GILLESPIE

As explained in the Motion, Plaintiff fails to state a plausible claim for supervisory liability applying the three factors enumerated in *Dodds*, 614 F.3d 1185.   In particular, Elder and Gillespie could not, and reasonably should not, have known that their alleged policies "would cause others to deprive the plaintiff of her constitutional rights," *id.* at 1211

(Tymkovich, J., concurring) (quotations omitted), because the alleged rights may not exist and, to the extent they do, they are not clearly established.  *See, e.g., Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 994-96 (6th Cir. 2017) ("But a municipal policymaker cannot exhibit fault rising to the level of deliberate indifference to a constitutional right when that right has not yet been clearly established.") (internal citations and quotations omitted); § II(C) above.  Accordingly, the Court should dismiss Plaintiff's claims asserted against Elder and Gillespie in their individual capacities pursuant to Fed. R. Civ. P. 12(b)(6).

### E.  THE COMPLAINT FAILS TO STATE A MUNICIPAL LIABILITY CLAIM

The Response clarifies that Plaintiff only seeks to impose municipal liability based upon a formal policy, an informal custom, and a final decision by a policy maker.  Plaintiff fails to plausibly allege municipal liability under any of these theories.

Plaintiff's assertion of a formal policy fails because she does not identify any specific written policy.  To this point, Plaintiff asserts that there was an official policy of housing transgender females in male wards, but she does not identify where such policy exists in writing or how it was adopted by any EPSO policymaker.  Consequently, this claim of municipal liability fails.  *See Carney v. Cty. & Cnty. of Denver*, 534 F.3d 1268, 1274 (10th Cir. 2008) (dismissing the allegation of a formal policy because plaintiff has neither alleged nor produced any evidence suggesting that her purported discrimination was caused by any legislative action by 'an official whose acts may fairly be said to be those of the municipality itself.'")

Plaintiff's assertion of an informal custom is premised upon *Crowson v. Wash. Cnty. State of Utah*, 983 F.3d 1166 (10th Cir. 2020), and a smattering of district court decisions finding that municipal liability can be established through the aggregation of different state actors' conduct, even if no individual actor committed a constitutional violation. First, *Crowson* is a "limited exception" to the standard municipal liability inquiry. 983 F.3d at 1191. Thus, the Court should follow the approach taken in *Taylor v. Armor Corr. Health Servs., Inc.,* and "decline[] to sidestep well-settle constitutional principle and find that, because [Plaintiff] has alleged a high number of incidents that, by themselves, do not give rise to a constitutional violation, the collective sum necessarily gives rise to a constitutional injury." 2021 WL 4556213, at * 14 (*report and recommendation adopted* 2021 WL 4272717 (D. Colo. Sept. 21, 2021)). Second, to the extent *Crowson* is applicable, it does not eliminate the requirement that a plaintiff show that the alleged custom was "widespread," commonly done through allegations of similarly situated individuals mistreated in a similar way. *See Carney*, 534 F.3d at 1274. Plaintiff's failure to make such a showing seriously undermines this claim, *see id.*, and Plaintiff provides no explanation as to how this claim can survive in the absence of such a showing. *See Johnson v. Davis Cnty.*, 2022 WL 830202, at ** 3-4 (10th Cir. Mar. 21, 2022) (unpublished) (acknowledging *Crowson* and finding that plaintiffs' municipal liability claim failed because "plaintiffs point[ed] to no prior similar constitutional violations…").

Plaintiff's claim of municipal liability based upon a final decision by a policymaker also fails. First, Plaintiff does not identify any specific decision made by Elder that resulted in a constitutional violation because the allegations regarding Elder's decisions are merely

formulaic.   Second, the Response fails to explain how Elder acted with deliberate indifference—a necessary element for this claim—given that the surrounding law is unclear.   *See Arrington-Bey*, 858 F.3d at 994-96 ("But a municipal policymaker cannot exhibit fault rising to the level of deliberate indifference to a constitutional right when that right has not yet been clearly established.") (internal citations and quotations omitted); *Bustillos v. El Paso Cnty. Hosp. Dist.*, 891 F.3d 214, 222 (5th Cir. 2018); *Nicholas v. Wany Cnty., Mich.*, 822 F. App'x 445, 451-52 (6th Cir. 2020) (unpublished); *Townes v. City of New York*, 176 F.3d 138, 143-44 (2d Cir. 1999); *Szabla v. City of Brooklyn Park*, 486 F.3d 385, 393 (8th Cir. 2007); *Moya v. City of Clovis*, 2019 WL 6255217, at * 10 (D.N.M. Nov. 22, 2019) (unpublished) ("But a municipal policymaker cannot exhibit fault rising to the level of *deliberate* indifference to a constitutional right when that right has not yet been clearly established.") (emphasis in original, quotations and citations omitted); *see also Montoya v. City & Cnty. of Denver*, 2021 WL 8087380, at *2 n.3 (D. Colo. July 27, 2021) (unpublished) (noting that the issue of whether a municipal entity can be deliberately indifferent to a right that is not clearly established was left open by *Contreras ex rel. A.L. v. Dona Ana Cnty. Comm'rs*, 965 F.3d 114, 1124 (10th Cir. 2020) (Carson, J. concurring)). Plaintiff should not, therefore, be able to maintain her claim of municipal liability based upon a final decisionmaker.

According, the Court must dismiss Plaintiff's municipal liability claims pursuant to Fed. R. Civ. P. 12(b)(6).

### F.  THE COMPLAINT FAILS TO STATE A PLAUSIBLE CLAIM UNDER THE ACT

#### i.      *No Direct Claim for Municipal Liability Exists Under the Act*

On August 18, 2022, the Colorado Court of Appeals ruled that no direct claim of municipal liability exists under the Act because "based on the plain language of the statute…it grants plaintiffs…the right to assert the specified civil rights action only against individual peace officers, not against the peace officers' employers." *Ditirro*, 2022 WL 3452486, at * 5. The Colorado Court of Appeals agrees with Defendants and this Court should too.

### ii. *The Complaint Fails to State a Claim for Supervisory Liability Against Elder or Gillespie Under the Act*

The Colorado Court of Appeals arrived at its conclusion in *Ditirro* by applying basic rules of statutory construction requiring a court to first look "to the express language of the statute, construing words and phrases according to the grammar and common usage." *Id.* at * 5 (internal quotations and citations omitted).

As argued in the Motion, the Court should not create a cause of action for supervisory liability under the Act because the Act's plain language does not expressly allow for it. The *Ditirro* decision bolsters Defendants' argument because it stands to reason that, if the Act's plain language does not provide for municipal liability, it also does not provide for supervisory liability. Yet the Response suggests that Defendants advocate for the interposition of § 1983 supervisory liability principles into the Act. *See* Response, p. 39. Not so. Defendants argue that no such cause of action exists.

Implicitly acknowledging that the Complaint does not state a claim for supervisory liability under more onerous § 1983 principles, Plaintiff implores this Court to transform the Act's cause of action for a constitutional violation into a simple tort and suggests she has stated a plausible claim for relief under less onerous "traditional tort principles."

14

Response, p. 40.  The Act's plain language provides no support for Plaintiff's position and Plaintiff cites no authority in support of her argument.  *See, e.g., id.* at p. 39 (stating, without citation to any authority, that the Act "creates a state cause of action in tort.").  The Court should reject Plaintiff's unsupported argument wholesale and find that no cause of action exists for supervisory liability under the Act.

But if such a cause exists, the Court should apply § 1983 supervisory liability principles and find that Plaintiff has failed to state such a claim, particularly due to the absence of deliberate indifference.

### iii.     O'Neal, Noe, and Ford Are Not "Peace Officers"

Colorado law enforcement agencies employ many individuals that do not meet the Act's definition of a "peace officer," such as dispatch operators, front desk clerks, information technology specialists, nurses, custodians, mechanics, and other administrative and civilian employees.  The plain language of the Act does not create a cause of action against these administrative and civilian employees because, unlike peace officers, they are not P.O.S.T. certified and are not tasked with enforcing Colorado's laws.  *See, e.g., Fraternal Order of Police, Colo. Lodge N. 27 v. City & Cnty. of Denver*, 914 P.2d 483, 486 (Colo. App. 1995) ("However, the legislative discussions concerning the addition of the phrase that a peace officer 'has the authority to enforce all the laws of the state of Colorado while acting within the scope of his authority and in the performance of his duties' generally indicate that the legislative intent was to allow peace officers to act in their law enforcement capacity only when they were on duty."), *aff'd* 926 P.2d 582 (Colo. 1996).

The Complaint's allegations concerning O'Neal, Noe, and Ford do not show that they satisfy the Act's definition of a "peace officer." The Complaint alleges that Noe classified Plaintiff into an all-male unit upon Plaintiff's intake at CJC, (Doc. 124, ¶ 54), Ford did an ADA interview of Plaintiff but did not place Plaintiff into an all-female unit (*id.* at ¶ 55), and O'Neal reviewed and denied Plaintiff's request for a transfer to an all-female unit (*Id.* at ¶ 57). Such duties do not plausibly assert that O'Neal, Noe, and Ford are "peace officers" as opposed to administrative employees, such as ADA coordinators or inmate intake coordinators. Consequently, Claims 5, 6, 7, 8, 9, 15, and 16 asserted against O'Neal, Ford, and Noe must be dismissed.

### iv.    The Complaint Does Not State a Plausible Claim Under the Act

The Response acknowledges that there is "little jurisprudence" surrounding some of Plaintiff's claims asserted under the Act.  *See* Response, p. 42.  For instance, Plaintiff argues that the Complaint states a violation of the Colorado Constitution's Equal Rights Amendment ("ERA") because this amendment "prohibits unequal treatment based exclusively on the circumstances of sex, social stereotypes connected with gender, and culturally induced dissimilarities." *Id.* (quoting *People v. Salinas,* 551 P.2d 703, 706 (Colo. 1976)).  Plaintiff's reliance on *Salinas* is misplaced. [2]  First, *Salinas* provides little, if any,

---

[2] Plaintiff's reliance on *People v. Green*, 514 P.2d 769 (Colo. 1973), is also misplaced. First, *Green* provides little, if any, guidance because it also involved a rapist's contention "that his conviction and sentence deny him equal protection of the law because statutes dealing with the crime of rape discriminate between the sexes."  *Id.* at 770.  Second, *Green* held that "*legislative classifications* based solely on sexual status must receive the closest judicial scrutiny."  *Id.* (emphasis added).  This case does not involve legislative classifications.  Third, the Colorado Supreme Court issued its decision in *Salinas* three years after its decision in *Green.*  Thus, *Salinas* controls.

guidance because it involved a convicted rapist's assertion that Colorado's statutory rape statute was unconstitutional.  *Salinas*, 551 P.2d at 705-06.  Second, the portion of *Salinas* quoted by Plaintiff is followed by this sentence: "However, [the ERA] does not prohibit differential treatment among the sexes when, as here, that treatment is reasonably and genuinely based on physical characteristics unique to just one sex."  *Id*. at 706 (citations omitted).  Following *Salinas*, then, Plaintiff fails to state a plausible claim under the ERA because she alleges that her housing and treatment in CJC were based upon characteristics unique to her biological sex.

Plaintiff's other claims asserted under the Act are supported by state court decisions espousing general tort principles.  *See* Response 44-46 (citing *Davenport v. Cmty. Corr. of the Pikes Peak Region*, 942 P.2d 1301, 1303 (Colo. App. 1997); *Leake v. Cain*, 720 P.2d 152, 159 (Colo. 1986)).  As explained above, Plaintiff's effort to transform her constitutional claims into simple torts finds no support in the Act's plain language and runs counter to the Court of Appeals' rationale in *Ditirro*.  Moreover, Plaintiff's inability to cite to any Colorado case recognizing the specific rights alleged under the Colorado Constitution only furthers Defendants' argument that "this federal Court should not recognize rights for the first time under the Colorado Constitution."  Motion, p. 32 (citing *Younger v. Harris*, 401 U.S. 37 (1971)); *see also People v. Young*, 814 P.2d 834, 843 (Colo. 1991) ("This history reflects our repeated recognition that the Colorado Constitution, written to address the concerns of our own citizens and tailored to our unique regional location, is a source of protection for individual rights that is independent of and

supplemental to the protections provided by the United States Constitution."). Accordingly, the Court should dismiss Plaintiff's claims asserted under the Act.

### G. THE COMPLAINT FAILS TO STATE A PLAUSIBLE CLAIM UNDER THE ADA OR REHABILITATION ACT

#### i.    The Complaint Fails to Allege a Covered Disability

When Defendants filed the Motion to Dismiss, there was no circuit court opinion addressing whether Gender Dysphoria falls within the ADA's categorical exclusion of coverage for "gender identity disorders not resulting from physical impairments," 42 U.S.C. § 12211(b)(1).  On August 16, 2022, a divided Fourth Circuit held that Gender Dysphoria is covered by the ADA.  *Williams v. Kincaid*, 2022 WL 3364824, at ** 3-7 (4th Cir. 2022).

Defendants maintain that Gender Dysphoria is excluded from coverage under the ADA because (i) *Williams* is not binding precedent in this District; (ii) there remains a significant disagreement amongst district courts as to whether Gender Dysphoria is excluded from coverage under the ADA; and (iii) in *Michaels v. Akal Sec., Inc.*, a court in this District ruled that "[g]ender dysphoria, as a gender identity disorder, is specifically exempted as a disability…"   2010 WL 2573988, at *6 (D. Colo. Jun. 24, 2010) (unpublished).  But fortunately, the Court does not need to wade into these murky legal waters because Plaintiff's ADA and Rehabilitation Act claims clearly fail for the other reasons set forth below.

#### ii.    The Complaint Fails to Allege Causation

The Response provides no cogent argument regarding causation.  Plaintiff argues that the ADA applies to "anything a public entity does" regardless of whether it is done

because of a person's disability.   Response, p. 47 (quoting *Hason v. Med. Bd. of California*, 279 F.3d 1167, 1172-73 (9th Cir. 2002)).   This argument belies binding precedent such as *Crane v. Utah Dep't of Corr.* where the Tenth Circuit held that "the ADA merely requires the plaintiff's disability be a but-for cause (i.e., 'by reason of') of the discrimination, rather than—as the Rehabilitation Act requires—its sole cause (i.e., 'solely by reason of')." 15 F.4th 1296, 1312-13 (10th Cir. 2021) (internal citations omitted).

Relying on *Doe v. Mass. Dep't of Corr.*, Plaintiff goes on to argue that a correctional institution violates the ADA when it assigns a transgender woman to a men's prison "by virtue of her gender assignment at birth" or denies a transgender woman access to facilities and programs that would "correspond to her gender identification."   Response, p. 47 (citing *Doe*, 2018 WL 2994403, at * 8 (D. Mass. June 14, 2018)).   The problem with Plaintiff's reliance on *Doe* is that Doe's disability discrimination claims were premised upon her "Gender Dysphoria (GD) disability" and "GD diagnosis," not her transgender status or gender identity.   *Doe*, 2018 WL 2994403, at ** 1 and 6.

Unlike *Doe*, the Complaint clearly alleges that Plaintiff was subject to discrimination because of her transgender status or gender identity, not her Gender Dysphoria diagnosis (the alleged disability).   (*See, e.g.,* Doc. 124, ¶¶ 1 ("El Paso County's policy of refusing to house transgender inmates based on their gender identity…"); 3 ("Defendants denied [Plaintiff] clothing that conforms with her gender identity despite the fact that cisgender women are allowed panties and lipstick."); 50 ("El Paso County, as a matter of policy, refuses to house transgender women in female housing facilities."); 71 ("It is El Paso County's official policy that transgender women (including those with Gender Dysphoria)

are searched, including strip searched, by male staff and not female staff." ); 98 ("El Paso County refuses to recognize transgender women…as the women they are.  Instead, El Paso County officials routinely refer to these women…using the male names they were assigned at birth…[and] routinely refer to these women as 'men' or using male pronouns…")).  That is to say, the Complaint does not allege a sufficient causal link between Plaintiff's Gender Dysphoria diagnosis and the conduct of which she complains.

And by now arguing that the ADA and Rehabilitation Act claims are based upon Plaintiff's transgender status or gender identity, not her Gender Dysphoria diagnosis, Plaintiff confirms that her claims fall squarely within the categorical exclusion discussed in Section II.G.i above and Section IV. H.1 of the Motion.

### iii. Plaintiff Cannot Pursue Remedies That Were Not Traditionally Available in Breach of Contract Actions

The Response urges this Court to disregard *Cummings v. Premier Rehab Keller P.L.L.C.* where the Supreme Court recently held that damages available under the Rehabilitation Act are limited to those remedies traditionally available in breach of contract actions.  142 S. Ct. 1562, 1571-76 (2022).  The Court should not bite.

*Montgomery v. Dist. Of Columbia*, cited in the Response, disproves Plaintiff's argument.  There, the district court applied *Cummings* retroactively to preclude the plaintiff from seeking emotional distress damages and other types of damages that are not "the usual contract remedies in private suits," such as reputation damages.  2022 WL 1618741, at * 26 (D.D.C. May 23, 2022) (citing *Cummings*, 142 S. Ct. at 1571)).  The district court also extended *Cummings*' holding to the plaintiff's claim asserted under Title II of the ADA because Title II "incorporates the remedies, procedures, and rights set

forth in the [Rehabilitation Act]; hence if a certain category of damages is not available under Section 504, it is not available under Title II either." *Id.* at * 24 (internal citations and quotations omitted). In sum, *Montgomery* validates Defendants' arguments and confirms that the only damages available under the Rehabilitation Act and Title II of the ADA are "those damages [that] fit within categories of damages that would be traditionally recoverable in a breach of contract case." *Id.*

Plaintiff further argues that *Montgomery* allows her to seek damages related to the "failure to reasonably accommodate [her] disability [that] led [her] to suffering greater injury or indignity than other arrestees." *Id.* at * 24. To the extent these are something other than emotional distress damages, Plaintiff has failed to state a claim because she does not plausibly allege that she suffered any greater damage or indignity *because of her disability* as described in Section II.G.ii above and Section IV.H.2 of the Motion (*i.e.*, no causation).

### iv. The Complaint Fails to State a Claim for Compensatory Damages Under the ADA or Rehabilitation Act

The Response does not confront the question posed in the Motion: how can an entity be deliberately indifferent under Title II of the ADA and Rehabilitation Act when the existence of the right alleged is unclear?

Compensatory damages are only available under Title II of the ADA and Rehabilitation Act in instances of intentional discrimination which can be inferred from a defendant's deliberate indifference to a strong likelihood that the pursuit of its questioned policies will likely result in a violation of federally protected rights and a corresponding failure to act. *Havens v. Colo. Dep't. of Corr.*, 897 F.3d 1250, 1264 (10th Cir. 2018). But

it is unclear whether Gender Dysphoria falls within the ADA's categorical exclusion of coverage.  As explained above, "[n]o federal court of appeals or the Supreme Court ha[d]…addressed whether [this] exclusion applies to gender dysphoria," *Venson v. Gregson*, 2021 WL 673371, at *2 (S.D. Ill. Feb. 22, 2021) (unpublished), until August 16, 2022, when a divided Fourth Circuit ruled that Gender Dysphoria falls outside the applicable exclusion.  *See Williams*, 2022 WL 3364824, at ** 3-7.  Moreover, there remains a  significant disagreement amongst district courts on this issue, *see London v. Evans*, 2019 WL 5726983, at * 6 n.3 (D. Del. Nov. 5, 2019), including a decision from this District ruling that Gender Dysphoria falls within the applicable exclusion. *Michaels*, 2010 WL 2573988, at *6 (D. Colo. Jun. 24, 2010).  It is thus exceedingly unclear whether Gender Dysphoria has any protections under Title II of the ADA and Rehabilitation Act.

In similarly unclear circumstances, the Eighth Circuit held that a municipal entity was not deliberately indifferent under Title II of the ADA or Rehabilitation Act because it lacked clear notice that its actions would violate any rights protected by these statutes. *See Roberts v. City of Omaha*, 723 F.3d 966, 975-76 (8th Cir. 2013).  The Response offers no reason why this Court should reject the Eighth Circuit's sound rationale in *Roberts*.  Accordingly, this Court should find that the Complaint fails to plausibly allege deliberate indifference.

## H. THE COURT DOES NOT HAVE JURISDICTION OVER PLAINTIFF'S CADA CLAIMS AND PLAINTIFF DOES NOT DISPUTE IT

The Response provides no argument addressing Plaintiff's Colorado Anti-Discrimination Act claims, particularly that this Court lacks jurisdiction over them

because Plaintiff failed to exhaust her administrative remedies.  Accordingly, the Court

must dismiss Claims 12 and 13 for the reasons set forth in Section IV.I of the Motion.

### III.   CONCLUSION

Defendants respectfully ask the Court to enter an order dismissing Plaintiff's

Complaint with prejudice, awarding Defendants reasonable attorneys' fees and costs, and

for such other and further relief the Court deems just and proper.

Dated this 26th day of August 2022.

By: s/ *Nathan J. Whitney*
Nathan J. Whitney, #39002
Senior Assistant County Attorney
Terry A. Sample, #33919
Senior Assistant County Attorney
Chris Strider, #33919
Assistant County Attorney
Steven Martyn, #47429
Assistant County Attorney
El Paso County Attorney's Office
200 S. Cascade Ave.
Colorado Springs, CO 80903
(719) 520-6485 (Main Line)
(719) 520-7264 (Office)
Email:
nathanwhitney@elpasoco.com
chrisstrider@elpasoco.com
terrysample@elpasoco.com
stevenmartyn@elpasoco.com

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on August 26, 2022, I electronically filed a true copy of the Defendants' Reply in Support of Their Motion to Dismiss Third Amended Complaint with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Andy McNulty
Mari Newman
1543 Champa Street, Suite 400
Denver, CO 80202
(303) 571-1000
(303) 571-1001
amcnulty@kln-law.com

s/*Dee Lambert*
Paralegal