1

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLORADO
 2
        Case No. 21-cv-00387-CMA-NRN
 3      _____

 4      DARLENE GRIFFITH,

 5          Plaintiff,

 6      vs.

 7      EL PASO COUNTY, COLORADO, et al.,

 8          Defendants.

 9      _____

10              Proceedings before N. REID NEUREITER, United

11      States Magistrate Judge, United States District Court for

12      the District of Colorado, commencing at 10:58 a.m., October

13      11, 2022, in the United States Courthouse, Denver, Colorado.

14      _____

15              WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

16      ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED. . .

17      _____

18                           APPEARANCES

19              ANDREW McNULTY and MARI NEWMAN, Attorneys at Law,

20      appearing for the Plaintiff.

21              CHRISTOPHER STRIDER and TERRY SAMPLE, Attorneys at

22      Law, appearing for the Defendants.

23      _____

24                     TELEPHONIC MOTION HEARING

25
```

2

1                    P R O C E E D I N G S

2            (Whereupon, the within electronically recorded

3    proceedings are herein transcribed, pursuant to order of

4    counsel.)

5            THE COURT:  This is Darlene Griffith vs. El Paso

6    County, 21-cv-387.  Appearances for the plaintiff.

7            MR. McNULTY:  Good morning, Your Honor.  This is

8    Andy McNulty on behalf of plaintiff Darlene Griffith and

9    also on the line we have Mari Newman.

10           THE COURT:  Okay.  And for the defendants?

11           MR. STRIDER:  Good morning, Your Honor.  This is

12   Chris Strider on behalf of the El Paso County defendants,

13   and I'm joined today by attorney Terry Sample also on behalf

14   of the defendants.  And for the Court's information, I'll be

15   handling the argument for the motion to dismiss and

16   Ms. Sample will be addressing the motion to stay.

17           THE COURT:  All right.  You know, on the motion to

18   stay, I'm going to go ahead and grant the motion to stay

19   conditioned on -- so because the motion to dismiss has been

20   referred to me and I intend to move relatively quickly on

21   the motion to dismiss, I'm going to go ahead and grant the

22   motion to stay.

23           And I recognize that if the motion to dismiss is

24   denied, the defendants have an opportunity to object to the

25   Article III, but if I do the heavy lifting of doing an

3

1    initial deep dive into the motion to dismiss and conclude

2    that parts of the case are going to go forward, it's likely

3    that I will lift the stay when I issue my report and

4    recommendation.  I think that that's only fair.

5         I recognize that when qualified immunity is

6    raised, there is substantial body of case law in this

7    district that suggests staying is appropriate.  There are

8    also other cases, some of which I've written, that says,

9    Look, don't stay it if there are claims against the

10   municipality, but in this instance I think it makes sense to

11   stay it and -- but I'm -- you know, it's not going to take

12   six months to get an order out of me.  It might take a third

13   of that time and so I think that's a good compromise.

14        Ms. Newman, if you want to make your pitch as to

15   why it's not appropriate, but that's kind of where I'm

16   coming down on the stay issue.

17        MR. McNULTY:  Thanks, Your Honor, I'll address

18   that.  This is Andy McNulty for plaintiff.

19        THE COURT:  Sure.

20        ("Indiscernibles" were due to the poor audio of

21   Mr. McNulty.)

22        MR. McNULTY:  Thank you.

23        You know, as this Court is aware and I think just

24   recognized, courts in this district have found that stay is

25   not appropriate when there are claims that qualified

4

1   immunity does not apply to and when there is a common

2   nucleus of facts that surround both the claims that

3   qualified immunity is applied to and the other claims.

4           In this case, not only do we have municipal

5   liability claims, but we also have claims under the state

6   law SB 217, the Enhanced Law Enforcement Accountability Act,

7   and also under the ADA and Rehab Act.  Those claims are not

8   entitled to qualified immunity -- those claims are not

9   entitled to qualified immunity as to those claims, and they

10  comprise about half the claims in this lawsuit, if not a

11  little bit more than that.

12          So in line with that and in line with this Court's

13  precedent in Estate of McClain (ph) and Love vs. Grafhorn

14  (ph) and then many judges in this district, including Judge

15  Martinez in the Estate of Bailey (ph), Magistrate Judge Wang

16  in Montillo (ph), Judge Brimmer in (indiscernible) and Judge

17  Krieger in (indiscernible) that (indiscernible) granted a

18  stay in this case while, you know, those defendants who are

19  claiming qualified immunity will still have to be deposed

20  related to plaintiff's other claims that they are not

21  entitled qualified immunity.

22          So that's our basis for saying that this case

23  should not be stayed and should be allowed to continue and

24  not be delayed any further.

25          I think that we have meritorious claims and all of

5

1    the String Cheese factors also weigh in favor of a stay not

2    applying.  In the extraordinary circumstances,

3    (indiscernible) not applying, and I can go through those,

4    but they're outlined in our briefing, so I won't.

5             So for those reasons, Your Honor, that's why I

6    would say that we don't believe a stay should be applied

7    here and that we should be allowed to discovery.

8             We already have a number of depositions set in

9    December in this case and having to reschedule those

10   depositions would require a decent amount of work because we

11   put the work into our different schedules, and we've already

12   received discovery from defendants and we're continuing to

13   receive discovery from defendants, and so I think staying it

14   at this point would kind of be a moot point.

15            THE COURT:  All right.  Let me hear -- you know,

16   if you've already spent the depositions and you've received

17   discovery, nobody filed for -- did anybody file for

18   protective order in light of the motion for the stay?  It

19   doesn't look like it.

20            MS. NEWMAN:  And Your Honor, I believe the

21   defendants did file a protective order.

22            THE COURT:  I was looking at that.  I don't see

23   any motion for protective order.

24            MR. STRIDER:  Your Honor, very briefly.  At one of

25   the previous hearings, we addressed the prior protective

6

1    order that the Court extended through the discovery

2    schedule, so it wasn't a separate filing.  It was addressed

3    in the previous hearing.

4            THE COURT:  All right.  I mean, this case has been

5    around for a while.  I remember my own involvement in trying

6    to get some settlement done.  Defense counsel, what's

7    your -- what's your pitch?  I mean, my hope would be to

8    get -- if you've got depositions scheduled in December,

9    defense counsel, what's your -- you know, I know some of

10   your people have moved for qualified immunity and that's the

11   primary justification for granting a stay.  It's likely that

12   some of these claims might survive, or it's possible that

13   some of these claims might survive, not all of them, and my

14   thought on granting the stay, it doesn't make sense to do

15   discovery on everything if a substantial part of them are

16   going to be dismissed and I'm able to issue a decision, say,

17   in the next two months.  If I get it out in 60 days,

18   that's -- that's better than waiting six months or longer if

19   you're getting the Article III.

20           But, defense counsel, what's your argument for why

21   it should all be stayed?

22           MS. SAMPLE:  Well, Your Honor, at this point in

23   time I haven't been noticed for the depositions and I don't

24   think that those would be as difficult as plaintiff's

25   counsel thinks to reschedule those.

Case No. 1:21-cv-00387-CMA-NRN    Document 163    filed 11/12/22    USDC Colorado
pg 7 of 62

1       Also, I could go through the String Cheese factors

2   and I believe that they all weigh in our favor.  I'm first

3   going to focus on Number 2, the burden of the defendants.

4   It would be difficult for the parties and the Court to

5   distinguish between discovery related to the claims that may

6   not be subject to qualified immunity and those that are not.

7       The discovery is the same for the individual

8   claims in official's capacity as the individual claims and

9   the government entities, as plaintiff's counsel already

10  directed this Court.

11      It is the exact same discovery as the Supreme

12  Court has made clear that qualified immunity is both a

13  defense and liability and limited entitlement not to stand

14  trial or face other burdens of litigation.  So having it be

15  the same discovery makes it burdensome on the defendants

16  here.

17      Qualified immunity is such an important issue that

18  a denial of a motion to dismiss based on qualified immunity

19  is considered a final decision and immediately appealable,

20  so therefore, making the defendants go through that burden

21  of discovery --

22      THE COURT:  Let's say they win on qualified

23  immunity, but some of the other claims are survived, those

24  people are still going to be deposed in the case, right?  So

25  even if you appeal -- so let's say ultimately I agree and

**PATTERSON TRANSCRIPTION COMPANY**
scheduling@pattersontranscription.com

8

1    recommend dismissing the claims against the individuals on

2    qualified immunity grounds, but then I end up saying, but

3    the claims against municipality and some of the state law

4    claims go forward, even if they have qualified immunity,

5    they're still going to be deposed about the underlying

6    facts, right?

7            MS. SAMPLE:  I agree with that, Your Honor, but

8    that's why I think a motion to stay for all parties involved

9    at this point is more efficient than trying to separate out

10    the discovery process, which would be burdensome on both

11    defendants and Your Honor.

12            THE COURT:  What do you mean separate out the

13    discovery process?  What do you mean?

14            MS. SAMPLE:  Well, I mean --

15            THE COURT:  The facts are the facts.  The facts --

16    regardless of whether somebody has a claim against your

17    individual clients, the facts are the same.  They're not --

18    well, I'm not answering that question because it relates to

19    qualified immunity -- you know, the claims to which I've

20    asserted qualified immunity, but I am answering this

21    question, because that addresses municipal liability.

22    That's not how it works.  Just answer all the questions.

23    They're just facts, right?

24            MS. SAMPLE:  Right.  So at this point in time,

25    Your Honor, if you're allowing just the motion to stay

9

1    regarding the individual defendants, it makes it more

2    cumbersome and difficult in a deposition, because at this

3    point in time if qualified immunity applied, then they

4    should not be put or stand for a trial or face other burdens

5    of litigation such as this discovery process.  And if you

6    are only granting the motion to stay for the qualified

7    immunity as you've stated in a deposition, trying to

8    separate that out, a question is a question.  So then

9    they're essentially back dooring that information in a

10   deposition and still getting the discovery on the qualified

11   immunity questions.

12          THE COURT:  That doesn't make any sense to me.

13   The qualified immunity is really a legal question as to

14   whether there is, you know, an existing state law -- or an

15   existing Tenth Circuit or Supreme Court decision.

16          Anyway, I hear you, I've got the briefs.  I'm

17   going to reserve and I'll have to issue a decision on

18   whether to stay it or not, but thank you for that.

19          Let's get to the substance of the motion to

20   dismiss.  I'll hear from defense counsel.

21          MR. STRIDER:  Your Honor, I think that we are

22   going to stay in the qualified immunity realm to begin with,

23   mainly because this is such a mirky area of law that's

24   unsettled.  And it's unfair to expect that reasonable people

25   in the position of the defendants should be on notice that

1    their -- their conduct was in violation of a constitutional

2    right, but hasn't been clearly established.  When the weight

3    of authority cited by the plaintiff in this case comes from

4    outside of this jurisdiction, the only binding precedent

5    that exists in this jurisdiction is contrary to the

6    plaintiff's claims.  And in addition, we're talking about a

7    circumstance where the -- the facts are unclear as to who

8    was doing what.

9           And so when we're talking about the assertion of

10   qualified immunity, there are questions of personal

11   participation, there are questions of scrutiny that the

12   Court should be applying here.  And so I think first and

13   foremost we would point out that the plaintiff has failed to

14   establish that there was a fundamental constitutional right

15   that was violated by the defendants' actions.

16          THE COURT:  What -- so there is -- are there any

17   Tenth Circuit cases that address this -- this issue?

18          MR. STRIDER:  Well, Your Honor, it kind of

19   addresses -- it depends on which claim we're talking about.

20   The Fourteenth Amendment claims and the plaintiff's

21   allegation to this Court that the actions of the defendant

22   should be viewed under -- under heightened scrutiny because

23   the plaintiff is a member of a suspect class.  That is

24   directly addressed by the Tenth Circuit in Brown vs.

25   Zavaras.  That's 63 Federal.3d 967.

11

1          And the Tenth Circuit plainly states that being

2    transgender is not a suspect or quasi suspect class.  It is

3    not -- doesn't fall under the protections enumerated in the

4    Fourteenth Amendment or in any of the subsequent case law.

5    That case is from 1995.  However, the Tenth Circuit in a

6    couple of unpublished opinions from 2015 and 2006, that

7    would be Druley vs. Patton, 601 F.Appx 632 at 635.  And

8    then -- and you're going to have to forgive me on the

9    pronunciation of this one.  Qz'etax -- and I can spell that.

10   It's Q-Z, like zebra, 'E-T-A-X, like x-ray -- vs. Ortiz, and

11   that's 170 F.Appx 551 at 553.  That's the 2006 case.  Both

12   those -- both of those cases relied on the Zavaras case for

13   the same holding that transgender is not a suspect or quasi

14   suspect class.

15          And that's -- that's arguing against the -- the

16   idea that the defendants' actions should be viewed under

17   heightened scrutiny and, therefore, should be required to

18   serve an important governmental interest, but the fact is,

19   even if the Court does apply that level of scrutiny, the

20   defendants' actions in this case do serve an important

21   governmental interest.

22          We're addressing the introduction and

23   classification of an inmate into general population in a

24   county jail, and this is an inmate who is -- has certain

25   female characteristics, but also has male genitalia.

12

1          This poses a question of both the safety and

2    security of this particular plaintiff, this particular

3    inmate, but also the other inmates that this person may be

4    housed with.  And if there is one thing that is paramount as

5    far as the duties of a jailer, you could argue that the

6    first thing is to make sure that the people in the jail get

7    to their -- get to their court dates, but I would say, more

8    importantly, especially based on my experience representing

9    a jailer, it's more important to keep those people safe and

10   secure.

11          And so the decision that was made here, the act

12   that would be per the plaintiff subject to heightened

13   scrutiny, would still be an important governmental interest

14   in protecting both the plaintiff and other inmates.  But

15   realistically, the Supreme Court has addressed --

16          THE COURT:  Let me just interrupt you.  I mean,

17   isn't part of the claim that by putting a person who has

18   female characteristics in a male prison does exactly the

19   opposite; it subjects her to assault that she wouldn't be

20   subjected to if she were housed with female inmates?

21          MR. STRIDER:  Your Honor, I think that that's

22   getting more into the conditions of confinement claim than

23   the Fourteenth Amendment claim.  The Fourteenth Amendment

24   claim, when we're talking about making a classification that

25   impinges on the constitutional rights of an inmate, the

13

1    Supreme Court has addressed this pretty clearly in Bell vs.

2    Wolfish (ph) and in Turner vs. Dackley (ph).  And that's to

3    say that, you know, loss of freedom of choice and privacy,

4    those are inherent in detention settings, and the test is

5    whether the conditions is reasonably related to a legitimate

6    government objective such as managing the facility.

7            Now, other case law has said that managing the

8    facility is too broad of an interest to cite in and of

9    itself as the sole purpose for the classification, but we're

10   going more into the idea of -- we're putting somebody who

11   has the potential to interact sexually with other inmates in

12   the -- if they're housed in the female ward.

13           Similarly, anybody placed in the male ward,

14   regardless of whether they are transgender, has potential to

15   be subject to sexual assault.  And that's why we have the

16   classification process in the first place, to assess whether

17   they are at a heightened risk of sexual assault or a

18   heightened risk of predation.  These are the balances that

19   need to be struck when you're classifying any inmate.

20           To argue that it's unsafe to put the plaintiff in

21   with the male inmates because she exhibits female

22   characteristics puts us on a slippery slope of saying, well,

23   we have a homosexual inmate who exhibits certain feminine

24   characteristics or feminine presentation to the world, and

25   if we put that person in with the male inmates, they are at

14

1    heightened risk for sexual assault.  That's a consideration

2    that goes into classification decisions for certain.  But

3    when we're talking, moving on to the conditions of

4    confinement claim, it's not enough that there is some

5    general danger to a person's safety by putting them in a

6    particular ward.  There has to be a particular knowledge

7    on -- on the idea that this person is going to be subject to

8    assault.  And we're talking about the -- the idea that

9    somebody has been specifically threatened and the prison

10   officials have ignored that.

11        That's not the case here.  Nobody had threatened

12   Ms. Griffith, and even -- even if taking as true her amended

13   allegations that she was repeatedly sexually harassed, which

14   did not appear in the original complaint in this case and

15   did not seek leave to amend to add that information, but

16   even if you take that as true, that's a broad and

17   specific -- broad allegation that nobody was noticed on

18   prior to the classification decision.

19        In that line --

20        THE COURT:  Go ahead.

21        MR. STRIDER:  I would just say that there are

22   other reasons that the -- and all of this kind of dovetails

23   with the idea that in addition to there being no

24   constitutional violation, we're talking about whether or not

25   a reasonable person in the position of the county defendants

1    would have been on notice that what they were doing was a

2    violation of a clearly established right.

3           So we have this Fourteenth Amendment claim.  The

4    defendant argues that that is not a clearly established

5    right based on the standing precedent in the Tenth Circuit

6    that transgender individuals are not afforded the

7    protections of the Fourteenth Amendment beyond the

8    reasonable -- reasonable basis test that we discussed.

9           But the plaintiff also goes on to talk about

10   Fourth amendment, and similarly, we're back to Bell vs.

11   Wolfish.  What is reasonable here?  What is the purpose?

12   We're talking about a -- a pre-entry search, per the

13   plaintiff's language, a visual body cavity inspection.  This

14   is where an inmate is told to remove their clothing and to

15   expose those parts of their body that might be hiding

16   contraband.

17          The Supreme Court has held that it is reasonable

18   to have this kind of -- I'm sorry, this kind of search.  And

19   the Tenth Circuit has ruled that it's reasonable to have

20   this kind of search specifically where an inmate is going to

21   be housed in general population, and the plaintiff in this

22   case was going to be housed in general population.

23          THE COURT:  I don't think the issue is the search.

24   The issue is who conducted the search.

25          MR. STRIDER:  And I think that might be part of --

16

1   part of the confusion in the plaintiff's claim and the

2   nature of their claim, because they do actually challenge

3   the search.  They say the search itself was unreasonable and

4   it kind of gets convoluted and melded with the idea that

5   this was a cross-gender search.

6           Now, establishing that the plaintiff's gender is

7   female or male and that dictates who searches this person,

8   you know, that's a -- that's a very nuanced decision to make

9   and it's not clearly established anywhere in -- in the

10  Prison Rape Elimination Act which addresses cross-gender

11  searches.  It's not addressed anywhere in any of the

12  existing case law.

13          What cases do address the reasonableness of a

14  cross-gender search deal with situations where a -- an

15  inmate was searched by a person of another gender in a

16  setting where they were exposed to other members of the

17  public, other inmates.  They were -- I think the language

18  that's typically used in these cases is paraded in front of

19  other people, sometimes in a hospital setting.  So we're

20  talking about a very factually distinguished cases.

21          Ms. Griffith was not subject to really anything

22  different than any other inmate going into general

23  population would have received other than the fact that

24  there were two deputies present.  And really the

25  consideration of those deputies was to address the idea of

17

1    Ms. Griffith's privacy.

2            We're talking about two deputies who do take into

3    consideration the fact that Ms. Griffith has a -- is

4    biologically male, but has other parts of her body that

5    present as female, and so they were taking their -- their

6    best approach to both preserve her right to privacy, but

7    also to protect the entity and themselves against liability.

8            I think they're caught on the point of a

9    double-edged sword in the sense that if they search

10   Ms. Griffith based purely on her -- her biological sex or

11   genitals, they know that that is not allowed by the Prison

12   Rape Elimination Act.

13           If there is only one piece of guidance here, it's

14   that the Prison Rape Elimination Act says you should not

15   take into consideration only the individual's biological sex

16   when conducting a search or doing a classification.

17           And so to that end, they have to consider, well,

18   we want to be in compliance with PREA, but we also need to

19   make sure that we are not exposing ourself to the other side

20   of that liability to say that this person is going to come

21   back and say, Well, this was a cross-gender search because

22   it was a female searching me and I have biological male

23   parts.  All of this points to the uncertainty of the

24   situation and the complete lack of guidance in the case law

25   and in the statutory law.

18

1          What cases are cited by the plaintiff to support

2    their position tend to be outside of the -- outside of this

3    jurisdiction.  They also tend to be factually

4    distinguishable from the situation.  None of the cases cited

5    by the plaintiffs deal with Title IX, what is colloquially

6    known as the school bathroom cases.  Obviously, this is an

7    area that's going to be -- that gets a lot of press coverage

8    and gets a lot of attention in courts as far as students'

9    rights to use the bathroom of their choice that they

10   identify with as far as gender.

11          Other cases, particularly the Bofdrop (ph) case

12   which they cite as controlling, well, that case resided in

13   Title VII and it doesn't extend the protections that they

14   claim beyond Title VII.

15          But really I think that we're talking about the

16   distinction between the prison setting and those settings

17   outside the prison, and that's an incredibly important

18   distinction because of the deference that the Supreme Court

19   in Bell vs. Wolfish and Turner vs. Staffley (ph) has

20   afforded to prison officials to make these tough decisions.

21   They know that -- the Supreme Court has raised that the

22   prison officials are the ones who are going to have the

23   on-ground knowledge about how best to manage their facility,

24   how most safely to manage their facility, and it -- that

25   deference is afforded to them for a reason.

1          You can see that this is an area of law and of

2     sociology really that's being constantly updated and

3     constantly debated around the country between the law that

4     was passed in California that allows inmates to be housed --

5     or that requires inmates to be housed in accordance with

6     their gender identity.  Well, that law quickly was

7     challenged by a group of female inmates as a class who claim

8     to have been sexually assaulted by transgender women in

9     their -- in their facilities.

10          These aren't easy questions, and the fact is, is

11    that these deputies, when they are making the decision,

12    okay, we have 150 inmates that we're processing through

13    searches tonight and Ms. Griffith is here, we're going to do

14    our best to balance between preserving her privacy rights

15    and preserving the safety, security of the facility, and

16    also making sure that we're not subjecting ourselves and the

17    agency to liability.

18          Beyond that, the -- I think that the

19    reasonableness of the search itself was fairly well

20    established, and even if we're accepting it's true, the

21    plaintiff's claim that Deputy Mustapick made sexually

22    charged comments to the plaintiff during his portion of the

23    search, the laws establish that the -- even very harsh

24    sexually aggressive comments do not suffice to establish a

25    constitutional violation.

1       THE COURT:  Don't they allege that he -- the

2  deputy grabbed the crotch area, touched her or something to

3  that effect?

4       MR. STRIDER:  So there was a previous claim,

5  Fourth Amendment claim against another deputy in which

6  Ms. Griffith claimed that she was subject to pat-down

7  searches -- cross-gender pat-down searches in which the

8  deputy forcibly grabbed her crotch; however, the plaintiffs

9  had dismissed that deputy I would note after they were

10  provided with security camera footage of the search in

11  question.

12       The -- the allegations in the current complaint do

13  not include any against Deputy Mustapick of having any

14  physical contact with the plaintiff.

15       THE COURT:  All right, go ahead.

16       MR. STRIDER:  Now, we're also addressing the issue

17  of municipal liability in this case.  Obviously that's --

18  that's been a pretty big factor as to how this case

19  proceeds, but really the plaintiff's claim fails to show

20  the -- the necessary municipal custom or policy that

21  supports the alleged violation.

22       Now, I don't want to concede at all that there was

23  a violation.  First and foremost, the question of

24  municipal -- pardon me, municipal liability turns on whether

25  or not there was a constitutional violation.  I would argue

1    that there has not been a constitutional violation in this

2    case properly established by the plaintiffs to support a

3    Monell claim.  However, beyond that, there are other burdens

4    that the plaintiff has to show that, one, there is a direct

5    causal link between municipal customer policy and the

6    violation alleged, and that's from Myers vs. Oklahoma

7    County -- Board of County Commissioners, 151 F.3d 1313 at

8    1316.  That's a Tenth Circuit case from 19 --

9            THE COURT:  Let me ask, was there a policy?  I

10   mean, is she being -- what instructions were the -- the

11   deputies following that allowed them to say, Hey, you know,

12   female breasts, male genitalia, you go in this box.  If you

13   had the surgery, you go in this box?  I mean, were they

14   educated at all or was there just no policy and they're just

15   kind of winging it as to what they were doing?  That's what

16   I'm having trouble with.

17           Are you denying that there was a policy or are you

18   saying that the policy as implemented wasn't

19   unconstitutional?  Those are two different arguments.  I

20   can't tell whether you're arguing there was no policy or

21   they haven't adequately alleged a policy.  So help me on

22   that piece.

23           MR. STRIDER:  Well, I think what you finished with

24   there is probably the crux of the matter.  Whether or not a

25   policy exists has not been established by the complaint.

1    We're talking about the fourth -- four corners of the third

2    amended complaint here, as well as any previous filings that

3    they have made, and there has been no citation to an

4    existing policy.

5            If we're looking for repeated implementation of

6    this type of conduct, they have also failed to allege any

7    other instance of this happening.  So the burden lies on the

8    plaintiff to establish that there is --

9            THE COURT:  Okay, but enlighten me, because I'm

10    curious, what was the policy?

11            MR. STRIDER:  Well --

12            THE COURT:  I mean, how -- when confronted with a

13    transgender inmate, what were the deputies supposed to do?

14            MR. STRIDER:  So the guidance that the deputies

15    rely on comes mainly from a few different areas.  It comes

16    from the Prison Rape Elimination Act, which as I stated is

17    the only statutory guidance that exists here when it comes

18    to addressing search issues of transgender inmates.  And

19    they have had routine training as to the Prison Rape

20    Elimination Act and its implementation.

21            They have antidiscrimination policies that exist

22    that say that you're not going to treat a transgender inmate

23    poorly based on their transgender status.  When it comes to

24    affecting a search, the deputies are going to be taking

25    those things into account.

23

1          The Court is aware that there is a -- that there

2    is a -- pardon me, settlement agreement on an injunction in

3    this case that has prompted a more thorough policy that's in

4    place now as far as everything being written down, but there

5    are practices in many jails that stem from the training that

6    deputies receive, but there are also many circumstances

7    where deputies are charged with making these kind of

8    in-the-moment decisions based on things like the flow of

9    inmates into the facility at that time, the availability of

10   other -- of other deputies to -- to address whether or not

11   somebody is being searched by the person they're choosing.

12          And again these -- these are implementations of

13   the policies that would comport with what appears the

14   plaintiff wants to be in place.  They present their own

15   problems.  The minute that a policy was put in place by

16   which inmates could identify who they wanted to search them

17   based on gender, the first inmate that was given the choice

18   verbally and visually, I guess, sexually harassed the female

19   deputy that was searching him.

20          Not to say that that's anything to do with -- with

21   this case or the facts of this case.  I'm just pointing out

22   that whatever -- whatever you put in place, there are going

23   to be pitfalls one way or the other, and for that reason,

24   they often rely on the training that they're given, the

25   experiences that they have in their work and the

1    on-the-ground situation that day, that night, that requires

2    them to conduct this type of search.

3            But again --

4            THE COURT:  Keep going.  So in terms -- you've

5    got -- I want to give both sides fair opportunity here.  I

6    kind of have a hard stop at 12:15, 12:20, so you've got

7    another ten minutes or so.

8            MR. STRIDER:  Well, then I'm going to just briefly

9    address the plaintiff's reliance on Krause (ph) in relation

10   to the municipal reliability claim.  And that again

11   dovetails with the idea that they did not identify any other

12   incidents of mistreatment similarly situated individuals,

13   which the Tenth Circuit as of March of this year

14   acknowledged is a thresh- -- a threshold where the plaintiff

15   has not identified a formal policy.

16           A couple other things that I want to touch on that

17   are very important.  Obviously, the Americans with

18   Disabilities Act is not subject to qualified immunity.  The

19   claims under that act are not subject to qualified immunity.

20   However, we're in a similar situation where there is no

21   clear binding precedent or weight of authority stating that

22   gender dysphoria is covered under the ADA.

23           The Fourth Circuit case cited by the plaintiffs,

24   the Williams vs. Kincaid (ph) case, that's -- that's the

25   Fourth Circuit.  You know, that's -- that's one outside case

1    that was published, I believe, in August.

2          So --

3          THE COURT:  But -- so let's say there isn't any

4    precedent under the ADA, it's not covered by qualified

5    immunity, so they're asking us to make -- you know, make a

6    little law.  We decide as here in the Tenth Circuit, and

7    maybe the Tenth Circuit will decide it, but they're asking

8    me to make a recommendation, at least, or Judge Arguello as

9    to whether gender dysphoria is covered by the ADA.  What's

10   your argument that it's not?

11         MR. STRIDER:  Well, Your Honor, I think in -- this

12   is a case where we're talking about a specific disability

13   that doesn't necessarily match with the plaintiff's claim

14   that she's transgender.  You know, you have gender

15   dysphoria, the specific diagnosis, and then the transgender

16   as more of a status.  And there has been no real

17   establishment that the plaintiff in this case has the

18   specific physically oriented gender dysphoria that the

19   Department of Justice and the Fourth Circuit has identified

20   as being covered under the ADA.

21         But really even if this Court does decide and does

22   decide to make new law in light of the Fourth Circuit

23   decision that gender dysphoria is covered under the ADA, I

24   think their claims still fail.  The -- for two reasons:

25   They have not established causation.  The plaintiff -- the

26

1  plaintiff claims disparate treatment based on being

2  transgender, not on being gender dysphoric.

3          And so if we're looking at the Crane (ph) vs. Utah

4  Department of Corrections case, disability has to be a but

5  for cause, and gender dysphoria is not the but for -- is not

6  cited as the but for cause.  What's cited as the but for

7  cause is for transgender status.  In fact, there are

8  numerous instances of the plaintiff receiving treatment

9  based on her claims of transgender dysphoria, whether it be

10  with mental health officials -- I'm sorry, mental health

11  practitioners or receiving the medication that she was

12  previously described -- prescribed.

13          Now, there is also another problem in the sense

14  that we have this new Supreme Court case, Cummings vs.

15  Premier Rehab Keller, PLLC (ph), and that requires the

16  plaintiff to seek damages traditionally found in breach of

17  contract cases, not just emotional distress.  Here the

18  plaintiff has not cited any tortious type of damage that you

19  would find in a breach of contract case, but mere illusions

20  to this not addressing her gender dysphoria is causing her

21  great emotional distress, causing her to feel these sense of

22  anxiety.

23          And then again, with an amendment in violation of

24  Rule 15, they added in -- I would add that they added in

25  post-Cummings (ph), the idea that she attempted to

1    self-castrate by use of a rubber band, but even there they

2    didn't say that the attempt of self-castration actually

3    caused physical harm.

4         It's kind of a moot point to drill down on, but

5    it's important in light of the Cummings' decision, that

6    there has to be established something beyond emotional

7    distress, and that's all that was established here.

8         Now, I want to end on an important point that

9    there are some -- some filing failings here that need to be

10   addressed.  They have not named the Board of County

11   Commissioners as a named defendant.

12        THE COURT:  Can't that just be -- I mean, you

13   started out by saying no further amendment should be

14   allowed, but isn't that one just easily addressed with an

15   amendment to name the Board of County Commissioners instead

16   of El Paso County?

17        MR. STRIDER:  Well, I would say so, except it's

18   only the first part of the failings.  How --

19        THE COURT:  Get to the other -- I mean, the naming

20   thing I'm not too worried about, but tell me what the other

21   failings are.

22        MR. STRIDER:  Well, the El Paso County and the

23   Board of County Commissioners are a separate entity that has

24   absolute -- does not have any policy control over the

25   running of the El Paso County Jail.  That's established very

28

1    clearly in statute. We're talking about a separate elected

2    official who has clear run over the facility and has clear

3    run over the -- the people involved here, including hiring

4    and firing authority.

5        This is not a conditions of confinement claim

6    where they're claiming that the jail has a leaky pipe that

7    gave them food poisoning or the, you know, jail has some

8    sort of structural failing. That maybe you could attribute

9    to El Paso County because they technically own the building

10   itself, but we're talking about the actual running of the

11   jail. El Paso County doesn't do that. Revised Statute

12   30-10-511 establishes that that authority rests solely with

13   the -- with the sheriff.

14       And to that end, they have not shown that there

15   has been deliberate indifference on the part of the sheriff.

16   They have not shown that the sheriff was deliberately --

17   knew about these things going on and chose to ignore them.

18   It's --

19       THE COURT: Well, let me ask about some of those

20   issues. I mean, I read in your motion, you go through a

21   number of the individuals and say, Well, they never -- you

22   know, she wrote a bunch of grievances and she said it was

23   obvious that she's transgender from her appearance and X, Y

24   and Z. And much of your defense with respect to the

25   individuals is, Well, they don't identify a time where she

1    actually informed somebody.

2            I mean, at some point, whether her visual

3    presentation or the multiple grievances or when she alleges

4    it's obvious that I'm transgender, how -- aren't they

5    entitled to get discovery as to what somebody knew and how

6    they knew it, because it's obvious from her appearance in

7    the multiple grievances that she's filing that she wants to

8    be in the women's side of the jail as opposed to the men's?

9    I had a little trouble with that defense on your part.  It's

10   like, Well, they never alleged and the specific individual

11   knew that she had a problem with being on the men's side.

12           MR. STRIDER:  You know, I think we're talking

13   about a couple of different specific individuals here and

14   where those communications go to.  I think that it is not

15   unreasonable to understand that the elected official in

16   charge of the jail is not going to be part of the kite

17   system, is not going to review specific inmate grievances on

18   a day-to-day basis, and inmates don't have that kind of

19   direct line to someone.  And so when we're talking about

20   specific knowledge, we're addressing people in the position

21   of Sheriff Elder, we're talking about people in position of

22   Commander Gillespie, but really we're also talking about

23   people in the position of Ms. Ford who is the ADA

24   coordinator.

25           When we're talking about ADA, we just discussed

30

1    how the assignment -- or the coverage of trans- -- I'm

2    sorry, gender dysphoria has a disability under the ADA has

3    yet to be rock solid clearly established.  An ADA

4    coordinator is going to be talking with Ms. Griffith about

5    her blindness.  They're not talking going to be talking with

6    her about whether or not she's transgender.

7            I would also point out that this -- this case

8    arose in 2020, so the processes in place may have been

9    affected by COVID-19 as to who exactly Ms. Griffith met with

10   individually.  But the fact is, is that even if they had

11   some knowledge, it's not -- the municipal policymaker can

12   exhibit fault rising to the level of deliberate indifference

13   to a constitutional right when that right has not yet been

14   clearly established.

15           I think we're missing the forest through the trees

16   when we're drilling down on specific knowledge when there

17   has been no -- no right that has been established as being

18   violated.

19           THE COURT:  That's a different argument.  I mean,

20   it's tough for me to -- that's a different argument than the

21   people didn't know or didn't understand that she was upset

22   about being on the male side.  Whether or not she has a

23   constitutional right to be on the female side is a different

24   question from whether they've adequately alleged knowledge

25   on the part of the people who see her and are hearing her

31

1    complain and are getting repeated kites.

2            I mean, yeah, maybe the sheriff doesn't read the

3    kites on a daily basis, but somebody has to read the kites,

4    somebody knows.  So, but I hear you.  You're arguing that

5    it's not a clearly established right.  So that seems to

6    be -- you know, when you file a 50-page motion to dismiss

7    and you have all these arguments, you're not prioritizing,

8    you're not telling me, This is why we really win.  And so I

9    lump them together and I'm like, well, this doesn't seem

10   right.

11           So just in the future, I think you ought to really

12   prioritize your arguments.  It seems like you're really

13   saying, Look, we're struggling with the issue of transgender

14   prisoners, the whole country is, courts are dealing with

15   this, and in the Tenth Circuit nobody has established what

16   the law is and so we win on qualified immunity, at least.

17   It seems to me that that's your best argument, at least with

18   respect to defending the individuals.

19           MR. STRIDER:  And Your Honor, just to kind of

20   close my argument, I would just say that the plaintiff here

21   is asking the Court to make new law.  The Court potentially

22   does have the opportunity to make different areas of new

23   law.  I don't think that -- and the defendant's position is

24   that the Court should not be in the business of divining

25   unclear areas of law in favor of one party or the other.

1    Where there is a question of whether a right has been

2    clearly established, that, of course, is going to make it

3    impossible for anyone to be on notice that that right was

4    violated, and it is also going to entitle those individuals

5    to qualified immunity.

6            THE COURT:  Okay.  Let me ask a little question on

7    this.  It might better be posed to the plaintiff, but I

8    would like your view on it.  Let's say the ADA does cover,

9    whether it's gender dysphoria or -- say, gender dysphoria,

10   what's the solution?  What -- do you make certain

11   accommodations?  I mean, the whole complaint here seems to

12   be, she's being searched by males and she's not housed in

13   the female side, she's not getting female undergarments and

14   other -- other things that females would get.

15           If the ADA recognized gender dysphoria as a

16   disability, is that the solution, to provide those kind of

17   accommodations to minimize the anxiety associated with

18   gender dysphoria?

19           MR. STRIDER:  Is that to --

20           THE COURT:  No, that's to defense counsel.  I

21   would like to know:  Hypothetically, if gender dysphoria is

22   recognized as a disability, what do you think the sheriff's

23   office should have done differently than it did in this

24   case?

25           MR. STRIDER:  Your Honor, I would argue that the

33

1    defendant already provides reasonable accommodations to

2    address issues related to gender dysphoria through the

3    provision of mental health treatment in the jail and through

4    the provision of gender-affirming care through hormone

5    replacement therapy, both of which Ms. Griffith received

6    during her time in the jail.

7            THE COURT:  Okay.

8            MR. STRIDER:  Those are -- those are the

9    reasonable accommodations specifically in the detention

10   setting.  Reasonable accommodations doesn't mean sacrificing

11   all other safety and security situations to accommodate the

12   person with the disability.  Similarly, you wouldn't give

13   somebody a violent criminal who has mobility issues a

14   stainless steel walker to get around the facility.  It's a

15   balancing -- balancing act.

16           THE COURT:  All right, let's hear from

17   Mr. McNulty.

18           MR. McNULTY:  Thank you, Your Honor.

19           THE COURT:  Or whoever is arguing it.

20           ("Indiscernibles due to the poor audio of Mr.

21   McNulty.)

22           MR. McNULTY:  It's me, Your Honor, Mr. McNulty.  I

23   appreciate it.

24           I'm going to start off where you ended and talk

25   about what reasonable accommodations would have been

34

1    appropriate in this case.  And we're not talking about

2    accommodations that are giving an inmate a weapon in a

3    facility as counsel for defense talked about.  We're talking

4    about providing a different set of undergarments or making

5    sure that the deputies in the jail don't misgender a person

6    or call them slurs while they're in the jail or sexually

7    harass them.  We're talking about housing an individual on

8    the side of the jail in accordance with security concerns.

9             Just because Ms. Griffith -- you know, just

10   because we're asking Ms. Griffith to be housed in the female

11   side of the jail doesn't mean that, if there are security

12   concerns related to her, she isn't subject to a heightened

13   classification on that side of the jail.  This isn't a you

14   have to put her in the general population no matter her

15   security status.  Just as any other woman inmate would be

16   placed in the women's side of the facility according to

17   their security status, if there there were a threat, they

18   would be placed in a higher security category.  If they had

19   to be placed in restrictive housing, they would be.  And so

20   that's all we're asking for in this case and that's what

21   we're looking for the law to recognize as the right of

22   transgender women to live and be treated as the women that

23   they are.

24            THE COURT:  Is that -- is that an ADA claim, I

25   guess, is my issue?

1          MR. McNULTY:  Yes.

2          THE COURT:  How is your ADA claim?

3          MR. McNULTY:  Gender dysphoria is -- is inflamed,

4    I guess would be one way to say, or activated when

5    transgender women are not treated the way that they see

6    themselves, which is as women.

7          So through treating Ms. Griffith as a man and

8    classifying her as a man and using he/him pronouns when

9    talking to her, providing her with undergarments that are

10   male undergarments, placing her in a facility that only

11   other men would be placed in, that is something that, you

12   know, is making her disability worse and a failure to

13   accommodate it.

14         And they're only doing that because Ms. Griffiths

15   is someone with gender dysphoria.  They're not doing that to

16   other women in the facility, they're not doing that to other

17   men in the facility.  They're not taking men with depression

18   and putting them in the women's side, the women with

19   depression and putting them in the men's side.  It's only

20   the women with gender dysphoria.  So that's our claim with

21   respect to the ADA.  And I'll get a little bit into that

22   going forward.

23         One thing I do want to address at the outset is

24   defense counsel has raised a couple times now and for the

25   first time (indiscernible) that we violated Rule 15 in our

1    amendments.  We moved to amend the complaint, this Court

2    granted that amendment.  Defense counsel didn't object when

3    we moved to amend the complaint, so I think our amendment

4    was proper under Rule 15.

5         I'm going to -- I'm going to begin where defense

6    counsel began with the Fourteenth Amendment, equal

7    protection clause claim.  And it's our position that, you

8    know, (indiscernible) to allow transgender individuals to

9    use public facilities that correspond with their gender

10   identities is sex-based and gender-based discrimination

11   under the Fourteenth Amendment, and there are cases that

12   have held as much at the circuit level, in the Eleventh

13   Circuit, the Fourth circuit, the Seventh Circuit Adams

14   (indiscernible) Whitaker and then (indiscernible) court

15   level, in district courts across the country.

16        And the only cases I've seen relating to women in

17   prison, and those all come out in the favor of Ms. Griffiths

18   as she's asking for in this case, and those include Hanson

19   vs. Baldwin (ph), Kay vs. Dennison (ph), (indiscernible),

20   Igelsias (ph) vs. Federal Bureau of Prisons.  They're cited

21   in our cases -- in our briefing.

22        Our basic claim in this case is that defendants

23   discriminated against Ms. Griffiths by denying her the same

24   treatments that they would give to assist a woman because

25   she is a transgender woman.

1            Now, defense counsel has --

2            THE COURT:  I guess, definitionally, you say they

3    denied her the same treatment they would have given to

4    cisgender women, but -- and that's kind of an equal

5    protection claim, but she is differently situated than

6    cisgender women, because she has male genitalia.

7            So isn't it appropriate to make whether it's --

8    you know, is it your view that if somebody comes in and

9    says, I identify as a transgender woman, that they

10   automatically have to be treated the same way that any

11   cisgender woman who does not have male genitalia, has to be

12   treated the same way?

13           And I think the County's response is, We are

14   entitled for security reasons to make distinctions -- call

15   it discrimination, if you want -- to make distinctions

16   between inmates who have female breasts and male genitalia

17   and inmates who have female breasts and female genitalia.

18   So I just want to try to understand your argument.

19           Is it that if she says, I want to be treated as a

20   woman, they have to treat her exactly the same way they

21   would treat a female prisoner and can't make any -- any --

22   can't treat her any differently at all as a matter of

23   constitutional law?

24           MR. McNULTY:  I think in this case, Your Honor,

25   we're saying that a woman who has lived her entire life as a

38

1    transgender woman, basically, the last 20 years, her entire

2    life, has been consistently said that she is a transgender

3    woman, has gender dysphoria and has previously been housed

4    in female facilities in the Colorado Department of

5    Corrections, when someone like that comes into this

6    facility, and that's what happened in this case, that

7    defendants must treat her like a woman that she is and

8    that's our -- that's our argument.

9           And so -- and I think the courts agree with that,

10   all the courts that have addressed this particular specific

11   issue in the cases that I previously cited, including

12   Hampton (ph) and (indiscernible) and Iglesias have said as

13   much.

14          And the courts across the country, you know, since

15   the cases that defendants have cited from the Tenth Circuit,

16   which came from 1995, have realized that, you know, our

17   previous law on this issue was wrong, just like courts have

18   done throughout this country's history, from overturning

19   interracial marriage, overturning (indiscernible)

20   interracial marriage, overturning, you know, laws that

21   (indiscernible) and gave lesbians and bisexual and

22   transsexual women from antidiscrimination laws like in Romer

23   (ph).

24          Courts have -- courts have recognized that

25   discrimination against transgender individuals is wrong and

39

1    it is discrimination against suspect or quasi suspect class,

2    and I think that the case law is pretty clear on that.

3         If you look at all the cases that are cited in our

4    briefing and the four factors, including that transgender

5    individuals have historically been subject to

6    discrimination, that they have defining characteristics that

7    there are no relation to their abilities (indiscernible),

8    they (indiscernible) just like everyone else, that they have

9    (indiscernible) and distinguishing characteristics and that

10   they're (indiscernible) powerless and a minority.

11        So because that transgender individuals are a

12   quasi or suspect class, they must -- any classifications

13   related to them, which is what we allege in this case

14   happened, must be subject to intermediate scrutiny.  And as

15   we allege in the complaint, there was no justification for

16   housing Ms. Griffiths on the male side of the prison.

17        She had previously been housed in a female unit in

18   the Colorado Department of Corrections (indiscernible).  She

19   openly lived as a woman.  There is no history of her

20   sexually assaulting other women.  And, in fact, her sexual

21   preference is for men.  And so based on that -- and there is

22   no justification as alleged in the complaint she should have

23   been housed on the female side of the prison (indiscernible)

24   classification is appropriate based on her history.

25        And so how do I get to the point where there is

40

1    clearly established law in this?  So if the Court looks at

2    the language from the Supreme Court in Bostoff (ph), which

3    courts have looked at Title VII, I'm interpreting this

4    (indiscernible) Fourteenth Amendment, and Bostoff is clear

5    that discrimination against transgender individuals is

6    wrong, when that happens, and that's what we're allege

7    willing here.

8         If you look at the authority from other circuits

9    which can clearly establish the law, as this court -- Tenth

10   Circuit case law is clear, and if you look at the Tenth

11   Circuit decision in Priminickle (ph), which talks about the

12   amount of scrutiny that must be given to classifications

13   between men and women, which -- and, you know, in that case,

14   it even talks about the differences between male and female

15   breasts and said, Hey, that's not a -- that's not a good

16   reason to discriminate against men and women, right?

17        So if you're talking about the distinction drawn

18   here that's being Ms. Griffith who has not had bottom

19   surgery and another, you know, woman, that -- I don't think

20   that that is a valid reason based on Priminickle vs. Fort

21   Collins to make that classification absent some other

22   security concerns related to that, which as alleged in the

23   complaint there were none.

24        So that's our basis for saying that these

25   individuals should also not be granted qualified immunity,

41

1   in addition to the fact that defendants, including a

2   municipality violated Ms. Griffith's constitutional rights.

3          So moving on to the other Fourteenth Amendment

4   claims, including the due process claim for the cross-gender

5   pat-down searches, which continued in spite of Ms. Griffith

6   constantly writing grievances, courts have held that these

7   types of instances are not acceptable, including against

8   transgender women.  If you look at Shaw or Farmer vs. Reddin

9   (ph), those cases have said that that is not an acceptable

10  thing and it violates the Fourteenth Amendment.

11         Cross-gender visual body cavity search, which

12  happened, was also a violation of Ms. Griffith's Fourteenth

13  Amendment and Fourth Amendment rights.

14         We're not only complaining -- our complaint isn't

15  really talking about the search itself, it's talking about

16  the manner in which it was conducted, which includes by a

17  male deputy and using sexually subjective -- sexually

18  explicit language that harassed Ms. Griffith.

19         And the fact that there is no -- some of these

20  cases (indiscernible) that defendants have is that there

21  were exigent circumstances that required that one particular

22  person be subjected to a cross-gender search because of

23  exigent circumstances.

24         In this case, there clearly were none of those

25  (indiscernible) in place, because there was a female deputy

1    present through the first half of the search.  So there was

2    a female deputy available and present in this matter and the

3    cross-gender search was unacceptable under the Fourteenth

4    Amendment for that reason.

5              THE COURT:  But help me understand this -- and my

6    ignorance of these issues will become apparent.  And I'm

7    not -- I actually want to be educated, because it seems like

8    if -- if your client is claiming emotional distress or

9    traumatization by having to be searched by a male inmate,

10   then she's asking that a female deputy search her, but the

11   female deputy will be presented with male genitalia when she

12   does the -- the search of your client.  And in the same way

13   that your client claims she may be traumatized by a male

14   seeing her naked body parts, why isn't it rationale if you

15   have a presurgical transgender inmate that a female deputy

16   not be subjected to the extent, you know, somebody could be

17   traumatized by saying that genitalia of the opposite sex

18   that why isn't it rational for them to say, Okay, if she

19   still has male genitalia, we're not going to have female

20   deputies search you?

21             And I honestly am perplexed by this, just because

22   from a public policy perspective, it does seem like a jail

23   is put in a difficult situation where if someone claims,

24   well, subjecting me to a cross-gender search may traumatize

25   me, so I should be -- I should be searched by the gender

43

1    that I declare myself to be.  If you have male genitalia,

2    maybe the female deputy is not interested in being exposed

3    to male genitalia, regardless of the claim's gender of the

4    owner of that genitalia.

5            So help me understand how a -- how a jail is

6    supposed to address that situation or what you think is the

7    appropriate way to -- to answer that?

8            MR. McNULTY:  Sure, Your Honor, I appreciate the

9    question.  I think that, frankly, this is something that

10   jails are going to have to confront more and more and going

11   forward now in 2022.

12           The -- I guess there is two ways I can answer

13   that.  First is that male genitalia in and of itself, I

14   don't know if it would cause as much distress as Your Honor

15   is thinking of.  In fact, for example, nurses, workers --

16   workers in, you know, retirement homes and places like that,

17   everyday, as they bathe patients or move patients, they are

18   in contact with male genitalia and it's just a part of the

19   job and that's how it works.

20           The other thing is that the Fourteenth Amendment

21   protects a person's right to privacy, not necessarily their

22   right to not be exposed to things.

23           So what we're talking about here is the privacy

24   interest and the distress caused by invasion of privacy of

25   seeing someone's most intimate parts, especially in a

44

1   setting that, you know, it's (indiscernible) cold and, you

2   know, uncomfortable, I would say, for most people.  And

3   that's what's happening to Ms. Griffiths here when her

4   genitalia are being seen by someone who she views as the

5   opposite sex.  So those are the two things I would say in

6   response to that question.

7           And the case law kind of talks about that a lot in

8   terms of how the invasion of privacy is much -- much greater

9   when someone of the opposite perceived sex or gender

10  conducting the search.  And so that's our basis for the

11  Fourth and Fourteenth Amendment claims in that this is not

12  only, you know, invasion of right to privacy, there is an

13  unreasonable search because there was no reason for a male

14  deputy -- a male deputy to be present at all with a female

15  deputy there, and the scope of the intrusion was large, the

16  manner in which the search was conducted is really

17  problematic.  The justification for initiating it was

18  pragmatic too.

19          If you look at the (indiscernible) Circuit case

20  law which talks about how subjecting all (indiscernible) to

21  visual body cavity searches no matter the crime could be

22  problematic.  And in the place in which was conducted, it

23  was conducted alone by the male deputy that -- the female

24  deputy had left the room.  The male deputy didn't leave the

25  room while the female deputy was conducting the tope half of

45

1    the search, but the female deputy left the room when the

2    male deputy was conducting the bottom half of the search,

3    and that really opens up the opportunity for abuse to

4    happen.  There is some (indiscernible) case law on that in

5    the Bird (ph) case.  And this search violated clearly

6    established rights in the Tenth Circuit.

7            If you look at the Hayde (ph) case and the Schroth

8    (ph) case, which are search cases in the prison

9    (indiscernible) when we talk about -- one talks about the

10   cross-gender -- the cross-gender search.  And the other one

11   even just talks about same gender search, but I think it was

12   just -- there was no reason for it to happen, no

13   (indiscernible) interest, as it was in this complaint.  So

14   (indiscernible) established right for the inmate.

15           I'm going to move on to municipal liability,

16   because I don't have that much time left, and I want to talk

17   about the -- one of the things that was raised by defense

18   counsel, which is notice to El Paso County.  And El Paso

19   County, from our perspective, based on the allegations of

20   that complaint, was very much on notice of what was

21   happening.

22           First off, because Ms. Griffith was constantly

23   writing grievances asking to be moved to the male side of

24   the facility -- or sorry, female side of the facility,

25   Ms. Griffith was constantly writing grievances asking not to

46

1  be searched by male deputies.  She was constantly writing

2  grievances saying that people were misgendering her,

3  including deputies within the facility and women

4  (indiscernible) using slur against her.  And so to say that

5  there was no notice (indiscernible) I think is a problem.

6          And the lawsuit itself, which was filed by

7  Ms. Griffith, and then this continued to happen.

8  Ms. Griffith continued to be housed in the male side of the

9  facility even after the lawsuit was filed, even after the

10  (indiscernible).

11          THE COURT:  -- (indiscernible - speaking over each

12  other) do anything with the jail?  So I mean, that's their

13  defense on El Paso County.

14          MR. McNULTY:  Well, Your Honor, the -- I'm sorry,

15  I apologize.  I didn't mean to interrupt.

16          THE COURT:  Well, my question is, their defense is

17  that El Paso County doesn't administer the jail, so --

18          MR. McNULTY:  Correct, Your Honor.  We also sued

19  -- so, first off, Monell talked about how El Paso -- how

20  suing the entity itself, you know, the (indiscernible) is

21  appropriate.  You know, it's Monell vs. Department of Social

22  Services, right?  They are the proper defendants.

23          But we also sued Sheriff Bill Elder in his

24  official capacity, which is the same as suing El Paso County

25  Jail, if there is a separate entity other than El Paso jail,

47

1    which I don't think is true.  I think El Paso County is

2    (indiscernible) that is in charge of the El Paso County.

3    Jail.  And then --

4         THE COURT:  Isn't it the sheriff's department?

5    Isn't that who you're suing?

6         MR. McNULTY:  Well, official capacity in the same

7    as sued against the sheriff's department, if you look at

8    Kentucky vs. Granville (ph) the case law and its progeny.

9    You know, you can sue a government official, and we sued all

10   of them in their official capacity, all of the officers, so

11   these are interpreted by the court as to, in essence, be the

12   municipality itself.

13        And so I don't think that there is a credible

14   claim that, you know, that we sued the wrong people.  We

15   sued the right people.  In fact, these are the belts and

16   suspender approach to (indiscernible), in my perspective,

17   (indiscernible) that you should sue El Paso County,

18   (indiscernible) should sue, you know, an individual in their

19   official capacity, so we did both.  So that's our

20   perspective.

21        And, you know, now all these folks are being

22   represented by El Paso County attorneys.  They're not being

23   represented by El Paso County Sheriff's Department

24   attorneys, so I think their representation by defense

25   counsel sheds some light into the relationship.  And that's

48

1    our perspective on that.

2            In terms of unconstitutional policies, we allege

3    that they -- that El Paso County and the jail has particular

4    policies that are unconstitutional that have been applied to

5    Ms. Griffith, including they have a policy of housing all

6    transgender individuals based on their biological sex.  And

7    in case you didn't notice, Your Honor, defense counsel

8    didn't deny that during his argument.  That Ms. Griffiths

9    was subjected to cross-gender visual body cavity search per

10   El Paso County policy, and that the pat-down searches

11   happened per El Paso County policy and that she was denied

12   access to give (indiscernible) policy per their official

13   policies.

14           And not only that, you have the customary denial

15   of Ms. Griffith's constitutional rights over the period of a

16   year and a half as evidenced that's been outlined in our

17   complaint.  This isn't an instance where, you know, there is

18   a use of force against one person in an instance and that's

19   the only incident we have.  We have Ms. Griffith for months

20   and months and months and months, years, (indiscernible)

21   asking to be moved and being denied that opportunity by El

22   Paso County.  And there is number of case law, including

23   Kraft (ph), but other cases cited in our briefing, Kadey

24   (ph) and Jacovy (ph) and Riker (ph) and Smith that say

25   this -- this pattern of tortious behavior against one

49

1    individual is enough to allege Monell liability.

2           Finally, we have allegations that plaintiff

3    Sheriff Elder himself had made the decisions relating to the

4    treatment of Ms. Griffith, including where she would be

5    housed and allowing certain things to happen in the jail

6    under his watch.  He was the final policy maker pursuant to

7    state law and a number of cases, including Cortez and Colio

8    (ph).

9           I don't think that's how the Enhanced Law

10   Enforcement Integrity Act was addressed, but we believe --

11   based on our briefing, we believe that we have strong claims

12   against all of these individual defendants that remain

13   because they're peace officers and because the Colorado

14   constitution --

15          THE COURT:  Walk me -- I'm not familiar with that

16   act, and to be honest with you, did not finish all 90 pages

17   of 120 pages of the briefing before this argument.  So fill

18   me on this the state law claim.

19          MR. McNULTY:  Yeah.  So the state law claims

20   (indiscernible) as a state section 1983 on some level, but

21   with a broader purpose and intent and scope, it allows

22   individuals to enforce their state constitutional rights

23   against peace officers within the state, and peace officers

24   is a statutorily defined term and it clears all the

25   individual defendants in this matter just based on the plain

50

1   language of the statute.

2           And under -- under that law, we have claims under

3   Colorado Equal Rights Amendment, because it's a sex-based

4   discrimination against Ms. Griffith and the Colorado Equal

5   Rights Amendment applies strict scrutiny, when you obviously

6   hire (indiscernible) claims that we're bringing.

7           We have an unreasonable search claim under

8   Colorado -- in the Colorado constitutional due process

9   cause.  We have a cruel and unusual punishment claim under

10  the Colorado constitutional -- under the cruel and unusual

11  punishment (indiscernible) claim.  And we have claims

12  against both the officers in their individual capacities and

13  against Sheriff Elder in his official capacity because of

14  the language of the statute and the purpose of its enactment

15  as outlined in our briefing.

16          If the Court has any specific questions at this

17  point, (indiscernible) I want to answer them.  I don't want

18  to -- we're almost done and I want to make sure I address

19  the ADA claims very quickly.

20          The first thing is that Ms. Griffith is under the

21  ADA claims that she is a person with a disability and that's

22  based on the case that defense counsel laid out, which is

23  Williams vs. Kincaid (ph), but Williams vs. Kincaid is just

24  a circuit court decision.  There have been multiple other

25  district court decisions across the country that have said

51

1    that -- that gender dysphoria is a qualifying disability

2    under the Americans with Disabilities Act, which include

3    (indiscernible) Department of Corrections, Day vs. Dennison

4    (ph), Shulgar vs. Barr (ph), that's a Florida case, and then

5    Doe vs. Pennsylvania Department of Corrections (ph).  That's

6    a Western District of Pennsylvania case.  And I haven't seen

7    other cases in this context come out the other way.

8           So the law is building a consensus that gender

9    dysphoria is not excluded under ADA Section 12211(b).  And

10   that's for a number reasons as outlined in Williams,

11   including this -- and I won't go into all of those, but one

12   of them is for constitutional avoidance reasons.  It says,

13   if it wasn't, that that -- it would be (indiscernible)

14   struck down for being discriminatory against transgender

15   individuals.

16          The second aspect of that claim is that

17   Ms. Griffith was discriminated against because of her

18   disability and we believe that the (indiscernible).  That's

19   the reason that she was projected to leave these convictions

20   of confinement.

21          And then to address Cummings, we address a number

22   of the reasons why it doesn't apply to this case in our

23   briefing, and I want -- I just want to address something

24   that defense counsel said, which is that we're only seeking

25   emotional distress damages.  We're not -- even if this Court

52

1    says that Cummings precludes emotional distress

2    (indiscernible), we don't believe it does, (indiscernible)

3    briefing, we're also seeking nominal damages and we are

4    seeking declaratory and injunctive relief to those claims,

5    which are remedies allowed in the contract law.

6              So --

7              THE COURT:  When you say injunctive relief,

8    isn't -- I mean, hasn't her situation changed and isn't

9    there an injunction?  Fill me in on where we are in terms of

10   modifications to policies in El Paso County.  Has anything

11   changed?

12             MR. McNULTY:  Your Honor, I am aware that El Paso

13   County, after we achieved preliminary injunction -- or a

14   stipulated injunction in this case essentially, the court

15   order adopting it, a similar agreement.  If they changed

16   some of their policies, I am not -- I haven't gone through

17   them with a fine tooth comb, but I do know that they have

18   changed some policies.  So that's kind of where we're at in

19   terms of that.

20             THE COURT:  If they have changed -- I mean, is

21   injunctive relief from the ADA still an issue in the case?

22   That's my question.

23             MR. McNULTY:  We believe it is, Your Honor.  I --

24   I'm not 100 percent sure it's -- we can make the argument

25   that, you know, we've already achieved everything --

53

1   everything achieved in those claims, those injunctions,

2   (indiscernible) they haven't done that as of yet.  But it's

3   possible, certainly possible that that could happen and

4   could be a summary judgment argument, but as it stands right

5   now, I believe (indiscernible) under the ADA for injunctive

6   relief.

7          And the last thing is that we believe that there

8   was intentional discrimination in violation of the ADA.

9   Again, defense counsel misunderstands what notice is

10  required.  It's not notice that ADA prevents discrimination.

11  It's notice that they're not reasonably populating

12  something, and that is clearly, given by Ms. Griffith

13  through her grievances, her verbal protestations and the

14  lawsuit that she filed and the amended complaint that she

15  filed in this court.

16         So for those reasons, Your Honor, we would ask

17  that the Court deny (indiscernible) dismiss in its entirety

18  and happy to answer any questions.  Thank you so much for

19  your time.

20         THE COURT:  Okay.  Rebuttal by -- thank you, Mr.

21  McNulty.  Rebuttal by defense counsel.

22         MR. STRIDER:  Your Honor, I would like to start

23  off with the state law that the plaintiff alleges applied in

24  this case and thus the Enhanced Police Accountability Act

25  that was passed in 20.

54

1          Plaintiff's counsel alleges that the definition of

2     peace officer applies to all named -- named defendants in

3     this case.  However, that is a specific definition that

4     appears by reference in that -- in that statute and it

5     applies to the definition that peace officers are those who

6     are sworn personnel with arrest authority.  Typically

7     they're going to have to be POST certified or has some other

8     statutory designation to grant some arrest authority.  That,

9     of course, is not going to apply to an ADA coordinator, a

10    classification manager and a -- her subordinate, which would

11    be named defendants Noe, Ford and O'Neal.  By no stretch of

12    the imagination, when looking at the plain language of the

13    definition of peace officer would that apply to these named

14    defendants.

15         Moreover, the -- that bill still requires the

16    establishment of a violation of a right guaranteed under the

17    Colorado constitution, and per my previous argument,

18    defendants' position is that no -- no such violation has

19    been established.

20         I would also note that the plaintiff's counsel

21    also stated that all individually named defendants have been

22    sued in their official capacities and I would ask the Court

23    to take notice of the complaint as to who has and who has

24    not been named in their official capacities.  In the case

25    caption, we see that Commander Cy Gillespie is in his

1    individual capacity, Elizabeth O'Neal in her individual

2    capacity, Deputy Andrew Mustapick in his individual

3    capacity, Deputy Dawne Elliss in her individual capacity,

4    Tiffany Noe in her individual capacity --

5                THE COURT:  Stop, I can read that, but isn't the

6    whole issue whether the sheriff was named in his official

7    capacity or whether they're naming the El Paso County Board

8    of County Commissioners, El Paso County itself, the El Paso

9    County Sheriff's Department, the El Paso County Jail.  By

10   naming the sheriff in his individual capacity, they get

11   whoever they need to get.  I mean, that's the only question

12   I have.

13               MR. STRIDER:  I think there is a bar of supervisor

14   liability under -- under the municipal liability case law

15   that would prevent the actions of all of those who are not

16   named in their official capacities from being directly

17   attributed to the municipality.  Basically there is no

18   respondent superior here.

19               And so I'm not --

20               THE COURT:  That's a different question from

21   whether they named the right defendant.

22               MR. STRIDER:  No, I do understand that.  I would

23   rest on my previous argument that El Paso County was

24   improperly named because there is a specific statute that

25   places all authority over the jail squarely in the hands of

56

1    the elected official, who is the sheriff.  So El Paso County

2    doesn't have the care and control over the jail and its

3    inmates that plaintiff's counsel alleges.

4          THE COURT:  Okay, but if they named -- I mean, six

5    of one, half dozen of another.  If they're trying to hold

6    whether it's El Paso County or the sheriff's department or

7    the jail or the sheriff in his official capacity, it seems

8    to me that those are all the same, the money is going to

9    come from the same place.  But have they accomplished -- is

10   it appropriate for them to have named the sheriff in his

11   official capacity if they're trying to go after the jail,

12   you know, the entity that is somehow is issuing the policies

13   here?

14         MR. STRIDER:  And, Your Honor, the defendant did

15   not contest naming the sheriff is the same as naming the

16   sheriff's office, but it is a separate entity from the

17   county.

18         THE COURT:  Okay, all right.  Thank you for that

19   clarification.

20         MR. STRIDER:  Sure.

21         So going back, the plaintiff claims that

22   accommodation under the ADA by housing in women's ward is

23   reasonable because it doesn't jeopardize other safety and

24   security concerns and failure to do so aggravates the

25   coverage disability -- the allegedly covered disability of

57

1    gender dysphoria.  However, that's not the only covered

2    disability that exists in the jail and not even the only

3    covered mental disability that exists in the jail.  Other

4    mental health accommodations don't address every possible

5    aggravating circumstance.  Depression can be aggravated by

6    the very fact of imprisonment, by being taken away of your

7    loved ones.  The risk of suicidal ideation is present in

8    almost every person in the jail, and even development of

9    severe depression while being incarcerated and facing

10   charges, that's a real thing that the jail has to deal with

11   on a daily basis.

12          When we're talking about reasonable accommodation

13   we aren't going to solve any and all disability-related

14   problems of the inmates in the jail.  We're going to try to

15   do our best to reasonably accommodate those -- those

16   disabilities.  That's accomplished here through the

17   provision of mental health services and through

18   gender-affirming care, which again Ms. Griffith did -- did

19   receive regardless of where she was housed.

20          Again, there are some broad assumptions here

21   saying that it's not the same that Ms. Griffith is going to

22   be housed in the female ward because she's not being

23   provided with a weapon.  Ms. Griffith is biological male and

24   has a penis.  There is a risk there.  It can't be discounted

25   that the safety of the people she is housed with has much

58

1    concern to the defendants as her own safety is.

2            When we're discussing the current status of her --

3    her injunctive relief, which has been granted, she has -- we

4    have updated and addressed the use of sexual identification

5    and declaration form to make sure that people's sexual

6    identity is identified pre- -- prebooking.  She has been

7    housed both, at the time of the injunction was put in place

8    and in her most recent incarceration, in the women's ward.

9            She has been -- the searches in regard to strip

10   searches have been updated and guidelines for searches of

11   transgender inmates have been updated to allow the inmates

12   to express greater preference.  So the defendant argues that

13   all injunctive relief requested has been granted and no

14   additional injunctive relief has been requested, which would

15   render the ADA claims moot.

16           Now, the plaintiff states that there are cases

17   involving transgender women in prison settings that have

18   come out across the country in favor of plaintiffs similarly

19   situated to their client, but the plaintiff glosses over the

20   fact of those cases.  We're talking about cases in large

21   part involving repeated sexual assault often by jailers.

22           The plaintiff's weighted authority doesn't deal

23   only with classification and housing other than the Doe vs.

24   Massachusetts Department of Corrections cases that they

25   cited, which is neither the weight of nor controlling

1    ability over this jurisdiction.

2            The plaintiff claims that she should be treated

3    for some reason with greater deference than other

4    transgender inmates based on how long she has identified as

5    transgender and how she lives on the outside, like those

6    should be considerations when it comes to classification and

7    housing, but how would this affect the decisions of the

8    defendant as to transgender it makes to identify as

9    transgender for the first time the day before they were

10   arrested.  Those people may have diagnosed or undiagnosed

11   gender dysphoria and suffer the same sort of claims -- harm

12   that the plaintiff claims, but by the plaintiff's argument,

13   they should not be given the same deference because they

14   haven't lived for 20 years as a woman and have not presented

15   as such in society, and that really comes down to kind of an

16   equity argument, but also highlights the difficulties faced

17   by the defendants.

18           The plaintiff claims that cross-gender pat-down

19   searches --

20           THE COURT:  I'm going to give you two more

21   minutes, okay.

22           MR. STRIDER:  I did want to highlight this because

23   I think it's very important.  The plaintiff claims that

24   cross-gender pat-down cases included throughout the

25   defendant's -- I'm sorry, the plaintiff's stay in violation

60

1    of the Fourteenth Amendment due process clause.  However,

2    the complaint contains no named defendants subject to such a

3    claim at this time, and it's not clear from the complaint

4    that the municipality is implicated in the due process claim

5    because there is no identification of a policy customer

6    practice cited.

7              The fact that the defendant -- I'm sorry, the

8    plaintiff was repeatedly subjected to these claims in and of

9    itself alone is not enough to establish that policy, custom

10   or practice.

11             And finally, in regard to the Fourth Amendment

12   case -- or claim, the plaintiff claims that there was a

13   violation of the Fourth Amendment because of the very

14   presence of the male deputy.  And the fact is, they have --

15   the jail also has to consider the safety of both deputies.

16   It's not uncommon regardless of gender for both -- for their

17   to be two deputies for the purposes that I've stated before:

18   The safety and security of the facility, but also the

19   considered liability because -- of those deputies because

20   they're doing the searches in a setting that is not on video

21   camera, they don't have body-worn camera, they're not

22   recorded, and so it's the claim of the -- it's the claim of

23   the plaintiff that stands and they have no recourse as they

24   did in pat-down search case here to show that it is patently

25   false.

1          Again, the defendant requests that the Court grant

2     both the motion to dismiss and the stay on discovery until

3     that motion has been decided as to all named defendants and

4     all municipal defendants.

5          THE COURT:  Okay.  I've got some work to do, or at

6     least my law clerk does.  I do too.  Thank you all very

7     much.  It's an interesting area to be confronted with,

8     because as you all recognize, it's not common.  It's a

9     developing area of the law and it has -- and a developing

10    area of sociology and psychology too.  So thank you all very

11    much.  I'll read the briefs again more thoroughly with

12    interest and I appreciate the professional presentations.

13         Anything else for the plaintiff today?

14         MR. McNULTY:  Nothing, Your Honor.  Thank you so

15    much.

16         THE COURT:  All right.  Defense counsel, anything?

17         MR. STRIDER:  Nothing from the defendant, Your

18    Honor.  Thank you for your time.

19         THE COURT:  All right.  You all have a good day.

20         (Whereupon, the within hearing concluded at 12:31

21    p.m.)

22

23

24

25

**PATTERSON TRANSCRIPTION COMPANY**
scheduling@pattersontranscription.com

62

```
 1                    TRANSCRIBER'S CERTIFICATE

 2          I certify that the foregoing is a correct

 3   transcript, to the best of my knowledge and belief (pursuant

 4   to the quality of the recording) from the record of

 5   proceedings in the above-entitled matter.

 6

 7   /s/Dyann Labo                    November 10, 2022

 8   Signature of Transcriber              Date

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**PATTERSON TRANSCRIPTION COMPANY**
scheduling@pattersontranscription.com