IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 21-cv-00387-CMA-NRN

DARLENE GRIFFITH,

Plaintiff,

v.

EL PASO COUNTY, COLORADO,
BILL ELDER, in his individual and official capacities,
CY GILLESPIE, in his individual capacity,
ELIZABETH O'NEAL, in her individual capacity,
ANDREW MUSTAPICK, in his individual capacity,
DAWNE ELLISS, in her individual capacity,
TIFFANY NOE, in her individual capacity,
BRANDE FORD, in her individual capacity,

Defendants.

---

## REPORT AND RECOMMENDATION ON
## DEFENDANTS' MOTION TO DISMISS THIRD AMENDED COMPLAINT
## PURSUANT TO Fed. R. Civ. P. 12(b)(1) and (6)
## (Dkt. #132)

---

**N. REID NEUREITER**
**United States Magistrate Judge**

This prisoner civil rights case is before the Court pursuant to an Order (Dkt.

#135) issued by Judge Christine M. Arguello referring Defendants El Paso County, Bill

Elder, Cy Gillespie, Andrew Mustapick, Dawne Elliss, Tiffany Noe, and Brande Ford's

(collectively "Defendants")[1] Motion to Dismiss Third Amended Complaint Pursuant to

---

[1] Defendant Elder is the El Paso County Sheriff and is sued in his individual and official capacities. (Dkt. #124 ¶ 14.) The other Defendants are sued in their individual capacities and are employed in various positions by the El Paso County Sheriff's Office: Defendant Gillespie is a Commander (*id.* ¶ 15), Defendant O'Neal is an "official" who

Fed. R. Civ. P. 12(b)(1) and (6) (the "Motion to Dismiss"). (Dkt. #132.) Plaintiff Darlene

Griffith ("Plaintiff" or "Ms. Griffith") filed a response (Dkt. #147) and Defendants filed a

reply. (Dkt. #155.) The Court heard argument on the subject motion on October 11,

2022. (*See* Dkt. #161.) The Court has carefully considered the motion. The Court has

taken judicial notice of the Court's file and has considered the applicable Federal Rules

of Civil Procedure and case law. The Court now being fully informed makes the

following recommendation.

## PROCEDURAL HISTORY

Plaintiff is a transgender woman who was housed in an all-male unit in the El

Paso County Criminal Justice Center ("CJC"). Initially proceeding pro se, Plaintiff filed a

Prisoner Complaint relating to her conditions of confinement on February 8, 2021. (Dkt.

#1.) Complying with an order (Dkt. #5) issued the next day by Magistrate Judge Gordon

P. Gallagher, Plaintiff filed an Amended Prisoner Complaint on March 4, 2021. (Dkt. #9.)

On April 19, 2021, Judge Lewis T. Babcock entered an Order to Dismiss in Part and to

Draw Case and the case was randomly reassigned to the undersigned. (Dkt. #16.) The

matter was eventually assigned to Judge Arguello as the presiding judge. (*See* Dkt.

##25 & 58.)

On June 8, 2021, the Court entered an Appointment Order (Dkt. #28) and

Andrew McNulty of the law firm of Killmer Lane & Newman LLP subsequently entered a

notice of appearance on Plaintiff's behalf on September 15, 2021. (Dkt. #41.)

---

apparently processes inmate grievances (*id.* ¶¶ 16, 57), and Defendants Mustapick,
Elliss, Noe, and Ford are deputies (*id.* ¶¶ 17–20).

The Court granted Plaintiff leave to file a Second Amended Complaint on October 4, 2021. (*See* Dkt. ##46 & 47.) Plaintiff then moved for a preliminary injunction that would require, among other things, El Paso County to house her in a women's unit. (Dkt. #48.) The day before the December 9, 2021 hearing on the injunction, the parties reached an agreement that resulted in Plaintiff being transferred to a female ward and having access to the same items from the commissary as all female inmates. (*See* Dkt. #91.) The preliminary injunction motion was denied as moot and the hearing vacated. (Dkt. #92.)

On April 8, 2022, the Court conducted a Settlement Conference. (*See* Dkt. #110.) While no settlement was reached at that time, Plaintiff eventually settled her claims with jail's private medical services provider and its employees. (*See* Dkt. ##117, 119, 121, & 122.)

On June 7, 2022, with Defendants' consent, Plaintiff filed a Third Amended Complaint and Jury Demand ("TAC"), the operative pleading. (Dkt. #124.) The subject Motion to Dismiss followed and further discovery was stayed. (*See* Dkt. #162.)

## BACKGROUND[2]

This lawsuit arises from El Paso County's policy of housing transgender women in male units within the CJC. Plaintiff alleges that, as a result of this policy, she suffered repeated sexual harassment, sexual assault, and discrimination at the hands of jail staff and other inmates.

---

[2] Allegations in this section are taken from the TAC, and all non-conclusory allegations are presumed true for the purposes of the Motion to Dismiss. All citations to docketed materials are to the page number in the CM/ECF header, which sometimes differs from a document's internal pagination.

Plaintiff has been diagnosed with gender dysphoria and has been openly living as a transgender woman for over twenty years. (Dkt. #124 ¶ 25.) Gender dysphoria is "the significant distress that may accompany the incongruence between a transgender person's gender identity and assigned sex." (*Id.* ¶ 22.) The symptoms of gender dysphoria can be alleviated by allowing the transgender person "to live, and be treated by others, consistently with the person's gender identity." (*Id.*) To that end, and as part of her medically supervised treatment, Plaintiff has "changed her name and altered her physical appearance to conform to her female gender identity, including dressing in feminine attire and taking feminizing hormones, which caused her to develop female secondary sex characteristics such as breasts, soft skin, a lack of facial hair, and other characteristics typically associated with women." (*Id.* ¶ 25.)

Plaintiff entered the CJC on July 20, 2020. (*Id.* ¶ 47.) On intake, Defendant Noe, in accordance with official El Paso County policy, classified and housed Plaintiff in an all-male unit, despite (1) Plaintiff's explicit request that she be placed in a women's facility "because she feared being sexually abused and assaulted in male facilities by both guards and inmates, along with fearing the humiliation of being constantly searched by male guards in a male unit and the general degradation of being considered a man when she is a transgender woman," and (2) her medical records noting that she has been diagnosed with gender dysphoria.[3] (*Id.* ¶¶ 48–54.) Plaintiff alleges that making facility assignments to people in custody solely on the basis of the individual's genitalia violates accepted World Professional Association for Transgender

---

[3] Plaintiff is also legally blind. (Dkt. #124 ¶ 50.)

Health ("WPATH") and Prison Rape Elimination Act of 2003, 42 U.S.C. § 15601 *et seq.,* ("PREA") standards. (*Id.* ¶¶ 40–46.)

Also pursuant to the county's policies, when booked into the CJC, Plaintiff was subjected to a visual body-cavity search by a male deputy. (*Id.* ¶ 72.) Plaintiff told Defendant Elliss, a female deputy, that she did not want Defendant Mustapick, a male deputy, present during the search. (*Id.* ¶ 74.) Nevertheless, after examining Plaintiff's breasts, Defendant Elliss left the room (intentionally misgendering Plaintiff on her way out by referring to Plaintiff using male pronouns) and left Plaintiff alone with Defendant Mustapick. (*Id.* ¶ 76.) Defendant Mustapick made lewd and derogatory comments to Plaintiff (telling Plaintiff to "spread [her] sexy cheeks" and that he was "going to go balls deep in that ass" while grabbing his groin) and "aggressively" searched Plaintiff's genitals. (*Id.* ¶ 78.) He then threatened Plaintiff and warned her not to tell anyone what happened. (*Id.* ¶ 79.)

On July 29, 2020, Plaintiff had an ADA interview with Defendant Ford, to whom she repeated her request to be placed into housing that corresponded with her gender identity. (*Id.* ¶ 55.) That request was again denied, and Defendant Ford wrote in Plaintiff's records that that there were no disability concerns related to Ms. Griffith's housing, despite gender dysphoria being a disability under the ADA. (*Id.*)

Over the next year, Plaintiff submitted numerous grievances and kites about her housing assignment and the ongoing harassment. (*See id.* ¶¶ 56–66.) On at least one occasion, it was Defendant O'Neal who conveyed to Plaintiff that one of the grievances was denied, although it is unclear if Defendant O'Neal was responsible for denying the grievance. (*Id.* ¶ 57.) In any event, Plaintiff remained housed in the all-male unit.

Throughout her incarceration, Plaintiff was subjected to cross-gender searches by male deputies, who would intentionally touch her breasts. (*Id.* ¶¶ 89–91.) These searches caused Plaintiff anxiety and exacerbated her gender dysphoria, and she complained about them several times. (*Id.* ¶¶ 91–95.)

Plaintiff was also continuously misgendered. For example, on September 16, 2020, Plaintiff informed Deputy Daniel Holder that, as a transgender woman, she was uncomfortable that other inmates in her unit were not wearing shirts. Deputy Holder walked over to the other inmates and loudly yelled at them, "the blind faggot said you need to put your shirts on." (*Id.* ¶ 100.) She was also frequently referred to as "Sir." (*Id.* ¶ 102.) She consistently complained through the grievance process about being misgendered. (*Id.* ¶¶ 101–04.)

Defendants denied Plaintiff the ability to dress in accordance with her gender identity as well. She had to go without a bra for over a month and, over her repeated protests, Plaintiff was denied any women's underwear. (*Id.* ¶¶ 110–16.) Plaintiff was not allowed to purchase lipstick at the commissary. (*Id.* ¶¶ 117–19.)

On July 1, 2021, Plaintiff told Raymond Carrington, a mental health provider, that, due to the constant mistreatment, she would remove her penis herself as soon she could figure out how to do. (*Id.* ¶ 31.) Although these concerns were communicated to El Paso County officials, Plaintiff attempted self-castration by wrapping a rubber band around her genitals. (*Id.* ¶ 32.) Plaintiff has a long history of self-harm, including self-castration behavior, which worsens when she is not permitted to live in accordance with her gender identity and when she is subjected to sexual harassment and misgendering. (*Id.* ¶ 38.)

Finally, on November 18, 2021, Plaintiff was groped and taunted by another inmate while laying on her bunk. (*Id.* ¶ 85.) This was not the first time she had been sexually assaulted by this individual; "[a] witness to the assault told El Paso County officials that he witnessed at least three to four other similar assaults[.]" (*Id.* ¶ 87.) Plaintiff was not moved to a female unit after the incident.

Plaintiff asserts sixteen claims for relief under state and federal law:

- The **First Claim for Relief** is a Fourteenth Amendment equal protection claim for discrimination against all Defendants.

- The **Second Claim for Relief** is a Fourteenth Amendment conditions of confinement claim against all Defendants.

- The **Third Claim for Relief** is a Fourth Amendment unreasonable search claim against Defendants El Paso County, Elder, Mustapick, and Elliss.

- The **Fourth Claim for Relief** is a Fourteenth Amendment substantive due process claim for invasion of bodily privacy and integrity against Defendants El Paso County, Elder, Gillespie, Mustapick, and Elliss.

- The **Fifth Claim for Relief** is brought under Colo. Rev. Stat. § 13-21-131 and Colo. Const. Art. II, Section 25 for unreasonable search against Defendants Elder, Gillespie, Mustapick, and Elliss.

- The **Sixth Claim for Relief** is brought under Colo. Rev. Stat. § 13-21-131 and Colo. Const. Art. II, Section 29 for sex discrimination against Defendants Elder, Gillespie, O'Neal, Mustapick, Elliss, Noe, and Ford.

- The **Seventh Claim for Relief** is a substantive due process claim brought under Colo. Rev. Stat. § 13-21-131 and Colo. Const. Art. II, Section 25 for invasion of

bodily privacy and integrity against Defendants Elder, Gillespie, Mustapick, and Elliss.

- The **Eighth Claim for Relief** is a cruel and unusual punishment conditions of confinement claim brought under Colo. Rev. Stat. § 13-21-131 and Colo. Const. Art. II, Section 20 against Defendants Elder, Gillespie, O'Neal, Mustapick, Elliss, Noe, and Ford.

- The **Ninth Claim for Relief** is a due process conditions of confinement claim brought under Colo. Rev. Stat. § 13-21-131 and Colo. Const. Art. II, Section 25 against Defendants Elder, Gillespie, O'Neal, Mustapick, Elliss, Noe, and Ford.

- The **Tenth Claim for Relief** is a disability discrimination claim brought pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et. seq.*, against Defendant El Paso County.

- The **Eleventh Claim for Relief** is a disability discrimination claim brought pursuant to the Rehabilitation Act of 1973 ("RA"), 29 U.S.C. § 701, *et. seq.*, against Defendant El Paso County.

- The **Twelfth Claim for Relief** is a sex and transgender discrimination claim brought pursuant to the Colorado Anti-Discrimination Act ("CADA"), Colo. Rev. Stat. § 24-34-601, *et. seq.*, against all Defendants.

- The **Thirteenth Claim for Relief** is a disability discrimination claim brought pursuant to the CADA against all Defendants.

- The **Fourteenth Claim for Relief** is a Fourteenth Amendment failure to protect claim against Defendants El Paso County, Elder, Gillespie, O'Neal, Noe, and Ford.

- The **Fifteenth Claim for Relief** is a cruel and unusual punishment/failure to protect claim brought pursuant to Colo. Rev. Stat. § 13-21-131 and Colo. Const. Art. II, Section 20 against Defendants El Paso County, Elder, Gillespie, O'Neal, Noe, and Ford.

- The **Sixteenth Claim for Relief** is a due process failure to protect claim brought pursuant to Colo. Rev. Stat. § 13-21-131 and Colo. Const. Art. II, Section 25 against Defendants El Paso County, Elder, Gillespie, O'Neal, Noe, and Ford.

*Id.* ¶¶ 123–347.

Defendants now move to dismiss all claims under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

## LEGAL STANDARDS

### I. Rule 12(b)(1)

"Federal courts are courts of limited jurisdiction; they are empowered to hear only those cases authorized and defined in the Constitution which have been entrusted to them under a jurisdictional grant by Congress." *Henry v. Off. of Thrift Supervision*, 43 F.3d 507, 511 (10th Cir. 1994). Statutes conferring subject matter jurisdiction on federal courts are to be strictly construed. *F & S Constr. Co. v. Jensen*, 337 F.2d 160, 161 (10th Cir. 1964). "[T]he party invoking federal jurisdiction," generally the plaintiff, "bears the burden of establishing its existence." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 104 (1998). Rule 12(b)(1) allows Defendants to raise the defense of the Court's "lack of subject-matter jurisdiction" by motion. Fed. R. Civ. P. 12(b)(1).

Rule 12(b)(1) motions to dismiss for lack of subject matter jurisdiction "generally take one of two forms: (1) a facial attack on the sufficiency of the complaint's allegations

as to subject matter jurisdiction; or (2) a challenge to the actual facts upon which subject matter jurisdiction is based." *Ruiz v. McDonnell*, 299 F.3d 1173, 1180 (10th Cir. 2002). A facial attack "questions the sufficiency of the complaint," and when "reviewing a facial attack . . . a district court must accept the allegations in the complaint as true." *Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995) *abrogated on other grounds by Cent. Green Co. v. United States*, 531 U.S. 425, 437 (2001). When reviewing a factual attack, courts cannot "presume the truthfulness of the complaint's factual allegations," and may consider documents outside the complaint without converting the motion to dismiss into a motion for summary judgment. *Ratheal v. United States*, No. 20-4099, 2021 WL 3619902, at *3 (10th Cir. Aug. 16, 2021) (unpublished).

## II. Rule 12(b)(6)

Rule 12(b)(6) "tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." *Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994). To survive a Rule 12(b)(6) motion, "[t]he complaint must plead sufficient facts, taken as true, to provide 'plausible grounds' that discovery will reveal evidence to support plaintiff's allegations." *Shero v. City of Grove, Okla.*, 510 F.3d 1196, 1200 (10th Cir. 2007) (citing Bell *Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[P]lausibility refers to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiff[ ] [has] not nudged [her] claims across the line from conceivable to plausible." *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012) (internal quotations and citations omitted).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). In making a plausibility assessment, the Court first discards those averments in the TAC that are merely legal conclusions or "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.* at 678–79. The Court takes the remaining, well-pled factual contentions, treats them as true, and ascertains whether those facts (coupled, of course, with the law establishing the requisite elements of the claim) support a claim that is "plausible" or whether the claim being asserted is merely "conceivable" or "possible" under the facts alleged. *Id.* "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement." *Id.* at 678 (brackets in original; internal quotation marks omitted).

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that [a] defendant has acted unlawfully." *Id.* (citation omitted). To survive a motion to dismiss pursuant to Rule 12(b)(6), the factual allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1191 (10th Cir. 2009). What is required to reach the level of "plausibility" varies from context to context, but generally, allegations that are "so general that they encompass a wide swath of conduct, much of it innocent," will not be sufficient. *Khalik*, 671 F.3d at 1191. And "the mere metaphysical possibility that some plaintiff could prove some set of facts

in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).

### III. Qualified Immunity

Qualified immunity, in certain circumstances, protects government officials from litigation when they are sued in their individual capacities. *See, e.g., Harlow v. Fitzgerald*, 457 U.S. 800, 814-18 (1982). A government official is entitled to qualified immunity from liability for civil damages when the allegedly unlawful conduct did not violate any of the plaintiff's statutory or constitutional rights that (1) were "clearly established" at the time of the conduct, and (2) would have been known to a reasonable person in the official's position. Id. at 818. A government official is entitled to qualified immunity "[i]n all but the most exceptional cases." *Harris v. Bd. of Educ. of Atlanta*, 105 F.3d 591, 595 (11th Cir. 1997).

"Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments . . . [and] protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). "The key to the qualified immunity inquiry is the objective reasonableness of the official's conduct in light of the legal rules that were clearly established at the time the action was taken." *Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 516 (10th Cir. 1998) (internal quotation marks omitted).

The threshold inquiry is whether the facts taken in the light most favorable to the plaintiff sufficiently allege a constitutional violation. *Saucier v. Katz*, 533 U.S. 194, 201

(2001). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Id.* However, "if a violation could be made out on a favorable view of the parties' submissions," a court must "ask whether the right was clearly established." *Id.*; *see also Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (holding that although qualified immunity determination involves a two-part inquiry, if the plaintiff fails either inquiry reviewed in any order, no further analysis need be undertaken and qualified immunity is appropriate).

Raising a qualified immunity defense in a motion to dismiss "subjects the defendant to a more challenging standard of review than would apply on summary judgment." *Sayed v. Virginia*, 744 F. App'x 542, 545–46 (10th Cir. 2018) (quoting *Peterson v. Jensen*, 371 F.3d 1199, 1201 (10th Cir. 2004)). "At the motion to dismiss stage, it is the defendant's conduct as alleged in the complaint that is scrutinized for objective legal reasonableness." *Id.* at 546 (quoting *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014)). Accordingly, to survive a motion to dismiss, a plaintiff "need 'only allege enough factual matter' to state a claim that is 'plausible on its face and provide fair notice to a defendant.'" *Id.* (quoting *Keith v. Koerner*, 707 F.3d 1185, 1188 (10th Cir. 2013)).

## ANALYSIS

Defendants move to dismiss all sixteen claims asserted against them. The Court will address Defendants' arguments in turn.

**I. Plaintiff's Claim Against El Paso County**

Defendant contends that the Court cannot exercise jurisdiction over El Paso County because it has not been properly named under Colo. Rev. Stat. § 30-11-105, which states, "In all suits or proceedings by or against a county, the name in which the county shall sue or be sued shall be, 'The board of county commissioners of the county of ................'" As this is the "exclusive method by which jurisdiction over a county can be obtained," *Calahan v. Jefferson Cnty.*, 429 P.2d 301, 302 (Colo. 1967), Plaintiff's naming of the El Paso County as a defendant is defective, and the County can be dismissed due to this jurisdictional defect alone.

Moreover, Defendants point out that El Paso County is not responsible for the CJC's operations, the El Paso Sheriff's Office is, and under Colorado law, the county sheriff is a separate and distinct position from the board of county commissioners. *See Terry v. Sullivan,* 58 P.3d 1098, 1102 (Colo. App. 2002) ("[T]he Board [of County Commissioners] does not exercise managerial control over either the sheriff or the detention center and its staff."); Colo. Rev. Stat. § 30-10-511 ("[T]he sheriff shall have charge and custody of the jails of the county, and of the prisoners in the jails, and shall supervise them himself or herself through a deputy or jailer.").

The Court agrees that El Paso County is not a proper party because Plaintiff only alleges misconduct on the party of employees of the El Paso County Sheriff's Office ("EPSO") working at the CJC. Without more, such misconduct cannot be attributed to El Paso County. While the Court will address Plaintiff's municipal liability claims as asserted against the El Paso Sheriff's Office, her claims against El Paso County should be dismissed.

**II. The § 1983 Claims Asserted Against Defendants Elder and Gillespie**

Next, Defendants argue that Plaintiff fails to adequately allege that Defendants Elder and Gillespie personally participated in violating Plaintiff's constitutional rights.

42 U.S.C. § 1983 provides that "[e]very person who, under color of any statute . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." Section 1983 creates a "species of tort liability" that provides relief to persons deprived of rights secured to them by the Constitution. *Carey v. Piphus*, 435 U.S. 247, 253 (1978) (quotations omitted).

"Individual liability under § 1983 must be based on personal involvement in the alleged constitutional violation." *Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009) (quoting *Foote v. Spiegel*, 118 F.3d 1416, 1423 (10th Cir. 1997)). "Personal participation in the specific constitutional violation complained of is essential" in a § 1983 action. *Henry v. Storey*, 658 F.3d 1235, 1241 (10th Cir. 2011); *see also Foote*, 118 F.3d at 1423 ("Individual liability . . . must be based on personal involvement in the alleged constitutional violation."). To establish personal participation, a plaintiff must show that each individual defendant caused the deprivation of a federal right. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985).

Defendants Elder and Gillespie are being sued in their roles of Sheriff and Commander, respectively. But the mere fact that a government official has supervisory or managerial authority does not create § 1983 liability. *Id.* (citing *Duffield v. Jackson*, 545 F.3d 1234, 1239 (10th Cir. 2008)). Rather, there must be "an affirmative link . . . between the constitutional deprivation and either the supervisor's personal participation,

his exercise of control or direction, or his failure to supervise." *Id.* (quoting *Green v. Branson*, 108 F.3d 1296, 1302 (10th Cir. 1997)); *accord Butler v. City of Norman*, 992 F.2d 1053, 1055 (10th Cir. 1993) (citing *Meade v. Grubbs*, 841 F.2d 1512, 1527 (10th Cir. 1988)). "When an official is sued on the basis of his supervisory status and policy-making authority, a plaintiff may establish the affirmative link by demonstrating that the defendant: '(1) promulgated, created, implemented or possessed responsibility for the continued operation of a policy, (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation.'" *Est. of Yoemans by & through Ishmael v. Campbell*, 501 F. Supp. 3d 1034, 1053 (D. Colo. 2020) (quoting *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010)).

With respect to Defendant Gillespie, Plaintiff makes several accusations that he was personally responsible for denying Plaintiff female clothing and grooming products. (*See* Dkt. #124 ¶¶ 114, 117.) Thus, Plaintiff has alleged that he personally participated in that alleged violation of Plaintiff's equal protection rights (although, as discussed below, Gillespie is protected by qualified immunity on this claim). However, Plaintiff's allegations regarding Gillespie's role in her housing assignments (*see id.* ¶ 220) and as a policymaker (*see id.* ¶¶ 42, 57, 312, 326, 340) are conclusory. Thus, Plaintiff's claims against Defendant Gillespie should be dismissed

The Court will address Plaintiff's claims against Defendant Elder as a final policymaker in its municipal liability section below.

### III. Plaintiff's Fourteenth Amendment Claims (One, Two, Four, and Fourteen)

Plaintiff asserts four claims under the Fourteenth Amendment for: (1) violating her equal protection rights; (2) subjecting her to unconstitutional conditions of confinement; (3) violating her substantive due process rights, and (4) failure to protect.

### a.      Equal Protection Claim (Claim One)

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall make or enforce any law which shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend XIV, § 1. The Fourteenth Amendment's equal protection guarantee "is essentially a directive that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). But the Equal Protection Clause "doesn't guarantee equal results for all, or suggest that the law may never draw distinctions between persons in meaningful dissimilar situations." *SECSYS, LLC v. Vigil*, 666 F.3d 678, 684 (10th Cir. 2012). Rather, "[i]t seeks to ensure that any classifications the law makes are made 'without respect to persons,' that like cases are treated alike, [and] that those who 'appear similarly situated' are not treated differently without, at the very least, a rational reason for the difference.'" *Id.* at 684–85 (quoting *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 602 (2008)). A plaintiff can assert an equal protection claim either under the "traditional" theory of a class-based claim or under a "class-of-one theory." *See id.* at 685–690 (discussing both theories).

To state an equal protection claim, a plaintiff must allege:

(1) that similarly-situated individuals were treated differently; and (2) either that the differential treatment was based on a suspect classification or fundamental right and not supported by a compelling government interest, or if the differential treatment was not based on a suspect classification or

fundamental right, the differential treatment was not justified by a rational connection to a legitimate state interest.

*Buggs v. Trujillo*, No. 13-cv-00300-CMA-MJW, 2014 WL 420005, at *7 (D. Colo. Feb. 4, 2014) (citations omitted).

The Tenth Circuit has explained,

If the challenged government action implicates a fundamental right, or classifies individuals using a suspect classification, such as race or national origin, a court will review that challenged action applying strict scrutiny. *See Johnson v. California,* 543 U.S. 499, 505, 125 S. Ct. 1141, 160 L. Ed. 2d 949 (2005) (addressing racial classification); *Save Palisade FruitLands v. Todd,* 279 F.3d 1204, 1210 (10th Cir. 2002) (addressing classifications that "target a suspect class or involve a fundamental right"). In such a case, "the government has the burden of proving that [its] classifications are narrowly tailored measures that further compelling governmental interests." *Johnson,* 543 U.S. at 505, 125 S. Ct. 1141 (quotation omitted).

If, instead, the challenged government action classifies people according to a quasi-suspect characteristic, such as gender or illegitimacy, then this court will apply intermediate scrutiny. *See Todd,* 279 F.3d at 1210. In those cases, the test would be whether the government can demonstrate that its classification serves "important governmental objectives" and is "substantially related to achievement of those objectives." *Concrete Works of Colo., Inc. v. City and County of Denver,* 321 F.3d 950, 959 (10th Cir. 2003).

Finally, where the challenged government action does not implicate either a fundamental right or a protected class, this court will apply a rational basis test. *See Todd,* 279 F.3d at 1210. In those cases, this court inquires whether the government's classification bears "a rational relation to some legitimate end." *Id.* at 1213 (quotation omitted).

*Price-Cornelison v. Brooks*, 524 F.3d 1103, 1109–10 (10th Cir. 2008).

Plaintiff alleges that "discrimination against transgender people is a form of sex discrimination that is presumptively unconstitutional and subject to heightened scrutiny." (Dkt. #124 ¶ 125.) Defendants disagree, arguing that "[t]ransgender is not a suspect or quasi-suspect class; therefore, the Defendants' classifications are subject to only

rational basis analysis." (Dkt. #132 at 11.) Regretfully, based on binding Tenth Circuit precedent that this Court is obligated to follow, the Court must agree with Defendants.

Over twenty years ago, the Tenth Circuit issued its opinion in *Brown v. Zavaras*, 63 F.3d 967 (10th Cir. 1995). In that case, the court rejected a transgender[4] inmate's claim that by denying her estrogen treatment, the defendants violated her equal protection rights. The court relied on *Holloway v. Arthur Andersen & Co.*, 566 F.2d 659 (9th Cir. 1977), where the Ninth Circuit "held that transexuals are not a protected class . . . because transsexuals are not a discrete and insular minority, and because the plaintiff did not establish that 'transsexuality is an immutable characteristic determined solely by the accident of birth' like race, or national origin.'" *Brown*, 63 F.3d at 971 (quoting *Holloway*, 566 F.2d at 663). Despite recognizing that "[r]ecent research concluding that sexual identity may be biological suggests reevaluating *Holloway*," the court determined that the plaintiff's "allegations are too conclusory to allow proper analysis of this legal question." *Id.* Thus, the court decided to "follow *Holloway* and hold that [the plaintiff] is not a member of a protected class in this case." *Id.* Subsequent unpublished Tenth Circuit opinions have confirmed that, "[t]o date, this court has not held that a transsexual plaintiff is a member of a protected suspect class for purposes of Equal Protection claims." *Druley v. Patton*, 601 F. App'x 632, 635 (10th Cir. 2015); *see also Qz'etax v. Ortiz,* 170 F. App'x 551, 553 (10th Cir. 2006).

---

[4] The court in *Brown* used the older term "transexual" and, although the plaintiff identified as female, the court used he/him pronouns because the plaintiff "is biologically male and refers to himself with masculine pronouns throughout his pleadings." *Brown,* 63 F.3d at 968 n.1.

This Court has little trouble stating that the Tenth Circuit needs to revisit its holding in *Brown v. Zavaras*. First, the Ninth Circuit authority it followed has since been overruled. *See Schwenk v. Hartford*, 204 F.3d 1187, 1201 (9th Cir. 2000); *see also Norsworthy v. Beard,* 87 F. Supp. 3d 1104, 1119 (N.D. Cal. 2015) (recognizing that *Holloway* "is no longer good law" and, applying *Schwenk*, concluding that "discrimination based on transgender status independently qualifies as a suspect classification under the Equal Protection Clause because transgender persons meet the indicia of a 'suspect' or 'quasi-suspect classification' identified by the Supreme Court"); *Karnoski v. Trump*, 926 F.3d 1180, 1200 (9th Cir. 2019) (affirming the district court's reasoning as to why transgender people are a quasi-suspect class). Second, it appears that the Tenth Circuit is out-of-step with the "many district courts" that "have analyzed the relevant factors for determining suspect class status and held that transgender people are at least a quasi-suspect class." *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 610 (4th Cir. 2020) (citing cases). Indeed, in *Grimm*, the Fourth Circuit, pointing to *Brown*, stated "[o]nly one court of appeals decision holding otherwise remains good law." *Id.* The *Grimm* decision also noted that *Brown* "reluctantly followed a since-overruled Ninth Circuit opinion. *Id.* at 611. Thus, it is likely that heightened scrutiny *should* apply to transgender people.

But *Brown* does remain, if not *good* in the normative sense, at least *binding* law on district courts in this district. The Court acknowledges the undeniable truth of Plaintiff's statement that a "growing consensus of courts have held that transgender individuals constitute a suspect or quasi-suspect class." (*See* Dkt. #147 at 9 n.1 (citing cases).) As articulated by one district court, "one would be hard-pressed to identify a

class of people more discriminated against historically or otherwise more deserving of the application of heightened scrutiny when singled out for adverse treatment, than transgender people." *Flack v. Wis. Dep't of Health Servs.*, 328 F. Supp. 3d 931, 953 (W.D. Wis. 2018); *see also Karnoski v. Trump*, No. C17-1297-MJP, 2018 WL 1784464, at *1 (W.D. Wash. Apr. 13, 2018) ("The Court also rules that, because transgender people have long been subjected to systemic oppression and forced to live in silence, they are a protected class.").

Indeed, if this Court were to apply the four-factor test used to determine whether a group constitutes a suspect or quasi-suspect class, in this Court's view, transgender people easily check all the boxes. The group has historically been subject to discrimination. The group has a defining characteristic that bears a relation to its ability to perform or contribute to society. The group may be defined as a discrete group by obvious, immutable, or distinguishing characteristics.[5] And the group is a minority that lacks political power. *See Grimm*, 972 F.3d at 611–13.

But, conspicuously, despite the "growing consensus" seen in district court cases around the country that apply heightened scrutiny to transgender people, none of the cases cited come from this circuit. Even if the Court were to agree with the straightforward holding in *Grimm* that it is "apparent that transgender persons constitute

---

[5] The *Grimm* decision relied on an amicus brief from medical experts to come to a very different conclusion as to the immutability of transgender characteristics from the Tenth Circuit in *Brown*: "As to the third factor, transgender people constitute a discrete group with immutable characteristics: Recall that gender identity is formulated for most people at a very early age, and, as our medical amici explain, being transgender is not a choice. Rather, it is as natural and immutable as being cisgender." *Grimm*, 972 F.3d at 612–13. By contrast, the *Brown* court was presented with a pro se plaintiff whose "conclusory" allegations were inadequate to allow the Tenth Circuit to make a "proper analysis" of the immutability question. *Brown*, 63 F.3d at 971

a quasi-suspect class," 972 F.3d at 611, it cannot ignore or overrule binding Tenth Circuit precedent that says otherwise. As Plaintiff herself says in opposing the motion to dismiss, "this case 'is part of a larger movement that is redefining and broadening the scope of civil and human rights so that they extend to a vulnerable group that has traditionally been unrecognized, unrepresented, and unprotected.'" (Dkt. #147 at 1 (quoting *G.G. v. Gloucester Cnty. Sch. Bd.*, 853 F.3d 729, 730 (4th Cir. 2017) (Davis, J., concurring)). But to the extent that Plaintiff, via this case, wants to "broaden the scope of civil and human rights" by changing Tenth Circuit law, it must be for the Tenth Circuit (or the Supreme Court) to take that step. This Court is bound to follow Tenth Circuit precedent unless it is overturned by the Tenth Circuit or a superseding contrary decision by the Supreme Court. *See Burlington N. & Santa Fe Ry. Co. v. Burton*, 270 F.3d 942, 947 (10th Cir. 2001).

Of course, if a transgender person does not qualify as a member of a suspect or quasi-suspect class, unequal treatment that does not involve a fundamental right or suspect classification must still bear a rational relation to legitimate penal interest. In this circumstance, a state action survives judicial review "if there is 'any reasonably conceivable state of facts that could provide a rational basis for the classification.'" *Davoll v. Webb*, 194 F.3d 1116, 1145 (10th Cir. 1999) (citing *Spragens v. Shalala*, 36 F.3d 947, 951 n.3 (10th Cir. 1994)). A court "will only strike the [action] down if the state's classification 'rests on grounds *wholly irrelevant* to the achievement of the State's objective.'" *City of Herriman v. Bell*, 590 F.3d 1176, 1194 (10th Cir. 2010) (emphasis in original).

As the Tenth Circuit explained in *Brown*, it is a "perplexing situation . . . when the rational basis standard meets the standard applied to a dismissal." 63 F.3d at 971 (quoting *Wroblewski v. City of Washburn*, 965 F.2d 452, 459-60 (7th Cir. 1992)). In adopting the framework applied by the Seventh Circuit, the Tenth Circuit instructed that lower courts should "take as true all of the complaint's allegations and reasonable inferences that follow" and "apply the resulting 'facts' in light of the deferential rational basis standard." *Id.* (citing *Wroblewski*, 965 F.2d at 460). Thus, the Tenth Circuit opined, "[t]o survive a motion to dismiss for failure to state a claim, a plaintiff must allege facts sufficient to overcome the presumption of rationality that applies to government classifications." *Id.*

Here, Plaintiff alleges that that the El Paso County Sheriff's Office (via Defendant Elder) has a policy in place to "make facility assignments to people in custody solely on the basis of the individual's genitalia," despite knowing that this "places transgender people at risk for victimization." (Dkt. #124 ¶ 42.) She alleges that the discriminatory placement decisions "were taken without an important or legitimate governmental interest or rational reason, and they had no penological basis to deny Plaintiff a safe and appropriate placement in a female facility, based on her sex, gender identity, characteristics, risk factors, and her history of sexual victimization in male facilities." (*Id.* ¶ 134.) She also alleges that she and other transgender inmates were denied access to items like clothing and grooming products that were available to cisgender female inmates. (*Id.* ¶¶ 110–22.) For their part, Defendants claim only that the "classification of Plaintiff as male, housing Plaintiff in the male ward, and employing

reasonable search procedures were all actions rationally based in the need to provide for the safe and secure function of CJC." (Dkt. #132 at 13.)

If the Tenth Circuit were to recognize transgender people as a quasi-suspect or suspect class whose treatment was subject to intermediate or strict scrutiny, then the Court would not hesitate to conclude (at least at the motion to dismiss stage) that Plaintiff's placement as a transgender woman in an all-male unit was not substantially related to an important governmental interest. *See*, e.*g. Tay v. Dennison,* 457 F. Supp. 3d 657, 682 (S.D. Ill. 2020) (holding that a transgender prisoner's placement in a men's prison was not substantially related to an important government interest even though the prisoner had a history of violent behavior); *Hampton v. Baldwin*, No. 3:18-CV-550-NJR-RJD, 2018 WL 5830730, at *12 (S.D. Ill. Nov. 7, 2018) (finding that a transgender female inmate's equal protection claim based on her placement in a men's prison had a "greater than negligible chance of success on the merits"). But, this Court is compelled by the Tenth Circuit to apply the rational basis test.

The Court finds that Plaintiff has not adequately alleged that there is no rational reason for Defendants to house transgender women in all-male units and not provide them with feminine products. Plaintiff's claims to the contrary cannot overcome the presumption of rationality that attach to government decision involving a person who is not a member of a suspect class. *See Druley*, 601 F. App'x at 635 ("Ms. Druley did not allege any facts suggesting the ODOC defendants' decisions concerning her clothing or housing do not bear a rational relation to a legitimate state purpose."). Thus, the Court cannot find that there was no rational basis for assigning all prisoners with male

genitalia, including transgender women, to the same housing facility, and Plaintiff's equal protection claim should be dismissed.

### b. Conditions of Confinement/Substantive Due Process Claims (Claims Two and Four)

"Pre-trial detainees have a Fourteenth Amendment due process right to humane conditions of confinement that is co-extensive with the Eighth Amendment right of convicted prisoners." *Waring v. Storey*, No. 12-cv-01338-BNB, 2012 WL 3245951, at *2 (D. Colo. Aug. 7, 2012). To state a due process claim based on unconstitutional conditions of confinement, a plaintiff must allege facts plausibly establishing both an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A plaintiff satisfies the objective component by alleging facts demonstrating that the "conditions [of confinement] were more than uncomfortable, and instead rose to the level of 'conditions posing a substantial risk of serious harm' to inmate health or safety." *DeSpain v. Uphoff*, 264 F.3d 965, 973 (10th Cir. 2001). And with respect to the subjective prong, a claimant makes a sufficient showing by alleging that the defendant "[knew] of and disregard[ed] an excessive risk to inmate health or safety." *Id.* at 975.

Moreover, "a pretrial detainee can establish a due-process violation by 'providing only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose.'" *Colbruno v. Kessler*, 928 F.3d 1155, 1163 (10th Cir. 2019) (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 389 (2015)).

Defendants argue in their motion that Plaintiff's claim fails for a variety of reasons. Unhelpfully, Plaintiff ignores these arguments and proceeds to her substantive due process claim. The Court will therefore address the two claims together.

Defendants first contend, and the Court agrees, that Plaintiff does not allege personal participation as to Defendant O'Neal, who is only alleged to have informed Plaintiff that one of her grievances was denied. (Dkt. #124 ¶ 57.) Plaintiff does not allege that Defendant O'Neal was even the one to deny the grievance and, in any event, a denial of a grievance, by itself and without any connection to the violation of constitutional rights alleged by plaintiff, does not establish personal participation under § 1983." *Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009).

Defendants next argue that Plaintiff cannot maintain a claim against Defendant Noe (who made the initial housing assignment) or Ford (who later refused to "re-classify" Plaintiff) because she does not allege either subjective or objective elements of deliberate indifference. Plaintiff does not counter this argument, and the Court must agree with Defendants. Plaintiff does not plausibly allege that Defendants Noe or Ford were aware that Plaintiff would be at risk of substantial harm if placed in the all-male facility or that they disregarded that risk. Moreover, Plaintiff has not demonstrated that her right to be placed in a female unit was clearly established, given the binding Tenth Circuit precedent described above.

Defendants further maintain that Plaintiff's conditions of confinement claim should be dismissed as to Defendants Elliss and Mustapick. Again, Plaintiff chose not to respond to these arguments. As to Defendant Elliss, the Court agrees with Defendants that one instance of misgendering, although no light matter, is not sufficient to state a claim for unconstitutional conditions of confinement. As to Defendant Mustapick, however, Plaintiff does argue that he violated her *substantive due process rights* by

"subject[ing] her to unconstitutional conditions of confinement through the cross-gender visual body-cavity search he performed on her." (Dkt. #147 at 17.)

The Tenth Circuit has recognized that inmates retain a limited right to bodily privacy under the Fourteenth Amendment. *See Cumbey v. Meachum*, 684 F.2d 712, 714 (10th Cir. 1982) ("Although the inmates' right to privacy must yield to the penal institution's need to maintain security, it does not vanish altogether."); *Michenfelder v. Sumner*, 860 F.2d 328, 332 (9th Cir. 1988) ("Shielding one's unclothed figure from the view of strangers, particularly strangers of the opposite sex is impelled by elementary self-respect and personal dignity."). An inmate's interest in bodily privacy may be restricted "only to the extent necessary to further the correction system's legitimate goals and policies." *Cumbey*, 684 F.2d at 714.

As an initial matter, the Court disagrees with Defendants that this claim is more properly brought under the Eighth Amendment's cruel and unusual punishment clause rather than the Fourteenth Amendment's substantive due process guarantee. In *Graham v. Connor*, the Supreme Court held that when government conduct is constrained by "an explicit textual source of constitutional protection . . . that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims" because "[a]ny protection that 'substantive due process' affords convicted prisoners against excessive force is . . . at best redundant of that provided by the Eighth Amendment." 490 U.S. 386, 395 n.10 (1989). But the Eighth Amendment applies to those prisoners already convicted of a crime. Plaintiff is (or was at the time of filing) a pretrial detainee, and therefore "finds h[er]self in the criminal justice system somewhere between the two stools of an initial seizure and post-

conviction punishment. *Porro v. Barnes*, 624 F.3d 1322, 1326 (10th Cir. 2010). In these circumstances, the due process clause of the Fourteenth Amendment and its protection against arbitrary governmental action by federal or state authorities applies. *Id.*

Turning to the visual body-cavity search itself, Plaintiff alleges that she was made to strip naked and told to spread her "sexy" butt cheeks to "go balls deep" while Defendant Mustapick grabbed his own penis. (Dkt. #124 ¶¶ 71-83.) Though this is sickening behavior, Plaintiff does not meet her burden in showing that it is clearly established that cross-gender searches of transgender women, even ones accompanied by odious verbal harassment, violate a clearly established constitutional right, nor is the conduct so egregious and the right so obvious that it could be deemed clearly established even without materially similar cases. *C.f. Lowe v. Raemisch*, 864 F.3d 1205, 1210 (10th Cir. 2017) ("When the public official's conduct is egregious, even a general precedent would apply with obvious clarity. After all, some things are so obviously unlawful that they don't require detailed explanation and sometimes the most obviously unlawful things happen so rarely that a case on point is itself an unusual thing" (citations and quotations omitted)). Despite the alleged abhorrent statements that accompanied the search, Plaintiff has failed to persuade the Court that such a comment in connection with a cross-gender search rises to the point of violating an established constitutional right. Defendant Mustapick is entitled to qualified immunity on Plaintiff's substantive due process claim and, by extension, so is Defendant Elliss on any claim that she failed to intervene.

Finally, the Court agrees with Defendants that Plaintiff's argument that Defendants should be liable for the "near-constant" harassment she was subjected to

and the "repeated" cross-gender pat down search is too generalized and imprecise to adequately allege personal participation as to the specified individual Defendants.

### c.    Failure to Protect (Claim Fourteen)

A failure to protect claim is comprised of two elements. "First, an inmate must show that [s]he is incarcerated under conditions posing a substantial risk of serious harm." *Riddle v. Mondragon*, 83 F.3d 1197, 1204 (10th Cir.1996) (citation omitted). "Second, the inmate must establish that the prison official has a sufficiently culpable state of mind, i.e., that he or she is deliberately indifferent to the inmate's health or safety." *Id.* (internal quotation marks and citation omitted). "The prison official's state of mind is measured by a subjective, rather than an objective, standard." *Id.* (citation omitted). "In other words, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id. see also Benefield v. McDowell*, 241 F.3d 1267, 1270–71 (10th Cir. 2001) ("[I]n order to establish a cognizable Eighth Amendment claim for failure to protect, a plaintiff must show that he is incarcerated under conditions posing a substantial risk of serious harm, the objective component, and that the prison official was deliberately indifferent to his safety, the subjective component.") (internal quotation marks and citations omitted).

Plaintiff claims that Defendants were aware that Ms. Griffith is a transgender woman, knew she is blind, and knew, because of these two things, that placing her into an all-male unit would make her particularly vulnerable to sexual assault. The Court is not persuaded.

First, as Defendants' note, Plaintiff does not allege that any Defendants other than Noe and Ford were involved in Plaintiff's housing assignment. Therefore, this failure to protect claim could only be maintained against these two Defendants due to the personal participation requirement.

Second, their mere knowledge of Plaintiff's disabilities (gender dysphoria and blindness) alone is not enough for hold Defendants Noe and Ford liable for failing to prevent Plaintiff's sexual assault. Significantly, both Defendants made their decisions regarding Plaintiff's housing assignment in July 2020, but Plaintiff alleges she was sexually assaulted by a fellow inmate on November 18, 2021. This 16-month span raises evident questions of causation. It strongly suggests that Defendants Noe and Ford had no reason to suspect that Plaintiff was in substantial and immediate danger.

Accordingly, Plaintiff does not state a claim for failure to protect, and Defendants Ford, O'Neal, Noe, Gillespie, and Elder are entitled to qualified immunity.

## III. Fourth Amendment

Plaintiff asserts that the visual strip search conducted by Defendants Mustapick and Elliss violated her Fourth Amendment right to be free from unreasonable searches and seizures as well as her Fourteenth Amendment substantive due process rights. As both claims require the careful balancing of penological concerns with inmates' right to privacy, the Court's analysis of the two will necessarily overlap.

It has long been recognized that "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Price v. Johnston*, 334 U.S. 266, 285 (1948). Thus, a prisoner's limited constitutional right to bodily privacy under the

Fourteenth Amendment, as addressed above, and to be free of unreasonable searches and seizures under the Fourth Amendment, must be weighed against the requirements of prison administration. *Turner v. Safley*, 482 U.S. 78, 84–85 (1987). The Court affords deference to the expertise of correctional officials, who "must be permitted to devise reasonable search policies to detect and deter the possession of contraband in their facilities." *Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 566 U.S. 318, 328, (2012) (citing *Bell v. Wolfish,* 441 U.S. 520, 546 (1979). However, as previously, "[a]lthough the inmates' right to privacy must yield to the penal institution's need to maintain security, it does not vanish altogether." *Cumbey*, 684 F.2d at 714.

"[A] strip search is an invasion of personal rights of the first magnitude." *Chapman v. Nichols*, 989 F.2d 393, 395 (10th Cir.1993); "[T]he greater the intrusion, the greater must be the reason for conducting a search." *Levoy v. Mills*, 788 F.2d 1437, 1439 (10th Cir. 1986) (citing *Blackburn v. Snow*, 771 F.2d 556, 565 (1st Cir.1985)). Determining the reasonableness or "constitutionality of a strip search 'requires a balancing of the need for the particular search against the invasion of personal rights that the search entails.'" *Farmer v. Perrill*, 288 F.3d 1254, 1259 (10th Cir. 2002) (quoting *Bell*, 441 U.S. at 559). Although the "test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," in making this determination, "[c]ourts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Bell*, 441 U.S. at 559. These factors aim to "[b]alanc[e] the significant and legitimate security interests of the institution against the privacy interests of the inmates." *Id.* at 560. "[A] regulation impinging on an inmate's constitutional rights must

be upheld if it is reasonably related to legitimate penological interests." *Florence*, 566 U.S. at 326 (internal quotation marks omitted).

Here, the scope of the search was invasive. *See Hyberg v. Enslow,* 801 F. App'x 647, 650 (10th Cir. 2020) (unpublished) *(*labelling strip searches "undeniably invasive"). However, "there are obvious security concerns inherent when an inmate will be placed in the general prison population." *Id.* (citing *Archuleta v. Wagner*, 523 F.3d 1278, 1284 (10th Cir. 2008)). Plaintiff was being processed for placement in the CJC's general population; "[t]here were therefore legitimate security interests served by the search[ ]." *Id.* According to the TAC, the search was performed in a "separate room," away from other inmates and CJC staff. *See Farmer*, 288 F.3d at 1260 (recognizing a strip search may be unreasonable if conducted in the open, "visible to a number of other inmates and staff," and without regard for the inmate's privacy interests); *see also id.* at 1261 ("[I]nfringements on prisoners' constitutional rights must not be arbitrary or irrational, nor an exaggerated response to security needs." (internal quotation marks omitted)). And In the Tenth Circuit, it is established that "the Constitution does not require 'complete privacy' for a strip search." *Smith v. Trapp*, No. 14-3220-JAR-JPO, 2018 WL 587230, *4 (D. Kan. Jan. 29, 2018) (quoting *Daughtery v. Harris*, 476 F.2d 292, 294 (10th Cir. 1973)).

As to the manner in which the search was conducted, a female deputy, Defendant Elliss, examined Plaintiff's bare breasts, and a male deputy, Defendant Mustapick, performed the search of Plaintiff's genitals. "Courts throughout the country have universally frowned upon cross-gender strip searches in the absence of an emergency or exigent circumstances." *Byrd v. Maricopa Cnty. Sheriff's Dep't*, 629 F.3d

1135, 1143 (9th Cir. 2011); *see* also *Hayes v. Marriott*, 70 F.3d 1147 (10th Cir.1995) (recognizing that an inmate's privacy rights may be violated by a single cross-gender strip search); (*Harris v. Miller*, 818 F.3d 49, 59 (2d Cir. 2016) ("Indeed, best-practice standards in prison management typically discourage cross-gender strip searches."). Plaintiff also alleges that Defendant Mustapick made frightening and humiliating comments to her and performed the search "aggressively." A search conducted in an abusive manner can be considered unreasonable and violative of the Fourth Amendment. *See Bell*, 441 U.S. at 560. However, "not . . . every malevolent touch by a prison guard gives rise to a federal cause of action." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). In *Hyberg*, the Tenth Circuit cited some examples type of conduct courts have found to be needlessly intrusive or abusive. *See* 801 F. App'x at 650–51 (citing *Hayes*, 70 F.3d at 1147 (reversing grant of summary judgment on Fourth Amendment claim where inmate alleged he was subjected to a video recorded "body cavity search [conducted] in the presence of over 100 people, including female secretaries and case managers from other buildings"); *Calhoun v. DeTella*, 319 F.3d 936, 940 (7th Cir. 2003) (holding inmate stated an Eighth Amendment claim by alleging that during search, guards made "ribald comments and sexually explicit gestures," "forced him to perform sexually provocative acts," and female guards "were neither mere passersby nor performing [a] legitimate penological function," but "were instead invited spectators")). The alleged conduct here, reprehensible as it is, does not rise to that level. On balance, then, despite the intrusiveness of the search and offensive manner it was performed, the Court finds that Plaintiff does not state a plausible violation of the Fourth Amendment.

Even if the Court determined that Plaintiff could plausibly state a Fourth Amendment claim, like her Fourteenth Amendment claim, it would necessarily fail based on the "clearly established" prong of qualified immunity. Plaintiff offers no Supreme Court or Tenth Circuit precedent clearly establishing that a visual strip search by a male and female deputy of a transgender inmate who identifies as female, has female breasts, and has male genitals violates the Fourth Amendment's prohibition of unreasonable searches and seizures. Accordingly, this claim should be dismissed.

### IV. Municipal Liability

Plaintiff asserts claims against Defendant Elder in his personal capacity and his official capacity as El Paso County Sheriff. "An action against a person in his official capacity is, in reality, an action against the government entity for whom the person works." *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1009 (10th Cir. 1998). Government entities can be sued directly only where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978). "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694.

"[A] claim under § 1983 against . . . a municipality cannot survive a determination that there has been no constitutional violation." *Crowson v. Wash. Cnty. Utah*, 983 F.3d 1166 (10th Cir. 2020). "[T]here must be a constitutional violation, not just an unconstitutional policy, for a municipality to be held liable." *Id.* at 1191. As discussed

above, Plaintiff has not alleged facts demonstrating that she suffered a constitutional injury. Therefore, the Court finds that he cannot state a claim against Defendant Elder in his official capacity. Accordingly, the Court respectfully recommends that Plaintiff's municipal liability claims be dismissed.

## V. Plaintiff's ADA and RA Claims (Claims Ten and Eleven)

Title II of the ADA states, in relevant part, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. ADA regulations require public entities to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(7). To state a claim under Title II, a plaintiff must allege that "(1) [s]he is a qualified individual with a disability, (2) who was excluded from participation in or denied the benefits of a public entity's services, programs, or activities, and (3) such exclusion, denial of benefits, or discrimination was by reason of a disability." *Id.* at 1193.

Section 504 of the RA provides that "[n]o otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). To state a claim under Section 504, "a plaintiff must allege (1) that [s]he is a 'handicapped individual' under the [ADA], (2) that [s]he is 'otherwise qualified for the [benefit] sought, (3) that [s]he was [discriminated

against] solely by reason of his handicap, and (4) that the program or activity in question receives federal financial assistance." *Cohon ex rel. Bass v. N.M. Dep't of Health*, 646 F.3d 717, 725 (10th Cir. 2011) (quoting *Johnson by Johnson v. Thompson*, 971 F.2d 1487, 1492 (10th Cir.1992)).

It has been commonly observed that "[t]he Rehabilitation Act is materially identical to and the model for the ADA," *Crawford v. Ind. Dep't of Corr.*, 115 F.3d 481, 483 (7th Cir. 1997) (citing *Bryant v. Madigan*, 84 F.3d 246, 248 (7th Cir. 1996*)); see also McDonald v. Penn. Dep't of Pub. Welfare*, 62 F.3d 92, 94 (3d Cir. 1995); *Duffy v. Riveland*, 98 F.3d 447, 455 (9th Cir. 1996)), "except that it is limited to programs that receive federal financial assistance." *Crawford*, 115 F.3d at 483. However, the Tenth Circuit recently clarified that the causation standards of the statutes are different: "the ADA merely requires the plaintiff's disability be a but-for cause (i.e., "by reason of") of the discrimination, rather than—as the Rehabilitation Act requires—its sole cause (i.e., "solely by reason of")." *Crane v. Utah Dep't of Corr.*, 15 F.4th 1296, 1313 (10th Cir. 2021). With this in mind, the Court will evaluate Plaintiff's ADA claim and RA claim together. *See Jarvis v. Potter*, 500 F.3d 1113, 1121 (10th Cir. 2007) (citing 29 U.S.C. § 794(d)).

### a. Whether Plaintiff Alleges a Disability

Defendants argue that Plaintiff fails to allege a disability. While the ADA defines the term "disability" broadly to include "a physical or mental impairment that substantially limits one or more major life activities of such individual," 42 U.S.C. § 12102(1)(A), it excludes "transvestism, transsexualism, pedophilia, exhibitionism, voyeurism, *gender identity disorders not resulting from physical impairments*, [and]

other sexual behavior disorders," Id. § 12211(b) (emphasis added). It is Defendants' position that gender dysphoria falls squarely within this exclusion.

Defendants acknowledge that there is significant disagreement amongst district courts across the country regarding whether gender dysphoria is a "gender identity disorder" and categorically excluded from the ADA's definition of "disability." They cite a case from this district where the court found that "gender dysphoria, as a gender identity disorder, is specifically exempted as a disability by the Rehabilitation Act." *Michaels v. Akal Sec., Inc.*, No. 09-cv-01300-ZLW-CBS, 2010 WL 2573988, at *6 (D. Colo. June 24, 2010). The Court is not bound by this ruling. It was decided over a decade ago and dealt with the issue summarily.

Instead, the Court finds persuasive a recent thorough and closely-reasoned decision issued by the Fourth Circuit in *Williams v. Kincaid*, 45 F.4th 759 (4th Cir. 2022). There, after careful analysis, the court held that "as a matter of statutory construction, gender dysphoria is not a gender identity disorder." *Id.* at 769. The court also held that a plaintiff need not plead by specific words that her gender dysphoria "result[ed] from a physical impairments") in order to state a claim. *Id.* at 771. Absent any Tenth Circuit authority to the contrary, the Court is likewise convinced that gender dysphoria is a disability included in the ADA's protections. *See Gibson v. Cmty. Dev. Partners*, No. 3:22-CV-454-SI, 2022 WL 10481324, at *7 (D. Or. Oct. 18, 2022) (citing *Williams* for the proposition that "nothing in the ADA compels the conclusion that gender dysphoria is excluded from ADA protection").

b.     Causation

Nevertheless, Defendants argue that Plaintiff's ADA and RA claims fail because she fails to allege that her gender dysphoria was the "but for" (much less "sole") cause of the alleged discrimination. Specifically, Defendants contend that Plaintiff complains that the discrimination was a result of her gender identity and transgender status—not gender dysphoria—and transgenderism ("transexualism") is specifically excluded from the definition of a disability. Defendants cite several allegations from the TAC that refer to EPSO's treatment of transgender women.

This argument misses the mark. First, Plaintiff alleges that the symptoms of gender dysphoria can be alleviated by, among other things, "outwardly presenting in a manner consistent with one's gender identity" (Dkt. #123 ¶ 24), and that placing her "in housing that does not conform with her gender identity has exacerbated symptoms of her Gender Dysphoria leading her to suffer significant emotional distress and have increased ideation of self-harm." (*Id.* ¶ 68.) Plaintiff also alleges that, pursuant to WPATH guidelines, part of the treatment of gender dysphoria is to "be treated as the woman she is." (*Id.* ¶ 97.) She also states she requested accommodations for her gender dysphoria. (*Id.* ¶¶ 48, 55, 61, 63, 92, 110, 111.)

A public entity must provide a reasonable accommodation under the ADA when it knows that the individual is disabled and "requires an accommodation of some kind to participate in or receive the benefits of its services." *Robertson v. Las Animas Cnty. Sheriff's Dep't*, 500 F.3d 1185, 1197 (10th Cir. 2007). "[A] public entity is on notice that an individual needs an accommodation when it knows that an individual requires one, either because that need is obvious or because the individual requests an

accommodation." *Id.* at 1197–98. Thus, Plaintiff's gender identity is relevant to the reasonable accommodation of her disability.

Moreover, the cherry-picked excerpts Defendants cite from the pleading ignore the numerous references Plaintiff makes to the EPSO's consistent failure to accommodate her gender dysphoria. (*See, e.g.,* Dkt. #124 ¶¶ 70 ("El Paso County's decision to house Ms. Griffith in housing that does not conform with her gender identity was a discriminatory action and a failure to reasonably accommodate Ms. Griffith's diagnosed Gender Dysphoria."); 81 ("El Paso County officials' threatening, intimidating and harassing visual body-cavity search of Ms. Griffith, . . . conducted by an unaccompanied male deputy, was a discriminatory action and a failure to reasonably accommodate Ms. Griffith's diagnosed Gender Dysphoria."); 107 ("El Paso County officials' actions in constantly mis-gendering Ms. Griffith was a discriminatory action and a failure to reasonably accommodate Ms. Griffith's diagnosed Gender Dysphoria."); 119 ("El Paso County officials' actions in denying Ms. Griffith access to female undergarments and lipstick was a discriminatory action and a failure to reasonably accommodate Ms. Griffith's diagnosed Gender Dysphoria."); 280 ("By confining Plaintiff in the men's unit at the El Paso County Jail, a facility where staff members referred to Plaintiff using a male pronoun and her male given name and staff refused to permit Plaintiff to wear her own gender's clothes and underwear, El Paso County subjected Plaintiff to discrimination based on Gender Dysphoria.").

For these reasons, the Court rejects Defendant's contention that Plaintiff asserts that her transgender status—not gender dysphoria—was the reason for her exclusion from certain programs and services within CJC.

**c.    Damages**

In *Cummings v. Premier Rehab Keller, P.L.L.C.*, 142 S. Ct. 1562, 1565 (2022), the Supreme Court held that emotional distress damages are not recoverable in a private action to enforce . . . the Rehabilitation Act of 1973." Instead, "victims of discrimination to recover damages only if they can prove that they have suffered economic harm." *Id.* at 1562 (Breyer, J., dissenting). Defendants therefore posit that other types of damages that are generally unavailable in breach of contract claims, like those for pain and suffering, should also be unavailable as a remedy under the RA. Defendants also claim that *Cummings*' damage limitation should also apply with equal force to claims asserted under Title II of the ADA.

Plaintiff argues that *Cummings* does not apply to other damages or ADA claims, and contends that the Supreme Court's holding should not apply retroactively. These are interesting arguments, but in the end, they need not be decided now because even pre-*Cummings*, the Tenth Circuit required a showing of intentional discrimination before a plaintiff may recover compensatory damages for mental or emotional injury. *Tyler v. City of Manhattan*, 118 F.3d 1400, 1403–4 (10th Cir. 1997); *Powers v. MJB Acquisition Corp.*, 184 F.3d 1147, 1152 (10th Cir. 1999). "Intentional discrimination does not require a showing of personal ill will or animosity toward the disabled person; rather, 'intentional discrimination can be inferred from a defendant's deliberate indifference to the strong likelihood that pursuit of its questioned policies will likely result in a violation of federally protected rights.'" *Barber ex rel. Barber v. Colo. Dep't of Revenue*, 562 F.3d 1222, 1229 (10th Cir. 2009) (quoting *Powers*., 184 F.3d at 1153). "The test for deliberate indifference in the context of intentional discrimination comprises two prongs: (1)

'knowledge that a harm to a federally protected right is substantially likely,' and (2) 'a failure to act upon that likelihood.'" *Id.* (quoting *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001) (alteration omitted).

While the Court believes that discrimination based on gender dysphoria violates the ADA and RA, this is not remotely settled law. Indeed, it appears that the "majority approach[ ] views the [ADA]'s language as expressing Congress's intent to exclude from the ADA's protection both disabling and non-disabling gender identity disorders that do not result from a physical impairment." *Doe v. Pa. Dep't of Corr.*, No. 120CV00023SPBRAL, 2021 WL 1583556, at *8 (W.D. Pa. Feb. 19, 2021), *report and recommendation adopted,* No. CV 20-23, 2021 WL 1115373 (W.D. Pa. Mar. 24, 2021). A court from this district took this tack. *See Michaels*, 2010 WL 2573988, at *6. Under these circumstances, the Court cannot say that the EPSO was deliberately indifferent to the "strong likelihood" of harm to a right that may not even be protected by the ADA and RA. *See Roberts v. City of Omaha*, 723 F.3d 966, 975–76 (8th Cir. 2013) ("Roberts can only prevail on his ADA and Rehabilitation Act claims by showing the city's deliberate indifference to his alleged right to be free from discrimination in the circumstances of this case, but the city, like the individual officers, lacked notice the officers' actions might have violated Roberts's asserted rights.").

Plaintiff cannot obtain compensatory damages for mental or emotional injury, and any injunctive relief is moot because she has been moved to a female facility and given access to feminine clothing and grooming items. Accordingly, Claims Twelve and Thirteen should be dismissed.

**VI. State Law Claims (Claims Five, Six, Seven, Eight, Nine, Twelve, and Thirteen)**

Plaintiff asserts various claims under the Colorado Constitution and state statute. "If federal claims are dismissed before trial, leaving only issues of state law, 'the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice.'" *Bauchman for Bauchman v. W. High Sch.*, 132 F.3d 542, 549 (10th Cir. 1997) (quoting *Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 350 (1988)). "Notions of comity and federalism demand that a state court try its own lawsuits, absent compelling reasons to the contrary." *Thatcher Enters. v. Cache Cnty. Corp.*, 902 F.2d 1472, 1478 (10th Cir. 1990). Because this Court has recommended dismissal of the federal claims, the Court further recommends that the presiding judge decline to exercise supplemental jurisdiction over Plaintiff's state-law claims and dismiss those claims without prejudice.

## CONCLUSION

In light of the foregoing, it is hereby **RECOMMENDED** that Defendants' Motion to Dismiss (Dkt. #132) be **GRANTED**, and that Plaintiff's Third Amended Complaint (Dkt. #124) be **DISMISSED**.

**NOTICE: Pursuant to 28 U.S.C. § 636(b)(1)(c) and Fed. R. Civ. P. 72(b)(2), the parties have fourteen (14) days after service of this recommendation to serve and file specific written objections to the above recommendation with the District Judge assigned to the case. A party may respond to another party's objections within fourteen (14) days after being served with a copy. The District Judge need not consider frivolous, conclusive, or general objections. A party's failure to file and serve such written, specific objections waives de novo review of the recommendation by the District Judge, *Thomas v. Arn*, 474 U.S. 140, 148–53**

(1985), and also waives appellate review of both factual and legal questions.

*Makin v. Colo. Dep't of Corr.*, 183 F.3d 1205, 1210 (10th Cir. 1999); *Talley v. Hesse*, 91 F.3d 1411, 1412–13 (10th Cir. 1996).

BY THE COURT

Date:  February 27, 2023
      Denver, Colorado

_____
N. Reid Neureiter
United States Magistrate Judge