**FILED**
**United States Court of Appeals**
**Tenth Circuit**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**February 19, 2025**

**FOR THE TENTH CIRCUIT**

**Christopher M. Wolpert**
**Clerk of Court**

_____

DARLENE GRIFFITH,

      Plaintiff - Appellant,

v.

EL PASO COUNTY, COLORADO;
BILL ELDER, in his individual and
official capacities; CY GILLESPIE, in
his individual capacity; ELIZABETH
O'NEAL, in her individual capacity;
ANDREW MUSTAPICK, in his
individual capacity; DAWNE
ELLISS, in her individual capacity;
TIFFANY NOE, in her individual
capacity; BRANDE FORD, in her
individual capacity,

      Defendants - Appellees.

------------------------------

DISABILITY RIGHTS EDUCATION
AND DEFENSE FUND; THE ARC
OF THE UNITED STATES;
AUTISTIC SELF ADVOCACY
NETWORK; AUTISTIC WOMEN
AND NONBINARY NETWORK;
THE JUDGE DAVID L. BAZELON
CENTER FOR MENTAL HEALTH
LAW; THE COELHO CENTER FOR
DISABILITY LAW POLICY AND
INNOVATION; CIVIL RIGHTS
EDUCATION AND

No. 23-1135

ENFORCEMENT CENTER;
DISABILITY LAW COLORADO;
DISABILITY RIGHTS ADVOCATES;
DISABILITY RIGHTS BAR
ASSOCIATION; IMPACT FUND;
NATIONAL ASSOCIATION FOR
RIGHTS PROTECTION AND
ADVOCACY; NATIONAL
DISABILITY RIGHTS NETWORK;
TRANSGENDER LEGAL DEFENSE
& EDUCATION FUND; UNITED
STATES OF AMERICA; AMERICAN
CIVIL LIBERTIES UNION;
AMERICAN CIVIL LIBERTIES
UNION OF COLORADO;
JEREMIAH HO; M. DRU
LEVASSEUR; NANCY C. MARCUS;
DARA E. PURVIS; ELIOT T. TRACZ;
ANN E. TWEEDY; KYLE
COURTENAY VELTE; EZRA
ISHMAEL YOUNG,

Amici Curiae.

_____

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:21-CV-00387-CMA-NRN)**

_____

Devi M. Rao of Roderick & Solange, Washington, DC (Meghan Palmer and
Wynne Muscatine Graham of Roderick & Solange, Washington, DC and
Andrew McNulty and Mari Newman of Newman|McNulty, Denver, Colorado
with her on the briefs), for Plaintiff-Appellant.

Christopher Michael Strider of El Paso County Attorney's Office, Colorado
Springs, Colorado (Nathan J. Whitney and Steven W. Martyn, El Paso
County Attorney's Office of Colorado Springs, Colorado, on the brief), for
Defendant-Appellees.

Matthew Drecun of U.S. Department of Justice Civil Rights Division,
Washington, DC (Kristen Clarke, Assistant Attorney General, Tovah R.
Calderon and Jonathan L. Backer of U.S. Department of Justice Civil Rights
Division, Washington, DC, with him on the brief), for the United States.

Cynthia L. Rice of Civil Rights Education and Enforcement Center, Denver,
Colorado and Maria Michelle Uzeta of Disability Rights Education & Defense
Fund of Berkeley, California filed an amici curiae brief for Disability Rights
Education and Defense Fund, The Arc of the United States, Autistic Self
Advocacy Network, Autistic Women and Nonbinary Network, The Judge
David L. Bazelon Center for Mental Health Law, The Coelho Center for
Disability Law, Policy and Innovation, Civil Rights Education and
Enforcement Center, Disability Law Colorado, Disability Rights Advocates,
Disability Rights Bar Association, Impact Fund, National Association for
Rights Protection and Advocacy, National Disability Rights Network, and
Transgender Legal Defense & Education Fund.

Anna I. Kurtz and Timothy R. MacDonald of ACLU of Colorado, Denver,
Colorado and Harper S. Seldin of American Civil Liberties Union Foundation,
New York, New York filed amici curiae brief for American Civil Liberties
Union and the American Civil Liberties Union of Colorado.

Kyle C. Velte of University of Kansas School of Law, Lawrence, Kansas and
Ezra Ishmael Young of Law Office of Ezra Young, Ithaca, New York filed
amici curiae brief for Legal Scholars of Sex and Gender.

---

Before **TYMKOVICH**, **EBEL**, and **ROSSMAN**, Circuit Judges.

---

**ROSSMAN**, Circuit Judge.

---

Plaintiff-Appellant Darlene Griffith, a transgender woman, filed a civil

rights lawsuit concerning her pretrial confinement at the El Paso County Jail

in Colorado. The district court dismissed Ms. Griffith's complaint under

Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Ms. Griffith now seeks

3

reversal. She specifically appeals the dismissal of her constitutional claims under 42 U.S.C. § 1983 and her claims under the Americans with Disabilities Act (ADA) and the Rehabilitation Act.

Exercising jurisdiction under 28 U.S.C. § 1291, we conclude remand is required, but only on some of Ms. Griffith's claims.

As we will explain, we reverse and remand for further proceedings on Ms. Griffith's Fourteenth Amendment Equal Protection claim against Sheriff Elder in his official capacity, Fourth and Fourteenth Amendment cross-gender search claims against Sheriff Elder in his official capacity, and Fourth Amendment abusive search claim against Deputy Mustapick. We vacate the district court's order dismissing Ms. Griffith's ADA and Rehabilitation Act claims under Federal Rule of Civil Procedure 12(b)(6) because those claims were dismissed without prejudice for lack of subject matter jurisdiction under Rule 12(b)(1) and that ruling is unchallenged on appeal. We otherwise affirm.

## I[1]

The legal issues before us require discussing fundamental aspects of a person's identity. We thus begin with an overview of the complaint's

---

[1] We take the facts from the well-pleaded allegations in the operative complaint.

allegations about sex and gender.[2] We then describe the factual and procedural background underlying this appeal and consider Ms. Griffith's appellate challenges.

## A

Sex is, generally speaking, assigned at birth by reference to one's anatomy. Gender identity is an "innate, internal sense of one's sex." R.31 ¶ 21. According to Ms. Griffith, "[m]ost people's gender identity is consistent with the sex they were assigned at birth." R.31 ¶ 21. People whose gender identity conforms to their biological sex are cisgender. Transgender people "have a gender identity that is different from their assigned sex." R.31 ¶ 21. The gender identity of a transgender person "is a basic part of [their] core identity." R.31 ¶ 21.

Some transgender people experience gender dysphoria. The American Psychiatric Association recognizes gender dysphoria as a medical condition characterized by the "significant distress that may accompany the incongruence between a transgender person's gender identity and assigned

---

[2] The dissent rejects these allegations because "Ms. Griffith defines 'sex' . . . without citation, and avoids defining gender." Dissent at 2. The dissent proffers its own explanations of those terms, rooted in sources other than the complaint. *See* Dissent at 3. At this procedural stage, as is consistent with our typical practice, we rely only on "the allegations within the four corners of the complaint" and "tak[e] those allegations as true." *Issa* v. *Comp USA*, 354 F.3d 1174, 1177 (10th Cir. 2003) (quoting *Mobley* v. *McCormick*, 40 F.3d 337, 340 (10th Cir. 1994)).

sex." R.31 ¶ 22. "The accepted course of medical treatment to alleviate the symptoms of gender dysphoria often involves allowing the individual to live as his or her chosen gender." R.31 ¶ 24. This can include changes to the way one dresses, grooms, or otherwise presents to be consistent with their gender identity. Gender dysphoria can be treated with hormone therapy, psychotherapy, or surgery to change "primary and/or secondary sex characteristics." R.31 ¶ 24. When gender dysphoria is left untreated, or is inadequately treated, it produces "intense emotional suffering, anxiety and depression, suicidality, and thoughts or acts of self-harm." R.33–34 ¶ 37.

## B

Ms. Griffith is transgender and has been living openly as a woman for over twenty years. She has been diagnosed with gender dysphoria. "As part of her medically supervised treatment," Ms. Griffith "changed her name and altered her physical appearance to conform to her female gender identity." R.32 ¶ 25. She dresses in feminine attire and takes feminizing hormones, which have caused her to develop "female secondary sex characteristics such as breasts, soft skin, a lack of facial hair, and other characteristics typically associated with women." R.32 ¶ 25.

Ms. Griffith entered El Paso County Jail (Jail) as a pretrial detainee in the summer of 2020. She asked to be housed in a female unit. Ms. Griffith explained she was a transgender woman and, as her medical records

confirmed, had gender dysphoria. Ms. Griffith feared "being constantly searched by male guards" and "being considered a man." R.37 ¶ 48. She also "feared being sexually abused and assaulted in male facilities by both guards and inmates." R.37 ¶ 48.[3]

According to Ms. Griffith, the Jail maintains an "official policy"— "promulgat[ed] and carr[ied] out" by "Defendants Elder and Gillespie"—of making custodial housing assignments "on the basis of the individual's genitalia" (Housing Policy). R.35 ¶ 42. The Jail thus "refuses to house transgender women in female housing facilities" and instead places "transgender women . . . in male units within the El Paso County Jail." R.37 ¶ 51. Appellee Deputy Tiffany Noe was involved in Ms. Griffith's intake screening. Deputy Noe assigned Ms. Griffith to male housing, pursuant to the Jail's Housing Policy.

Ms. Griffith also underwent a visual body cavity examination—also known as a strip search—during the intake process. Ms. Griffith contends "official policy" at the Jail dictates "transgender women (including those with Gender Dysphoria) are searched, including strip searched, by male staff and not by female staff" (Search Policy). R.41 ¶ 71. Appellee Deputy Dawne Elliss, a female, and Appellee Deputy Andrew Mustapick, a male, searched Ms.

---

[3] Ms. Griffith is also legally blind.

7

Griffith. Before the search started, Ms. Griffith asked several times for Deputy Mustapick to leave the room. Deputy Elliss told Ms. Griffith a male deputy would have to search her "pursuant to El Paso County policy and procedure" because "she was 'still a male' in El Paso County's 'system.'" R.41–42 ¶ 74.

With Deputy Mustapick present, Deputy Elliss told Ms. Griffith to remove her shirt. She examined Ms. Griffith's bare breasts. Deputy Elliss then left Ms. Griffith alone with Deputy Mustapick. Deputy Mustapick "ordered Ms. Griffith to take off her socks, pants, and panties" and place her hands on the wall. R.42 ¶ 77. He told Ms. Griffith to "step back, bend over, and 'spread [her] sexy cheeks.'" R.42 ¶ 77. Deputy Mustapick said he was "'going to go balls deep in that ass' while grabbing his own penis." R.42 ¶ 78. He was "extremely aggressive while searching Ms. Griffith's genitals." R.42 ¶ 78. Deputy Mustapick "warned [Ms. Griffith] that she had better not tell anyone about what he did and said to her" during the strip search—otherwise, "he would make sure that she was brutalized by the guards at El Paso County Jail." R.42 ¶ 79.

A few days after intake, Ms. Griffith asked Appellee Deputy Brande Ford to transfer her out of the male housing unit and into female housing. Deputy Ford refused. Ms. Griffith alleges "housing her in an all-male unit subjected her to a risk of sexual harassment, sexual assault, and extreme emotional distress from being treated as a man." R.53 ¶ 146. In her complaint, Ms.

Griffith describes experiencing mistreatment by Jail staff and fellow inmates during her pretrial confinement. Following "official El Paso County policy" male deputies "continuous[ly]" subjected Ms. Griffith to cross-gender pat-down searches. R.44 ¶ 89. Ms. Griffith claims male deputies regularly touched "her breast[s] and groin when patting her down." R.44 ¶ 90. And the Jail allowed male deputies to search Ms. Griffith without a female deputy present. R.45 ¶ 94. Ms. Griffith experienced anxiety and exacerbated symptoms of gender dysphoria.

Ms. Griffith claims she was sexually assaulted by a fellow inmate in the male housing unit. While "lying in her bunk in the all-male unit," Ms. Griffith alleged, another inmate "groped her right breast" and told her "you know you want this dick." R.43 ¶ 85. Ms. Griffith was "so distressed that she asked to see a mental health provider." R.43 ¶ 86. A witness "told El Paso County officials that he witnessed at least three to four other similar assaults of Ms. Griffith." R.44 ¶ 87.[4]

---

[4] Ms. Griffith alleged Jail staff intentionally made the situation worse. A few months into her detention, Ms. Griffith informed a deputy at the Jail she was uncomfortable that the other inmates in her unit were not wearing shirts. The deputy then walked over to the male inmates and yelled, "the blind faggot said you need to put your shirts on." R.46 ¶ 100. According to Ms. Griffith, this statement was "designed to create an antagonistic relationship between her and other inmates, placing her at an even greater risk of assault." R.46 ¶ 100.

Ms. Griffith also claims the Jail would not allow her to have a sports bra and women's underwear—products provided to cisgender women at the Jail. Several months after intake, Ms. Griffith wrote a grievance requesting the items. In response to her grievance, the Jail provided Ms. Griffith with a sports bra but continued to deny her request for female underwear because "she did not need to 'hold female products down there.'" R.48 ¶ 111. Appellee Cy Gillespie, a commander at the Jail, told Ms. Griffith she would "never get panties in the El Paso County Jail." R.49 ¶ 114. Ms. Griffith further alleges "[c]isgender women [were] allowed to purchase lipstick at the commissary," but Commander Gillespie told her she could not, "per El Paso County Jail policy" (Commissary Policy). R.49 ¶ 117.[5] She alleges this Commissary Policy is, in turn, a result of "Defendant Elder's policy of housing Ms. Griffith in a male unit," as well as "customs and practices . . . that condone discriminatory treatment of transgender prisoners." R.49 ¶ 118.

Ms. Griffith regularly complained to officials at the Jail about her alleged mistreatment. She also submitted at least six grievances, which she believed would be transmitted to Commander Gillespie. The grievances described Ms.

---

[5] We use the term Commissary Policy to refer to the allegations in Ms. Griffith's complaint about both the Jail's policy of refusing to issue transgender female inmates products available to cisgender female inmates and the Jail's policy of prohibiting transgender women from buying those products at the commissary.

Griffith's gender dysphoria, her extreme anxiety, and the hardship she experienced in the men's housing unit. She explicitly requested to be housed with other women.[6] Ms. Griffith also filed grievances concerning the cross-gender searches and the Jail's refusal to allow her to "dress in accordance with her gender identity." R.48 ¶¶ 110–112.

Due to the pervasive mistreatment stemming from the Jail's policies, Ms. Griffith told jail staff she planned to "remove her penis herself once she could figure out how to do it." R.47 ¶ 104. Ms. Griffith has a long history of self-harm, including "self-castration behavior," when her gender dysphoria is not "accommodated and treated." R.34 ¶ 38. During her pretrial confinement at the Jail, Ms. Griffith wrapped "a rubber band around her genitalia extremely tightly with the purpose of self-castration." R.41 ¶ 69.

### C

Ms. Griffith alleged sixteen claims under federal and state law, and named as defendants El Paso County, Sheriff Elder, Commander Gillespie, and Deputies O'Neal, Mustapick, Elliss, Noe, and Ford.[7] Ms. Griffith did not plead

---

[6] At least one of Ms. Griffith's grievances informed the Jail she "had previously been housed in female units in other correctional facilities." R.38 ¶ 58. The response informed Ms. Griffith "she would continue to be housed in a male unit based on El Paso County's policies and procedures." R.38 ¶ 58.

[7] Ms. Griffith first filed a *pro se* lawsuit in February 2021. Counsel was soon appointed. The Third Amended Complaint is the operative pleading before us.

every claim against every defendant. We identify the relevant defendants and the claims against them when discussing the issues on appeal.

As relevant to this appeal, Ms. Griffith alleged four constitutional claims under 42 U.S.C. § 1983: (1) a claim under the Equal Protection Clause of the Fourteenth Amendment against all defendants challenging the Jail's policies that required housing her in an all-male unit and denying her clothing and products available to cisgender female inmates; (2) a Fourteenth Amendment substantive due process claim against Sheriff Elder and Deputies Noe and Ford alleging unconstitutional conditions of confinement at the Jail; (3) a Fourth Amendment claim against Sheriff Elder and Deputies Mustapick and Elliss challenging the abusive cross-gender strip search; and (4) a Fourteenth Amendment claim against Sheriff Elder, Commander Gillespie, and Deputies Mustapick and Elliss alleging the strip search violated Ms. Griffith's rights to privacy and bodily integrity. Ms. Griffith also alleged El Paso County violated the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, *et. seq.*, and the Rehabilitation Act, 29 U.S.C. § 701, *et. seq.*, because the Jail refused to accommodate her gender dysphoria.

Appellees moved to dismiss the complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). The district court referred the motion to a magistrate judge. After briefing and oral argument, the magistrate judge recommended granting the motion to dismiss. Ms. Griffith objected to the

magistrate judge's recommendation under Federal Rule of Civil Procedure
72(b). The district court fully adopted the recommendation and dismissed Ms.
Griffith's complaint. This timely appeal followed.

## II

Appellees first insist "the firm waiver rule forecloses this appeal." Resp.
Br. at 14. We are not persuaded.

Federal Rule of Civil Procedure 72(b)(2) permits a party to "serve and
file specific written objections" to a magistrate judge's recommendation. The
district court must then "determine de novo any part of the magistrate judge's
disposition that has been properly objected to." Fed. R. Civ. P. 72(b)(3). We
have "adopted a firm waiver rule" that "provides that the failure to make
timely objection . . . waives appellate review of both factual and legal
questions." *Casanova* v. *Ulibarri*, 595 F.3d 1120, 1123 (10th Cir. 2010)
(alteration in original) (quoting *Wirsching* v. *Colorado*, 360 F.3d 1191, 1197
(10th Cir. 2004)). A "district court's decision to review [a recommendation] *de
novo*, despite the lack of an appropriate objection, does not, standing alone,
preclude application of the [firm] waiver rule" on appeal. *Vega* v. *Suthers*, 195
F.3d 573, 580 (10th Cir. 1999).

Appellees contend Ms. Griffith "failed to make *specific* objections to the
Recommendation below," so appellate review in this court is foreclosed. Resp.
Br. at 14 (emphasis added). We disagree. To preserve an issue for appellate

review, a party's objections to the magistrate judge's report and recommendation need only be "sufficiently specific to focus the district court's attention on the factual and legal issues that are truly in dispute." *United States* v. *2121 E. 30th St.*, 73 F.3d 1057, 1060 (10th Cir. 1996) (citing *Thomas* v. *Arn*, 474 U.S. 140, 147 (1985)); *see Silva* v. *United States*, 45 F.4th 1134, 1136 n.2 (10th Cir. 2022) (firm waiver rule applied where plaintiff "only offered a single sentence about *Bivens* and cited authority addressing claims under 42 U.S.C. § 1983"); *Ayala* v. *United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (firm waiver rule applied where plaintiff wholly failed to object to magistrate judge's recommendation). Ms. Griffith's objection satisfied this standard.

Ms. Griffith filed a timely objection to the magistrate judge's recommendation. Her objection spanned 30 pages, with each section identifying the magistrate judge's alleged errors and advancing arguments to support reversal. It is true the arguments in Ms. Griffith's objection could have been better developed. As the district court correctly observed, Ms. Griffith at times "merely reargue[d] her positions and ask[ed] the Court to interpret the facts and authorities differently in order to arrive at a more favorable result." R.140. But the firm waiver rule does not bar this appeal. We will discuss specific preservation problems in connection with our substantive analysis.

### III

We now proceed to Ms. Griffith's Equal Protection claim. Ms. Griffith
alleged the Jail's Housing Policy assigns inmates to housing units "solely on
the basis of [their] genitalia." R.35 ¶ 42. When Ms. Griffith arrived at the Jail,
Deputy Noe "classified Ms. Griffith" as a man and, pursuant to the Housing
Policy, "placed her into an all-male unit despite knowing that Ms. Griffith is a
transgender woman." R.37 ¶ 54. Ms. Griffith further alleged the Jail's
Commissary Policy prohibited her from obtaining female underwear or lipstick
because of her sex. R.48–50 ¶¶ 111–19. Specifically, she claims the Jail
suggested she could receive female underwear only if she "need[ed] to 'hold
female products down there,'" an allusion to her lack of female anatomy. R.48
¶ 111. And she alleges she was denied "the ability to purchase lipstick because
she is a transgender woman," whereas "[c]isgender women are allowed to
purchase lipstick." R.49 ¶ 117. The Housing and Commissary Policies are sex
classifications, Ms. Griffith explained, because "discrimination against
transgender people is a form of sex discrimination." R.50 ¶ 125; *see also* Aplt.
June 20, 2024, Rule 28(j) Ltr. at 1 ("[T]he County's policy of housing
transgender women solely on the basis of their biological sex discriminates on
the basis of sex, and is subject to intermediate scrutiny."). These policies are
thus subject to heightened scrutiny under the Equal Protection Clause. The

district court—applying rational-basis review—dismissed the Equal Protection claim under Rule 12(b)(6).

We review *de novo* a dismissal for failure to state a claim. *Clinton* v. *Sec. Benefit Life Ins. Co.*, 63 F.4th 1264, 1274 (10th Cir. 2023). When reviewing a Rule 12(b)(6) dismissal, we "accept a complaint's well-pleaded allegations as true, viewing all reasonable inferences in favor of the nonmoving party, and liberally construe the pleadings." *Lucas* v. *Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1136 (10th Cir. 2023). With these standards in mind, we consider whether Ms. Griffith stated a plausible Equal Protection claim. As we explain, she has.

The Housing Policy and the Commissary Policy are sex classifications.[8] As alleged, the Jail uses an inmate's biological sex to determine where they will be housed during pre-trial detention and whether they will receive, or be allowed to purchase, certain products from the commissary. In *Fowler* v. *Stitt*, this court explained "in *Bostock* . . . . the [Supreme] Court held, '[I]t is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." 104

---

[8] We describe the Jail's policies according to the allegations in Ms. Griffith's complaint. *Waller* v. *City & Cnty. of Denver*, 932 F.3d 1277, 1286 n.1 (10th Cir. 2019) ("'[A] Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true,' and we will not consider evidence or allegations outside the four corners of the complaint . . . ." (quoting *Mobley*, 40 F.3d at 340)).

16

F.4th 770, 789 (10th. Cir. 2024) (quoting *Bostock* v. *Clayton Cnty.*, 590 U.S. 644, 660 (2020)). Here, as in *Fowler*, the challenged "[p]olic[ies] intentionally treat[] [detainees] differently because of their sex assigned at birth." *Id.* at 789. Specifically, the Jail lets only cisgender females (who were assigned a female sex at birth based on their genitalia)—but not transgender females (who were assigned a male sex at birth based on their genitalia)—live in female housing and receive the products at issue. "Accordingly, [Ms. Griffith] ha[s] plausibly alleged the [Housing and Commissary] Polic[ies] . . . discriminate[] on the basis of sex." *Id.* at 794.

The Supreme Court has made clear "all" sex-based classifications "warrant heightened scrutiny." *United States* v. *Virginia* (*VMI*), 518 U.S. 515, 555 (1996) (quoting *J.E.B.* v. *Alabama ex rel. T.B.*, 511 U.S. 127, 136 (1994)). And under that standard, Ms. Griffith has plausibly alleged the Housing and Commissary Policies impermissibly perpetuate sex-based stereotypes and harms. The Policies might ultimately survive heightened scrutiny, but that issue is not before us. This appeal presents only the antecedent questions relevant at the motion to dismiss stage: does a sex classification exist, and has Ms. Griffith plausibly stated an Equal Protection claim? We answer yes to both. While we find Ms. Griffith plausibly alleged an Equal Protection violation, we must affirm as to all but one defendant—Sheriff Elder, sued in

his official capacity—because the individual defendants are entitled to qualified immunity on this claim.

## A

The Equal Protection Clause of the Fourteenth Amendment provides "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Government action triggers the Equal Protection Clause when it "affect[s] some groups of citizens differently than others." *Engquist* v. *Or. Dep't of Agric.*, 553 U.S. 591, 601 (2008) (quoting *McGowan* v. *Maryland*, 366 U.S. 420, 425 (1961)). "At a minimum," the Equal Protection Clause requires that any government classification or differentiation between classes of people "must be rationally related to a legitimate governmental purpose." *Clark* v. *Jeter*, 486 U.S. 456, 461 (1988). This standard is termed rational-basis review, and it applies when government action implicates neither "a fundamental right nor classif[ies] along suspect lines." *Burlington N. R. Co.* v. *Ford*, 504 U.S. 648, 651 (1992).

Ms. Griffith challenges government action that classifies based on sex. Until the 1970s, the Supreme Court reviewed sex-based classifications deferentially. *See VMI*, 518 U.S. at 531–32. But it is now firmly established the Equal Protection Clause requires courts to apply "a heightened standard of review" to government classifications "based on gender." *City of Cleburne* v.

18

*Cleburne Living Ctr., Inc.*, 473 U.S. 432, 440 (1985).[9] Heightened scrutiny is warranted because sex "generally provides no sensible ground for differential treatment," *id.*, and because sex-based reasoning all too often reflects stereotypes or "overbroad generalizations about the different talents, capacities, or preferences of males and females," *VMI*, 518 U.S. at 533. Sex classifications are thus only constitutional if they serve "important governmental objectives" through means "substantially related to" achieving those objectives. *Id.* (quoting *Miss. Univ. for Women* v. *Hogan*, 458 U.S. 718, 724 (1982)). This standard is stated unambiguously in our circuit's precedents. *See Doe ex rel. Doe* v. *Rocky Mountain Classical Acad.*, 99 F.4th 1256, 1258 (10th Cir. 2024) ("For the last forty-seven years, the Supreme Court has recognized only one test for determining whether a sex-based classification violates the right to equal protection under the Fourteenth Amendment."); *Free*

---

[9] We note courts, including the Supreme Court, at times refer to sex and gender interchangeably in the Equal Protection context. *See, e.g.*, *Miss. Univ. for Women* v. *Hogan*, 458 U.S. 718, 728 (1982) ("In limited circumstances, a gender-based classification favoring one sex can be justified if it intentionally and directly assists members of the sex that is disproportionately burdened."); *VMI*, 518 U.S. at 532–34 (using "sex" and "gender" interchangeably). Absent argument from the parties, we "treat this line of cases on perhaps its narrower terms—that is, as referring to classifications based on biological sex." *Grimm* v. *Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 607 n.8 (4th Cir. 2020), *as amended* (Aug. 28, 2020). According to our reasoning in *Fowler* v. *Stitt*, "intend[ing] to discriminate based on transgender status . . . necessarily [entails] intend[ing] to discriminate based in part on sex," understood as biological sex assigned at birth. 104 F.4th 770, 793 (10th Cir. 2024).

*the Nipple-Fort Collins* v. *City of Fort Collins, Colo.*, 916 F.3d 792, 799 (10th Cir. 2019) ("[G]ender-based classifications 'call for a heightened standard of review,' . . . a standard dubbed 'intermediate scrutiny' . . . ." (first quoting *City of Cleburne*, 473 U.S. at 440; and then quoting *Clark*, 486 U.S. at 461)).

Ms. Griffith separately alleged Appellees violated the Equal Protection Clause because transgender status is a quasi-suspect class. When government action classifies based on membership in a quasi-suspect class, heightened scrutiny applies. *City of Cleburne*, 473 U.S. at 442–43. The Supreme Court has articulated four factors to guide the protected-class analysis: (1) whether the class has historically been subject to discrimination, *Bowen* v. *Gilliard*, 483 U.S. 587, 602 (1987); (2) whether the class has a defining characteristic that bears a relation to its ability to perform or contribute to society, *City of Cleburne*, 473 U.S. at 440–41; (3) whether the class can be defined as a discrete group by obvious, immutable, or distinguishing characteristics, *Bowen*, 483 U.S. at 602; and (4) whether the class is a minority lacking political power, *id.* However, we need not consider the quasi-suspect-class issue to resolve this appeal.

**B**

Appellees moved to dismiss Ms. Griffith's Equal Protection claim under *Brown* v. *Zavaras*, 63 F.3d 967, 971 (10th Cir. 1995). In *Brown*, a *pro se* transgender plaintiff brought an Equal Protection challenge to a prison's

refusal to provide hormone therapy. 63 F.3d at 968–69, 972. The plaintiff argued he was discriminated against based on transgender status. *Id.* at 970–71. The district court determined transgender people were not a protected class and therefore analyzed the claim using rational-basis review. *Id. Brown* recognized the Ninth Circuit had previously held a transgender plaintiff was not part of a protected class. *Id.* at 971 (citing *Holloway* v. *Arthur Anderson & Co.*, 566 F.2d 659, 663 (9th Cir. 1977)). But the panel observed "research concluding sexual identity may be biological" called that decision into question. *Id.* Still, following the Ninth Circuit's approach, we held "Mr. Brown is not a member of a protected class in this case." *Id.*

Relying centrally on *Brown*, Appellees contended the Jail's policies are subject to rational-basis review because "[t]ransgender is not a suspect or quasi-suspect class." SR.25. In response, Ms. Griffith maintained the Jail's Housing and Commissary policies are sex classifications, which warrant the application of heightened scrutiny. And, separately, Ms. Griffith contended that, notwithstanding the outcome in *Brown*, transgender people are members of at least a quasi-suspect class.

The magistrate judge recommended dismissing Ms. Griffith's Equal Protection claim under Federal Rule of Civil Procedure 12(b)(6). *Brown* compelled the conclusion, the magistrate judge reasoned, that a transgender person is "not a member of a protected class" and thus rational-basis review

applied to Ms. Griffith's Equal Protection claim.[10] R.100–04. Under that standard, the magistrate judge found Ms. Griffith had "not adequately alleged that there is no rational reason for Defendants to house transgender women in all-male units and not provide them with feminine products." R.106. The magistrate judge did not address the portion of Ms. Griffith's Equal Protection claim challenging the Housing and Commissary Policies as *sex classifications.*

Ms. Griffith objected to the magistrate judge's recommendation. She argued the magistrate judge failed to consider whether the Jail's Housing and Commissary Policies classified based on sex. *Brown* could not control the disposition of the sex-classification component of her claim, Ms. Griffith contended, because *Brown* never "addressed whether discrimination against transgender individuals constitutes sex- or gender-based discrimination." SR.143. Separately, Ms. Griffith challenged the magistrate judge's conclusion that transgender people are not members of a quasi-suspect class. In reply,

---

[10] The magistrate judge urged this court to "revisit its holding" in *Brown.* R.102. And according to the magistrate judge, if he "were to apply the four-factor test used to determine whether a group constitutes a suspect or quasi-suspect class . . . transgender people easily check all the boxes." R.103. He explained transgender people have "historically been subject to discrimination," have a "defining characteristic that bears" no relation to their "ability to perform or contribute to society," may be "defined as a discrete group by obvious, immutable, or distinguishing characteristics," and "lack[] political power." R.103. The district court agreed.

Appellees again argued only that *Brown* controlled and did not address the sex-classification aspect of the Equal Protection claim.

The district court agreed *Brown* compelled the application of rational-basis review to Ms. Griffith's Equal Protection claim.[11] The district court did not consider Ms. Griffith's contention that *Brown* was simply *irrelevant* to the portion of her Equal Protection claim addressing sex classifications.

---

[11] When analyzing *Brown*'s applicability, the district court considered whether *Brown* was overruled by *Bostock* v. *Clayton County*, 590 U.S. 644 (2020). R.141–42. The district court believed "*Brown* should be reconsidered" because, under applicable law, "transgender persons constitute a quasi-suspect class." R.143 (quoting *Grimm*, 972 F.3d at 611). "Untethered by *Brown*," the district court reasoned, it "would not hesitate to find that heightened scrutiny is warranted for Plaintiff's equal protection claim because transgender-based discrimination constitutes sex-based discrimination triggering intermediate scrutiny." R.143. But ultimately, the district court concluded *Brown* was dispositive, notwithstanding *Bostock*.

We make two observations on this line of reasoning. First, as we will explain, *Brown* does not control the disposition of Ms. Griffith's Equal Protection claim. The Housing and Commissary Policies classify based on sex, and sex classifications "call for a heightened standard of review." *City of Cleburne*, 473 U.S. at 440. Second, the district court correctly queried the import of *Bostock*, a Title VII case, on Equal Protection law. As we recently held in *Fowler*, 104 F.4th at 790, nothing about the Title VII context prevents "*Bostock*'s commonsense reasoning—based on the inextricable relationship between transgender status and sex—from applying to the initial inquiry of whether there has been discrimination on the basis of sex in the equal protection context." And, as we will discuss, *Fowler*'s logic translates to this case.

On appeal, Ms. Griffith challenges the dismissal of her Equal Protection claim on two grounds. *First*, she contends the district court did not consider whether the Housing and Commissary Policies classify based on sex—separate and apart from her claim that the Policies discriminate based on transgender status. "Even if *Brown* dictated that Ms. Griffith is not a member of a suspect class on the basis of her transgender *status*," she contends, "the challenged policies still trigger heightened scrutiny for the independent reason that they are sex-based *classifications*." Op. Br. at 24. *Second*, Ms. Griffith continues to argue transgender status is at least a quasi-suspect class, and the district court mistakenly held otherwise.

We agree with Ms. Griffith's first argument, so we need not reach her second.

## 1

As alleged in Ms. Griffith's complaint, the Housing and Commissary Policies classify inmates according to biological sex, regardless of gender identity. R.40 ¶ 67 (arguing, by "hous[ing] transgender women in facilities that do not correspond with their gender identity, El Paso County is routinely discriminating against these women, including Ms. Griffith, based on their sex"); R.50 ¶ 119 ("El Paso County officials' actions in denying Ms. Griffith access to female undergarments and lipstick was a discriminatory action . . . ."). If an inmate has male genitalia, the inmate is assigned to the male

housing unit and denied access to certain commissary products. If an inmate has female genitalia, the inmate is assigned to the female housing unit and allowed to receive or purchase those commissary products.

This policy operates regardless of whether an inmate is transgender or cisgender. In other words, all biological males—both cisgender men and transgender women—are classified as "male," with the attendant restrictions outlined above. So too with all biological females—both cisgender women and transgender men. As Ms. Griffith summarized in the context of the Housing Policy, the Jail makes these classifications "on the basis of the individual's genitalia" alone. R.35 ¶ 42. Thus, Ms. Griffith has adequately alleged the Jail treats transgender women differently from cisgender women, which—as we will explain—means they treat individuals differently on the basis of sex.

Our decision in *Fowler* confirms the Housing and Commissary Policies are sex classifications subject to heightened scrutiny. In *Fowler*, plaintiffs challenged an Oklahoma policy "of refusing to provide transgender people with birth certificates that match their gender identity." 104 F.4th at 777. As the *Fowler* panel summarized,

> [b]efore the [birth certificate] Policy, cisgender and transgender people could obtain Oklahoma birth certificates that accurately reflected their gender identity. After the Policy, cisgender people still have access to Oklahoma birth certificates reflecting their gender identity. Transgender people, however, may no longer obtain a birth certificate reflecting their gender identity.

25

> Consequently, the Policy affects transgender people but not
> cisgender people.

*Id.* at 786. Based on the "totality of relevant facts," including that disparate impact, *id.*, this court then found "Plaintiffs have sufficiently alleged the Policy was motivated by an intent to treat transgender people differently" and "have thus adequately alleged the Policy purposefully discriminates against transgender people," *id.* at 788.

The *Fowler* panel next found this allegation to be sufficient to allege *sex* discrimination for purposes of "equal protection claims." *Id.* It adhered to the logic of *Bostock* that suggests a defendant "who intends to discriminate based on transgender status necessarily intends to discriminate based in part on sex." *Id.* at 789. To illustrate, the panel looked at the situation of Ms. Fowler, a transgender woman who was barred from changing the sex on her birth certificate to match her gender identity: "If her sex were different (i.e., if she had been assigned female at birth), then the Policy would not deny her a birth certificate that accurately reflects her identity." *Id.* "So too," the panel continued, "for Mr. Hall and Mr. Ray," two transgender men in analogous situations: "had they been assigned male at birth, the Policy would not impact them. Thus, the Policy intentionally treats Plaintiffs differently because of their sex assigned at birth." *Id.* Because of this different treatment, this court concluded "Plaintiffs have plausibly alleged the Policy purposefully

discriminates on the basis of sex." *Id.* at 794. The Equal Protection claim therefore survived a motion to dismiss, *id.* at 797—the same procedural stage at issue here.

*Fowler*'s logic—grounded in *Bostock*—readily applies to Ms. Griffith's claim. "If her sex were different (i.e., if she had been assigned female at birth), then the [Housing and Commissary] Polic[ies] would not deny her a [housing arrangement and purchasable products] that accurately reflect[] her identity." *Id.* at 789. So, like the plaintiffs in *Fowler*, Ms. Griffith "ha[s] plausibly alleged the Polic[ies] purposefully discriminate[] on the basis of sex." *Id.* at 794.[12]

Under these circumstances, heightened scrutiny applies.[13] *Free the Nipple-Fort Collins*, 916 F.3d at 801 ("Today, heightened scrutiny 'attends "all

---

[12] To clarify, "[a]n equal protection claim must allege that the challenged state action *purposefully* discriminates based on class membership." *Fowler*, 104 F.4th at 784 (emphasis added). But, "[w]hen a distinction is facially apparent, purposeful discrimination is presumed and no further examination of intent is required." *Id.* The "distinction" in treatment between transgender and cisgender women—and thus between biological males and biological females—"is facially apparent" from Ms. Griffith's allegations about the Jail's policies at issue. When a transgender woman who is deemed biologically male reports to the Jail, she is denied female housing and certain commissary products; not so for women deemed biologically female. In other words, an inmate is treated differently precisely based on a determination of her biological sex. For that reason, discriminating between transgender and cisgender women is necessarily discriminating on the basis of sex.

[13] The dissent says "the implication of [our] reasoning is that housing inmates based on their biological sex is presumptively unconstitutional." Dissent at 1. Not so. For one, our holding is limited to the specific housing

gender-based classifications."""" (quoting *Sessions* v. *Morales-Santana*, 582 U.S.

47, 57 (2017))); *see also Fowler*, 104 F.4th at 794 ("[T]he Policy discriminates

based on sex, so intermediate scrutiny applies . . . .").[14] The district court was

---

policy in this case. Ms. Griffith does not challenge *that* the Jail separates
people based on sex; she challenges *how* it does so. Because the Jail treats
transgender women differently from cisgender women, as we have explained,
intermediate scrutiny applies. We need not decide whether any other policies
trigger heightened scrutiny. Moreover, we have not considered at this
procedural stage whether the challenged policies before us *withstand*
heightened scrutiny. That is, we do not opine on whether they are
constitutional whatsoever.

[14] And many of our sister circuits have similarly suggested when a policy
makes decisions by reference to biological sex—including by treating
transgender and cisgender people differently—that may constitute a sex
classification subject to heightened scrutiny. *See Grimm*, 972 F.3d at 608
("[W]hen a 'School District decides which bathroom a student may use based
upon the sex listed on the student's birth certificate,' the policy necessarily
rests on a sex classification." (quoting *Whitaker ex rel. Whitaker* v. *Kenosha
Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1051 (7th Cir. 2017)));
*Hecox* v. *Little*, 104 F.4th 1061, 1074 (9th Cir. 2024), *as amended* (June 14,
2024) (affirming application of heightened scrutiny to policy "categorically
excluding [transgender women] from female sports"); *Brandt ex rel. Brandt* v.
*Rutledge*, 47 F.4th 661, 670 (8th Cir. 2022) ("The biological sex of the minor
patient is the basis on which the law distinguishes between those who may
receive certain types of medical care and those who may not. The Act is
therefore subject to heightened scrutiny."). Others appear to have recognized
this principle in at least some cases. *See Whitaker*, 858 F.3d at 1051 (like
*Grimm*, holding when a "School District decides which bathroom a student may
use based upon the sex listed on the student's birth certificate," such a policy
"is inherently based upon a sex-classification"); *Adams* v. *Sch. Bd.*, 57 F.4th
791, 801 (11th Cir. 2022) (*en banc*) (recognizing the same, but finding the policy
at issue passed intermediate scrutiny). *But see K.C.* v. *Individual Members of
Med. Licensing Bd. of Ind.*, 121 F.4th 604, 617 (7th Cir. 2024) (holding
"*Whitaker* did not hold that a state draws a sex-based classification each time
it must reference sex to enforce the law," and declining to extend *Whitaker*'s

bound to apply heightened scrutiny to analyze whether, based on the allegations in Ms. Griffith's complaint, the Housing and Commissary Policies serve "important governmental objectives" through means "substantially related to" achieving those objectives. *VMI*, 518 U.S. at 533 (quoting *Miss. Univ. for Women*, 458 U.S. at 724).

**2**

Why, then, did the district court rely on *Brown* to apply rational-basis review, asking only whether the Housing and Commissary Policies were rationally related to any legitimate government objective? Because, as Ms. Griffith correctly argues, it seems the district court considered only the portion of her Equal Protection Claim alleging transgender status is itself a protected class. *Brown* implicates, at most, that aspect of her claim. The district court did not pass on the separate component challenging sex classifications, over which *Brown* holds no sway.

Our decision in *Brown* was not about sex classifications. It addressed whether transgender status was a protected class under the Equal Protection Clause. When asked at oral argument to identify where in *Brown* we addressed sex classifications, Appellees' counsel directed us back to *Brown*'s protected

---

heightened-scrutiny rule to a law restricting gender-transition procedures); *Eknes-Tucker* v. *Governor of Ala.*, 80 F.4th 1205, 1227–30 (11th Cir. 2023) (similarly declining to extend *Adams* to that context).

class holding. Oral Arg. at 29:25–29:49 (Appellees' counsel stating *Brown* stands for a "fairly one-line holding that says transgender people are not a protected class under the Fourteenth Amendment"). *But see* Oral Arg. at 29:57–30:10 (Appellees' counsel stating *Brown* did not address the plaintiff's Equal Protection challenge as "gender classification").

Having concluded intermediate scrutiny applies, we need not also decide in this case whether transgender status is itself a protected class. *Burton* v. *United States*, 196 U.S. 283, 295 (1905) ("It is not the habit of the court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case."); *see also People for the Ethical Treatment of Prop. Owners* v. *U.S. Fish and Wildlife Serv.*, 852 F.3d 990, 1008 (10th Cir. 2017) ("If it is not necessary to decide more, it is necessary not to decide more." (quoting *PDK Labs., Inc.* v. *DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part)); *Griffin* v. *Davies*, 929 F.2d 550, 554 (10th Cir. 1991) ("We will not undertake to decide issues that do not affect the outcome of a dispute.").[15]

---

[15] We recently took a similar approach in *Fowler*, where we declined to decide whether transgender status is a quasi-suspect class" because intermediate scrutiny applied regardless. 104 F.4th at 794. Still, Ms. Griffith urges us to "affirmatively address *Brown*, to avoid future confusion, as courts both within and outside this Circuit . . . have continued to construe *Brown* as mandating rational-basis review of Equal Protection claims by transgender plaintiffs." Aplt. June 20, 2024, Rule 28(j) Ltr. at 1. We decline the invitation because answering that question is not necessary to resolving this appeal.

But there is good reason to think *Brown* would not control the protected-class issue. First, *Brown*'s holding was expressly limited to the situation and arguments then before us. *Brown*, 63 F.3d at 971 ("[W]e decline to make such an evaluation *in this case* because Mr. Brown's allegations are too conclusory to allow proper analysis of this legal question. We therefore . . . hold that Mr. Brown is not a member of a protected class *in this case*." (emphasis added)).

Second, the *Brown* panel explicitly "decline[d]" to decide conclusively whether transgender people belonged to a protected class because the *pro se* plaintiff's "allegations [were] too conclusory to allow proper analysis of this legal question." *Id.*; *see Lowe* v. *Raemisch*, 864 F.3d 1205, 1209 (10th Cir. 2017) ("If an issue is . . . reserved [in a decision of this court], the decision does not constitute a precedent to be followed." (quoting *United Food & Commercial Workers Union, Local 1564* v. *Albertson's, Inc.*, 207 F.3d 1193, 1199 (10th Cir. 2000))). Critical developments in legal precedent and societal understanding further reinforce that deciding whether transgender people are members of a protected class will require proper analysis in the appropriate case. *See generally Obergefell* v. *Hodges*, 576 U.S. 644, 673 (2015) ("[I]n interpreting the Equal Protection Clause, the Court has recognized that new insights and societal understandings can reveal unjustified inequality within our most fundamental institutions that once passed unnoticed and unchallenged."); Legal Scholar Br. at 16 ("A growing body of evidence point to a biologic underpinning of gender identity programmed from birth."); *see also Bostock*, 590 U.S. at 660 ("[I]t is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex.").

Finally, the persuasive authority that animated the rational-basis review holding in *Brown* was overruled by the Ninth Circuit decades ago. *See Schwenk* v. *Hartford*, 204 F.3d 1187, 1201 (9th Cir. 2000) (overruling *Holloway* because of intervening Supreme Court precedent recognizing discrimination based on a failure "to conform to socially-constructed gender expectations" is actionable sex discrimination); *see also Hecox*, 104 F.4th at 1079 (finding heightened scrutiny applies because plaintiff challenged classification based on transgender status and "gender identity is at least a 'quasi-suspect class.'" (quoting *Karnoski* v. *Trump*, 926 F.3d 1180, 1200–01 (9th Cir. 2019))). Since then, at least another of our sister circuits has held transgender status is a protected class. *See Grimm*, 972 F.3d at 611 ("Engaging with the suspect class test, it is apparent that transgender persons constitute a quasi-suspect class.").

31

**C**

With the level of scrutiny settled, we now look to the allegations in Ms. Griffith's complaint using the appropriate standard. "The heightened review standard our precedent establishes does not make sex a proscribed classification." *VMI*, 518 U.S. at 533. But to "survive intermediate scrutiny, the Government must provide a justification for the sex-based classification that is 'exceedingly persuasive,' and that classification must serve 'important governmental objectives' through means 'substantially related to' achieving those objectives." *Rocky Mountain Classical Acad.*, 99 F.4th at 1260 (quoting *VMI*, 518 U.S. at 524). Intermediate scrutiny requires Appellees, not Ms. Griffith, to prove the classifications meet this standard. *Price-Cornelison* v. *Brooks*, 524 F.3d 1103, 1109 (10th Cir. 2008) (explaining when intermediate scrutiny applies "the test would be whether *the government* can demonstrate that its classification serves 'important governmental objectives' and is 'substantially related to achievement of those objectives.'" (quoting *Concrete Works of Colo., Inc.* v. *City & Cnty. of Denver*, 321 F.3d 950, 959 (10th Cir. 2003) (emphasis added))).

Ms. Griffith's complaint plausibly alleged the Housing and Commissary policies perpetuated sex-based stereotypes and affirmatively harmed her. R.48 ¶ 108 (alleging Ms. Griffith's placement in male housing "exacerbated symptoms of her Gender Dysphoria leading her to suffer significant emotional

distress, become depressed, [and] have increased ideation of self-harm"); R.50

¶ 121 (alleging the Commissary Policy "exacerbated symptoms of [Ms.

Griffith's] Gender Dysphoria" by denying her the ability to "dress in accordance

with her gender identity"); *see also* R.45, 47, 48 (describing Ms. Griffith's

extreme anxiety and ideas of self-harm attendant to her treatment at the

Jail).[16] Appellees have not yet attempted to identify a government interest

justifying the Housing and Commissary policies. The absence of a developed

record on the justification for the policies makes sense at the motion-to-dismiss

stage.

We do not speculate about the ultimate outcome of Ms. Griffith's Equal

Protection claim. But there is a "low bar for surviving a [Rule 12(b)(6)] motion

to dismiss," *Quintana* v. *Santa Fe Cnty. Bd. of Comm'rs*, 973 F.3d 1022, 1034

(10th Cir. 2020), and "a well-pleaded complaint may proceed even if it strikes

a savvy judge that actual proof of those facts is improbable, and 'that a recovery

is very remote and unlikely,'" *Dias* v. *City & Cnty. of Denver*, 567 F.3d 1169,

1178 (10th Cir. 2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 556

---

[16] The dissent concludes "Ms. Griffith's complaint also facially fails
heightened scrutiny" as to the Commissary Policy, chiefly because of an
"inference . . . that panties and lipstick make her appear more feminine, which
will also place her at a heightened risk of sexual victimization" given they
would exacerbate "her 'discern[a]ble feminine characteristics.'" Dissent at 24
n.14 (quoting R.51 ¶ 129). But, at this early stage, we will not assume this
policy is, in fact, in Ms. Griffith's best interests, especially given the harms she
describes stemming from the Policy.

(2007)); *see also Clinton*, 63 F.4th at 1276 ("[G]ranting [a] motion to dismiss is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice." (alterations in original) (quoting *Dias*, 567 F.3d at 1178)).

At this early stage of the litigation, where we must accept Ms. Griffith's allegations as true and draw all reasonable inferences in her favor, we cannot say the particular sex-based classifications at issue in this case serve important government objectives through means substantially related to those objectives. Accordingly, we conclude Ms. Griffith has stated a plausible Equal Protection claim under 42 U.S.C. § 1983.

## D

The dissent insists Ms. Griffith's Equal Protection claim fails. The dissent first argues Ms. Griffith is not similarly situated to those enjoying the benefits she seeks. Our colleague then avers rational-basis review must apply to the Jail's policies. But, as we will explain, neither position is correct.[17]

## 1

According to the dissent, Ms. Griffith was not "'similarly situated' to inmates receiving differential treatment." Dissent at 5 (quoting *Fogle* v. *Pierson*, 435 F.3d 1252, 1261 (10th Cir. 2006)). Indeed, our colleague maintains

---

[17] The dissent concludes affirmance in full is required, and to that end, disagrees only with the claims on which we reverse.

"[s]he cannot" establish she was similarly situated "because she is biologically male and the prisoners she claims to be 'similarly situated' to are biologically female." Dissent at 5. Of course, if two people cannot be "similarly situated" because they have a different biological sex, then no sex discrimination claim would ever succeed. And Ms. Griffith has alleged the Jail treats her (and other transgender women) differently than cisgender women, who are similarly situated in all ways other than biological sex. Even the dissent seems to recognize the Jail discriminates against her on the basis of sex. *See* Dissent at 6 ("The Jail's policies classify inmates based on sex . . . ."). That is the relevant comparator. *Fowler*, again, is instructive. There, under Oklahoma's birth certificate policy, all biological males were treated alike, as were all biological females, because they were unable to change their birth certificates reflecting their biological sex. *See* 104 F.4th at 776–78 (explaining the Policy). But what triggered intermediate scrutiny was the fact that transgender males and cisgender males were treated differently—as were transgender females and cisgender females. *Id.* at 788–94. So too here.

Likewise, that Ms. Griffith "does not allege the Jail treats her differently than other transgender inmates" is irrelevant. Dissent at 5; *see Fowler*, 104 F.4th at 791 (adopting the Supreme Court's reasoning "that an employer discriminates based on sex even if it is 'equally happy to fire male *and* female employees who are homosexual and transgender'" (quoting *Bostock*, 590 U.S.

at 662)). Ms. Griffith was denied the housing and products to which she would
have been entitled were she biologically female. Put simply, were Ms. Griffith's
biological sex different, she would have been treated differently.

### 2

Next, the dissent says "Ms. Griffith's Equal Protection claim
independently fails because" *Turner* v. *Safley*, 482 U.S. 78 (1987), compels
rational-basis review—a low bar the Appellees can clear easily. Dissent at 7.
In *Turner*, detainees challenged two prison policies on constitutional grounds:
one that limited inter-institutional correspondence with other detainees and
one that limited their ability to marry. 482 U.S. at 81–82. The Supreme Court
held, to protect prisons' discretion in setting policies, "when a prison regulation
impinges on inmates' constitutional rights, the regulation is valid if it is
reasonably related to legitimate penological interests." *Id.* at 89. That lax
standard, the dissent argues, applies to sex classifications and thus resolves
Ms. Griffith's Equal Protection claim in favor of the Appellees. Dissent at 1.

But Appellees never made the argument advanced by the dissent. And
that failure of party presentation is decisive *in this case* because whether
*Turner* controls is, at best, unclear.

### a

The Appellees' brief mentions *Turner*—the case on which the dissent's
Equal Protection analysis centrally turns, *see* Dissent at 7–19—exactly once,

*see* Resp. Br. at 20. And that single mention is *only* in the context of Ms. Griffith's challenges to the strip search. *Compare* Resp. Br. at 19–23, *with* Resp. Br. at 17–19. The Appellees' central Equal Protection theory on appeal is that *Brown*—a case about whether transgender people constitute a quasi-suspect class—mandates rational-basis review.[18] *See* Resp. Br. at 17–19.

At most, the Appellees invoke one of the policy rationales underlying *Turner*, as articulated in one of its predecessor cases. "To subject [the Jail's policies] to unnecessarily heightened scrutiny," Appellees insist, "would stand in stark opposition to well-established precedent affording deference to the decisions of jail administrators." Resp. Br. at 18 (citing *Bell* v. *Wolfish*, 441 U.S. 520, 547 (1979)). But that stray assertion is a far cry from reliance on *Turner*'s holding, which permeates the dissent's entire Equal Protection discussion. Besides, the case Appellees cite is easily distinguishable from this one; it "is not an equal protection case." *Bell*, 441 U.S. at 579 (Stevens, J., dissenting).

---

[18] The Appellees' paramount focus on *Brown* is consistent with their litigation strategy below. Their motion to dismiss mentioned *Turner* only as to the strip search, SR.34–35, and it did not mention *any* cases relying on *Turner*'s policy rationales in the Equal Protection discussion, *see* SR.25–27. In their reply in support of the motion to dismiss, the Appellees mention *Turner* only in passing in arguing that applying *strict* (not intermediate) scrutiny would not fall within the clearly established law needed to overcome a qualified-immunity defense. SR.116. Not surprisingly, then, the district court never analyzed or even mentioned *Turner*.

Thus, the dissent raises and resolves for Appellees an argument they never made—that "we remain bound to apply *Turner*" and affirm the dismissal of Ms. Griffith's Equal Protection claim under rational-basis review. Dissent at 18. In fact, Appellees seem to have the *opposite understanding*: they concede, after *Fowler*, "intermediate scrutiny . . . appl[ies] to their classification decisions made with respect [to Ms. Griffith]." Aplee. July 3, 2024, Rule 28(j) Resp. at 2.

"[O]urs is a party-directed adversarial system and we normally limit ourselves to the arguments the parties before us choose to present." *Animal Legal Def. Fund* v. *Kelly*, 9 F.4th 1219, 1240–41 (10th Cir. 2021) (alteration in original) (quoting *United States* v. *Ackerman*, 831 F.3d 1292, 1299 (10th Cir. 2016)). In this system, "we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present." *United States* v. *Sineneng-Smith*, 590 U.S. 371, 375 (2020) (quoting *Greenlaw* v. *United States*, 554 U.S. 237, 243 (2008)). Thus, "[w]e will not make arguments for [a party] that it did not make in its briefs." *O'Neal* v. *Ferguson Constr. Co.*, 237 F.3d 1248, 1257 n.1 (10th Cir. 2001); *see also Rodriguez* v. *IBP, Inc.*, 243 F.3d 1221, 1227 (10th Cir. 2001) ("This court will not make arguments for Rodriguez that he did not make himself."). Relatedly, our "discretion to raise and decide issues sua sponte" "should be exercised only sparingly." *Animal Legal Def. Fund*, 9 F.4th at 1241 n.20 (quoting *Margheim* v. *Buljko*,

855 F.3d 1077, 1088 (10th Cir. 2017)). I see no reason to deviate from these sound principles here. *Id.* ("The dissent does not explain why we should act sua sponte here, and we decline to do so.").

### b

We now show why the Appellees' briefing failure is decisive in this case. We may have had a good basis to overlook that failure if the applicable law were certain. But it is not—as the dissent itself recognizes.

According to the dissent, *Turner* "compels our application of rational basis review to sex-based classifications in prisons and jails." Dissent at 7. That is because *Turner* dictates "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Dissent at 8 (quoting 482 U.S. at 89). Because the Supreme Court "has only narrowed *Turner* once, when it held that racial classifications in prison are subject to strict scrutiny," the dissent reasons, *Turner must* apply to Ms. Griffith's Equal Protection claim based on sex. Dissent at 8 (citing *Johnson* v. *California*, 543 U.S. 499, 510 (2005)).

But the dissent itself shows why this conclusion is far from certain. Our colleague appropriately "acknowledge[s] some doctrinal inconsistency between" the holding in *Washington* v. *Harper*, 494 U.S. 210, 224 (1990), "that '*Turner* applies to *all* circumstances in which the needs of prison administration implicate constitutional rights,' and the Court's holding in

*VMI*." Dissent at 18; *see VMI*, 518 U.S. at 555 (clarifying "all" sex-based classifications "warrant heightened scrutiny" (quoting *J.E.B.*, 511 U.S. at 136)). Given those incompatible holdings, the dissent explains, "one principle must cede to another," and "the best reading of the Court's precedent is that *Turner* applies to a prison's sex-based classifications when those classifications do not result in distinctions in funding or programming available to members of each sex." Dissent at 18.

That *Turner* controls is not so obvious that we should overlook the parties' contrary understanding. After all, as Ms. Griffith has observed, "deference [to prison and jail policies] is not limitless," and the Court has carved out at least some "prison and jail policies that discriminate on the basis of protected classes" from *Turner*'s ambit. Reply Br. at 8 (citing *Johnson*, 543 U.S. at 502, 506–07, 512). Specifically, the *Johnson* Court held, despite *Turner*'s general command, "strict scrutiny" applies "to *all* racial classifications," including those stemming from jail policies. 543 U.S. at 506, 512. Of course, as the dissent points out, race "is different" from sex. Dissent at 14 n.8. But it may not be "different" in the relevant respects. Instead, *Johnson*'s logic *may* extend to at least *some* sex classifications:

- As with race, the Court has made clear that "all" sex classifications trigger heightened scrutiny, *see VMI*, 518 U.S. at 555 (quoting *J.E.B.*, 511 U.S. at 136);

- Some sex "classifications 'threaten to stigmatize individuals by reason of their membership in a [sex],'" *Johnson*, 543 U.S. at 507 (quoting *Shaw* v. *Reno*, 509 U.S. 630, 643 (1993));

- "The right not to be discriminated against based on one's [sex]" may not be "a right that need necessarily be compromised for the sake of proper prison administration," *id.* at 510; and

- "In the prison context, when the government's power is at its apex," "searching judicial review of [sex] classifications" may be "necessary to guard against invidious discrimination," *id.* at 511.[19]

To reiterate, these arguments may not carry the day. And we recognize the discretion generally afforded to corrections officials managing the day-to-day operations of prisons and jails. *See Rhodes* v. *Chapman,* 452 U.S. 337, 351 n.16 (1981) ("[T]he problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree. Most require expertise, comprehensive planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government." (quoting *Procunier* v. *Martinez*, 416 U.S.

---

[19] The dissent argues *Johnson* clearly does not extend to sex because it "does not mention *VMI*," and "the Court would have mentioned [that *VMI* overrode *Turner*] in creating *another*, ostensibly similar, carve out [for race] in *Johnson*." Dissent at 13 n.8. Put differently, "[i]t would be odd for the Court to acknowledge the *Turner* 'carve[] out[s]'"—including racial discrimination and cruel and unusual punishment—"while ignoring a massive one" created by *VMI*. Dissent at 14 n.9 (second and third alterations in original) (quoting *Johnson*, 543 U.S. at 546). We see *Johnson*'s silence on *VMI* as much less odd. Unlike racial discrimination and cruel and unusual punishment, the Court has never considered whether *Turner* or *VMI* controls the level of scrutiny that applies to sex discrimination.

396, 404–05 (1974))); *Pitts* v. *Thornburgh*, 866 F.2d 1450, 1455 (D.C. Cir. 1989) ("Heightened scrutiny does not eliminate appreciation of both the difficulties confronting prison administrators and the considerable limits of judicial competency, informed by basic principles of separation of powers."). The point is simply that, as the dissent acknowledges, there is tension between *VMI*'s categorical holding that *all* sex discrimination triggers heightened scrutiny and *Washington*'s categorical holding that *all* prison policies (except those for which a carve-out applies) undergo rational-basis scrutiny, particularly when *Johnson* recognized heightened scrutiny applied for the Equal Protection category most like sex. 543 U.S. at 506, 512 (finding the Supreme Court's standard of "apply[ing] strict scrutiny to *all* racial classifications" trumps *Turner*'s contrary standard).

And this tension is not obviously resolvable in favor of applying *Turner* to foreclose heightened scrutiny in this case. Indeed, "[s]ome commentators have noted that," "[s]ince the *Johnson* decision," "intermediate scrutiny might now be the required standard for" detainees' sex-based Equal Protection claims. Grace DiLaura, Comment, *"Not Susceptible to the Logic of* Turner*":* Johnson v. California *and the Future of Gender Equal Protection Claims from Prisons*, 60 UCLA L. Rev. 506, 510 (2012); *id.* at 510 n.14 (citing such commentators); *id.* at 510 ("By creating a complete separation between prison deference doctrine and equal protection doctrine in the racial discrimination

42

context, *Johnson* renders prison deference wholly inappropriate in the gender context as well."). And courts are split on whether intermediate scrutiny applies to such claims.[20] *Id.* at 517–18.

In sum, the conclusion that *Turner* governs Ms. Griffith's Equal Protection claim is far from certain.[21] No party has argued for this reading— and given all parties apparently have a contrary reading, we decline to apply it *sua sponte*, especially in light of *Turner*'s unclear limits and its admitted tension with *VMI*.[22] Thus, intermediate scrutiny still applies.

---

[20] According to the dissent, this court has already decided what side of this split it is on: "we applied *Turner* to an Equal Protection claim asserting sex-based discrimination in prison two years after *VMI*." Dissent at 12 (citing *Barney* v. *Pulsipher*, 143 F.3d 1299, 1313 n.17 (10th Cir. 1998)). But the footnote in *Barney* is unhelpful. While *Barney* was decided two years after *VMI*, it also comes seven years before *Johnson*, the case that provides a basis (alongside *VMI*) for locating sex-based Equal Protection claims outside *Turner*'s ambit.

[21] And, even if that were not true, at this procedural stage, we would be less convinced than the dissent that Ms. Griffith's claim must fail. *Turner* itself demonstrates its standard is still *somewhat* searching, as the Court struck down a restriction on marriage as "an exaggerated response to . . . security objectives," largely because "[t]here [we]re obvious, easy alternatives to the [marriage] regulation that accommodate the right to marry while imposing a *de minimis* burden on the pursuit of security objectives." *Turner* v. *Safley*, 482 U.S. 78, 97–98 (1987). Without a district court ruling or *any* briefing on the matter, and bound by the complaint's allegations at this early procedural stage, we cannot conclude, as the dissent does, the same is not true here. *See* Dissent at 19–24.

[22] The dissent's particular arguments for why *Turner* trumps *VMI* in this case do not change our view. "First," the dissent observes, "*Turner* remains

43

## E

## 1

Based on the foregoing, we find Ms. Griffith has stated a plausible claim that the Housing and Commissary Policies violate the Equal Protection Clause. We now explain what our conclusion means for each defendant. Recall, on this claim, Ms. Griffith sued all defendants, including seven people in their individual capacities and Sheriff Elder also in his official capacity.[23]

---

good law." Dissent at 12. True, but so does *VMI*. And *Turner*'s *reach*, not its overall *validity*, is the relevant question.

The dissent continues: "Second, in *Washington v. Harper* the Court 'made quite clear that the standard of review we adopted in *Turner* applies to *all* circumstances in which the needs of prison administration implicate constitutional rights.'" Dissent at 14 (emphasis added by dissent) (quoting 494 U.S. 210, 224 (1990)). But *VMI* was similarly categorical in applying "heightened scrutiny" to "*all* gender-based classifications." 518 U.S. 515, 555 (1996) (emphasis added) (quoting *J.E.B.* v. *Alabama ex rel. T.B.*, 511 U.S. 127, 136 (1994)). The dissent avers (without citation), "To fall outside *Turner*'s ambit, the Court must explicitly recognize a carveout." Dissent at 14. The same could be said for falling outside *VMI*'s ambit. And the Court has never ruled one way or another regarding whether sex classifications are, in relevant part, like the racial classifications that *Johnson* carved out of *Turner*. While "[w]e cannot infer from *Johnson* or *VMI* that sex-based housing classifications warrant a categorical *Turner* carve out," Dissent at 15, we also would not infer the opposite, as the dissent does, at least without adversarial briefing.

"Third," the dissent says, "the policies here do not lend themselves to *VMI*'s logic because they do not favor one sex over the other." Dissent at 15. We cannot agree. For the reasons outlined above—particularly under *Fowler*'s logic—that is just what these policies do. They deny certain housing assignments and commissary products based on genitalia alone.

[23] We address defendant El Paso County below.

We start with all defendants sued in their individual capacities. These defendants "raised the qualified immunity defense to Griffith's constitutional claims" and maintain it on appeal. Resp. Br. at 28. To overcome that defense, Ms. Griffith must show "(1) the officers' alleged conduct violated a constitutional right, and (2) it was clearly established at the time of the violation, such that 'every reasonable official would have understood,' that such conduct constituted a violation of that right." *Perea* v. *Baca*, 817 F.3d 1198, 1202 (10th Cir. 2016) (quoting *Mullenix* v. *Luna,* 577 U.S. 7, 11 (2015)).

Appellees argue both prongs of the defense. They first maintain "Griffith did not establish that a constitutional violation occurred." Resp. Br. at 29. For the reasons above, as to the Equal Protection claim, that is wrong.

They next allege Ms. Griffith could not "show a clearly established right." Resp. Br. at 29. On that, we are persuaded. Our analysis of the Equal Protection claim applies this court's decision in *Fowler*, a 2024 case. All actions pertinent to this appeal occurred well before that year. Appellees correctly observe, "Before *Fowler*, neither the Supreme Court nor this Court had imported *Bostock*'s Title VII reasoning to an equal protection claim brought under the Fourteenth Amendment." Aplee. July 3, 2024, Rule 28(j) Resp. at 2. While Appellees seem to agree intermediate scrutiny applies after *Fowler*, they are also correct that "they had not been given fair notice that intermediate

scrutiny would apply to their classification decisions made with respect" to Ms.
Griffith. Aplee. July 3, 2024, Rule 28(j) Resp. at 2.

## 2

We next turn to Sheriff Elder in his official capacity. The thrust of this
claim is that the unconstitutional Jail policies "are set by Defendant . . . Elder."
R.52 ¶ 135. Ms. Griffith alleges he "discriminated against Plaintiff and other
transgender women by adopting and applying these customs policies, and
practices." R.52 ¶ 135. Claims pled against Sheriff Elder in his official capacity
under 42 U.S.C. § 1983 are treated as municipal liability claims. *Monell* v. *Dep't
of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978) ("[O]fficial-capacity suits . . .
represent only another way of pleading an action against an entity of which an
officer is an agent . . . ."). Qualified immunity "is available only in suits against
officials sued in their personal capacities, not in suits against governmental
entities or officials sued in their official capacities." *Starkey ex. rel. A.B.* v.
*Boulder Cnty. Soc. Servs.,* 569 F.3d 1244, 1263 n.4 (10th Cir. 2009). So that
defense is no bar to liability here.

The district court adopted the magistrate judge's recommendation to
dismiss Ms. Griffith's official-capacity suit on one ground: she "has not alleged
facts demonstrating that she suffered a constitutional injury." R.117; *see also*
R.140, 144 (adopting that recommended conclusion). That premise is incorrect.
We therefore reverse the district court's rejection of Ms. Griffith's Equal

Protection claim against Sheriff Elder in his official capacity. In so doing, we do not opine on the ultimate merits of that claim. We conclude only that the district court's reason for dismissal was erroneous.

In conclusion, then, Ms. Griffith has adequately alleged the Housing and Commissary Policies violated her Equal Protection rights. We therefore reverse on that claim against Sheriff Elder in his official capacity. We must, however, affirm the dismissal of this claim as to all Appellees sued in their individual capacities because the law was not "clearly established at the time of the violation." *Perea*, 817 F.3d at 1202.

## IV

Ms. Griffith next appeals the district court's dismissal of her Fourteenth Amendment conditions of confinement claim. According to Ms. Griffith, the Jail assigned "all detained transgender individuals to housing units based on their genitalia as the default or sole criterion, without any individualized assessment of the individual's safety or gender identity," which posed an excessive risk to Ms. Griffith's health and safety, in violation of the Fourteenth Amendment. R.53 ¶ 145. Each Appellee knew Ms. Griffith to be a "transgender woman and that housing her in an all-male unit subjected her to a risk of sexual harassment, sexual assault, and extreme emotional distress from being treated as a man given her Gender Dysphoria." R.53 ¶ 146. Although this claim is pled against each Appellee, Ms. Griffith clarified at oral argument she

47

appeals only the dismissal of her conditions of confinement claim against Deputies Noe and Ford and Sheriff Elder.[24] We thus focus only on these three defendants.

## A

### 1

Appellees moved to dismiss Ms. Griffith's conditions of confinement claim under Rule 12(b)(6). They argued the Eighth Amendment's deliberate indifference framework applied, meaning "an official is only liable if he 'knows of and disregards an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" SR.28 (quoting *Farmer* v. *Brennan*, 511 U.S. 825, 837 (1994)). According to Appellees, Ms. Griffith failed to plausibly allege deliberate indifference under that standard by Deputy Noe or Deputy Ford. SR.29. The magistrate judge agreed, concluding the facts alleged did not show either Deputy Noe or Deputy Ford knew Ms. Griffith "would be at risk of substantial harm if placed in the all-male facility [and] that they disregarded that risk." R.108.

In objecting to the recommendation, Ms. Griffith made general arguments about being subjected to "repeated cross-gender pat-down searches"

---

[24] Ms. Griffith does not suggest any *personal* mistreatment by Sheriff Elder, so we only consider this claim pled against him in his official capacity.

48

in the male housing unit. SR.150. Ms. Griffith did not challenge the magistrate
judge's ruling with respect to Deputies Noe and Ford. Appellees pointed this
out in their response, contending Ms. Griffith failed to explain how Deputies
Noe and Ford "had specific knowledge of a risk to [Ms. Griffith] and ignored
it." SR.172. The district court adopted the magistrate judge's recommendation
without further analysis.

Ms. Griffith now urges reversal, but we need not reach the merits of her
appellate challenge as to Deputies Noe and Ford. We agree with Appellees that
she has failed to properly preserve an argument that *those two deputies*
violated the Fourteenth Amendment. It is well settled that a plaintiff must
prove each defendant personally participated in a constitutional violation. *See,
e.g.*, *Pahls* v. *Thomas*, 718 F.3d 1210, 1231 (10th Cir. 2013) ("Liability under
§ 1983 . . . requires personal involvement."). The magistrate judge concluded
Ms. Griffith did not allege "either [the] subjective or objective elements of
deliberate indifference" with respect to Deputies Noe and Ford. R.108. Ms.
Griffith failed to challenge this ruling in her objection.

Applying firm waiver principles, Ms. Griffith's objection to the dismissal
of her conditions of confinement claim was not "sufficiently specific to focus the
district court's attention on the factual and legal issues that are truly in
dispute." *2121 E. 30th St.*, 73 F.3d at 1060. It was not until her opening brief
on appeal that Ms. Griffith explained how Deputies Noe and Ford were

involved in her unconstitutional conditions of confinement. This argument comes too late. *Davis* v. *Clifford*, 825 F.3d 1131, 1137 n.3 (10th Cir. 2016) (finding appellant waived arguments not made in objection to the magistrate judge's recommendation).

## 2

We also affirm as to Sheriff Elder in his official capacity. Recall, Ms. Griffith alleged the unconstitutional Jail policies "are set by Defendant . . . Elder." R.52 ¶ 135. In her complaint, Ms. Griffith claims Sheriff Elder orchestrated the policies that led to her placement in male housing. R.37 ¶ 54; R.38 ¶ 57. She further alleged these policies caused extensive mistreatment— for instance, threatening her health and safety, exposing her to risks of sexual assault and harassment, and exacerbating her gender dysphoria. *See* R.37 ¶ 54; R.38 ¶ 57; R.53 ¶¶ 145–46.

The magistrate judge recommended dismissing this claim against Sheriff Elder for one reason: because Ms. Griffith "has not alleged facts demonstrating that she suffered a constitutional injury." R.117. According to the magistrate judge, Ms. Griffith could not proceed against Sheriff Elder in his official capacity because she had not adequately alleged *any of the named individual defendants*—including Deputies Noe, Ford, and others—personally caused unconstitutional conditions of confinement. R.108–11. The district

court accepted the magistrate judge's recommendation on this issue without elaboration. R.140.

Unlike with Deputies Noe and Ford, Ms. Griffith's objection to the dismissal of her conditions-of-confinement claim against Sheriff Elder is properly before us. She objected to the magistrate judge's recommendation to dismiss that claim and has maintained that position on appeal. *See* SR.137 (arguing promulgating or maintaining policies that cause constitutional rights violations suffices to impose liability on Sheriff Elder); Op. Br. at 50 (similar); Reply Br. at 21–24 (similar).

Ms. Griffith's claim is Sheriff Elder's policies caused unconstitutional conditions of confinement through a number of channels, none of which necessarily depends on particular subordinates' actions. *See, e.g.*, R.53 ¶¶ 145–46 (focusing on risks to "health and safety" and "a risk of sexual [harassment], sexual assault, and extreme emotional distress," without naming any specific perpetrators); SR.137 (contending Sheriff Elder's policies "caused the violation of Plaintiff's constitutional rights in numerous ways"—again not naming a particular perpetrator). The law permits this kind of *Monell* claim. *See Quintana*, 973 F.3d at 1033 (acknowledging our circuit precedent provides that "municipal liability under *Monell* may exist without individual liability"); *Crowson*, 983 F.3d at 1188 (reaffirming this principle); *id.* at 1184 (explaining, for municipal liability, a plaintiff "must allege facts showing: (1) an official

policy or custom, (2) causation, and (3) deliberate indifference" (quoting *Quintana*, 973 F.3d at 1034)). We thus agree with Ms. Griffith that her claim against Sheriff Elder in his official capacity does not necessarily depend on unconstitutional conduct by a subordinate named in the same suit, as the magistrate judge seemed to conclude.

Still, affirmance is required because Ms. Griffith has not plausibly alleged deliberate indifference by Sheriff Elder or stated facts to support that his policy was the legally relevant cause of the harassment, assaults, and other mistreatment—carried out by others—underlying this claim. *See Bd. of Cnty. Comm'rs of Bryan Cnty., Okla.* v. *Brown*, 520 U.S. 397, 405 (1997) ("Where a plaintiff claims that the municipality has not directly inflicted an injury, . . . rigorous standards of culpability and causation must be applied . . . ."); *Barney* v. *Pulsipher*, 143 F.3d 1299, 1308 (10th Cir. 1998) (applying these rigorous standards when "the policy at issue is lawful on its face and the municipality therefore has not directly inflicted the injury through its own actions"). Under these circumstances, we affirm the district court's dismissal of Ms. Griffith's Fourteenth Amendment conditions of confinement claim. *See Fed. Trade Comm'n* v. *Elite IT Partners, Inc.*, 91 F.4th 1042, 1045 (10th Cir. 2024) ("[W]e can affirm on any ground adequately supported by the record.").

# V

Ms. Griffith also appeals the dismissal of her Fourth and Fourteenth Amendment claims challenging the allegedly unlawful strip search conducted at intake. Recall, Ms. Griffith asked Deputy Elliss, a female, to "conduct the search because Ms. Griffith is a transgender woman." R.41–42 ¶¶ 74, 76. Deputy Elliss "refused and cited El Paso County's [Search] policy." R.42 ¶ 74. After Deputy Elliss searched Ms. Griffith's breasts, she left the room. Deputy Mustapick, alone in the room with Ms. Griffith, proceeded to "search Ms. Griffith's genitals." R.42 ¶ 78. Ms. Griffith claims the strip search was conducted pursuant to the Jail's "official policy" of allowing "male deputies to search transgender women without any supervision." R.57 ¶ 172.

In the district court, Appellees raised a qualified immunity defense to Ms. Griffith's Fourth and Fourteenth Amendment claims. Appellees further maintained Commander Gillespie could not be liable because Ms. Griffith failed to allege his personal participation in the strip search. The magistrate judge agreed with Appellees and recommended dismissal. The district court adopted the magistrate judge's reasoning without further analysis.

On appeal, Ms. Griffith insists the strip search was unconstitutional, and the district court erroneously concluded otherwise. Ms. Griffith maintains the cross-gender nature of the search violated the Fourth and Fourteenth Amendments. She further contends Deputy Mustapick conducted an abusive

search in violation of the Fourth Amendment. Reviewing *de novo*, we agree with Ms. Griffith—but only in part.

Commander Gillespie and Deputies Elliss and Mustapick are entitled to qualified immunity, as the district court properly determined. But, unlike the district court, we conclude Ms. Griffith has plausibly alleged Deputy Mustapick committed a constitutional violation by conducting a cross-gender strip search. For this reason, we must reinstate the Fourth and Fourteenth Amendment cross-gender search claims against Sheriff Elder in his official capacity. Those claims had previously been dismissed for lack of a constitutional violation by a subordinate. Finally, we reverse the grant of qualified immunity to Deputy Mustapick on Ms. Griffith's Fourth Amendment abusive search claim.

## A

Ms. Griffith's Fourth Amendment claim implicates her right to be free from unreasonable searches. *Chapman* v. *Nichols*, 989 F.2d 393, 394 (10th Cir. 1993) (plaintiffs "brought this suit . . . contending [the sheriff] violated their Fourth Amendment rights by promulgating the policy under which they were [strip] searched."). To analyze a Fourth Amendment claim based on an allegedly unlawful search, we "balance[] the need for the particular search against the invasion of personal rights that the search entails." *Bell*, 441 U.S. at 559. "[T]he greater the intrusion, the greater must be the reason for

conducting a search." *Levoy* v. *Mills*, 788 F.2d 1437, 1439 (10th Cir. 1986) (quoting *Blackburn* v. *Snow*, 771 F.2d 556, 565 (1st Cir. 1985)). In conducting this analysis, we "consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Id.* (quoting *Bell*, 441 U.S. at 559).

Ms. Griffith's Fourteenth Amendment claim implicates her right to personal privacy. *Colbruno* v. *Kessler*, 928 F.3d 1155, 1163–64 (10th Cir. 2019) (analyzing a pretrial detainee's Fourteenth Amendment claim to vindicate his right to privacy after officers forced him to walk down a hospital hallway naked). Although "inmates' right to privacy must yield to the penal institution's need to maintain security, it does not vanish altogether." *Id.* at 1164 (quoting *Cumbey* v. *Meachum*, 684 F.2d 712, 714 (10th Cir. 1982) (*per curiam*)). The Constitution protects a prisoner from being forced to unnecessarily expose their naked body which, as we have held, "is a severe invasion of personal privacy." *Id.* And a plaintiff can state a Fourteenth Amendment claim by alleging facts supporting the inference that "the exposure of [her] body was 'not rationally related to a legitimate governmental objective or [was] excessive in relation to that purpose.'" *Id.* at 1164 (finding a plaintiff plausibly alleged a Fourteenth Amendment violation by pleading facts from which the court could infer officers walked plaintiff down a hospital hallway

naked without a "vital urgency" justifying their actions (quoting *Kingsley* v.

*Hendrickson*, 576 U.S. 389, 398–99 (2015))).

Whether analyzed under the Fourth or Fourteenth Amendments, we

must balance the intrusiveness of the search against the government's reason

for conducting it.[25] We therefore evaluate Ms. Griffith's Fourth and Fourteenth

Amendment claims together.

**B**

To overcome the qualified immunity defense, Ms. Griffith must show "(1)

the officers' alleged conduct violated a constitutional right, and (2) it was

clearly established at the time of the violation, such that 'every reasonable

official would have understood,' that such conduct constituted a violation of

that right." *Perea*, 817 F.3d at 1202 (quoting *Mullenix,* 577 U.S. at 11).[26] At the

Rule 12(b)(6) stage, we conduct the qualified immunity inquiry bound by the

facts alleged in the operative complaint. *See Keith* v. *Koerner*, 707 F.3d 1185,

1188 (10th Cir. 2013).

---

[25] The magistrate judge recognized as much when analyzing Ms. Griffith's claims, and no party has identified a meaningful difference between these legal standards for purposes of this case.

[26] Again, qualified immunity "is available only in suits against officials sued in their personal capacities, not in suits against governmental entities or officials sued in their official capacities." *Starkey ex. rel. A.B.* v. *Boulder Cnty. Soc. Servs.,* 569 F.3d 1244, 1263 n.4 (10th Cir. 2009). It therefore cannot protect Sheriff Elder from claims pled against him in his official capacity.

With these legal principles in mind, we proceed to analyze Ms. Griffith's appellate challenges. We begin with the claims against Commander Gillespie and Deputy Elliss and then discuss Ms. Griffith's arguments as to Deputy Mustapick and Sheriff Elder.

## C

Ms. Griffith has given us no reason to reverse the dismissal of her Fourteenth Amendment claim against Commander Gillespie. Ms. Griffith does not even mention Commander Gillespie in her appellate briefing when discussing the Fourteenth Amendment search claim. *State Farm Fire & Cas. Co.* v. *Mhoon*, 31 F.3d 979, 984 n.7 (10th Cir. 1994) ("[A]ppellant failed to raise this issue in his opening brief and, hence, has waived the point."). Ms. Griffith has the burden of establishing Commander Gillespie had "personal involvement in the alleged constitutional violation." *Fogarty* v. *Gallegos*, 523 F.3d 1147, 1162 (10th Cir. 2008) (quoting *Foote* v. *Spiegel,* 118 F.3d 1416, 1423 (10th Cir. 1997)). There are no allegations in the complaint that plausibly suggest Commander Gillespie participated in the strip search. Ms. Griffith alleged only "Gillespie's decision to house [her] in an all-male unit subjected her to have her privacy constantly invaded." R.57 ¶ 174. But this allegation is not about the strip search. And, like the district court, we find it conclusory. *Erikson* v. *Pawnee Cnty. Bd. of Cnty. Comm'rs*, 263 F.3d 1151, 1154 (10th Cir.

57

2001) (explaining a "conclusory allegation is insufficient to survive [a] motion[]
to dismiss").

As to Deputy Ellis, Ms. Griffith likewise failed to develop an argument
for reversal. In a footnote in her opening brief, Ms. Griffith contends Deputy
"Elliss is liable for her failure to intervene" because she "left Ms. Griffith alone
with Defendant Mustapick after Ms. Griffith begged for a woman to search her
instead, and in doing so failed to prevent an unsupervised and wholly
unnecessary cross-gender strip search." Op. Br. at 40–41 n.13. Ms. Griffith
cites *Vondrak* v. *City of Las Cruces*, 535 F.3d 1198, 1210 (10th Cir. 2008), but
she does not explain how that case, which is about excessive force, supports
her appellate position. "Arguments raised in a perfunctory manner, *such as in
a footnote*, are waived." *In re C.W. Min. Co.*, 740 F.3d 548, 564 (10th Cir. 2014)
(quoting *United States* v. *Berry,* 717 F.3d 823, 834 n.7 (10th Cir. 2013)).

We thus affirm the dismissal of Ms. Griffith's Fourth and Fourteenth
Amendment claims against Deputy Elliss and Fourteenth Amendment claim
against Commander Gillespie.

### D

We next address Ms. Griffith's Fourth and Fourteenth Amendment
claims against Deputy Mustapick based on the strip search. Ms. Griffith
challenges two distinct aspects of the strip search: who conducted it and the
way it was conducted. First, Ms. Griffith contends having a male deputy

perform the strip search violated the Fourth and Fourteenth Amendments. Second, and separately, Ms. Griffith maintains Deputy Mustapick conducted the search in an abusive manner, in violation of the Fourth Amendment. We consider each argument in turn.

**1**

We begin with Ms. Griffith's claim concerning the cross-gender nature of the strip search. Ms. Griffith alleged Deputy Mustapick's participation in the search was "objectively unreasonable in light of the circumstances" and "violated [Ms. Griffith's] right to be secure in her bodily integrity, a liberty right protected by . . . the Fourteenth Amendment." R 55–56. The magistrate judge concluded Ms. Griffith could not overcome qualified immunity because she failed to plausibly allege a constitutional violation under clearly established law. R.115 (Fourth Amendment); *see also* R.110 (Fourteenth Amendment). The district court adopted the magistrate judge's recommendation.

On appeal, Ms. Griffith concedes the Jail could subject her to a strip search before she entered general population. She contends only that assigning a male deputy to perform that strip search had no "relationship to legitimate penological concerns" and thus violated the Constitution. Op. Br. at 40; *see also* R.55 ¶ 159 ("[T]here was no basis for [Deputy] Mustapick to perform a visual body-cavity search" of Ms. Griffith.). As we explain, the district court's

59

qualified-immunity ruling must be affirmed. Though we conclude Ms. Griffith has plausibly alleged a constitutional violation, the law was not clearly established that Deputy Mustapick's participation as alleged violated the Constitution.

### a

Our point of departure is straightforward: "it is axiomatic that a strip search represents a serious intrusion upon personal rights." *Shroff* v. *Spellman*, 604 F.3d 1179, 1191 (10th Cir. 2010) (quoting *Chapman*, 989 F.2d at 395)). Strip searches are "demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, signifying degradation and submission." *Levoy*, 788 F.2d at 1439 (quoting *Blackburn*, 771 F.2d at 564)). And there are serious privacy concerns when prison officials view, or search, undressed inmates of the opposite gender. *See Hayes* v. *Marriott*, 70 F.3d 1144, 1146 (10th Cir. 1995) (discussing privacy concerns stemming from a body cavity search of inmates in view of members of the opposite sex); *Cumbey*, 684 F.2d at 714 (finding plausible constitutional claim when plaintiff alleged naked male inmates were subjected to "a certain amount of viewing" by female officers); *Shroff*, 604 F.3d at 1191 (affirming denial of summary judgment to officer who required female in police custody to pump breast milk in view of another officer because he "failed to present any justification for requiring [plaintiff] to expose her breasts in the presence of

another person"); *see also Canedy* v. *Boardman*, 16 F.3d 183, 185 (7th Cir. 1994) ("[W]hile all forced observations or inspections of the naked body implicate a privacy concern, it is generally considered a greater invasion to have one's naked body viewed by a member of the opposite sex."); *Byrd* v. *Maricopa Cnty. Sheriff's Dep't*, 629 F.3d 1135, 1146 (9th Cir. 2011) ("This litany of cases over the last thirty years has a recurring theme: cross-gender strip searches in the absence of an emergency violate an inmate's right under the Fourth Amendment to be free from unreasonable searches."). As the district court correctly recognized, strip searches are invasive, and cross-gender searches are "universally frowned upon . . . in the absence of an emergency." R.114–15 (citing *Byrd*, 629 F.3d at 1143).

Evaluating the constitutionality of the search in this context requires "balancing the need for the particular search against the invasion of personal rights that the search entails." *Bell*, 441 U.S. at 559; *see also Blackmon* v. *Sutton*, 734 F.3d 1237, 1241 (10th Cir. 2013) (explaining Fourteenth Amendment violation occurs when "the restriction in question bears no reasonable relationship to any legitimate governmental objective."). The Fourth Amendment analysis of a strip search is "fact-specific, 'measured in objective terms by examining the totality of the circumstances.'" *Nelson* v. *McMullen*, 207 F.3d 1202, 1206 (10th Cir. 2000) (quoting *Ohio* v. *Robinette*, 519 U.S. 33, 39 (1996)).

Ms. Griffith alleges there was *no* "legitimate penological purpose" for Deputy Mustapick to be involved in the strip search. R.43 ¶ 80. At this procedural stage, we agree. According to the allegations in Ms. Griffith's complaint, Deputy Mustapick knew Ms. Griffith is a transgender woman and that she lived with gender dysphoria. He also knew Ms. Griffith asked to be searched by a female deputy. And the complaint alleges a female deputy was available to conduct the search. Indeed, Deputy Elliss had *just* helped with the search. Nothing in the complaint suggests there was an emergency or other justification requiring Deputy Mustapick to participate. Ms. Griffith thus has plausibly alleged facts from which we can infer, in *this* case, that a male deputy's participation in the strip search of a transgender female detainee had no "reasonable relationship" to a "legitimate governmental objective." *Colbruno*, 928 F.3d at 1163; *see also Turner*, 482 U.S. at 89–91 ("[T]here must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it." (quoting *Block* v. *Rutherford*, 468 U.S. 576, 586 (1984))).

Resisting this conclusion, Appellees contend there is a strong interest in preventing "weapons or contraband" from entering jails. Resp. Br. at 21. We do not doubt this is so. But Appellees do not explain what this interest in contraband prevention has to with having a *male deputy* strip search Ms. Griffith—particularly when a female deputy was available. As the Supreme

Court has explained, "a court may consider [alternative options] as evidence that the [prison] regulation does not satisfy the reasonable relationship standard." *Turner*, 482 U.S. at 91.[27] Subjecting Ms. Griffith to a strip search by a male officer is, at least on the face of the complaint, plausibly unrelated to the asserted governmental interest of preventing contraband in the Jail. *Farmer* v. *Perrill*, 288 F.3d 1254, 1260 (10th Cir. 2002) ("We [have] held that a strip search of a motorist detained for a minor traffic offense . . . violated his constitutional rights because there was neither a sufficient security justification for the search, nor any justification for conducting the search in a public area."); *Byrd*, 629 F.3d at 1143 ("[A]lthough valid reasons to search the inmates existed generally, there was no justification given for conducting a cross-gender strip search."); *Williams* v. *City of Cleveland*, 771 F.3d 945, 954 (6th Cir. 2014) (finding plaintiff plausibly pled a Fourth Amendment challenge to a strip search by alleging obvious less-invasive alternatives to the jail's procedure). We thus conclude Ms. Griffith plausibly alleged Deputy Mustapick violated her Fourth and Fourteenth Amendment rights by conducting a cross-gender strip search.[28]

---

[27] This requirement has teeth: *Turner* struck down a restriction on marriage largely on this ground. *Turner*, 482 U.S. at 97–98.

[28] The dissent insists Ms. Griffith "offers no factual allegations which, taken as true, demonstrate that the Jail's same-sex strip search policy is

Finally, Ms. Griffith alleged Sheriff Elder violated the Constitution by enforcing a policy "requir[ing] . . . male deputies to search transgender women without any supervision." R.57 ¶ 172. The district court dismissed all claims against Sheriff Elder for failure to allege a constitutional violation by a subordinate. Because we conclude Ms. Griffith plausibly alleged a constitutional violation by Deputy Mustapick, we must reverse the dismissal of the Fourth and Fourteenth Amendment claims against Sheriff Elder in his official capacity relating to the cross-gender strip search and remand for further proceedings. *Cox* v. *Glanz*, 800 F.3d 1231, 1256 (10th Cir. 2015) (explaining we "generally will allow 'a suit [against a county] to proceed when immunity [based on a lack of clearly established law] shields the individual defendants" (quoting *Lynch* v. *Barrett*, 703 F.3d 1153, 1164 (10th Cir. 2013))).

---

unrelated to its legitimate interests in prison security and employee welfare" under *Turner*. Dissent at 25. We disagree. Her complaint clearly alleged Deputy Elliss defended having Deputy Mustapick conduct part of the strip search only "because she was 'still a male' in El Paso County's 'system,'" without referencing any other reasons for the cross-gender search. R.41 ¶ 74.

On appeal, Ms. Griffith continues the same thread: "there was no justification—let alone an emergency—for having a male guard conduct her strip search and see her naked body" when "a female guard, Defendant Elliss, was initially in the room and available to do the search—indeed, she was the one who searched Ms. Griffith's breasts." Op. Br. at 38. If a female deputy was available to conduct *part* of the search, then it is reasonable to infer she would have also been able to conduct *the rest* of the search, as Ms. Griffith's complaint suggests. Recall, the existence of "obvious, easy alternatives . . . that accommodate the" right asserted is key to the constitutional inquiry. *Turner*, 482 U.S. at 98.

64

As above, we take no position on the merits of Ms. Griffith's Fourth and Fourteenth Amendment claims against Sheriff Elder. We say no more than the district court's stated reasons for dismissal were erroneous.

**b**

We now consider the second prong of the familiar qualified immunity analysis. According to the district court, it was not "'sufficiently clear' that every 'reasonable official would understand'" at the time of Ms. Griffith's strip search that a male deputy could not strip search a transgender female detainee. *Ashcroft* v. *al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson* v. *Creighton*, 483 U.S. 635, 640 (1987)). We agree with the district court.

The relevant question is whether "the law put officials on fair notice that the described conduct was unconstitutional." *Casey* v. *City of Fed. Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007) (quoting *Gomes* v. *Wood*, 451 F.3d 1122, 1134 (10th Cir. 2006)). True, our law is clear that cross-gender strip searches must be motivated by some penological interest. *See, e.g.*, *Shroff*, 604 F.3d at 1191 (finding constitutional violation because officer viewed detainee's breasts without "any justification"). But as Appellees persuasively point out, we have not previously applied this principle to searches of transgender inmates. *See Hayes*, 70 F.3d at 1146–47 (male inmate challenging female guards viewing male inmates naked); *Cumbey*, 684 F.2d at 714 (male inmate challenging female guards viewing the strip search of a male detainee). Only one case,

65

*Farmer* v. *Perrill*, involved a transgender inmate. 288 F.3d at 1257. But the *Farmer* plaintiff challenged the overall justification for strip searches conducted in view of other inmates. *Id.* Unlike here, the constitutional challenge in *Farmer* did not concern whether the person who searched the transgender detainee was male or female. These cases therefore could not have provided guidance to a reasonable officer in Deputy Mustapick's position.

Ms. Griffith insists no factually analogous case is required to show the law was clearly established. According to Ms. Griffith, "common sense tells us conducting a cross-gender strip search of a psychologically vulnerable transgender detainee, over vociferous protestations . . . violates the constitutional protections against punishment and unreasonable searches." Op. Br. at 45. Ms. Griffith relies on *Colbruno*, where we recognized an obvious violation of the Fourteenth Amendment when a pretrial detainee was paraded naked through a hospital. *Colbruno* acknowledged we "can occasionally rely on the general proposition that it would be 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted . . . even though existing precedent does not address similar circumstances.'" *Colbruno*, 928 F.3d at 1165 (quoting *District of Columbia* v. *Wesby*, 583 U.S. 48, 64 (2018)).

Ms. Griffith is correct that "[e]ven when no precedent involves facts 'materially similar' to ours, [a] right can be clearly established if a precedent applies with 'obvious clarity.'" *Lowe* v. *Raemisch*, 864 F.3d 1205, 1210 (10th

Cir. 2017); *see also Taylor* v. *Riojas*, 592 U.S. 7, 9 (2020) (discussing same). But that standard is not met on the facts before us. Accordingly, in the absence of clearly established law, we affirm the grant of qualified immunity to Deputy Mustapick on the Fourth and Fourteenth Amendment claims concerning the cross-gender nature of the strip search.

2

Ms. Griffith also contends Deputy Mustapick violated the Fourth Amendment by conducting the strip search in an abusive manner. The magistrate judge acknowledged Deputy Mustapick searched Ms. Griffith in a "sickening" and "reprehensible" way and made "abhorrent statements that accompanied the search." R.110, 115. But the magistrate judge nevertheless concluded Ms. Griffith could not overcome either prong of the qualified immunity defense. According to the magistrate judge, Deputy Mustapick's conduct, "reprehensible as it [was]," did not "rise to [the] level" of a constitutional violation. R.115. Even if Ms. Griffith could state a constitutional claim, the magistrate judge determined "it would necessarily fail based on the 'clearly established' prong of qualified immunity." R.116. The district court adopted the magistrate judge's reasoning without elaboration.

On appeal, Ms. Griffith maintains there "is no plausible justification for conducting a search in this [abusive] manner—rather, it appears calculated to inflict psychological pain on a vulnerable individual," in violation of the Fourth

Amendment. Op. Br. at 40. She contends the Supreme Court's decision in *Bell*, holding an abusive search "cannot be condoned," clearly established that Deputy Mustapick's "harassing, humiliating, [and] abusive search" violated the Constitution. Op. Br. at 43. Considering the totality of the circumstances as alleged by Ms. Griffith, we agree.

We start with the constitutional prong of Deputy Mustapick's qualified immunity defense. In determining whether a search is constitutional under the Fourth Amendment, we must consider the "manner in which [it] is conducted." *Bell*, 441 U.S. at 559. And it is well established a "search [conducted] in an abusive fashion . . . . cannot be condoned." *Id.* at 560; *see also Seltzer-Bey* v. *Delo*, 66 F.3d 961, 962–63 (8th Cir. 1995) (finding plaintiff plausibly alleged a Fourth Amendment violation where officer "made sexual comments about [inmate's] penis and buttocks" during one strip search and "rubbed [his] buttocks with a nightstick and asked him whether it reminded him of something" during another). For that reason, "not all strip search procedures will be reasonable; some could be excessive, vindictive, harassing, or unrelated to any legitimate penological interest." *Michenfelder* v. *Sumner*, 860 F.2d 328, 332 (9th Cir. 1988); *see also Joseph* v. *U.S. Fed. Bureau of Prisons*, 232 F.3d 901 (10th Cir. 2000) (unpublished table decision) (recognizing "the sexual harassment or abuse of an inmate by a corrections officer can never serve a legitimate penological purpose and may well result in severe physical and

psychological harm" (quoting *Freitas* v. *Ault*, 109 F.3d 1335, 1338 (8th Cir.
1997))).[29]

Ms. Griffith has alleged facts from which we can reasonably infer Deputy
Mustapick conducted the strip search in an abusive fashion. Consider what
Deputy Mustapick knew at the time of the strip search: Ms. Griffith is a legally
blind transgender woman living with gender dysphoria; her gender dysphoria
caused her anxiety and could lead to self-harm; and she made repeated
requests for him to leave the room and asked for a female deputy to conduct
the strip search. Taken together, it is reasonable to infer Deputy Mustapick
knew Ms. Griffith was particularly vulnerable to searches by male deputies.

It is against this backdrop that we consider the reasonableness of Deputy
Mustapick's actions. After Deputy Elliss left the room, Deputy Mustapick
ordered Ms. Griffith to undress and stand bent over with her hands against
the wall. With Ms. Griffith naked, in an exposed position, and alone in a closed
room with only a male deputy, Deputy Mustapick proceeded to grab his penis
and make sexually explicit and threatening comments. The complaint alleges
he "was extremely aggressive while searching Ms. Griffith's genitals." R.42
¶ 78. He then warned Ms. Griffith not to tell anyone "about what he did and

---

[29] *Joseph* was an unpublished Eighth Amendment case, but we rely on it
for its commonsense pronouncement that sexual harassment serves no
legitimate penological purpose. *See* 10th Cir. R. 32.1(A) ("Unpublished
decisions are not precedential, but may be cited for their persuasive value.").

said to her" during the strip search—otherwise, "he would make sure that she was brutalized by the guards." R.42 ¶ 79. We conclude Ms. Griffith has stated a plausible violation of the Fourth Amendment. Our conclusion is compelled by "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Levoy*, 788 F.2d at 1439 (quoting *Bell*, 441 U.S. at 559).

Appellees—appropriately—do not attempt to justify Deputy Mustapick's behavior. Instead, they contend "verbal statements made during a search are insufficient to establish a constitutional violation." Resp. Br. at 21. Appellees principally rely on *Adkins* v. *Rodriguez*, 59 F.3d 1034, 1037 (10th Cir. 1995), and *Hyberg* v. *Enslow*, 801 F. App'x 647, 650 (10th Cir. 2020). Neither case supports affirmance.

In *Adkins*, the inmate plaintiff challenged sexual harassment by a prison guard. 59 F.3d at 1036. She did so, however, under the Eighth Amendment deliberate indifference framework. *Id.* at 1036–37. And we specifically observed the plaintiff *did not challenge* "an unreasonable search or seizure under the Fourth Amendment or [that] she was denied substantive due process under the Fourteenth Amendment." *Id.* at 1037 n.4. These are precisely the claims advanced by Ms. Griffith. *Adkins* does not move the needle for Appellees.

*Hyberg* is neither precedential nor persuasive. The plaintiff there worked at a factory inside the jail and was strip searched before and after going to work. *Hyberg*, 801 F. App'x at 648. He challenged two searches, contending they were unreasonable under the Fourth Amendment. *Id.* But *Hyberg* did not involve an allegedly *abusive* search. There, we explicitly refused to credit the plaintiff's conclusory allegation that a search was conducted "in a very demeaning and derogatory way." *Id.* at 650.

Accepting Ms. Griffith's allegations as true and drawing all inferences in her favor, she has "nudged" her abusive search claim "across the line from conceivable to plausible." *Twombly,* 550 U.S. at 570. At this early stage of the litigation, no more is required.

We turn next to the clearly established law prong. We may not "define clearly established law at too high a level of generality." *City of Tahlequah, Okla.* v. *Bond*, 595 U.S. 9, 12 (2021). "[E]xisting law must have placed the constitutionality of the officer's conduct 'beyond debate.'" *Wesby*, 583 U.S. at 63 (quoting *al-Kidd*, 563 U.S. at 741). We therefore typically require a plaintiff to identify "an on-point Supreme Court or published Tenth Circuit decision; alternatively, 'the clearly established weight of authority from other courts must have found the law to be as [she] maintains.'" *A.M.* v. *Holmes*, 830 F.3d 1123, 1135 (10th Cir. 2016) (quoting *Quinn* v. *Young*, 780 F.3d 998, 1005 (10th Cir. 2015)).

The district court faulted Ms. Griffith for failing to identify a prior case involving the abusive search of a *transgender* detainee. Ms. Griffith urges reversal, relying "on the general proposition that it would be 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted . . . even though existing precedent does not address similar circumstances.'" Op. Br. at 44 (quoting *Colbruno*, 928 F.3d at 1165). While this principle did not carry the day on Ms. Griffith's cross-gender search challenge, here, it is dispositive.

A "general constitutional rule already identified in the decisional law" can overcome qualified immunity when it "appl[ies] with obvious clarity to the specific conduct in question." *Hope* v. *Pelzer*, 536 U.S. 730, 741 (2002) (quoting *United States* v. *Lanier*, 520 U.S. 259, 271 (1997)); *see also Taylor*, 592 U.S. at 9 (applying *Hope* to conclude "any reasonable officer should have realized [the plaintiff's] conditions of confinement offended the Constitution"); *Rivas-Villegas* v. *Cortesluna*, 595 U.S. 1, 5 (2021) (recognizing "in an obvious case, [general constitutional] standards can 'clearly establish' the answer, even without a body of relevant case law" (quoting *Brosseau* v. *Haugen*, 543 U.S. 194, 198 (2004))).[30] A "general rule can serve as clearly established law when

---

[30] *Taylor* involved an inmate housed in "deplorably unsanitary" conditions, including in a cell covered "nearly floor to ceiling" in feces. *Taylor*, 592 U.S. at 8. *Taylor* is an extreme case, but the situation before Deputy Mustapick was no less obvious.

it states 'the contours of [a] constitutional transgression' in a 'well[-]defined' or 'well-marked' manner without leaving a 'vaguely-defined legal border.'" *Ashaheed* v. *Currington*, 7 F.4th 1236, 1246 (10th Cir. 2021) (quoting *Janny* v. *Gamez*, 8 F.4th 883, 918 (10th Cir. 2021)).

*Bell* established abusive searches "cannot be condoned" under the Fourth Amendment and thus defined the constitutional boundaries for Deputy Mustapick. 441 U.S. at 560. The constitutional prohibition against abusive searches obviously does not depend on the inmate's sex or gender identity. A reasonable officer in Deputy Mustapick's position did not need a body of case law involving abusive searches of *transgender* inmates to put him on notice that his search of Ms. Griffith was unlawful. *See Taylor*, 592 U.S. at 9. A contrary conclusion means "the words of the Constitution become little more than good advice." *Trop* v. *Dulles*, 356 U.S. 86 (1958) (plurality opinion). We thus have no trouble concluding this is the "rare" case where "the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address" precisely these circumstances, *Wesby*, 583 U.S. at 64, and the "very action in question has [not] previously been held unlawful." *Hope*, 536 U.S. at 741 (quoting *Anderson*, 483 U.S. at 640).[31] We reverse the grant of

---

[31] The dissent believes "Ms. Griffith has not identified caselaw clearly establishing that deplorable language makes an otherwise permissible search unconstitutional." Dissent at 26. Deputy Mustapick's language was deplorable

qualified immunity to Deputy Mustapick on Ms. Griffith's Fourth Amendment abusive-search claim and remand for further proceedings.

## VI

Finally, we turn to Ms. Griffith's challenge to the dismissal of her disability discrimination claims under the ADA and Rehabilitation Act. These claims were pled only against one defendant—El Paso County. Ms. Griffith alleged El Paso County failed to reasonably accommodate her gender dysphoria in violation of both statutes.

In the district court, Appellees moved to dismiss all claims against El Paso County—including the ADA and Rehabilitation Act claims—under Rules 12(b)(1) and 12(b)(6). Under Rule 12(b)(1), Appellees contended the district court lacked subject matter jurisdiction over all claims against El Paso County because Ms. Griffith failed to follow Colo. Rev. Stat. 30-11-105. That statute requires, in "all suits or proceedings by or against a county, the name in which the county shall sue or be sued shall be, 'The board of county commissioners of the county of . . . .'" Colo. Rev. Stat. 30-11-105. Ms. Griffith named only "El

---

largely *because*, as Ms. Griffith plausibly alleges, it was part of an abusive search—"conducted in a harassing manner intended to humiliate and inflict psychological pain." Op. Br. at 39 (quoting *Calhoun* v. *DeTella*, 319 F.3d 936, 940 (7th Cir. 2003)). And it bears emphasizing the allegations do not *only* concern Deputy Mustapick's language; he was also allegedly "extremely aggressive while searching Ms. Griffith's genitals." R.42 ¶ 78. The totality of well-pled facts thus plainly constitute abuse. And the Court has been clear that "abuse cannot be condoned." *Bell* v. *Wolfish*, 441 U.S. 520, 560 (1979).

Paso County" and not the board of county commissioners. Under Rule 12(b)(6), Appellees maintained Ms. Griffith failed to state plausible ADA and Rehabilitation Act claims because, among other things, gender dysphoria is not a "disability" under the statutes. The district court granted the motion under Rule 12(b)(1), thereby dismissing El Paso County from the case. The district court then proceeded to rule on the Rule 12(b)(6) arguments, concluding Ms. Griffith failed to allege plausibly that El Paso County violated the ADA and Rehabilitation Act claims.

On appeal, Ms. Griffith challenges only the Rule 12(b)(6) dismissal. But before we can address her arguments, we must decide what effect, if any, the district court's unchallenged Rule 12(b)(1) ruling has on this appeal. The parties do not address this issue, but we must reach it because it implicates the scope of our authority. If a district court concludes it lacks subject matter jurisdiction but proceeds to the merits, we have jurisdiction only to correct "the error of the [district] court in entertaining the suit." *Steel Co.* v. *Citizens for a Better Env't*, 523 U.S. 83, 95 (1998) (quoting *Arizonans for Off. Eng.* v. *Arizona*, 520 U.S. 43, 73 (1997)). As relevant here, the district court held it lacked subject matter jurisdiction over the ADA and Rehabilitation Act claims. The district court nevertheless reached the merits of those claims. Ms. Griffith has not challenged the district court's Rule 12(b)(1) dismissal on appeal. Under

these circumstances, we must conclude the district court erroneously reached the merits of claims already dismissed for lack of subject matter jurisdiction.

## A

We first explain why, on this record, we must conclude the dismissal of the ADA and Rehabilitation Act claims was for lack of subject matter jurisdiction. We start with Appellees' motion to dismiss, which proceeded under Rule 12(b)(1)—the rule used to challenge a federal court's "lack of subject matter jurisdiction." Fed. R. Civ. P. 12(b)(1). Appellees moved to dismiss all claims against El Paso County—including the ADA and Rehabilitation Act claims—because Ms. Griffith "fail[ed] to properly name El Paso County as a party" under Colo. Rev. Stat. 30-11-105. SR.22. Appellees emphasized that failure deprived the court of "jurisdiction over" El Paso County, and thus, "the claims asserted against El Paso County must be dismissed under Fed. R. Civ. P. 12(b)(1)." SR.23.

The district court agreed Ms. Griffith failed to comply with Colo. Rev. Stat. 30-11-105 and accordingly granted the Rule 12(b)(1) motion to dismiss. The district court set out the familiar Rule 12(b)(1) standard, and the district court's order used the word "jurisdiction" only in connection with Ms. Griffith's failure to comply with Colo. Rev. Stat § 30-11-105. The district court explained all claims against El Paso County—including the ADA and Rehabilitation Act claims—"can be dismissed due to this jurisdictional defect alone." R.96.

76

**B**

On appeal, the district court's conclusion that it lacked subject matter jurisdiction over the ADA and Rehabilitation Act claims is unchallenged. Ms. Griffith stated in her opening brief that she does not appeal "the district court's ruling that the County was not properly named." Op. Br. at 6 n.2. She says no more about the Rule 12(b)(1) dismissal. She proceeds to challenge only the Rule 12(b)(6) ruling that she failed to state plausible ADA and Rehabilitation Act claims against El Paso County. But Ms. Griffith has never argued the district court *had* subject matter jurisdiction to reach the Rule 12(b)(6) arguments in the first place.[32] She thus has waived the issue.

_____

[32] It is not at all clear that Colo. Rev. Stat. 30-11-105 is about *subject matter* jurisdiction. In *Gonzales* v. *Martinez*, we explained Colo. Rev. Stat. 30-11-105 "provides the exclusive method by which jurisdiction over a county can be obtained," an "action attempted to be brought under any other designation is a nullity, and no valid judgment can enter in such a case." 403 F.3d 1179, 1182 n.7 (10th Cir. 2005) (quoting *Calahan* v. *Jefferson County*, 163 Colo. 212 (1967)). We described the failure to follow the statute as a "jurisdictional flaw." *Id.* But we have never explained what "jurisdictional" means in this context.

"Jurisdiction . . . is a word of many, too many, meanings." *Wilkins* v. *United States*, 598 U.S. 152, 156–57 (2023) (quoting *Arbaugh* v. *Y & H Corp.*, 546 U.S. 500, 510 (2006)). Ms. Griffith presumably could have argued it was incorrect for Appellees and the district court to understand the failure to comply with Colo. Rev. Stat. 30-11-105 as a problem of *subject matter* jurisdiction. But she did not do so, and it is not our role to make those arguments for her. *Rodriguez* v. *IBP, Inc.*, 243 F.3d 1221, 1227 (10th Cir. 2001) ("This court will not make arguments for Rodriguez that he did not make himself."); *O'Neal* v. *Ferguson Constr. Co.*, 237 F.3d 1248, 1257 (10th Cir. 2001)

Subject matter jurisdiction refers to federal "courts' statutory or constitutional *power* to adjudicate the case." *Steel Co.*, 523 U.S. at 89. Challenges to the district court's improper *exercise* of "subject-matter jurisdiction may be raised by the defendant 'at any point in the litigation,' and courts must consider them *sua sponte*." *Fort Bend Cnty., Tex.* v. *Davis*, 587 U.S. 541, 548 (2019) (quoting *Gonzalez* v. *Thaler*, 565 U.S. 134, 141 (2012)). But the same is not true of challenges to a district court's conclusion that it *lacked* subject matter jurisdiction. "We have no duty under the general waiver rule" to consider "untimely raised legal theories which may support . . . [subject matter] jurisdiction." *Daigle* v. *Shell Oil Co.*, 972 F.2d 1527, 1539 (10th Cir. 1992). Said differently, a "federal court is not obliged 'to conjure up possible theories' to support subject-matter jurisdiction" when a plaintiff has failed to do so. *Atlas Biologicals, Inc.* v. *Kutrubes*, 50 F.4th 1307, 1322 (10th Cir. 2022) (quoting *Raley* v. *Hyundai Motor Co., Ltd.*, 642 F.3d 1271, 1275 (10th Cir. 2011)). In circumstances where, as here, a district court concludes it lacks subject matter jurisdiction and an appellant does not argue otherwise on appeal, we enforce traditional waiver principles. *See United States ex rel. Ramseyer* v. *Century Healthcare Corp.,* 90 F.3d 1514, 1518 n.2 (10th Cir. 1996) (acknowledging a potential argument for subject matter jurisdiction but

---

(declining to decide whether precedent was distinguishable when no party suggested it was).

finding it waived and refusing to consider it because plaintiff did not make it),
*superseded by statute on other grounds*, False Claims Act, Pub. L. N. 111-203,
124 Stat. 1376, *as recognized in United States ex rel. Reed* v. *KeyPoint Gov't
Sols.*, 923 F.3d 729, 764–65 (10th Cir. 2019).

## C

In this unusual posture, we must conclude the district court had no
authority to consider the ADA and Rehabilitation Act claims under Rule
12(b)(6). A district court must have subject matter jurisdiction "before it can
rule on the merits" of a plaintiff's claims. *Trackwell* v. *U.S. Gov't*, 472 F.3d
1242, 1245 (10th Cir. 2007); *Steel Co.*, 523 U.S. at 88–89 (a challenge to subject
matter jurisdiction under Rule 12(b)(1) is "considered a threshold question that
must be resolved in respondent's favor before proceeding to the merits."); *see
also* 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure*
Civ. § 1350 (4th ed. 2024) ("[W]hen the motion [to dismiss] is based on more
than one ground, the cases are legion stating that the district court should
consider the Rule 12(b)(1) challenge first because if it must dismiss the
complaint for lack of subject matter jurisdiction, the accompanying defenses
and objections become moot and do not need to be determined by the judge.").

The district court dismissed the ADA and Rehabilitation Act claims for
lack of subject matter jurisdiction under Rule 12(b)(1). At that point, the
district court was without authority to resolve those claims under Rule

12(b)(6). "Without jurisdiction the court cannot proceed at all" because "[j]urisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." *Steel Co.*, 523 U.S. at 94 (quoting *Ex parte McCardle*, 4 U.S. 506, 514 (1868)).

Because the district court concluded it lacked subject matter jurisdiction over the ADA and Rehabilitation Act claims, and because Ms. Griffith does not challenge that conclusion on appeal, we must vacate the district court's Rule 12(b)(6) ruling with respect to those claims. *Rio Grande Silvery Minnow* v. *Bureau of Reclamation*, 601 F.3d 1096, 1128 & n.19 (10th Cir. 2010) ("Because the district court was without subject-matter jurisdiction, and thus without the power to enter [the] judgment, that judgment must be vacated.").[33]

---

[33] We recognize this may be an unsatisfying result for the parties. But our disposition is compelled by the legal principles we have discussed and applied to the record as developed in the district court. At oral argument, Ms. Griffith could not explain how we had authority to reach the merits of her ADA and Rehabilitation Act claims where, as here, the district court dismissed those claims for lack of subject matter jurisdiction. Ms. Griffith suggested we should "fix the error" she has alleged and remand "back to the district court" where the parties "can work out . . . who the defendants are for" the ADA and Rehabilitation Act claims. Oral Argument at 2:50–3:09. While it might be more expedient for the parties if we took Ms. Griffith's proposed course of action, "[s]ubject-matter jurisdiction . . . does not entail an assessment of convenience." *Wachovia Bank* v. *Schmidt*, 546 U.S. 303, 305 (2006). And El Paso County—the only defendant against whom the ADA and Rehabilitation Act claims were pled—is no longer in the case. We have no power to affect the rights of the litigants not before us. *Princeton Univ.* v. *Schmid*, 455 U.S. 100, 102 (1982)

# VII

For the reasons described above, we **REVERSE** the dismissal of Ms. Griffith's Fourteenth Amendment Equal Protection claim only as to Sheriff Elder in his official capacity. Though we ultimately **AFFIRM** the grant of qualified immunity on Ms. Griffith's Fourth and Fourteenth Amendment cross-gender search claims against Commander Gillespie and Deputies Elliss and Mustapick, we conclude Ms. Griffith has plausibly alleged a constitutional violation by Deputy Mustapick. For this reason, we must **REVERSE** the dismissal of Ms. Griffith's related Fourth and Fourteenth Amendment claims against Sheriff Elder in his official capacity. We **REVERSE** the dismissal of Ms. Griffith's Fourth Amendment abusive search claim against Deputy Mustapick. Finally, because the district court dismissed the ADA and Rehabilitation Act claims against El Paso County without prejudice under Rule 12(b)(1), and because that ruling is not challenged by Ms. Griffith on appeal, we **VACATE** the district court's order dismissing those claims under Rule 12(b)(6). We otherwise **AFFIRM**.

---

(explaining federal courts "do not sit to decide hypothetical issues or to give advisory opinions about issues as to which there are not adverse parties before us").

81

23-1135, <u>Griffith v. El Paso County</u>
**EBEL**, Circuit Judge, concurring:

I concur.

This case presents some novel and difficult equal protection issues which require us ultimately to balance the parties' conflicting interests. As is often the case, the balancing decisions will be affected by how the parties' interests are defined and what level of scrutiny is applied to the government's policy being challenged.

Here, our task is made more difficult because of some arguably divergent language in several of the United States Supreme Court decisions and in the decisions of several of the lower courts, including the Tenth Circuit. Further, gender dysphoria is a relatively new diagnosis and it contains inherent ambiguities in its application.

To make matters worse, this case comes to us at the motion to dismiss stage, where we do not have a developed factual record.

With regard to appellant Griffith's equal protection arguments, my decision to concur in the majority ruling is influenced by the ambiguity of the current law and the high burden that must be met by a defendant who moves to dismiss at the pleading stage. Ultimately, I have determined that the plaintiff has the right, and justice will best be served by allowing her claims to continue at this pleading stage against the potentially liable parties.

The Fourth Amendment, ADA, and Rehabilitation Act claims are, by contrast, clearer for me, and I concur with the majority opinion on those claims as well.

I want to compliment both Judge Tymkovich and Judge Rossman for their careful
and thorough analysis on these issues, and I am confident that their conflicting opinions
will contribute to the further evolution of the law in this case.

I concur in the majority decision.

23-1135, *Griffith v. El Paso County*

**TYMKOVICH**, Circuit Judge, dissenting.

The El Paso County Jail classifies and houses inmates based on their biological sex. Darlene Griffith is a biological male who identifies as a transgender woman. The Jail's classification resulted in three consequences Ms. Griffith alleges are unconstitutional.

*First*, the Jail assigned Ms. Griffith to the male housing unit when she wanted to be housed with females. *Second*, male inmates are allegedly not permitted to wear female underwear or buy lipstick from the commissary—both things she wanted to do. *Third*, inmates are strip searched and patted down by guards of the same biological sex, and she wanted to be searched solely by female guards.

Ms. Griffith alleges these policies violate the Equal Protection Clause and the Fourth Amendment of the Constitution. The majority, largely based on its determination that "all" sex-based classifications trigger heightened scrutiny, concludes her claims are plausible. Though it avoids saying as much, the implication of the majority's reasoning is that housing inmates based on their biological sex is presumptively unconstitutional.

I disagree. In my view, binding Supreme Court precedent prescribes rational basis review to these sorts of correctional policies. In *Turner v. Safley*, the Supreme Court held "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." 482 U.S. 78, 89 (1987). Properly applied, *Turner* forecloses Ms. Griffith's Equal Protection claim and her Fourth Amendment claim directed at the Jail's allegedly unconstitutional search

policy. *Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 566 U.S. 318, 339 (2012) (holding *Turner* applies to "[t]he Fourth and Fourteenth Amendments."). I would also dismiss her Fourth Amendment claim directed at Deputy Mustapick because she has failed to identify law clearly establishing that abusive language can transform an otherwise constitutional search into an unconstitutional one.

Because I would affirm dismissal of Ms. Griffith's complaint in its entirety, I respectfully dissent.

### A. Background

The core of Ms. Griffith's complaint is that "[u]nder the Equal Protection Clause of the Fourteenth Amendment, discrimination against transgender people is a form of *sex* discrimination that is presumptively unconstitutional and subject to heightened scrutiny." Complaint ¶ 125. That allegation requires us to engage with terms like "sex," "gender," "male," "female," "man," and "woman." Central to Ms. Griffith's complaint is an alleged distinction between "sex" and "gender" since she concedes the Jail properly engages in some form of sex-segregated housing. Complaint ¶ 134 (Defendants "had no penological basis to deny Plaintiff a safe and appropriate place *in a female facility*.") (emphasis added).

While Ms. Griffith defines "sex"—"e.g., being male or female"—she does so without citation, and avoids defining gender. Complaint ¶ 21. In other places, however, she defines terms by reference to the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013) (DSM-5). Complaint ¶ 22 (citing

the DSM-5's definition of "Gender Dysphoria"). Throughout this dissent, I use these terms as they are defined in the DSM-5.[1]

Historically, "gender" was used as a synonym, or at least cultural proxy, for "sex." Indeed, as the majority observes, courts' Equal Protection decisions—including the Supreme Court's—use the terms "sex" and "gender" interchangeably, although the majority understands the terms to refer to biological sex.[2] Op. at 19 n.9. According to the DSM-5, these terms now have different meanings. The DSM-5 defines "sex" as the "[b]iological indication of male and female (understood in context of reproductive capacity), such as sex chromosomes, gonads, sex hormones, and nonambiguous internal and external genitalia." DSM-5 at 829. "Gender identity," in contrast, is a "category of social identity that refers to an individual's identification as male, female or, occasionally, some category other than male or female." *Id.* As I understand and use the terms, sex is a biological fact springing from chromosomal variations resulting in somatic differences (male or female) while gender identity reflects lived norms (man or woman).

This distinction is significant and ultimately fatal to Ms. Griffith's claims. That is because she functionally (and appropriately in my view) cedes to the constitutionality of *sex*-based segregation in jail—she merely alleges that she was on the wrong side of it. *See, e.g.*, Complaint ¶ 134 (alleging the Jail "had no penological basis to deny Plaintiff a

---

[1] The majority takes issue with my use of these definitions. Op. at 5 n.2 ("The dissent proffers his own explanations of those terms, rooted in sources other than the complaint."). I understand that the meaning of these words has been obscured and is subject to dispute, but the ordinary meaning of a word is not an allegation we are bound by.

[2] Like the majority, I read these cases as referring to biological sex. Op. at 19 n.9.

safe and appropriate placement *in a female facility*, based on her sex, gender identity, characteristics, risk factors, and her history of sexual victimization in male facilities.") (emphasis added). But of course, Ms. Griffith could not claim constitutional entitlement to a "safe and appropriate placement in a female facility" if the Jail couldn't create "female facilities" in the first place.

In my view, the "segregation of inmates by sex is unquestionably constitutional." *Women Prisoners of D.C. Dep't of Corr. v. D.C.*, 93 F.3d 910, 926 (D.C. Cir. 1996). If detention facilities can constitutionally classify inmates based on their biological sex—an assumption baked into Ms. Griffith's complaint and one I agree is constitutional—then the question is not whether jails can classify based on sex, but how much deference federal courts should afford their classification methodology. Binding precedent obliges our deference to these sorts of policies in correctional institutions.

### B. Equal Protection

Ms. Griffith alleges the Jail's sex-based classification policies violate the Constitution's Equal Protection Clause. U.S. Const. amend. XIV, § 1 ("No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."). I disagree.

"The Equal Protection Clause does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons who are *in all relevant respects* alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992) (emphasis added). *See also City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (the Equal

4

Protection clause is "essentially a direction that all persons similarly situated should be treated alike.").

Put differently, the Equal Protection Clause requires states to "treat like cases alike." *Vacco v. Quill*, 521 U.S. 793, 799 (1997). So long as that happens, state policies are "presumed to be valid" and will be upheld if they bear a rational relationship to a legitimate state interest. *City of Cleburne*, 473 U.S. at 440.

In my view, Ms. Griffith's Equal Protection claims fail both because she has not shown she is similarity situated to others who were treated differently and, independently, her claims fail rational basis review.

### 1.  *Similarly Situated*

To state a plausible Equal Protection claim, Ms. Griffith must first show that she was "similarly situated" to inmates receiving differential treatment. *Fogle v. Pierson*, 435 F.3d 1252, 1261 (10th Cir. 2006) (considering whether inmate housed in administrative segregation after escaping was similarly situated to other inmates). *See also Barney v. Pulsipher*, 143 F.3d 1299, 1312 (10th Cir. 1998) ("In order to assert a viable equal protection claim, plaintiffs must first make a threshold showing that they were treated differently from others who were similarly situated to them."). She cannot do so because she is biologically male and the prisoners she claims to be "similarly situated" to are biologically female.

Her complaint, moreover, does not allege the Jail treats her differently than other transgender inmates. *Fogle*, 435 F.3d at 1261 ("In order to succeed on his first equal protection claim, Fogle would have to show that he was 'similarly situated' to those

general population inmates and that the difference in treatment was not 'reasonably related to legitimate penological interests.'") (citing *Barney*, 143 F.3d at 1312 and quoting *Turner*, 482 U.S. at 89). *See also Keevan v. Smith*, 100 F.3d 644, 648 (8th Cir. 1996) ("Treatment of dissimilarly situated persons in a dissimilar manner by the government does not violate the Equal Protection Clause."). The Jail's policies classify inmates based on sex, *not* gender identity. According to the logic of Ms. Griffith's complaint, the "similarly situated" inmates are biologically female prisoners, whom the Jail housed separately and allowed certain personal items. But Ms. Griffith does not allege she is biologically female. Rather, she alleges she is biologically male (her sex) while psychologically she identifies as a woman (her "female gender identity"). *See, e.g.*, Complaint ¶ 2 ("Ms. Griffith is a transgender woman" who "lives in accordance with her female gender identity"). Nor does she suggest that she believes her biological *sex* to be female—just her gender identity. The consequence is that she has not shown that she has "in all relevant respects alike" to biologically female prisoners. *Nordlinger*, 505 U.S. at 10. She is different in the relevant respect—her biological sex.

The way in which Ms. Griffith claims to be similarly situated (her gender identity) is not the relevant distinction the Jail permissibly draws (her biological sex).[3]

---

[3] Ms. Griffith's complaint concedes as a necessary predicate that jails can segregate based on some criteria, just not solely based on sex. It isn't clear from her complaint, however, why classifying based on gender identity would be any less constitutionally suspect then classifying based on sex. If the Jail can constitutionally segregate by gender *or* sex, caselaw compels our deference to a jail administrator's determination, which is discussed below.

Ms. Griffith was treated identically to those with whom she is similarly situated,

biological males. That identical treatment forecloses her Equal Protection claim.

## 2. *Rational Basis Review Applies*

Ms. Griffith's Equal Protection claim independently fails because she cannot

satisfy *Turner*'s rational basis review. The majority interprets her complaint to allege *sex*

discrimination and so concludes heightened scrutiny applies. Op. at 18 (citing *United*

*States v. Virginia*, 518 U.S. 515, 533 (1996) (*VMI*)); Op. at 28 n.14 (Any government

policy that "makes decisions by reference to biological sex [is] subject to heightened

scrutiny.").

But the law is not so simple. The majority's formulation ignores the Court's

decision in *Turner v. Safley* which compels our application of rational basis review to

sex-based classifications in prisons and jails. 482 U.S. at 89 ("[W]hen a prison regulation

impinges on inmates' constitutional rights, *the regulation is valid if it is reasonably*

*related to legitimate penological interests*.") (emphasis added).[4]

---

[4] The majority refuses to apply *Turner*, in part, because no party raised *Turner* as
controlling the standard of review. But the party presentation principle only "restricts
courts from *raising* new issues." *United States v. Cortez-Nieto*, 43 F.4th 1034, 1052
(10th Cir. 2022) (emphasis in original). The standard of review is not a new claim, it is
part and parcel of how we decide constitutional issues. "When an issue or claim is
properly before the court, the court is not limited to the particular legal theories advanced
by the parties, but rather retains the independent power to identify and apply the proper
construction of governing law." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99
(1991). Ms. Griffith's equal protection claim is properly before this court. Getting the
law right means getting the standard of review right.

### a. Turner *Compels Rational Basis Review*

In *Turner*, the Supreme Court reviewed prison policies restricting inmate marriage

and correspondence. *Id.* at 84–85.[5]  Striking down the latter but not the former, it held

that even "when a prison regulation impinges on inmates' constitutional rights, the

regulation is valid if it is reasonably related to legitimate penological interests."  482 U.S.

at 89.  The Court has since "made quite clear that the standard of review we adopted in

*Turner* applies to *all* circumstances in which the needs of prison administration implicate

constitutional rights."  *Washington v. Harper*, 494 U.S. 210, 224 (1990) (emphasis

added).

The Court has only narrowed *Turner* once, when it held that racial classifications

in prison are subject to strict scrutiny.[6]  *Johnson v. California*, 543 U.S. 499, 510 (2005).

*Johnson* held that racial classifications in prison are subject to strict scrutiny.  *Id.*  The

Court reasoned "[t]he right not to be discriminated against based on one's race is not

---

[5] While *Turner* specifically mentions "prison" the Court recently applied it to pre-
trial detainees in jail—meaning it applies in all detention contexts.  *Florence*, 566 U.S. at
326 ("The Court has confirmed the importance of deference to correctional officials and
explained that a regulation impinging on an inmate's constitutional rights must be upheld
'if it is reasonably related to legitimate penological interests.'") (quoting *Turner*, 482
U.S. at 89).

[6] *Turner* applies to regulations or policies—not to individual violations.  For that
reason, the Court "judge[s] violations of [the Eighth] Amendment under the 'deliberate
indifference' standard, rather than *Turner*'s 'reasonably related' standard."  *Id.* at 511
(citations omitted).  The same logic applies to individual searches under the Fourth
Amendment.  But when a search *policy* is challenged, the *Turner* framework applies.
*Florence*, 566 U.S. at 330 (considering a jail's policy of strip searching all incoming
detainees and holding "[t]he current case is . . . governed by the principles announced in
*Turner*.").

8

susceptible to the logic of *Turner*" because "it is not a right that need necessarily be
compromised for the sake of proper prison administration." *Id.* at 510–11. In other
words, constitutional rights that "must necessarily be limited in the prison context" are
subject to rational basis review, while constitutional rights "that need [not] necessarily be
compromised for the sake of proper prison administration" may be subject to greater
scrutiny. *Id.*

"Maintaining safety and order" is at the heart of day-to-day prison administration.
*Florence*, 566 U.S. at 326. In fact, the "necessities of prison security and discipline are a
*compelling* government interest." *Johnson*, 543 U.S. at 512 (internal citation and
quotation marks omitted). Maintaining prison security "necessarily makes unavailable
many rights and privileges of the ordinary citizen, a retraction justified by the
considerations underlying our penal system." *Wolff v. McDonnell*, 418 U.S. 539, 555
(1974) (internal quotation marks omitted). Nothing in Ms. Griffith's complaint suggests
that sex-based classifications are ones that "need [not] necessarily be compromised for
the sake of proper prison administration." *Johnson*, 543 U.S. at 510. To the contrary, the
complaint alleges the opposite—that "female" specific facilities lead to "safe and
appropriate" housing placements for transgender inmates. *See e.g.*, Complaint ¶ 134.

The conclusion that sex-segregation leads to safer institutions is bolstered by
common experience evidencing that opposite sex housing "must necessarily be limited in
the prison context." *Johnson*, 543 U.S. at 510. Justice Ginsburg explained why:
"[p]hysical differences between men and women . . . are enduring: 'the two sexes are not
fungible; a community made up exclusively of one [sex] is different from a community

9

composed of both.'" *VMI*, 518 U.S. at 533 (quoting *Ballard v. United States*, 329 U.S. 187, 193 (1946)).

These "male-female differences are a cause for concern in the prison context because increased rape, prostitution, and pregnancies, and the potential exploitation of outnumbered women in desegregated prisons are very real dangers." Jennifer Arnett Lee, *Women Prisoners, Penological Interests, and Gender Stereotyping: An Application of Equal Protection Norms to Female Inmates*, 32 Colum. Hum. Rts. L. Rev. 251, 259–60 (2000). Enduring *physical* differences mean that indiscriminate housing in prison could place females at increased risk from males—something Ms. Griffith's own complaint concedes. *See, e.g.*, Complaint ¶ 134 (recognizing the "safe[ty]" benefits inuring from "appropriate placement in a female facility"). If this were not so, Ms. Griffith's allegation that her housing in the male unit "exposed her to a significantly increased risk of sexual harassment [and] assault" would not be plausible. Complaint ¶ 2.

These differences mean the "segregation of inmates by sex is unquestionably constitutional." *Women Prisoners*, 93 F.3d at 926. *See also L. W. by & through Williams v. Skrmetti*, 83 F.4th 460, 484 (6th Cir.), *cert. dismissed in part sub nom, Doe v. Kentucky*, 144 S. Ct. 389, 217 L. Ed. 2d 285 (2023), *and cert. granted sub nom. United States v. Skrmetti*, 144 S. Ct. 2679 (2024) ("[T]he government does not trigger heightened review when it houses men and women separately at a prison without making distinctions in funding or programming available to members of each sex.").

*Turner* is so deferential to correctional policies because "[r]unning a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment

10

of resources, all of which are peculiarly within the province of the legislative and executive branches of government." 482 U.S. at 84–85 (invoking separation of powers concerns). *See also Florence*, 566 U.S. at 326 ("The difficulties of operating a detention center must not be underestimated by the courts."). Given the "inordinate[] difficult[y]" in running a prison, we, the Supreme Court, and other circuits have mandated deference to these sorts of policies. *Id.*; *Est. of DiMarco v. Wyoming Dep't of Corr., Div. of Prisons*, 473 F.3d 1334, 1342 (10th Cir. 2007) (cautioning that "any assessment" of inmate housing assignments "must be mindful of the primary management role of prison officials who should be free from second-guessing or micro-management from the federal courts"); *Barney*, 143 F.3d at 1313 (reviewing county's policy of keeping women, but not men, in solitary confinement and noting "[w]e hesitate to interfere with prison officials' decisions concerning the day-to-day administration of prisons, to which we must accord deference"); *Griffin v. Brooks*, 13 F. App'x 861, 864–65 (10th Cir. 2001) (reviewing administrative segregation policy and noting "we hesitate to interfere with prison officials' decisions concerning the day-to-day administration of prisons, to which we must accord deference unless they violate the constitution or federal law"); *Klinger v. Dep't of Corr.*, 31 F.3d 727, 732 (8th Cir. 1994) ("[b]ecause courts have little expertise in the inordinately difficult task of running prisons, courts should accord a high degree of deference to prison authorities") (internal quotations omitted); *Women Prisoners*, 93 F.3d at 926–27 (applying *Turner* and warning against "completely eviscerat[ing] the deference that federal courts are obliged to give prison administrators"); *Veney v. Wyche*, 293 F.3d

726, 733 (4th Cir. 2002) (applying *Turner* and deferring housing decisions to prison officials).

Consistent with this approach, we applied *Turner* to an Equal Protection claim asserting sex-based discrimination in prison two years after *VMI*. *Barney*, 143 F.3d at 1313 n.17 (applying rational basis review to jail's policy of "keeping women"—but not men—"in solitary confinement" and upholding that policy as "reflect[ing] a legitimate and rational decision to provide for the safety of inmates and the efficient running of the jail."). We have also applied rational basis review to Equal Protection claims on two other occasions involving challenges to prison policies outside the sex-discrimination context. *See Templeman v. Gunter*, 16 F.3d 367, 371 (10th Cir. 1994) (applying *Turner* to prison's decision to transfer inmate to administrative segregation), and *Fogle*, 435 F.3d at 1261 (same).

*Turner*—and the caselaw applying it—prescribe deferential rational basis review for jail policies impacting constitutional rights other than race.[7] We are bound to apply that standard here.

### b. VMI *did not create a* Turner *carveout*

The majority creates a new *Turner* "carve[] out," *Johnson*, 543 U.S. at 545 (Thomas, J., dissenting), by focusing on *VMI*'s language saying "all gender-based

---

[7] The detention context distinguishes the majority's citations to and reliance on *Doe through Doe v. Rocky Mountain Classical Acad.*, 99 F.4th 1256, 1258 (10th Cir. 2024) (Title IX claim); *Free the Nipple-Fort Collins v. City of Fort Collins, Colorado*, 916 F.3d 792, 799 (10th Cir. 2019) (city's public nudity ordinance); and *Fowler v. Stitt*, 104 F.4th 770 (10th Cir. 2024) (state practice denying sex-designation amendments to birth certificates).

classifications today warrant heightened scrutiny." 518 U.S. at 555. I next explain why that cannot be correct.

First, *Turner* remains good law. In fact, the Court has twice reaffirmed its central holding after *VMI*. *Johnson*, 543 U.S. at 512 (reaffirming *Turner*'s general applicability in 2005—9 years after *VMI*); *Florence*, 566 U.S. at 339 (same in 2012 and also holding *Turner* applies to the "Fourth and Fourteenth Amendments."). Most recently in *Florence*, the Court "confirmed the importance of deference to correctional officials and explained that a regulation impinging on an inmate's constitutional rights must be upheld if it is reasonably related to legitimate penological interests." 566 U.S. at 326 (quotation marks omitted). It also "reaffirm[ed]" in *Johnson* that the "necessities of prison security and discipline are a *compelling* government interest." *Johnson*, 543 U.S. at 512 (emphasis added and citations omitted) (holding even racial segregation could satisfy strict scrutiny sometimes). *Turner* applies with particular force to policies directed at "[m]aintaining safety and order at these institutions [which] requires the expertise of correctional officials, who must have substantial discretion to devise reasonable solutions to the problems they face." *Florence*, 566 U.S. at 326. For that reason, *Turner* has uniformly been applied to policies "implicating prison security and day-to-day management concerns."[8] *Pitts v. Thornburgh*, 866 F.2d 1450, 1454 (D.C. Cir. 1989).

---

[8] *Johnson*—the only case narrowing *Turner*—was also decided nine years after *VMI*. *Johnson*, 543 U.S. 499. Yet it does not mention *VMI*. *See generally id.* If *VMI* created a *Turner* carve out for sex-based classifications, the Court would have mentioned it in creating *another*, ostensibly similar, carve out in *Johnson*. Yet it didn't. And it makes sense why: the Court does not "equat[e] gender classifications . . . to classifications based on race or national origin." *VMI*, 518 U.S. at 532. Race, according

Housing inmates and managing their personal property is a "day-to-day"

management concern "implicating prison security." *Id.* Ms. Griffith concedes as much.

*See, e.g.*, Complaint ¶ 134 (alleging the Jail "had no penological basis to deny Plaintiff a

safe and appropriate placement in a female facility."). *Turner* applies to these policies.

Second, in *Washington v. Harper* the Court "made quite clear that the standard of

review we adopted in *Turner* applies to *all* circumstances in which the needs of prison

administration implicate constitutional rights." 494 U.S. at 224 (emphasis added). To

fall outside *Turner*'s ambit, the Court must explicitly recognize a carveout. It only did so

once, in *Johnson*, for race.[9] *Id.* This was justified, it reasoned, because "[w]hen

government officials are permitted to use race as a proxy for gang membership and

violence . . . society as a whole suffers." *Id.* at 511. Yet *VMI* was careful to note the

Court does not "equat[e] gender classifications . . . to classifications based on race." 518

U.S. at 532. Rather, "[t]he Court has thus far reserved most stringent judicial scrutiny for

---

to the Court, is different; that is why race-based classifications get strict scrutiny while
sex-based classifications (outside of prison) get intermediate scrutiny.

    [9] The Court in *Johnson* also observed "[w]e have not used *Turner* to evaluate
Eighth Amendment claims of cruel and unusual punishment in prison. We judge
violations of that Amendment under the 'deliberate indifference' standard, rather than
*Turner*'s 'reasonably related' standard." 543 U.S. at 511. It would be odd for the Court
to acknowledge the *Turner* "carve[] out[s]," *id.* at 546, while ignoring a massive one the
majority functionally alleges the Court created nine years beforehand. *See also supra*
n.4.

    The majority resolves the tension between *VMI* and *Turner* by arguing that sex fits
inside the *Johnson* carveout because race is "the Equal Protection category most like
sex." Op. at 42. But the Supreme Court's sex discrimination caselaw developed
"[w]ithout equating gender classifications, for all purposes, to classifications based on
race or national origin." *VMI*, 518 U.S. at 532.

14

classifications based on race or national origin." *Id.* at 533 n.6. We cannot infer from

*Johnson* or *VMI* that sex-based housing classifications warrant a categorical *Turner* carve

out simply because race-based classifications do. Race, the Court has explained, is

different. Until the Supreme Court creates such a carveout, we must hold that the Jail's

policies are one of the circumstances to which *Turner* applies. *Washington*, 494 U.S. at

224 ("*Turner* applies to *all* circumstances in which the needs of prison administration

implicate constitutional rights.") (emphasis added).

Third, the policies here do not lend themselves to *VMI*'s logic because they do not

favor one sex over the other. The Court in *VMI* was concerned about the unequitable

distribution of benefits to the sexes predicated on invidious stereotypes about sex. Its

central teaching—and that of all the cases it relied on and all those coming since—is that

unconstitutional sex *discrimination*—as opposed to constitutional sex-based

*classification*—requires *favoring* one sex over the other. *VMI*, 518 U.S. at 555 (favoring

males by excluding female applicants from unrivaled military school based solely on

sex); *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982) (favoring females

by excluding male applicants from regional nursing school); *J.E.B. v. Alabama ex rel.*

*T.B.*, 511 U.S. 127, 137 (1994) (creating a more favorable jury pool by striking potential

jurors "based on gender stereotypes"). *See also Fowler v. Stitt*, 104 F.4th 770, 783–84

(10th Cir. 2024) (analyzing gender identity claim involving birth certificates: "[t]o state a

viable equal protection claim, Plaintiffs must allege that the Policy purposefully

*discriminates* against them because of their membership in a particular class.") (emphasis

added).

15

Underscoring the interpretation that discrimination is a necessary predicate, the Court has *not* applied heightened scrutiny to "all" sex-based classifications. *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 236 (2022) ("The regulation of a medical procedure that only one sex can undergo does not trigger heightened constitutional scrutiny unless the regulation is a 'mere pretex[t] designed to effect an *invidious discrimination* against members of one sex or the other.'") (emphasis added) (citing *Geduldig v. Aiello*, 417 U.S. 484, 496 n.20 (1974)).

As the Sixth Circuit explained in *Skrmetti*:

> What of language in the cases saying that "all" sex-based classifications receive heightened review? *Virginia*, 518 U.S. at 555, (quoting *J.E.B.*, 511 U.S. at 136); *see Hogan*, 458 U.S. at 724–25. The laws in those cases used sex classifications to bestow unequal treatment on men and women. *See Virginia*, 518 U.S. at 519 (excluding female applicants); *Hogan*, 458 U.S. at 719 (excluding male applicants). Those cases show only that the government cannot classify individuals by sex when doing so perpetuates invidious stereotypes or unfairly allocates benefits and burdens.

*Id.* (cleaned up and internal quotations omitted).

Justice Ginsburg recognized this bedrock tenet in *VMI*:

> "Inherent differences" between men and women, we have come to appreciate, remain cause for celebration, but not for denigration of the members of either sex or for artificial constraints on an individual's opportunity. Sex classifications may be used to compensate women "for particular economic disabilities [they have] suffered," *Califano v. Webster*, 430 U.S. 313 (1977) (per curiam), to "promot[e] equal employment opportunity," *see California Fed. Sav. & Loan Assn. v. Guerra*, 479 U.S. 272, 289, (1987), to advance full development of the talent and capacities of our Nation's people. *But such classifications may not be used*, as they once

16

> were, *see Goesaert*, 335 U.S., at 467, *to create or perpetuate
> the legal, social, and economic inferiority of women*.

518 U.S. at 533–34 (cleaned up and emphasis added).

The Court in *VMI* was concerned with policies that "create or perpetuate the legal, social, and economic inferiority of women" based on "overbroad generalizations about the different talents, capacities, or preferences of males and females." *Id.* at 533. It was not concerned with "[m]aintaining safety and order" in prisons, *Florence*, 566 U.S. at 326, by classifying inmates in accordance with their biological sex.

The touchstone of the Equal Protection scrutiny analysis is not whether sex factors into a policy or law, as the majority claims, but whether it *discriminates* based on sex by ascribing different benefits or burdens to the sexes. Put another way, it is differential treatment—not mere classification—that triggers heightened scrutiny. *See Women Prisoners*, 93 F.3d at 953 ("The Supreme Court's sex discrimination cases make it clear that the government may not rely on generalizations—even somewhat accurate ones—about women to justify different treatment of the sexes.") (Rogers, J., concurring in part).

Even if *VMI* applies to some degree in the prison context, its normative thrust is not implicated here because the complaint does not allege the Jail's policies favor one sex over the other by, for example, "making distinctions in funding or programming available to members of each sex." *Skrmetti*, 83 F.4th at 484 (citing *Women Prisoners*, 93 F.3d at 926). *See also Barney*, 143 F.3d at 1312 n.15 ("The Equal Protection Clause in the prison-conditions context is usually invoked to remedy disparities in educational, vocational, and recreational programs offered to male and female inmates."). The burden

17

Ms. Griffith alleges is shared by both sexes without regard to stereotypes—they are classified based on their physical differences in furtherance of a "legitimate penological interest": "[m]aintaining safety and order." *Florence*, 566 U.S. at 326.  Because the Jail's policies do not impermissibly discriminate by favoring one sex over the other, but permissibly classify based on biological sex in furtherance of the "necessities of prison security and discipline," *id.* at 512, *Turner* applies.

That said, I acknowledge some doctrinal inconsistency between *Washington*'s holding that "*Turner* applies to *all* circumstances in which the needs of prison administration implicate constitutional rights," 494 U.S. at 224 (emphasis added), and the Court's holding in *VMI*.  518 U.S. at 555.  While that inconsistency is ultimately not for lower courts to remedy, one principle must cede to the other.  For the reasons explained above, I believe the best reading of the Court's precedent is that *Turner* applies to a prison's sex-based classifications when those classifications do not result in distinctions in funding or programming available to members of each sex.  *See Skrmetti*, 83 F.4th at 484.

Because the policies here do not inequitably allocate benefits or burdens based on sex, we remain bound to apply *Turner*.[10]

\* \* \* \* \*

---

[10]  Even if intermediate scrutiny applies, I am unaware of, nor has the majority identified any, case holding segregation of inmates by sex is unconstitutional.  *Contra Women Prisoners*, 93 F.3d at 926 ("the segregation of inmates by sex is unquestionably constitutional.").

To recap, "*Turner* applies to *all* circumstances in which the needs of prison administration implicate constitutional rights." 494 U.S. at 224 (emphasis added). For *Turner* not to apply, the Supreme Court must create a carveout. *See Johnson*, 543 U.S. at 511. For the reasons explained above, *VMI* does not create a categorical carveout for sex-based classifications. Rather, heightened scrutiny only applies to sex-based classifications in prison when those classifications are the basis for bestowing unequal treatment upon the sexes. That is not the case here.

Accordingly, we remain compelled to apply *Turner* to "all" circumstances not otherwise delineated. *Washington*, 494 U.S. at 224; *Johnson*, 543 U.S. at 511. Ms. Griffith's allegations do not survive *Turner* review.[11]

### 3. Ms. Griffith cannot overcome rational basis review

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

---

[11] Ms. Griffith also argues transgender status is a suspect or quasi-suspect class warranting heightened scrutiny. The majority does not reach this argument since it concludes the Jail's policies automatically trigger heightened scrutiny. Op. at 20–24. If I am wrong that rational basis review applies, I agree with the lower court that we are bound by *Brown v. Zavaras*'s holding that transgender status is not "a protected class"—meaning rational basis review applies either way. 63 F.3d 967, 971 (10th Cir. 1995).

Recall that the Jail's policies are "valid if [they are] reasonably related to legitimate penological interests." *Turner*, 482 U.S. 78. And the Court considers "institutional security" to be a "valid penological objective[]." *O'Lone v. Est. of Shabazz*, 482 U.S. 342, 348 (1987). So to overcome a motion to dismiss, Ms. Griffith's complaint must show that any "difference in treatment was not reasonably related to" its "legitimate penological interest[]" in institutional security. *Fogle*, 435 F.3d at 1261. It doesn't.

Ms. Griffith's challenge to the Jail's sex placement and accoutrement policies cannot overcome rational basis review because they "reflect[] a legitimate and rational decision to provide for the safety of inmates and the efficient running of the jail." *Barney*, 143 F.3d at 1313 n.17; *c.f. Johnson*, 543 U.S. at 512 ("[T]he necessities of prison security and discipline are a compelling government interest.") (internal citations and quotations omitted). Ms. Griffith's only allegation that the Jail lacks a penological interest in its policies is her conclusory statement that it has "no penological basis to deny Plaintiff a safe and appropriate placement in a female facility." Complaint ¶¶ 134, 204. But this allegation is simply a "[t]hreadbare recital[] of the elements of a cause of action, supported by mere conclusory statements," *Iqbal*, 556 U.S. at 678, and cannot overcome the Jail's motion to dismiss.

Even if we accepted this allegation, her complaint would still be deficient because she has not "nudged [her] claim[] across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. Determining whether a complaint states a "plausible" claim for relief is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. Facts alleged in a

complaint might state a claim that is "conceivable," but not "plausible," if it disregards "obvious alternative explanations" for government action. *Id.* at 682 (citing *Twombly*, 550 U.S. at 567).

I do not think the existence of obvious alternative explanations is necessarily fatal to a complaint. *See Hughes v. Nw. Univ.*, 63 F.4th 615, 629 (7th Cir. 2023) ("Where alternative inferences are in equipoise—that is, where they are all reasonable based on the facts—the plaintiff is to prevail on a motion to dismiss."). But if obvious alternative explanations exist, a complaint may need to refute them for its allegations to be plausible—particularly when "common sense," *Iqbal*, 556 U.S. at 679, counsels against accepting the allegations. That is the case here.

Without additional factual allegations, Ms. Griffith's assertion that the Jail lacks a penological interest in assigning her to a male facility based on her sex is not plausible. Complaint ¶ 134. The obvious reason for the Jail's sex-based classifications—indeed the reason cited in Ms. Griffith's complaint—is to "significantly" reduce the "risk of sexual harassment, assault, and emotional distress" for inmates by segregating the sexes—an institutional safety concern. Complaint ¶ 2, *O'Lone*, 482 U.S. at 348 ("institutional security" is a "valid penological objective[]."). The policy, therefore, is at least "reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89.

Our deference to these sorts of policies is particularly warranted in jails (as opposed to most prisons), which as a matter of day-to-day administration must accommodate a constant stream of newly arrested inmates—about whom they often have little information—meaning it is virtually impossible to make nuanced placement

21

decisions based on an inmate's gender identity or particular risk factors. *Florence*, 566

U.S. at 326 ("The largest [jails] process hundreds of people every day . . . . Maintaining

safety and order at these institutions requires the expertise of correctional officials, who

must have substantial discretion to devise reasonable solutions to the problems they

face."). Simply put, the obvious alternative explanation for the jail's sex-based

classifications is that doing so is the best way to regulate institutional security in the

dynamic jail environment.

And again, Ms. Griffith's complaint does not actually allege there is *no*

penological interest in sex-based jail classifications *or* that such classifications are

unconstitutional—just that she is on the wrong side of them. Even the majority's opinion

acknowledges the obvious penological justifications for the Jail's policies: inmate safety,

Op. at 8 ("housing her in an all-male unit subjected her to a risk of sexual harassment,

sexual assault, and extreme emotional distress"); dignitary concerns as to other inmates,

*id.* at 9 n.4 ("Ms. Griffith informed a deputy at the Jail she was uncomfortable that the

other inmates in her unit were not wearing shirts"); and dignitary concerns as to staff, *id.*

at 9 ("Ms. Griffith claims male deputies regularly touch 'her breast[s] and groin when

patting her down.").

Simply put, I do not believe the Constitution compels jails to house males and

females together, or to otherwise be sex-blind in their policies. Her requested relief

would impose on others the very consequences she fears, and which the Jail's policies

aim to minimize. These consequences include female guards having to search and female

prisoners being exposed to Ms. Griffith's male anatomy. Balancing these cross-sex

22

consequences exactly the kind of decision we owe *Turner* deference.  There is an obvious

penological interest, so we need not accept her allegation as true.[12]

While I acknowledge that an inmate's transgender status raises significant

placement, security, and treatment challenges for jail administrators, Ms. Griffith has not

plausibly alleged her gender identity overrides the justifications for the Jail's sex-based

policies—the outcome necessary to defeat rational basis review.  Her desire to be placed

in female housing is just one of many factors that a facility must consider when housing

detainees.  Indeed, one must acknowledge that many male and female inmates may also

be at greater risk in a particular sex-based housing unit because of their individual

characteristics (such as size, sexual orientation, type of crime, race, religion), and thus

prefer to be housed in a different unit.  These inmates do not have plausible sex-based

Equal Protection claims.  Under the majority's logic, they do.

Ms. Griffith's request to be housed with biological females undermines her claim

that the Jail lacks a penological interest in sex-based classifications.  Simply put, her

complaint is circular.  Detention facilities across the country must grapple with the

---

[12]  The majority acknowledges this tension.  *See, e.g.*, Op. at 61 ("[I]t is generally considered a greater invasion to have one's naked body viewed by a member of the opposite sex.") (quoting *Canedy v. Boardman*, 16 F.3d 183, 185 (7th Cir. 1994)).  Under Ms. Griffith's view, female guards will now have to perform cross-sex strip searches. Dignitary interests run both ways.

This observation leads to another.  While the majority begins its opinion by defining sex relative to gender, Op. at 5 , it later conflates the two.  *See, e.g., id.* at 65 (stating, "our law is clear that cross-gender strip searches must be motivated by some penological interest" but quoting *Shroff v. Spellman*, 604 F.3d 1179 (10th Cir. 2010), for support, which concerned cross-*sex* nudity and does not even mention "gender").

23

challenges of transgender inmates in housing, medical care, programming, and security. The Jail (and every detention facility) must balance myriad such competing interests to promote safe, dignified inmate housing. But those challenges must be met by prison administrators on a case-by-case basis. And difficult decisions do not a viable Equal Protection claim make. Rather, they emphasize why deferential rational basis review applies.[13]

       In sum, Ms. Griffith's complaint does not survive deferential rational basis review, so I would affirm the district court's dismissal of her complaint.[14]

---

    [13]  If an individualized detention decision places inmates in harm's way, they might have Eighth Amendment or substantive due process claims. *See supra* n.4. But *c.f. Estate of DiMarco*, 473 F.3d at 1336 (concluding transgender inmate "does not have a liberty interest in her placement and the conditions of confinement.").

    [14]  Ms. Griffith's best Equal Protection claim is that the Jail's accoutrement policy impermissibly discriminates based on sex by allowing females, but not males, to have lipstick and female underwear. But recall that Ms. Griffith claims her "discernible feminine characteristics" placed her at "heightened risk of sexual victimization." Complaint ¶ 129. And she alleges "panties and lipstick" "conform[] with her [female] gender identity." Complaint ¶ 3. The inference is that panties and lipstick make her appear more feminine, which will also place her at a heightened risk of sexual victimization. The obvious reason for the Jail's policy, then, is that permitting vulnerable male inmates to have articles that make them appear more "feminine" increases the likelihood of sexual violence and harassment—the harms Ms. Griffith fears. In *Barney*, we held this sort of jail policy—one treating women differently based on security concerns—"reflects a legitimate and rational decision to provide for the safety of inmates and the efficient running of the jail." 143 F.3d at 1313 n.17. And institutional security is more than a legitimate government interest, it is a "compelling" one. *Johnson*, 543 U.S. at 505. Preventing inmates from having items that increase their likelihood of being sexually victimized is "substantially related to" achieving that compelling objective— meaning Ms. Griffith's complaint also facially fails heightened scrutiny.

### C. Fourth Amendment Claim

Ms. Griffith also brings two Fourth Amendment claims flowing from alleged
"cross-gender" strip searches and pat downs: one directed at El Paso County and the
other directly at Deputy Mustapick.  *See, e.g.*, Complaint ¶ 3.  Taking her claims in order,
Ms. Griffith's claims fail for several independent reasons.

She first alleges a Fourth Amendment violation against the County because its
alleged search policy resulted in a male deputy searching her lower body—even though a
female deputy searched her upper body.  Complaint ¶ 76.  Adjudicating a Fourth
Amendment unreasonable search claim requires courts to weigh "the need for the
particular search against the invasion of personal rights that the search entails.  Courts
must consider the scope of the particular intrusion, the manner in which it is conducted,
the justification for initiating it, and the place in which it is conducted."  *Bell v. Wolfish*,
441 U.S. 520, 559 (1979).  Boiled down, this claim asks us to find that the Constitution
requires female deputies to strip search biologically male inmates who identify as
women.

As discussed above, prison policies such as this one are subject to rational basis
review.  *Turner*, 482 U.S. at 89; *Florence*, 566 U.S. at 330 (search policies in jails are
"governed by the principles announced in *Turner* and *Bell*.").  Ms. Griffith plausibly
alleges that she found the search to be distressing.  I have no doubt it was.  But she offers
no factual allegations which, taken as true, demonstrate that the Jail's same-sex strip
search policy is unrelated to its legitimate interests in prison security and employee
welfare or privacy.  *Turner*, 482 U.S. at 90 (relevant to the reasonableness of a prison

25

regulation is "the impact accommodation of the asserted constitutional right will have on guards and other inmates."). I therefore disagree with the majority that Ms. Griffith has plausibly alleged that the policy violates the Fourth Amendment.

Second, Ms. Griffith asserts a Fourth Amendment claim directly against Deputy Mustapick owing to his use of abusive language while conducting a strip search. Deputy Mustapick is presumptively shielded by qualified immunity, so Ms. Griffith must show that her Fourth Amendment right "was clearly established at the time of the violation, such that every reasonable official would have understood, that such conduct constituted a violation of that right." *Reavis Estate of Coale v. Frost*, 967 F.3d 978, 984 (10th Cir. 2020) (internal quotation marks omitted). To do so, she must refer to a Supreme Court or Tenth Circuit opinion, or to the established weight of authority from other circuits. *Truman v. Orem City*, 1 F.4th 1227, 1235 (10th Cir. 2021).

While it is clearly established that strip searches "must be conducted in a reasonable manner," *Bell*, 441 U.S. at 560, Ms. Griffith has not pointed to any precedent that would transform an otherwise reasonable search into a constitutionally violative one owing exclusively to offensive language. While Deputy Mustapick's alleged speech is deplorable, Ms. Griffith has not identified caselaw clearly establishing that deplorable language makes an otherwise permissible search unconstitutional. Nor does it appear that the Jail's search policy condoned abusive language as a part of its practices.

The majority thinks this isn't an issue because, it concludes, "'a general constitutional rule already identified in the decisional law' can overcome qualified immunity when it 'appl[ies] with obvious clarity to the specific conduct in question.'"

26

Op. at 72 (citing *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).  The "general constitutional rule" it relies on is that abusive searches "cannot be condoned."  *Bell*, 441 U.S. at 560.

In *Bell*, the Court concluded a prison did not violate the Fourth Amendment by mandating full-body strip searches after visits.  *Id.* at 558–60.  It is impossible to conclude from an opinion *permitting* strip searches that abusive language during an otherwise reasonable search violates the Fourth Amendment.  This undercuts the requirement that a "rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted" and that "courts must not define clearly established law at a high level of generality"—a requirement that is "especially important in the Fourth Amendment context."  *D.C. v. Wesby*, 583 U.S. 48, 63–64 (2018).

By permitting Ms. Griffith to overcome qualified immunity based on *Bell*, the majority misapplies the "clearly established" prong to overcome qualified immunity.  Because no such authority exists, I would affirm the district court's dismissal of this claim.

* * * * *

This case pits profoundly personal convictions against jail policies aimed at maintaining institutional security while balancing the dignitary concerns of officers and inmates.  Ms. Griffith alleges her interests transcend the Jail's.  But I do not believe either the Equal Protection Clause or the Fourth Amendment affords the relief she seeks.

For the reasons stated above, I would affirm the district court's dismissal of her complaint, and so respectfully dissent.

27